## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

EA INDEPENDENT FRANCHISEE
ASSOCIATION, LLC

Civil Action No.

                        Plaintiff,

                                                    September 20, 2010

        vs.

EDIBLE ARRANGEMENTS
INTERNATIONAL, INC., EA CONNECT,
INC., NETSOLACE, INC., DIPPEDFRUIT,
INC., and XYZ CORPORATIONS 1-20,
fictitious entities,

                        Defendants.

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, EA Independent Franchisee Association, LLC ("EAIFA"), by and through its

attorneys, Berdon, Young & Margolis, P.C. and Marks & Klein, LLP, by way of Complaint for

Declaratory Judgment, hereby states, as follows:

## INTRODUCTION

1.      Over the course of the last several months, Defendant, Edible Arrangements

International, Inc., ("EAI" or "EA"), a national franchisor of stores offering fruit bouquets and

other specialty designed candy and fruit products to customers for purchase, has unfairly

imposed a series of system-wide changes on its franchisees under the pretext of its unilateral

right under its form, adhesive franchise agreement that "EA may modify the Operations Manual

periodically to reflect changes in System Standards."

2.     However, the system-wide changes, including without limitation, new fees, systems, policies and procedures forced upon EAI franchisees do not constitute "changes in System Standards."  Rather, these material changes, which have been unfairly implemented and only recently proposed: (i) amount to unreasonable standards of performance on all of EAI franchisees to their financial detriment, (ii) substantially strip EAI franchisees of their contractually-based autonomy in running their respective businesses, fundamentally change the nature of each EAI franchisee's business, and (iii) render the franchise agreements illusory and meaningless.

3.     For example, as set forth in detail herein, EAI has recently undertaken certain wholesale modifications to its Franchise System Website by implementing certain on-line product ordering and fulfillment systems, most principally the EAConnect central-order processing system discussed herein, its policies and procedures.  EAI has also imposed new fees and proposed new fees related to these modifications, all of which have drastically altered the EAI system and business model and its franchisee's contractual obligations as they pertain to the Franchise System Website, in violation of the implied covenant of good faith and fair dealing.

4.     In its most recent version of its prescribed disclosure document, previously called a Uniform Franchise Offering Circular ("UFOC") and now a Franchise Disclosure Document ("FDD"), and form franchise agreement ("FA") and operations manual, EAI reserves the right to establish and maintain a Franchise System Website, which is materially different from that which was previously disclosed and defined in its versions of the FDD and FA in prior years. Moreover, in its FDD, EAI *now* reserves its right to "use the [National Adverting Fund's] assets to develop, maintain, operate and update the Franchise System Website" and further reserves its right to "update and modify the Franchise System Website."  However, the recent modifications

detailed herein constitute an abuse of EAI's discretion to "update and modify" the Franchise System Website, and have led to the imposition of fees not contemplated by franchisees that entered EAI's franchise system prior to 2008.

5.      In addition, as more fully set forth herein, EAI has unfairly and improperly implemented wholesale modifications and changes to the system including, but not limited to, Store 98, substantial and additional fees and costs in connection with "mandatory" software updates, the Fresh Program Mandate, an Extended Hours Mandate, and Dippedfruit.com in violation of the terms of the franchise agreement, the implied covenant of good faith and fair dealing and the statutory protections afforded under the Connecticut Unfair Trade Practices Act ("CUTPA").

6.      The EA Independent Franchisee Association, LLC ("EAIFA") brings this action on behalf of its members to preserve and protect their rights under the franchise agreements, for a declaration that EAI's implementation of various system-wide changes violates the implied covenant of good faith and fair dealing, for a declaration that EAI's recent modifications to the Franchise System Website on-line product ordering and fulfillment systems and associated fees to be paid by EAI franchisees in connection with its use of the Franchise System Website constitute a breach of contract, and for a declaration that the implementation of the EAConnect Program and its proposed attendant fees violate the registration and disclosure regulations of the Federal Trade Commission ("FTC") thereby constituting a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes §§ 42-110(a) - 42-110(q), which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Conn. Gen. Stat.* § 42-110b(a), and entitles EAIFA to obtain injunctive and declaratory relief pursuant to *Conn. Gen. Stat.* §§ 42-110g(a) and 42-110g(d).

**PARTIES**

7.     The EA Independent Franchisee Association, LLC ("EAIFA") is a limited liability company formed under the laws of the state of Michigan.  EAIFA was formed as the direct result of its members' commonly-themed grievances pertaining to certain practices and operations of EAI, its representatives and principals, and the related tortious actions and conduct of one its affiliate entities, EAConnect, Inc.  The EAIFA was organized and exists for the purpose of protecting and preserving the rights of EAI franchisees and was created to serve as an official voice of the EAI franchise community.  EAIFA and its members' concerns generally regard various internal systems, practices and newly-implemented mandates that Edible Arrangements has unfairly thrust upon its franchisees.

8.     The EAIFA is currently comprised of over 170 members, all of whom are owners and operators of Edible Arrangements-brand franchise stores located throughout the United States.

9.     EAI franchisees execute franchise agreements which are substantially similar in form and substance.  The EAI form franchise agreements are typically non-negotiable and are presented to prospective franchisees on a take-it-or-leave-it basis.

10.     Edible Arrangements-brand stores sell "designed arrangements" whose primary ingredients are cut fresh fruit and chocolate products as well as gourmet dipped fruit boxes and is typically located in strip shopping centers, shopping malls, and other similar venues located in both downtown commercial and suburban areas.

11.     EAI franchisees typically invest between $150,000 and $300,000 to open an Edible Arrangements-brand franchise store.

12.     Defendant, EAI is a corporation formed in 1999 organized and existing under the

laws of the State of Connecticut under the name Edible Arrangements Franchise Group, Inc., with a principal business address located at 95 Barnes Road, Township of Wallingford, New Haven County, Connecticut, 06492.

13.     Defendant, EA Connect, Inc., ("EAConnect") is an affiliate of EAI is a Corporation organized and existing under the laws of the State of Connecticut with its principal business address located at 95 Barnes Road, Township of Wallingford, New Haven County, Connecticut, 06492. Upon information and belief, EAConnect, Inc., is owned and operated by one or more of the same individuals that own Edible Arrangements International, Inc.

14.     Defendant, Netsolace, Inc., is an affiliate of EAI and a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at 95 Barnes Road, Township of Wallingford, New Haven. County, Connecticut, 06492.   Upon information and belief, Netsolace, Inc., is owned and operated by one or more of the same individuals that own EAI.

15.     Defendant, Dippedfruit, Inc. is an affiliate of EAI and a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at 95 Barnes Road, Township of Wallingford, New Haven. County, Connecticut, 06492.   Upon information and belief, Dippedfruit, Inc., is owned and operated by one or more of by the same individuals that own EAI.

16.     Defendants, XYZ Corporations 1-20, fictitious entities, are, upon information and belief, certain other companies, the identity of which are currently unknown, that have been recently formed by EAI in connection with the operation of the Edible Arrangements franchise system. Upon information and belief, XYZ Corporations 1-20 are owned and operated by one or more of the same individuals that own EAI and may have participated in certain wrongful

conduct imposed upon Plaintiff, its members, and all EAI franchisees, as discussed herein.

## JURISDICTION AND VENUE

17.    Plaintiff has satisfied the amount in controversy requirement as the value of the requested declaratory relief exceeds the jurisdictional threshold of $75,000.

18.    This Court has jurisdiction over this action under its pendant jurisdiction, and under diversity of citizenship jurisdiction, 28 U.S.C. § 1332, as  Plaintiff EAIFA, a limited liability company, is Michigan Limited Liability company with no legal Member residing within the State of Connecticut and Defendants are each Connecticut Corporations with principal offices located in New Haven, Connecticut.

19.    This Court has subject matter jurisdiction pursuant to 28 USC § 1331.

20.    Venue is proper in this jurisdiction as EAI is located in Connecticut and a substantial amount of the events giving rise to the complained of conduct herein occurred in Connecticut and/or such complained of conduct was directed to occur out of Connecticut where Defendants maintain their principal places of business.

## ASSOCIATIONAL STANDING

21.    The EAIFA has standing to maintain this action.  At least one of its members (indeed, all of its members) will suffer injury in fact by the real and immediate threatened harm from Defendants' conduct.

22.    Further, the interests sought to be protected by this action are germane to the EAIFA's purpose.

23.    The interests sought to be protected are the rights of EAI's franchisees to prevent EAI from unfairly and unilaterally modifying the terms of the franchise agreement and the relationship of the parties and to change system standards in a manner so as to render the terms

of the parties' franchise contracts commercially impracticable.

24.     Pursuant to Article II of the EAIFA's bylaws (emphasis added), "The purposes of the EAIFA bylaws are: (1) To increase the profitability of Members; (2) To provide EA Customers with the best possible retail experience; (3) *To protect and promote the rights of EA franchise owners ("Members") in their EA franchised business* ("Store"); (4) To safeguard and enhance Members' business interests and equity; (5) To provide access to free and open communication among the Members; (6) To represent the interests of its Members in discussions with the management of EA International Inc.(the "Franchisor"); (7) To improve communication between its Members and the Franchisor; (8) *To promote fairness in the franchise relationship between its Members and the Franchisor*; and, (9) To assist the Franchisor in identifying the needs of the Members." (Emphasis added.)

25.     Finally, neither the claim asserted nor the relief requested requires the participation of individual members of the EAIFA (i.e. the EAI franchisees) since the EAIFA can prove its allegations of EAI's breach of the duty of good faith and fair dealing, which is both contractual and implied by law, and other franchisee abuses through EAI's own internal documents and data, and through expert testimony.  The claim for relief involves issues that are common to all members of the EAIFA and do not require determination on an individual basis. The claim is for declaratory relief only and does not involve any potentially differing claims for monetary compensation.

## BACKGROUND FACTS

## FTC REGULATIONS, EAI'S UNIFORM FRANCHISE OFFERING CIRCULAR, AND FRANCHISE DISCLOSURE DOCUMENT

26.     The Federal Trade Commission has promulgated certain laws requiring the delivery to prospective franchisees of a prescribed disclosure document, previously called a

UFOC and now an FDD, concerning the franchisor, its management, and the material terms and conditions of the franchise agreement, among other things, prior to the execution of any agreement by a prospective franchisee.   This was known as the Franchise Rule, and the Amended Franchise Rule became effective as of July 1, 2007.   The UFOC was, and the FDD is now, a disclosure format accepted by the FTC for conveying such information to prospective franchisees.

27.   The Franchise Rule requires a franchisor to provide prospective franchisees with disclosures that are "accurately, clearly, and concisely stated." 16 C.F.R. § 436.l (a).   Moreover, "it is an unfair and deceptive act" for any franchisor to violate a provision of the Franchise Rule. 16 C.F.R. § 436.1.

28.   The Franchise Rule further holds that "it is an unfair and deceptive act or practice...for any franchisor" to violate a provision of the Franchise Rule. 16 C.F.R. § 436.1; 15 U.S.C. § 57a (d) (3).

**A.      EAI's Failure to Properly Disclose Nature of Relationships with its Affiliates**

29.   With regard to the proper disclosure of a franchisor's affiliates FTC § 436.1 (emphasis added) states:

> It is an unfair or deceptive act or practice within the meaning of section 5 of that Act for any franchisor or franchise broker: (a) To fail to furnish any prospective franchisee with the following information accurately, clearly, and concisely stated, in a legible, written document at the earlier of the "time for making of disclosures "or the first "personal meeting": . . .  "(9) *A statement setting forth the name of each person (including the franchisor) the franchisee is directly or indirectly required or advised to do business with by the franchisor, where such persons are affiliated with the franchisor*."

30.   According to FTC § 436.2(i)

> The term "affiliated person" means a person (as defined in paragraph (b) of this section):

(1) Which directly or indirectly controls, is controlled by, or is under common control with, a franchisor; or

(2) Which directly or indirectly owns, controls, or holds with power to vote, 10 percent or more of the outstanding voting securities of a franchisor; or

(3) Which has, in common with a franchisor, one or more partners, officers, directors, trustees, branch managers, or other persons occupying similar status or performing similar functions.

31.    As set forth herein, in violation or FTC § 436.1(a)(9), EAI has failed to appropriately disclose the nature of its relationships with its listed "affiliates" including EAConnect, Inc., which entity was never even listed as an affiliate until the issuance of the 2009 FDD.

**B.     Failure to Properly Disclose Required Fees**

32.    FTC § 436.1(a) (emphasis added) also dictates that it is an unfair or deceptive practice for a franchisor to fail to disclose the existence of the following financial obligations of the franchisee:

(7) *A statement of the total funds which must be paid by the franchisee to the franchisor or to a person affiliated with the franchisor*, or which the franchisor or such affiliated person imposes or collects in whole or in part on behalf of a third party, in order to obtain or commence the franchise operation, *such as initial franchise fees, deposits, down payments, prepaid rent, and equipment and inventory purchases*. If all or part of these fees or deposits are returnable under certain conditions, these conditions shall be set forth; and if not returnable, such fact shall be disclosed.

(8) *A statement describing any recurring funds required to be paid, in connection with carrying on the franchise business, by the franchisee to the franchisor or to a person affiliated with the franchisor*, or which the franchisor or such affiliated person imposes or collects in whole or in part on behalf of a third party, including, but not limited to, royalty, lease, advertising, training, and sign rental fees, and equipment or inventory purchases.

(10) *A statement describing any real estate, services, supplies, products, inventories, signs, fixtures, or equipment relating to the establishment or the operation of the franchise business which the franchisee is directly or indirectly required by the franchisor to purchase,* lease or rent; and if such purchases, leases or rentals must be made from specific persons (including the franchisor), a list of the names and addresses of each such person. Such list may be made in a separate document delivered to the prospective franchisee with the prospectus if the existence of such separate document is disclosed in the prospectus.

33.    As set forth herein, EAI has routinely failed to properly disclose the funds required to be paid to itself and certain of its affiliates, particularly Defendant, Netsolace Inc., for the purchase of required products (i.e., and series of updates and upgrades to previously-existing computer hardware and software products) relating to the establishment of the franchise business, or, at the very least, has unfairly and materially changed its requirements and its franchisees' attendant obligations to pay certain fees to EAI, EAI's affiliates and/or EAI's required product vendors, only after its franchisees had already entered into the franchise system based upon a prior set of disclosures and system standards.

34.    In fact, in the advent of the EAI franchise system's exponential growth between 2003 and 2005, it has implemented a scheme through which to materially change its system by implementing repeated and seemingly insignificant changes to its UFOC and franchise agreement over the course of each of each year for the purpose of making changes to the system, which in the aggregate, unfairly and materially change the system for franchisees who signed agreements prior to the enactment of these various changes, including, but not limited to, the following:

●      In 2006, introducing, for the first time, a "Call Center and On-Line Ordering fee," in which EAI reserves its right to take up to twenty percent (20%) of the price paid "for each [customer] order directed to [a] franchisee that is processed through EA's system-wide call center and any on-line ordering and fulfillment system."

● In 2007, requiring *all* franchisees, for the first time, to pay 20% of their Stores' gross internet sales to EAI's newly-established Order Referral Program in order to fund EAI's first ever National TV Commercial Campaign, in addition to the 2% fee required to be paid into EAI's Marketing Fund (f/k/a National Advertising Fund). As a result of widespread protestations throughout EAI's system, this Order Referral Program was later cancelled and replaced with what is now called the National TV Fund (f/k/a NTV) which requires franchisees to contribute another 3-4% on all gross sales in order to fund EAI's multi-million dollar annual National TV Campaigns.

● In 2008, reserving its right, for the first time, to charge a 20% commission on certain orders processed through its revamped central-order processing system known as EAConnect, *despite EAConnect being included in what EAI defines as its "Franchise System Website" for which there is a total disclosed fee (only to some franchisees) of only $200*.

● In 2009, for the first time, identifying EAConnect, Inc., as an affiliate of EAI, despite the EAConnect program having already been in existence for at least one year.

● In 2010, the imposition of various system-wide changes and "Mandates" requiring, among other things, extended hours of operations requiring extended daily evening hours and Sunday operation, and the use of pre-approved produce vendors without properly market-testing these changes and without any consideration to the affects of these changes on franchisees' individual business interests.

## EAI FOUNDER AND CEO, TARIQ FARID

35. Edible Arrangements' Chairman of the Board and Chief Executive Officer (CEO) is Tariq Farid, who, upon information and belief, developed the Edible Arrangements "designed arrangement" concept in or about 1999.

36. Mr. Farid also owns and operates affiliate entities that do business in connection with and provide various services to Edible Arrangements International, Inc., that provide among other things software, point-of-sales system and various other services that EAI mandates be purchased by franchisees.

37. Mr. Farid is a self-proclaimed "entrepreneur."

11

38.    By most accounts, Mr. Farid's business experience began in the area of floral businesses in the mid-to-late 1980s, when his parents purchased a flower shop in East Haven, Connecticut, which shop he purports to have worked in for the purpose of learning about the business.

39.    Upon information and belief, Mr. Farid's own business background prior to the formation of EAI has deep roots in the technology industry, particularly in the development and sale of software services, programs and products.

40.    Upon information and belief, in the early 1990s, Mr. Farid developed a computerized "point of sale" system ("POS") for floral shops, and began selling computer systems to flower retailers shortly thereafter, in or about 1991.

41.    By way of background, in general terms, a POS or "checkout" is the location where a transaction occurs.  A "checkout" refers to a POS terminal or, more generally, to the hardware and software used for checkouts, the equivalent of an electronic cash register.  A POS terminal manages the selling process by a salesperson accessible interface.  The same system allows the creation and printing of the voucher.

42.    Since the early 2000s, web-based POS software can be run on any computer with an Internet connection and supported browser, without additional software.  The POS software is hosted on secure servers in multiple data centers with real-time backups.

43.    In 1993, Mr. Farid founded the entity known as Netsolace, Inc., a computer software distributor.  Netsolace is the software vendor from which EAI franchisees are required to purchase their business related software, known as "SMS" as well as mandated hardware purchases.  Upon information and belief, his business Northeast Business Systems Group was later renamed "Netsolace" when he created Edible Arrangements.

44.     In the late 1990s, Mr. Farid and certain of his family members began designing decorative fruit arrangements, which he marketed as "Edible Arrangements." The first Edible Arrangements-brand store was opened in or about 1999 in Hamden, Connecticut.

45.     The Edible Arrangements concept was franchised in 2001 and is currently touted as one of the nation's fastest-growing franchise businesses, with more than 900 locations in the United States and abroad. A notable feature of the franchise is Mr. Farid's hands-on approach to designing the computer systems, training manuals, production and the supply chain management process. This approach has led to an increasing amount of system-wide mandates including the use of specific vendors, including vendors owned and operated by Mr. Farid himself, that franchisees are required to purchase products from, despite more advantageous pricing being offered by their competitors.

46.     In recent years, praise has been heaped by the mass media and the franchise press on both EAI and Mr. Farid individually, based Mr. Farid's perceived "excellence" as an entrepreneur, and upon the growth of the EAI franchise both in the United States and internationally. In fact, in 2009, Mr. Farid was named "Entrepreneur of the Year" in 2009 by the International Franchise Association.

47.     As set forth in detail herein, Mr. Farid has spearheaded EAI's efforts to strong-arm its franchisees into disadvantageous contractual relationships with various vendors and to arbitrarily and capriciously change the terms and conditions of relationships with its required vendors, such as Netsolace, Inc., and EAConnect, which entities are owned by Mr. Farid himself.

## EAI'S FRANCHISE AGREEMENT

48.     Section 5(C) of Franchise Agreement defines "System Standards" as "mandatory and suggested specifications, standards, operating procedures and rules." See exemplar form

13

franchise agreement attached hereto as Exhibit "A" and a part hereof.

49.     Pursuant to Section 7 of the Franchise Agreement, "At EA's option, EA may establish one or more websites (a) to advertise, market, and promote EDIBLE ARRANGEMENTS® Businesses, the products that they may offer and sell, and/or the EDIBLE ARRANGEMENTS® franchise opportunity, (b) through which to operate on-line product ordering and other fulfillment systems, and (c) for any other purposes EA determines is appropriate or necessary for the EDIBLE ARRANGEMENTS® Business franchise system (each a "Franchise System Website").

50.     Further, Section 7 of the Franchise Agreement expressly provides: "EA will maintain Franchisee's webpage, if any, on its Franchise System Website, and/or otherwise allow Franchisee to participate in the Franchise System Website (including any on-line product ordering or other fulfillment system), only while Franchisee is in full compliance with this Agreement and all mandatory System Standards."

51.     Pursuant to Section 7, EAI franchisees are neither obligated nor required to pay any fees to EAI to participate in and receive the benefits of the Franchise System Website.

52.     Section 5 of the Franchise Agreement provides: "EA may modify the Operations Manual periodically to reflect changes in System Standards."

53.     As detailed below, under the pretext of its "rights" and discretion to implement "changes in System Standards," EAI has abused its "rights" and extensive, unilateral discretion under the Franchise Agreement by improperly implementing, imposing and forcing material and wholesale changes to the EAI system and business model – the result of which have served to drastically change the nature of the business and the contractual relationship between the parties and further has served to render the Franchise Agreements illusory.

14

## EACONNECT AND THE EACONNECT PROGRAM

54.     Recently, EAI announced the implementation of the EAConnect program, which is an on-line product ordering and fulfillment system established by EAI, and, thus, a Franchise System Website as that term is defined in the EAI franchise agreement.

55.     EAI has presented the EAConnect Program as an order exchange clearinghouse that will "organize and disseminate information in timely reports" and will "help [Edible Arrangements International] facilitate various promotional activities and partnerships."

56.     However, in actuality the EAConnect Program is not new but is a different permutation of an existing internet order system, previously known as Netcenter, with amended terms and conditions.

57.     Netcenter served the same purpose and function as EAConnect, and, significantly, there were no fees or charges to EAI franchisees associated with the use of Netcenter.

58.     The EAConnect program requires every franchisee to fill orders placed via the Program and EAI reserves the right to charge its franchisees substantial and previously undisclosed fees for each and every customer order directed or referred to the franchisee through the Franchise System Website under the auspices of the "EAConnect Program."

59.     Prior to 2009, EAConnect, Inc., was never disclosed by EAI as an affiliated entity of EAI.  Consequently, EAConnect, Inc., was not properly disclosed under the FTC Rule or Amended Rule to any and all EAI franchisees whose franchise agreements pre-date the initial disclosure of EAConnect, Inc. in 2009.

60.     Likewise, prior to 2008 EAI did not disclose any fees associated with EAI franchisees' required use of the EAConnect program or that the EAConnect program was a mandated program franchisees must participate in with an affiliate.

61.     Moreover, in the 2009 FDD and form Franchise Agreement, EAConnect is included by EAI in its definition of Franchise System Website, for which there is a total associated fee (properly disclosed to only some franchisees) in the amount of only $200:

> At EA's option EA may establish one or more websites (a) to advertise, market and/or promote EDIBLE ARRANGEMENTS Businesses, the products that they offer and sell, and/or the EDIBLE ARRANGEMENTS franchise opportunity (b) *through which to operate line aspects of the EACONNECT program*, and (c) for any other purposes EA determines is appropriate or necessary for the EDIBLE ARRANGEMENTS business franchise system. (Emphasis added.)

62.     EAI's inclusion of, or explicit reference to, the EAConnect program in its definition of the Franchise System Website, for which there is only a $200 fee (which was properly disclosed to only some of the EAI franchisees), will create significant confusion amongst its current and prospective franchisees, and drastically undermines EAI's reservation of any right to collect any additional twenty 20% per order processed through the EAConnect Program.

63.     Accordingly, any potential fees associated with the EAConnect program were not properly disclosed to any EAI franchisees whose franchise agreements pre-date the initial disclosure of EAConnect, and violate the FTC Amended Rule.

64.     Critically, the revamped EAConnect program had not yet been implemented, or even tested, when any of EAIFA's members signed their respective franchise agreements prior to 2009, and its overarching concern with centralizing product sales, a previously untested and unproven business strategy, clearly divests each EAI franchisee of its previously-enjoyed autonomy over its respective customer base, and further restricts its franchisees' ability to control product sales through their respective locations.

65.     The EAConnect program allows EAI to exclusively control and monitor any and all incoming customer orders through a centralized call center; the net effect of which is to exert unfettered corporate control over all facets of customer orders.

66.     The breadth of corporate control EAI derives from the EAConnect program includes, but is not necessary limited to: receiving orders, managing customer contacts, issuing orders to stores, processing payments and refunds through a centralized system controlled solely by the franchisor, discounting tickets, and, finally, a substantial and unjustified delay in paying the franchisee for said orders.

67.     The EAConnect Program controls all of the following sources of customer orders, the breadth and scope of which is extraordinary:

- All Internet Orders received from one or more EA websites;

- All Call Center orders received from the EA Call Center;

- All "Inter-franchise" orders;

- All Gift Card transactions;

- All orders from any EA affiliated program or partnership;

- All promotional orders generated by EAI and/or affiliates;

- All other orders identified from time to time in the Franchise Agreement and Operations Manual.

68.     While EAI has not yet charged fees for the use of the EAConnect Program, it disclosed upon implementation of the program that it reserves its right to charge up to a twenty percent (20%) commission for each order placed and filled through EAConnect and has expressed its intent to charge these fees.

17

69. Upon information and belief, EAI and its principal Mr. Farid formed Defendant, EAConnect, Inc. in late 2008 or early 2009 for the purpose of developing the EAConnect program and to charge associated fees from which Mr. Farid (and other individuals) would directly and individually benefit at the expense of EAI franchisees.

70. To the detriment of the EAIFA's members and franchisees throughout the Edible Arrangements franchise system, franchisees' businesses are being effectively used as "guinea pigs" so that EAI and its affiliate EAConnect, Inc., can beta-test its product in an already depressed economy and individually profit, once again, at the expense of EAI franchisees.

71. The very rules and regulations implemented by EAI in or about January 2010, which purport to govern the EAConnect program, do not fully or even adequately disclose the amount of the actual fees associated with this mandatory service. In fact, the fees associated with each order derived from EAConnect is variable and is subject to change at the whim of the franchisor:

> EAI and/or its affiliates may charge franchisee an applicable fee for each customer order directed or referred to franchisee through the EAConnect Program . . . The amount of this fee: *may vary at the discretion of EAI*; may be a fixed collar amount a specified percentage of each order *or denominated in some other manner*; may be collected on a per transaction, daily, weekly, monthly or other basis; will be specified in the operations manual and schedule to these rules and regulations

72. Moreover, although the Franchise Agreement does not permit EAI to discontinue products or services based on a franchisee's non-participation in the Franchise System Website, EAI has threatened such action and default of the franchisee in the event that an EAI franchisee declines to participate in the EAConnect program and accept the Terms of Use.

73.     The fee structure imposed by the EAConnect program and endorsed by EAI constitutes a clear violation of the regulations and disclosure requirements governing franchisors that have been promulgated by the Federal Trade Commission ("FTC").

74.     Likewise, the nature, extent and amount of the fees imposed upon EAI franchisees by EAI for participation in the EAConnect program violate the covenant of good faith and fair dealing.

## NETSOLACE, INC.

75.     EAI mandates its franchisees to enter into a Support Services Agreement ("SSA") with its required software vendor and affiliate, Defendant, Netsolace, Inc., which is an affiliate of EAI.

76.     In violation of FTC Rule 436.1(a)(9), EAI has failed to properly disclose that Netsolace, Inc. is owned and operated by one or more of the principals of EAI, including CEO Tariq Farid, and/or their family members.

77.     Under the terms of the SSA, franchisees must agree to purchase a license to use Netsolace's Store Management System (SMS) software program for a period of one (1) year.

78.     The monthly fee for this software service, including, but not limited to support services and upgrades, is $65.00 per month.

79.     Pursuant to the SSA and Schedule A thereto, Netsolace is contractually required to provide:

> (a)     Software Upgrades/New Releases:  Netsolace shall provide to its licensees as part of the regular process of enhancement and repair of the software, upgrades and new releases for the Software, including bug fixes, which Netsolace may develop at its discretion from time to time.

80.     Pursuant to the SSA and Schedule A thereto, in March 2009, Netsolace announced the update or "new build" of SMS ("Update Announcement"), which described

several specifically upgrades and releases for the SMS program.

81.     The Update Announcement unequivocally indicated that the SMS 2.5 update "is available *at no additional cost to all Edible Arrangements stores* currently subscribed to Netsolace's Monthly Support and Updates plan."  The upgrade was provided free of charge in accordance with the payment terms and obligations of the parties as set forth in the SSA. (Emphasis added.)

82.     In 2009, despite the promise contained in the SSA that all upgrades would be provided free of charge, Netsolace, Inc. required its franchisee subscribers to purchase an additional software program known as "NxStep" ("NXStep Software") and further required subscriber franchisees to make a lump sum $2,000 fee to purchase the product and pay an additional $30 monthly support fee for updates. (Emphasis added.)

83.     Neither the "NxStep software" nor the $2,000 fee was contemplated in the SSA signed by the parties.

84.     In or about April, 2010, Netsolace announced an additional upgrade and release for the SMS program, entitled SMS-X, which it purports to be a "new" product, and not an upgrade which carries an implied service agreement and support fee with the purchase of the product.

85.     However, in connection with the unveiling and required use of SMS-X, Netsolace has demanded that EAI franchisees pay a lump sum $1,200 installation fee for a "new" software program. Netsolace will complete a hardware assessment only after the $1,200 installation fee is paid and will then require EAI franchisees to purchase additional hardware from Netsolace, only, as opposed to other competing computer companies such as Dell, or otherwise face additional installation fees for re-configuring a "non-preferred vendor" computer.

86.     The installation of SMS-X also requires franchisees to upgrade various other components of their software and hardware systems such as:

(a)     Franchisees' PCs with 256K memory (specified by Netsolace 3 years ago in connection with the SMS program) must be upgraded to 1 MEG each.

(b)     Netsolace now requires franchisees with "single core" (or 32-bit) processor servers to replace their servers on the basis that SMS-X is incompatible with franchisee servers that are not "dual core processor models," which replacement costs thousands of dollars.  In what can only be described as a pat response to inquiries from concerned franchisees regarding the need to replace their servers, Netsolace representatives have advised that Servers and PCs usually only last for two or three years and should then be replaced.

(c)     In developing the purportedly "new" SMS-X software, Netsolace has failed to consider the technology currently used by its franchisee client base (which was compatible with both SMS and SMS 2.5), most of whom currently use 32-bit processor servers.  SMS-X software has been written to handle only 64bit, requiring both a hardware and an operating system upgrade, since bit level is controlled by the operating system and backed up by processor type.

(d)     Additionally, EAI's franchisees have continually reported the existence of numerous problems and unresolved software "glitches" in the SMS-X software that adversely affect these franchisees' day-to-day operations, including, but not limited to, the following:

- Tax not being applied to pick-up orders;

- Franchisees' inability to process credit card transactions;

- Outgoing orders not being processed correctly, or not at all;

- Products not properly importing on inter-franchise orders (orders between franchisees) if the referring the order does not have SMS-X;

- SMS-X does not permit franchisees to enter recipient addresses outside their "delivery area," which in some cases comprises approximately 10% of franchisees' sales;

- The new server that is required to be purchased from Netsolace will not auto-print internet orders; and,

- Franchisees experiencing periodic SMS-X Program "freezing."

87.     Despite agreeing that all upgrades and releases to SMS would be provided to franchisees free of charge, Netsolace now seeks to charge a new fee and premium for the SMS-X update, constituting a material breach of its obligations under and the payment terms of the SSA. Contemporaneous with these required upgrades, software and hardware purchases, EAI advised franchisees that a new entity, Farid Capital, LTD, which entity is owned and operated by EAI CEO Tariq Farid will provide financing to franchisees who could not afford to purchase the required upgrades without the assistance of a third-party financier.

88.     EAI has at all times been aware of Netsolace's intention to breach the terms of the SSA, but has nevertheless continued to require its franchisees to purchase and use the additional software upgrades and pay the associated fees, all to its franchisees' detriment.

89.     Upon information and belief, EAI was fully aware of, and endorsed, Netsolace's writing of incompatible software requiring franchisees to purchase new computers and servers in order to advance the interests of Netsolace as well as Farid Capital, LTD, all to its franchisees' detriment.

90.     In 2010, EAI also cancelled its contract with Iron Mountain, Inc., a data back-up provider with whom its franchisees were previously obligated to contract.

91.     In 2010, EAI announced that Netsolace would be replacing Iron Mountain as the exclusive vendor providing these data back-up services.  With the replacement of Iron Mountain, Netsolace now controls all software and hardware-related products and services provided to EAI's franchisees.

92.     EAI's recognition of Netsolace, an entity with the same principal owner(s), intent

to breach of its SSA with EAI's franchisees and refusal to permit franchisee's to buy software or hardware from alternative vendors constitutes a breach of its implied duty of good faith and fair dealing.

## EXTENDED HOURS MANDATE

93.     A further example of the recent abuses of EAI's purported unilateral and extensive "rights" to modify System Standards is the recently implemented Extended Hours Mandate commencing March 1, 2010 system wide.

94.     The Extended Hours Mandate requires all Edible Arrangements franchise locations, irrespective of the location of the store or stores to remain open and operating 7 days per week, including Sundays, with little to no regard for the individual needs or surrounding demographics of its franchisees.

95.     When the franchisee members of the EAIFA contracted with Edible Arrangements prior to the enactment of the Extended Hours Mandate, they each agreed to operate their stores pursuant to a business operations-structure promoted as effective, efficient and profitable by Mr. Farid and the other representatives of EAI, that is, store hours of 8:00 a.m. to 5:00 p.m. on Monday through Friday of each week, and 8:00 a.m. to 3:00 p.m. on Saturday.

96.     At the time these franchisees contracted with EAI, this business model was promoted by EAI as being "sound and ideal" for its franchisees' typical customer base.

97.     EAI's franchisees also used this business model as a framework in connection with their decisions on staffing, ordering and budgeting anticipated business-related expenses.

98.     The changes in the franchisees' hours of operation materially changes the costs of operating an EAI franchised store and negatively affects each franchisees' profit margins.

99.     EAI has since "enforced" the Extended Hours Mandate despite the fact that a

number of its franchisees, including members of the EAIFA, have complained of unnecessary overhead expenses, estimated to average more than $10,000 per year/per franchisee, and other monetary losses as a direct result of the extended and unnecessary Sunday operation.

100.    In certain instances non-compliant Edible Arrangements stores have been deprived of their internet ordering capabilities, which comprises as much as 50-60% of their revenue.

101.    The Extended Hours Mandate has caused, among other things, the risk of loss associated with the Extended Hours Mandate to be fully borne by EAI's franchisees, while EAI stands to sustain little to no economic fallout in connection with the Extended Hours Mandate's expected failure, and can merely return to its previous business model if unsuccessful, all to its franchisees' detriment.

102.    Despite widespread protest throughout their franchise system regarding losses and safety concerns, EAI has, to date, steadfastly failed and refused to address or reconsider the Extended Hours Mandate.

103.    Moreover, certain franchisees whose religious observance falls on Sundays, some of whom are members of the EAIFA, have formally requested an exemption from the Mandate based upon their religious observance but were flatly denied such relief out of hand, without good cause or justification.

104.    The arbitrary and capricious nature of EAI's response to the requested religious observance-based exemptions and requirement that every EAI franchisee remain open on Sundays is highlighted by the fact that certain other franchisees, whose day of religious observance fell on Saturdays, requested and were granted an exemption from working on Saturdays.

105.   EAI's Extended Hours Mandate is an abuse of its discretion to amend the operations manual is not in the best interests of its franchisees and is not based on sound business judgment and is, thus, further indicative of EAI's failure to recognize its duty of good faith and fair dealing implied in its franchise agreement.

## ENHANCED FRESH PROGRAM MANDATE

106.   In early 2010, as part of what it has entitled the "New" or "Enhanced" "FRESH" Program, EAI enacted a new Mandate which in which it purports to require all of its franchisees to purchase produce products from a limited group of required vendors, such as J. Ambrogi, that have been selected by EAI ("Enhanced FRESH Program Mandate").

107.   The requirements of the Enhanced FRESH Program Mandate did not exist, or were not properly disclosed, in either the franchise agreements signed by, or the Franchise Disclosure Documents furnished to, most, if not all, of the Association's members in 2009 and prior years.

108.   Franchisees throughout EAI's system have protested the imposition of the Enhanced FRESH Program Mandate as being adverse to their ability to run profitable stores, particularly in that they can receive produce orders far more quickly, efficiently, and economically and of a higher quality, with alternative vendors that service a much smaller, local clientele.

109.   For instance, the produce vendor J. Ambrogi currently services forty-eight (48) franchise locations in the State of New Jersey.  New Jersey franchisees have complained directly to EAI that this vendor has repeatedly failed to fill product orders in a timely manner and has, in some instances, improperly filled orders on holidays such as Mother's Day, a principal source of revenue for EAI franchisees.

110.    Notably, the Enhanced FRESH Program Mandate has not been uniformly enforced throughout EAI's franchise system, as certain, but not all, of EAI's franchisees have been cited for their failure and/or refusal to abide by the terms of the FRESH Program Mandate and their use of alternative vendors, while other franchisees in different geographic locations continue to use alternative vendors have not been cautioned, cited or threatened by EAI in any way.

111.    The failure of EAI to uniformly impose the Enhanced FRESH Program Mandate is further evidence of the arbitrary and capricious manner in which EAI has imposed and continues to impose this and other mandates discussed herein.

112.    Despite failing to enforce the Enhanced FRESH Program Mandate uniformly, EAI has nevertheless threatened to default, terminate and/or seek other interim relief, from certain franchisees who have opted not to use FRESH Program vendors in lieu of alternative and less expensive produce vendors.

113.    More particularly, as recently as August 2010, EAI has threatened interim relief against some, but not all, "non-compliant" franchisees, including, but not limited to: (1) suspending referrals to franchisees of orders received through EAI's website and call center for as long as the franchisee is in default and sending those referrals to other franchisees; (2) arranging, without notice, for the FRESH-approved/designated suppliers to supply the franchisee with its "produce needs" and subsequently debiting the franchisee's account to pay for the product; and/or (3) requiring the "non-compliant" franchisee to attend and complete mandatory training classes its store, or in EAI's offices in Wallingford, Connecticut, in which case the franchisee is held responsible for all costs related to such training.

26

114.    EAI has threatened to default, terminate or otherwise sanction only certain of its franchisees for failure to acknowledge the Enhanced FRESH Program Mandate, even where it was placed on notice by these franchisees that it would be more cost-effective for their stores to use alternative vendors.

115.    In certain instances, in lieu of termination, and in order to gain leverage over franchisees to participate in this unreasonable Mandate, EAI has also threatened certain franchisees that have not complied with FRESH Program Mandate that it will, and has cut off these franchisees' access to EAI's internet order processing system, which would effectively terminate those franchisees from the EAI system, since approximately sixty percent (60%) of its franchisees' product orders are received via the internet.

116.    EAI's enactment of the Fresh Program is yet another example of its abuse of discretion in making sweeping system-wide changes, without taking into account their effect on the day-to-day business operations of its Franchisees and the associated costs of compliance with the system changes.

**STORE 98**

117.    EAI has also been actively competing with its franchisees by improperly re-routing product orders from certain hand-picked corporate customer national accounts through a mechanism known as "Store 98."

118.    "Store 98" is not a corporately-owned franchise location with a physical address; rather it is a "phantom" and corporate-run Edible Arrangements "store" that does business solely through EAI's centralized internet order- processing system.

119.    Upon receiving centrally-processed internet orders from certain returning corporate clients ("Corporate Customer Orders"), EAI has required its franchisees within the

customer's geographical location, which franchisee had previously filled an order from that same corporate customer, to fill the Corporate Customer Order.

120.    In general, where a customer order is sent to one EAI store but is referred to, and processed by, another store, a twenty (20%) inter-franchise commission is paid to the store that received and referred the Order.

121.    In connection with the central processing and re-routing of Corporate Customer Orders through Store 98, EAI requires the franchisee chosen to fill the order to pay EAI a twenty (20%) "Commission" for "referring" the Order to the franchisee through "Store 98" ("Store 98 Commission"), as though the Order was handled as an inter-franchise referral between two actual stores.

122.    The imposition of a Store 98 Commission was never properly disclosed to EAI's franchisees in any of the franchise disclosure documents furnished to the Association's members between 2003 and 2009 and, by charging these franchisees the Store 98 Commission, EAI has violated, and continues to violate, the express federal regulations promulgated under FTC Rule 436.

123.    Certain, but not all, of EAI franchisees, including members of the Association, were granted, in exchange for good and valuable consideration, an exclusive and/or protected territory, identified by zip code, as part of their franchise agreement.  EAI has also used the Store 98 re-routing mechanism to directly solicit Corporate Customer Orders from franchisees within that franchisee's exclusive or protected territory, thereby encroaching on their franchisee's territory, all in order to collect a previously undisclosed Store 98 Commission.

124.    EAI has represented that, in order to identify the particular coporate accounts in question, it acquired a list of such businesses from "Hoovers" ("Hoovers List").

125.    Upon information and belief, the Hoovers list was purchased using EAI's Marketing/National Advertising Fund ("NAF") monies, a fund into which all of its franchisees are contractually obligated to contribute a percentage of their monthly gross sales.

126.    In its most recent Franchise Agreement, EAI acknowledges that it has a contractual obligation to hold all Fund contributions *for the benefit of the contributors* and use contributions *only for the purposes described,* which include the following:

> a)      Preparing and producing video, audio, and written materials and electronic media;
>
> b)      Developing and implementing, maintaining*, operating, and modifying a Franchise System Website and/or related strategies; maintaining or paying third parties to* maintain a system-wide call center, toll-free numbers, and an on-line ordering and fulfillment system;
>
> c)      Administering regional and multi-regional marketing and advertising programs, including, without limitation, purchasing trade journal, direct mail, and other media advertising and using advertising, promotion, and marketing agencies and other advisors to provide assistance; and,
>
> d)      Supporting public relations, market research, and other advertising, promotion, and marketing activities. (Emphasis added.)

127.    The use of the NAF Fund as a means to locate corporate customers, re-route their orders through EAI's central processing system and charge franchisees a previously undisclosed fee in connection with filling these orders, is outside of the defined purpose of the NAF Fund and the finite parameters established by EAI, and constitutes an egregious misuse of the NAF Fund.

128.    Moreover, EAI has also taken its contractually-based 5% royalty fee on these same corporate customer orders which, coupled with the Store 98 Commission, which in the aggregate constitutes, 25% fee on a single order, which drastically undercuts any profit the franchisee would have otherwise made on these corporate customer orders, and is in direct violation of the franchise agreements which indicate a royalty fee of only 5% evidencing further

bad faith and lack of regard for the business success of its franchisees.

129.   The imposition of the Store 98 Commission further evidences EAI's violation of the covenant of good faith and fair dealing implied in its franchise agreement.

### DIPPEDFRUIT.COM

130.   EAI and/or its affiliate Defendant, DippedFruit, Inc., has recently developed a website known as dippedfruit.com through which it sells certain "dipped fruit" products that are also sold at most, if not all, Edible Arrangements stores, albeit with different packaging.  In other instances, products are sold exclusively at dippedfruit.com, such as "Limited Edition Celebration Strawberries."

131.   The "dippedfruit.com" website allows customers to place an online order for a dippedfruit.com product through the website and, in order to process each order, asks the customer to choose, by entering a zip code, the particular geographic location from which it would like the product delivered.  Customers ordering via EdibleArrangements.com website that select a zip code that is not within the delivery area of an existing franchisee are given an option for pick up at the closest store or a delivery option.  Upon selecting the delivery option a selection of dipped fruit products is shown, presented for sale and designated as a product that will be shipped via United Parcel Service (UPS) thus the Edible Arrangements.com website supports orders for dippedfruit.com.

132.   The dippedfruit.com website is a potential source of consumer confusion and is detrimental to the EAI brand in that a customer that places an order on the dippedfruit.com website may objectively believe he is ordering a "dippedfruit" product directly from the website; while the customer is actually purchasing the product from a dipped-fruit approved EAI franchisee.

133.    While placing an order, a dippedfruit.com customer is never directed to the Edible Arrangements website.  Similarly, the customer invoice includes only the "dippedfruit" logo; however the invoice is states: "your order will be serviced by Edible Arrangements [Store No.]"

134.    EAI represents to its franchisees that a dippedfruit.com order will be filled by the Edible Arrangements store closest in proximity to the customer, or the selected zip code.

135.    However, EAI only allows certain designed "dippedfruit.com-approved" franchisees to fill customer orders that are made through dippedfruit.com, *so l*ong as their Edible Arrangements store is located in the general geographic proximately of the location the customer chose to place the order.

136.    Upon information and belief, EAI enters into contractual addenda to certain of its franchisee's franchise agreements, wherein it grants them a "dippedfruit.com-approved" designation, and permits them to sell dippedfruit.com products, in exchange for a significant monetary payment.

137.    EAI permits only "dippedfruit.com-approved" franchisees to fill customer orders through dippedfruit.com, even where by filling the order these franchisees are technically encroaching upon an exclusive or extended geographical delivery territory that was previously granted to a non-dippedfruit.com approved franchisee, for which the non-dippedfruit.com approved franchisee paid good and valuable consideration.

138.    Upon information and belief, EAI has routinely used its franchisees' NAF fund (which monies are purportedly used for the sole purpose of benefiting its contributors and the franchise system at large) in order to promote, advertise and further develop the separate and distinct "dippedfruit.com" concept and website; despite not uniformly affording the dippedfruit.com website and products' benefits uniformly to all of its franchisees.

139.    Based upon the brand separation on the dippedfruit.com website and its apparent lack of affiliation with Edible Arrangements brand, EAI is improperly using franchisee contributions to the NAF Fund in order to market and promote a new franchise concept and a potential spin-off brand.

140.    EAI's use of NAF funds to promote an entirely different concept at the expense of its franchisees constitutes a continued and willful misuse of its NAF fund, a breach of its franchise agreement with its franchisees and a breach of the covenant of good faith and fair dealing implied in its franchise agreement.

## COVENANT OF GOOD FAITH AND FAIR DEALING

141.    The franchise agreement between EAI and its franchisees gives rise to express obligations and also gives rise to a mutual implied covenant of good faith and fair dealing between the parties.

142.    Under this covenant, each party has an obligation and duty to act fairly towards the other, to do nothing destructive of the other party's right to enjoy the fruits of the contract, and to do everything that the contract presupposes they will do to accomplish its purpose.

143.    The obligations of EAI to abide by the implied covenant of good faith and fair dealing is heightened by the substantial imbalance of power between EAI and its franchisees, which imbalance allows the EAI to implement the business scheme described in detail in this Complaint and incorporated by reference.

144.    As set forth above, EAI maintains near unilateral discretion in the implementation of its Franchise Agreements and UFOCs/FDDs.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

145.    Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length.

146.   The Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, grants the Court, in cases of actual controversy such as this one, the power to issue judgments declaring the rights and other legal relations of any interested party, whether or not further relief is or could be sought.

147.   Certain disputes have arisen between the EAIFA, on behalf of its members and EAI franchisees, on the one hand, and EAI, on the other, arising out of and relating the franchise agreement between EAI and its franchisees.

148.   These disputes include:

a.   Whether EAI may, without the franchisees consent, amend the franchise agreements and require the payment of fees for the franchisee's use and participation in EAI's Franchise System Website.

b.   Whether EAI's implementation of the EAConnect Program and its associated fees is permitted under EAI's franchise agreement.

c.   Whether EAI, in implementing the EAConnect Program, its rules and associated fees, abused its discretionary authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and dealt with EAI franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements.

d.   Whether EAI through its various actions, as fully detailed in paragraphs 1 through 145 above, abused its discretionary authority under the franchise

agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and dealt with EAI franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements.

e.   Whether EAI's unilateral right "to modify the Operations Manual periodically to reflect changes in System Standards (specifications, standards, operating procedures and rules)" permits EAI to:

(1)   modify and implement the EAConnect Program and associated order-processing fees;

(2)   impose a previously undisclosed twenty percent (20%) Store 98 Commission for orders processed and re-routed through the phantom corporate-owned Store 98;

(3)   impose the substantive changes made to the vendor agreement with Netsolace, Inc., including the imposition of the substantial and additional fees;

(4)   impose the Extended Hours Mandate without taking into account the impact of the Mandate on particular store locations; and/or

(5)   require the use of pre-approved produce vendors under the recently imposed FRESH Program Mandate despite the existence of alternative produce vendors with whom it would be more efficient and economical to do business.

149.   EAI has already implemented, effectuated and/or evidenced its intent to take additional action in furtherance of the drastic, material system-wide changes detailed above, all

34

of which constitute breach of contract and/or a violation of its implied duty of good faith and fair dealing under the FA.

150.     Therefore, an actual controversy has arisen and now exists between the EAIFA, on the one hand, and EAI, on the other, concerning the rights of EAI franchisees under the express terms of their franchise agreements, and EAI's right, if any, to take the action, engage in the conduct and implement the change it has performed.

151.     The EAIFA accordingly desires a judicial determination that:

    a. EAI may not, without the franchisees consent, amend the franchise agreements and require the payment of fees for the franchisee's use and participation in EAI's Franchise System Website.

    b. EAI's implementation of the EAConnect Program and its associated fees is not permitted under EAI's franchise agreement.

    c. EAI, in implementing the EAConnect Program, its rules and associated fees, abused its discretionary authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and dealt with EAI franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements in violation of the implied covenant of good faith and fair dealing.

    d. EAI through its various actions, as fully detailed herein, abused its discretionary authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and dealt with EAI franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements, all in violation of the

implied covenant of good faith and fair dealing.

e. Defendant, Netsolace Inc., has knowingly and repeatedly breached its contractual obligations to subscribing EAI franchisees under the SSA and EAI's requirement that all franchisees continue to use Netsolace, Inc., an affiliated entity, in light of its contractual breach, constitutes a violation of its implied duty of good faith and fair dealing under the FA.

f. EAI's actions, in the aggregate, (1) offend public policy as it has been established by the regulations promulgated under Federal Trade Commission Rule 436, and by statute, the common law, or otherwise; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers, competitor and other businessmen, in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes §§ 42-110(a) - 42-110(q), which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Conn. Gen. Stat.* § 42-110b(a), and entitles EAIFA to obtain injunctive and declaratory relief pursuant to *Conn. Gen. Stat.* §§ 42-110g(a) and 42-110g(d).

g. EAI's unilateral right "to modify the Operations Manual periodically to reflect changes in System Standards" does not permit EAI to:

    (1)    modify and implement the EAConnect Program and associated order-processing fees;

    (2)    impose a previously undisclosed twenty percent (20%) Store 98 Commission for orders processed and re-routed through the phantom corporate-owned Store 98;

(3)    impose the substantive changes made to the vendor agreement with Netsolace, Inc., or impose the substantial and additional fees for software upgrades;

(4)    impose the Extended Hours Mandate without taking into account the impact of the Mandate on particular store locations; and/or

(5)    require the use of pre-approved produce vendors under the recently imposed FRESH Program Mandate despite the existence of alternative produce vendors with whom it would be more efficient and economical to do business.

152.    A judicial declaration is necessary and appropriate at this time under the circumstances so that the parties to this action may ascertain their rights and duties under the franchise agreements.  Given EAI's announcements, communications and actions concerning the changes and modifications detailed above, the facts have sufficiently crystallized to permit an intelligent and useful decision to be made, and the issues are fit for a judicial determination.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff EAIFA respectfully prays for the following relief against Respondents:

1.    For a judicial declaration that:

a. EAI may not, without the franchisees consent, amend the franchise agreements and require the payment of fees for the franchisee's use and participation in EAI's Franchise System Website.

b. EAI's implementation of the EAConnect Program and its associated fees is not permitted under EAI's franchise agreement.

c.  EAI, in implementing the EAConnect Program, its rules and associated fees, abused its discretionary authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and dealt with EAI franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements in violation of the implied covenant of good faith and fair dealing.

d.  EAI through its various actions, as fully detailed in paragraphs 1 through 144 above, abused its discretionary authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and dealt with EAI franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements in violation of the implied covenant of good faith and fair dealing.

e.  Defendant, Netsolace Inc., has knowingly and repeatedly breached its contractual obligations to subscribing EAI franchisees under the SSA and EAI's requirement that all franchisees continue to use Netsolace, Inc., an affiliated entity, in light of its contractual breach, constitutes a violation of its implied duty of good faith and fair dealing under the FA.

f.  EAI's actions, in the aggregate, (1) offend public policy as it has been established by the regulations promulgated under Federal Trade Commission Rule 436, and by statute, the common law, or otherwise; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers, competitor and other businessmen, in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes §§ 42-

110(a) - 42-110(q), which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Conn. Gen. Stat.* § 42-110b(a), and entitles EAIFA to obtain injunctive and declaratory relief pursuant to *Conn. Gen. Stat.* §§ 42-110g(a) and 42-110g(d).

g. EAI's unilateral right "to modify the Operations Manual periodically to reflect changes in System Standards" does not permit EAI to:

    (1)    modify and implement the EAConnect Program and associated order-processing fees;

    (2)    impose a previously undisclosed twenty percent (20%) Store 98 Commission for orders processed and re-routed through the phantom corporate-owned Store 98;

    (3)    impose the substantive changes made to the vendor agreement with Netsolace, Inc., or impose the substantial and additional fees for software upgrades;

    (4)    impose the Extended Hours Mandate without taking into account the impact of the Mandate on particular store locations; and/or

    (5)    require the use of pre-approved produce vendors under the recently imposed FRESH Program Mandate despite the existence of alternative produce vendors with whom it would be more efficient and economical to do business.

2.    An award of costs and expenses, including reasonable attorneys' fees, incurred by Plaintiff in connection with this action; and

3.    For such other and further relief as the Court deems just and proper.

## DESIGNATION OF TRIAL COUNSEL

Justin M. Klein, Esq. is hereby designated as trial counsel for Plaintiff.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated: September 20, 2010

Respectfully Submitted,

**BERDON, YOUNG & MARGOLIS, P.C.**
Attorneys for Plaintiff

/S/Stuart A. Margolis
Stuart A. Margolis ct08803
132 Temple Street
New Haven, Connecticut 06510
Tel: (203) 772-3740
Fax: (732) 492-4444

**MARKS & KLEIN, LLP**
Attorneys for Plaintiff

/S/Justin M. Klein
Justin M. Klein
Louis D. Tambaro
(To be admitted *pro hac vice*)
63 Riverside Avenue
Red Bank, N.J. 07701
Tel: (732) 747-7100
Fax: (732) 219-0625