# EXHIBIT A



## FRANCHISE AGREEMENT

### BETWEEN

### EDIBLE ARRANGEMENTS FRANCHISE GROUP, INC.
*(A Connecticut Corporation)*

and

_____

_____

Phone Number (_____)_____-_____

Fax Number (_____)_____-_____

Date _____

~EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1

# TABLE OF CONTENTS

**SECTION**                                                                          **PAGE**

1.   GRANT AND FRANCHISE FEE.................................................................................2
     A.   Grant of Franchise, Territory, and Delivery Area.................................................2
     B.   Franchisee's Initial and Additional Franchise Fees...............................................4
2.   TERM AND RENEWAL ...........................................................................................4
     A.   Term.........................................................................................................4
     B.   Renewal.....................................................................................................5
3.   FRANCHISED BUSINESS LOCATION ........................................................................6
     A.   Operation of Franchised Business.....................................................................6
     B.   Selection of Location by Franchisee..................................................................7
     C.   Development of Location for Franchised Business ................................................7
4.   EQUIPMENT AND MATERIALS ...............................................................................8
     A.   Use of Proper Operating Assets.......................................................................8
     B.   Computer System.........................................................................................9
5.   TRAINING REQUIREMENTS AND ASSISTANCE BY EA.............................................9
     A.   Training.....................................................................................................9
     B.   General Guidance........................................................................................11
     C.   Operations Manual......................................................................................11
6.   PROPRIETARY NAMES AND MARKS .....................................................................12
     A.   EA's Ownership of Names and Marks ..............................................................12
     B.   Franchisee's Use of Names and Marks..............................................................12
     C.   Unauthorized Use of Names and Marks .............................................................13
     D.   EA's Right to Modify...................................................................................13
     E.   EA's Right to Inspect and Audit Franchised Business ...........................................14
7.   FRANCHISE SYSTEM WEBSITE .............................................................................15
8.   CONFIDENTIALITY OF PROPRIETARY INFORMATION ............................................16
9.   MODIFICATION OF THE SYSTEM AND EXERCISE OF JUDGMENT .....................17
10.  ADVERTISING AND PROMOTION ..........................................................................18
11.  ONGOING FEES...................................................................................................18
     A.   Royalty Fees..............................................................................................19
     B.   Late Payments.............................................................................................19
     C.   National Advertising Fees..............................................................................20
     D.   Method of Payment of Fees ...........................................................................21
12.  ACCOUNTING AND BOOKKEEPING RECORDS ........................................................22
     A.   Accounting and Bookkeeping Records...............................................................22
     B.   Submission of Financial Statements ..................................................................22
     C.   Entity Franchisee .........................................................................................22
13.  STANDARDS OF QUALITY AND PERFORMANCE .......................................................22
     A.   Open Business in One Hundred Twenty Days ......................................................23
     B.   Image of Franchised Business .........................................................................23
     C.   Approved Manufacturers, Suppliers and Distributors .............................................24
     D.   Authorized Materials and Supplies...................................................................24

i

|       | E.  | Specifications, Standards and Operating Procedures | 24 |
|       | F.  | Franchises, Permits and Certificates | 25 |
|       | G.  | Names and Marks | 26 |
|       | H.  | Supervision of Franchised Business | 26 |
|       | I.  | Maintenance of Highest Moral Standards | 26 |
|       | J.  | Use of Advertising and Promotional Claims | 26 |
|       | K.  | Notice of Legal Proceedings | 26 |
| 14.   | INSURANCE | | 26 |
|       | A.  | Overall Coverage Required | 26 |
|       | B.  | Qualified Insurance Carrier | 27 |
|       | C.  | No Limitations on Coverage | 27 |
|       | D.  | Evidence of Coverage | 27 |
|       | E.  | EA May Procure Insurance Coverage | 28 |
| 15.   | TERMINATION OF FRANCHISE | | 28 |
|       | A.  | By Franchisee | 28 |
|       | B.  | By EA | 28 |
|       | C.  | Assumption of Management | 30 |
| 16.   | FRANCHISEE'S OBLIGATIONS UPON TERMINATION OR EXPIRATION | | 31 |
|       | A.  | Payment of Monies Owed to EA | 31 |
|       | B.  | Marks | 31 |
|       | C.  | Confidential Information | 32 |
|       | D.  | EA Purchase of Inventory and Equipment | 32 |
|       | E.  | Liquidated Damages | 33 |
| 17.   | COVENANTS | | 33 |
|       | A.  | In-Term | 33 |
|       | B.  | Post-Term | 34 |
| 18.   | ASSIGNMENT | | 35 |
|       | A.  | By EA | 35 |
|       | B.  | By Franchisee | 35 |
|       | C.  | Conditions For Approval of Transfer | 37 |
|       | D.  | Transfer to a Wholly-Owned Corporation or Limited Liability Company | 38 |
|       | E.  | Franchisee's Death or Disability | 39 |
|       | F.  | Effect of Consent to Transfer | 40 |
|       | G.  | EA's Right of First Refusal | 40 |
|       | H.  | Public Offerings | 42 |
| 19.   | RELATIONSHIP OF THE PARTIES/INDEMNIFICATION | | 42 |
|       | A.  | Independent Contractors | 42 |
|       | B.  | No Liability for Acts of Other Party | 42 |
|       | C.  | Taxes | 42 |
|       | D.  | Indemnification | 43 |
| 20.   | ENFORCEMENT | | 44 |
|       | A.  | Severability and Substitution of Valid Provisions | 44 |
|       | B.  | Waiver of Obligations | 44 |
|       | C.  | Costs and Attorneys' Fees | 45 |
|       | D.  | Franchisee May Not Withhold Payments Due to EA | 45 |
|       | E.  | Rights of Parties are Cumulative | 45 |

ii

F.   Arbitration..........................................................................................46
G.   Governing Law ...................................................................................47
H.   Consent to Jurisdiction.......................................................................47
I.    Waiver of Punitive Damages and Jury Trial............................................48
J.    Binding Effect....................................................................................48
K.   Limitations of Claims .........................................................................48
L.   Construction......................................................................................48
21.  NOTICES AND PAYMENTS .................................................................50
22.  VARYING STANDARDS .......................................................................50
23.  SPECIAL REPRESENTATIONS .............................................................50

EXHIBIT A  —   TERRITORY AND DELIVERY AREA
EXHIBIT B  —   FRANCHISEE AND ITS OWNERS
EXHIBIT C  —   GUARANTY AND ASSUMPTION OF OBLIGATIONS

~EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1

# EDIBLE ARRANGEMENTS® FRANCHISE AGREEMENT

Franchisee(s) Name _____

Mailing Address _____

City _____ State _____ Zip _____

Street Address _____

City _____ State _____ Zip _____

**THIS FRANCHISE AGREEMENT** (the "Agreement") is made by and between **EDIBLE ARRANGEMENTS FRANCHISE GROUP, INC.**, a Connecticut Corporation located at 1920 Dixwell Ave. #200, Hamden, Connecticut 06514 ("Franchisor" or "EA"), and the person(s) listed above (referenced individually or collectively as "Franchisee") to evidence the agreement and understandings between the parties. This Agreement is intended to be effective as of _____ (the "Effective Date"), regardless of the dates of the parties' signatures.

**WHEREAS,** EA and its affiliates, under their trade names, trademarks, logos, and service marks (the "Names and Marks"), have developed policies and procedures (including confidential information) and a distinctive and comprehensive system (the "System") for the promotion, operation, and identification of businesses operating under the mark "EDIBLE ARRANGEMENTS®" that sell edible floral arrangements ("EDIBLE ARRANGEMENTS® Businesses");

**WHEREAS,** EA provides a uniform system for the establishment and operation of EDIBLE ARRANGEMENTS® Businesses, including sales development programs, sales techniques, training techniques, and other related benefits for Franchisee's use under the Names and Marks;

**WHEREAS,** EA and its affiliates have a proprietary interest in the Names and Marks and System;

**WHEREAS,** Franchisee recognizes the benefits to be derived from being identified with and receiving a Franchise from EA; and

**WHEREAS,** Franchisee desires to obtain a Franchise from EA for the right to use the Names and Marks and the System in operating an EDIBLE ARRANGEMENTS® Business.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth in, and subject to the terms and conditions of, this Agreement, the parties agree as follows:

1.    **GRANT AND FRANCHISE FEE**

    A.    **Grant of Franchise, Territory, and Delivery Area**

        (1)    **Grant of Franchise**

        EA hereby grants to Franchisee, and Franchisee hereby accepts, a Franchise under the terms and conditions set forth herein for the right, license, and privilege to operate an EDIBLE ARRANGEMENTS® Business within both the Territory and the Delivery Area (defined below) using the Names and Marks, the System, and related advertising and sales methods, provided Franchisee shall adhere to the terms and conditions hereof.

        (2)    **Territory and Delivery Area**

        EA agrees that, during the term of this Agreement and provided that Franchisee is not in default of this Agreement (including the passage of any applicable notice and/or grace periods), EA and its affiliates will not, except as provided below, operate or grant to any other person or entity the right to operate an EDIBLE ARRANGEMENTS® Business within the territory described in Exhibit "A" (the "Territory"), whether EA and its affiliates, or such other person or entity, would operate such an EDIBLE ARRANGEMENTS® Business within the Territory from locations within or outside the Territory. The phrase "operate an EDIBLE ARRANGEMENTS® Business within the Territory" shall mean to maintain one or more store locations within such Territory or to make deliveries of merchandise to persons within the Territory, including to fulfill any order for merchandise to be delivered to a final destination within the Territory, whether the order is placed in person, by telephone, or via the Internet, fax, or other means.

        Franchisee may accept and fulfill orders for delivery to customers and/or recipients located within the Territory as well as to customers and/or recipients located outside the Territory but only if the customers and/or recipients outside the Territory are located within the delivery area described in Exhibit "A" (the "Delivery Area"). Franchisee may not accept or fulfill orders for delivery to customers and/or recipients located outside both the Territory and Delivery Area. Franchisee acknowledges that, unlike the Territory (with the exception noted below), the Delivery Area is not exclusive. EA may engage, and/or allow other franchise owners and third parties to engage, in any activities EA desires within the Delivery Area without any restrictions whatsoever, including, without limitation, allowing other franchise owners and third parties to accept and fulfill orders for delivery to customers and/or recipients located in the Delivery Area. Franchisee's Delivery Area and the delivery area or areas of one or more other franchise owners may overlap partially or even completely. The Delivery Area is nothing more than the geographic boundaries beyond the Territory in which Franchisee may, except as provided in the following paragraph, deliver orders to customers and/or recipients. It confers no other rights on Franchisee whatsoever.

        Franchisee acknowledges that EA may during this Agreement's term grant a new EDIBLE ARRANGEMENTS® Business franchise to a franchise owner whose exclusive

2

territory under that franchise will be comprised in whole or in part by a portion of the Delivery Area. If EA takes this action, which it may do as it deems best, Franchisee will be required to cease accepting and fulfilling orders for delivery within the portion of the Delivery Area that has become part of the new franchise owner's exclusive territory. Franchisee agrees that, before the new franchise owner commences operations, Franchisee will comply with this requirement and begin accepting and fulfilling orders for delivery only within its Territory and the portion of the Delivery Area that is not part of the new franchise owner's exclusive territory. EA will promptly notify Franchisee of the new franchise owner's exclusive territory. Franchisee acknowledges that EA will not be liable for reducing the portion of Franchisee's Delivery Area within which Franchisee may accept and fulfill orders for delivery because that action is expressly allowed as provided above. Except as provided below, under no circumstances may Franchisee deliver orders to customers and/or recipients located within another franchise owner's exclusive territory, even if that exclusive territory formerly was a portion of the Delivery Area,

Franchisee acknowledges and agrees that EA and/or its affiliates may refer customers to Franchisee as a result of contacts received from, or orders placed by, such customers through EA's and/or its affiliates' Web site, through affiliated or unaffiliated "800" numbers, or through other means, or as a result of arrangements with national or regional accounts (defined below) negotiated by EA and/or its affiliates for the sale of products prepared by EDIBLE ARRANGEMENTS® Businesses to or through national or regional account locations. EA will not allow another franchise owner or third party (including EA's affiliates) to accept or fulfill orders for delivery to customers and/or recipients located in Franchisee's Territory (including wholesale, retail, and national or regional account customers) unless Franchisee refuses, or is unable, to accept and fulfill such orders within the timeframe or in the manner requested by the customers. In those circumstances only and for such time periods that EA deems necessary, EA may allow another franchise owner or third party (including EA's affiliates) to accept and fulfill such orders for delivery to such customers and/or recipients located in Franchisee's Territory. Similarly, EA may allow Franchisee to accept and fulfill orders for delivery to customers and/or recipients located in another franchise owner's exclusive territory if that other franchise owner refuses, or is unable, to accept and fulfill customer orders within the timeframe or in the manner requested by the customers.

During this Agreement's term, EA may prohibit Franchisee from selling the products and services of its Franchised Business to certain categories of customers if EA and/or its affiliates have established national or regional account arrangements that restrict the customers (typically competitors of the national or regional account) with whom EDIBLE ARRANGEMENTS® Businesses may do business. Franchisee agrees to comply with EA's directions and restrictions. EA also may condition Franchisee's right to do business with the locations of a national or regional account in the Territory and/or Delivery Area on Franchisee's complying with the terms that EA and/or its affiliates have negotiated with the national or regional account for the sale to or through its locations of the products and services of EDIBLE ARRANGEMENTS® Businesses. If Franchisee fails to comply with such terms, EA may (as provided above) allow another franchise

3

owner or third party (including EA's affiliates) to accept and fulfill orders for delivery to the locations of the national or regional account in the Territory. A "national or regional account" is defined as any customer that has one (1) or more locations outside the Territory in addition to one (1) or more locations within the Territory.

Except to the extent specifically described above with respect to the Territory, the Franchise granted under this Agreement is non-exclusive, and EA and its affiliates expressly retain all rights to own and operate, and, to license others to own or operate, EDIBLE ARRANGEMENTS® Businesses anywhere outside of the Territory on any terms they deem appropriate and to engage in any activities not expressly prohibited by this Agreement.

**B.      Franchisee's Initial and Additional Franchise Fees**

### (1)      Payment of Fee

By executing this Agreement, Franchisee agrees to become a Franchisee and pay an Initial Franchise Fee to EA of twenty-five thousand dollars ($25,000) for the first store location within the Territory. Franchisee may not have any store locations in the Delivery Area. This Initial Franchise Fee is due and fully earned by EA when Franchisee signs this Agreement. Franchisee is obligated to pay EA an additional fee of ten thousand dollars ($10,000) for each additional store location to be opened within the Territory, even though the operation of all store locations in the Territory is governed by this Agreement and included within the Franchise. Additional fees due for additional store locations to be opened in the Territory are payable when the store location actually opens for business. The Initial Franchise Fee and additional fees are not refundable under any circumstances.

### (2)      Location and Opening of EDIBLE ARRANGEMENTS® Business by Franchisee

Within one hundred twenty (120) days after execution hereof, Franchisee must select a location for its first store within the Territory, cause to have installed at the store the EDIBLE ARRANGEMENTS® standard equipment package, secure all necessary occupational licenses and/or zoning approvals for the location, and open the Franchised Business and commence operations. In the event Franchisee does not meet each of the obligations described above within this one hundred twenty (120) day period, then EA may terminate this Agreement.

## 2.      TERM AND RENEWAL

### A.      Term

This Agreement shall be effective and binding from the Effective Date for an initial term equal to ten (10) years.

4

**B.**    **Renewal**

Franchisee shall have the right to renew this Franchise at the expiration of the initial term for one (1) additional successive term of ten (10) years, commencing immediately upon the expiration of this Agreement, provided that all of the following conditions have been fulfilled:

(1)    Franchisee (and its owners) has, during the entire term of this Agreement, substantially complied with all its provisions;

(2)    Franchisee continues to operate the Franchised Business in compliance with this Agreement through the end of the initial term and, by the expiration date of this Agreement, has brought the Franchised Business into full compliance with EA's then current specifications and standards for EDIBLE ARRANGEMENTS® Businesses, including, but not limited to, a new equipment package and new décor at all store locations and an upgraded point-of-sale and computer system;

(3)    Franchisee has satisfied all monetary obligations owed to EA and any of its subsidiaries, affiliates, and approved suppliers and has in a timely manner met these obligations throughout the term of this Agreement;

(4)    Franchisee has executed EA's then-current form of franchise agreement (with appropriate modifications to reflect the fact that the agreement relates to the grant of a renewal franchise), which agreement shall supersede this Agreement in all respects and any and all of the terms of which may differ materially from the terms of this Agreement, including, without limitation, higher continuing fees and a newly-defined Territory and Delivery Area; provided, however, Franchisee shall not be required to pay the then-current initial franchise fee but shall pay a renewal fee of two thousand dollars ($2,000);

(5)    Franchisee has complied with EA's then-current qualification and training requirements;

(6)    Franchisee has executed a general release, in a form prescribed by EA, of any and all claims against EA and its subsidiaries and affiliates, if any, and all of their respective shareholders, officers, directors, agents, and employees; and

(7)    Franchisee notifies EA of its desire to renew the franchise not more than nine (9) months, and not less than six (6) months, before this Agreement expires.

EA agrees to give Franchisee written notice ("Our Notice"), not more than ninety (90) days after it receives Franchisee's notice, of EA's decision:

5

(a)    to grant Franchisee a renewal franchise;

(b)    to grant Franchisee a renewal franchise on the condition that Franchisee corrects existing deficiencies of the Franchised Business or in its operation of the Franchised Business; or

(c)    not to grant Franchisee a renewal franchise based on EA's determination that Franchisee and its owners have not substantially complied with this Agreement during its term.

If applicable, Our Notice will:

(i)    describe the remodeling, expansion, improvements, and/or modifications required to bring the Franchised Business into compliance with then applicable specifications and standards for new EDIBLE ARRANGEMENTS® Businesses; and

(ii)   state the actions Franchisee must take to correct operating deficiencies and the time period in which it must correct these deficiencies.

If EA elects not to grant a renewal franchise, Our Notice will describe the reasons for EA's decision. If EA elects to grant a renewal franchise, Franchisee's right to acquire the renewal franchise is subject to its full compliance with all of the terms and conditions of this Agreement through the date of its expiration, in addition to its compliance with the obligations described in Our Notice.

If Our Notice states that Franchisee must cure certain deficiencies of the Franchised Business or its operation as a condition to EA's granting Franchisee a renewal franchise, EA will give Franchisee written notice of its decision not to grant a renewal franchise, based upon Franchisee's failure to cure those deficiencies, not less than sixty (60) days before this Agreement expires, provided, however, that EA need not give Franchisee this sixty (60) days' notice if EA decides not to grant Franchisee a renewal franchise due to Franchisee's breach of this Agreement during the sixty (60) day period before it expires.

At its option, EA may extend this Agreement's term for the time period necessary to give Franchisee either reasonable time to correct deficiencies or the sixty (60) days' notice of EA's refusal to grant a renewal franchise. If Franchisee fails to notify EA of its election to acquire a renewal franchise within the prescribed time period, EA need not grant Franchisee a renewal franchise.

3.    **FRANCHISED BUSINESS LOCATION**

A.    **Operation of Franchised Business**

Franchisee may operate the Franchised Business and service customers only within the Territory and Delivery Area, as provided in Section 1.A. above.

6

**B.**   **Selection of Location by Franchisee**

Franchisee will be responsible for selecting a prominent location for the Franchised Business within the Territory. Such location, and the terms of any lease, shall be subject to the prior approval of EA. Prior to granting approval of such lease, EA shall be entitled to require the execution by the Franchisee (and, at the option of EA, the landlord) of a conditional assignment of such lease.

EA will use reasonable efforts to help analyze Franchisee's market area, to help determine site feasibility, and to assist in designating the location, although EA will not conduct site selection activities for Franchisee. EA will not unreasonably withhold its approval of a site that meets EA's criteria for demographic characteristics; traffic patterns; parking; character of neighborhood; competition from, proximity to, and nature of other businesses; other commercial characteristics; and the proposed site's size, appearance, and other physical characteristics. Franchisee agrees to send EA a description of the proposed site, including a summary of the items listed above, along with a letter of intent or other evidence confirming its favorable prospects for obtaining the proposed site. EA will approve or disapprove the proposed site within thirty (30) days after receiving Franchisee's written proposal.

Franchisee acknowledges and agrees that, if EA recommends or gives Franchisee information regarding a location for the Franchised Business, it is not a representation or warranty of any kind, express or implied, of the site's suitability for an EDIBLE ARRANGEMENTS® Business or any other purpose. EA's recommendation indicates only that it believes that the site meets its then acceptable criteria. Applying criteria that have appeared effective with other sites might not accurately reflect the potential for all sites, and demographic and/or other factors included in or excluded from EA's criteria could change, altering the potential of a site. The uncertainty and instability of these criteria are beyond EA's control, and EA is not responsible if a site it recommends fails to meet Franchisee's expectations. Franchisee acknowledges and agrees that its selection of a location will be based on its own independent investigation of the site's suitability.

**C.**   **Development of Location for Franchised Business**

Franchisee is responsible for developing each location of the Franchised Business within the Territory. EA will give Franchisee mandatory and suggested specifications and layouts for the location, including requirements for dimensions, design, image, interior layout, decor, fixtures, equipment, signs, furnishings, and color scheme. These plans might not reflect the requirements of any federal, state, or local law, code, or regulation, including those arising under the Americans with Disabilities Act (the "ADA") or similar rules governing public accommodations for persons with disabilities. It is Franchisee's responsibility to prepare a site survey and all required construction plans and specifications to suit the location and to make sure that these plans and specifications comply with the ADA and similar rules, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions. Franchisee agrees to submit to EA construction plans and specifications for review before it begins

7

constructing the location and all revised or "as built" plans and specifications during construction. EA's review is limited to ensuring Franchisee's compliance with EA's design requirements. EA's review might not assess compliance with federal, state, or local laws and regulations, including the ADA, as compliance with these laws is Franchisee's responsibility. EA may inspect the location while Franchisee is developing the Franchised Business at the location.

Franchisee agrees to do the following, at its own expense, to develop the Franchised Business at each location:

    (1)    secure all financing required to develop and operate the Franchised Business;

    (2)    obtain all required building, utility, sign, health, sanitation, business, and other permits and licenses;

    (3)    construct all required improvements to the location and decorate the location according to approved plans and specifications;

    (4)    obtain all customary contractors' sworn statements and partial and final waivers of lien for construction, remodeling, decorating, and installation services;

    (5)    purchase or lease, and install, all required Operating Assets (defined in Section 4.A. below) for the Franchised Business; and

    (6)    purchase an opening inventory of authorized and approved products, materials, and supplies to operate the Franchised Business.

## 4.    EQUIPMENT AND MATERIALS

### A.    Use of Proper Operating Assets

Franchisee agrees to use in operating the Franchised Business only those fixtures, furniture, equipment (including a required or recommended computer with high-speed Internet connection, facsimile, and point-of-sale information system), furnishings, vehicles, and signs (collectively, "Operating Assets") that EA approves for EDIBLE ARRANGEMENTS® Businesses as meeting its specifications and standards for quality, design, appearance, function, and performance. Franchisee agrees to place or display at each store location (interior and exterior), and on all delivery vehicles, only the signs, emblems, lettering, logos, and display materials that EA approves from time to time. Franchisee agrees to purchase or lease approved brands, types, or models of Operating Assets only from suppliers EA designates or approves (which may include or be limited to EA and/or its affiliates).

.   8

**B.    Computer System**

Franchisee agrees to obtain and use specified integrated computer hardware and/or software, including an integrated computer-based point-of-sale system (the "Computer System"). EA may modify specifications for and components of the Computer System. Franchisee also agrees to maintain a functioning e-mail address and all specified points of high-speed Internet connection. EA's modification of specifications for the Computer System, and/or other technological developments or events, might require Franchisee to purchase, lease, and/or license new or modified computer hardware and/or software and to obtain service and support for the Computer System. Although EA cannot estimate the future costs of the Computer System or required service or support, and although these costs might not be fully amortizable over this Agreement's remaining term, Franchisee agrees to incur the costs of obtaining the computer hardware and software comprising the Computer System (or additions and modifications) and required service or support. EA has no obligation to reimburse Franchisee for any Computer System costs. Before it begins operating the Franchised Business, and then afterward within sixty (60) days after notice from EA, Franchisee agrees to obtain the Computer System components that EA designates and to ensure that its Computer System, as modified, is functioning properly.

Franchisee agrees that EA or its affiliates may condition any license of proprietary software to Franchisee, or its use of technology that EA or its affiliates develop or maintain, on Franchisee's signing the Software License Agreement or similar document that EA or its affiliates prescribe to regulate Franchisee's use of, and EA's, its affiliates', and Franchisee's respective rights and responsibilities with respect to, the software or technology. EA and its affiliates may charge Franchisee a monthly or other fee for any proprietary software or technology that EA or its affiliates license to Franchisee and for other maintenance and support services that EA or its affiliates provide during this Agreement's term.

Despite the fact that Franchisee agrees to buy, use, and maintain the Computer System according to EA's standards and specifications, Franchisee will have sole and complete responsibility for: (1) the acquisition, operation, maintenance, and upgrading of the Computer System; (2) the manner in which its Computer System interfaces at EA's specified levels of connection speed with EA's and any third party's computer system; and (3) any and all consequences if the Computer System is not properly operated, maintained, and upgraded.

**5.    TRAINING REQUIREMENTS AND ASSISTANCE BY EA**

**A.    Training**

(1)    **Initial Training**. Before the Franchised Business opens, EA will train Franchisee (or, if Franchisee is an entity, its managing shareholder, member, or partner ("Managing Owner")) and one (1) on-site manager on the material aspects of operating an EDIBLE ARRANGEMENTS®

9

Business.   EA will provide approximately ten (10) business days of training (although the specific number of days depends on EA's opinion of Franchisee's or its Managing Owner's, and the manager's, experience and needs) at a designated training facility of EA's choice and/or at an operating EDIBLE ARRANGEMENTS® Business.   Franchisee (or its Managing Owner) and its manager must satisfactorily complete initial training and participate in all other activities required to operate the Franchised Business.  After completing the training program, attendees must pass an operations proficiency test, which will entitle them to receive management certification.

Although EA provides initial training for no additional fee for two (2) people, Franchisee agrees to pay for all travel and living expenses which it (or its Managing Owner) and its employees incur and for its employees' wages and workers' compensation insurance while they train at an operating EDIBLE ARRANGEMENTS® Business.   Franchisee agrees to replace any manager who EA believes is not qualified or suitable to hold that position and to pay EA's then current fee for training a replacement manager. If EA determines that Franchisee (or its Managing Owner) cannot complete initial training to EA's satisfaction, EA may terminate this Agreement.

Franchisee (or its Managing Owner) may request additional training at the end of the initial training program, to be provided at EA's then current per diem charges, if Franchisee (or its Managing Owner) do not feel sufficiently trained in the operation of an EDIBLE ARRANGEMENTS® Business. EA and Franchisee will jointly determine the duration of this additional training. However, if Franchisee (or its Managing Owner) satisfactorily completes EA's initial training program, and has not expressly informed EA at the end of that program that Franchisee (or its Managing Owner) does not feel sufficiently trained in the operation of an EDIBLE ARRANGEMENTS® Business, then Franchisee will be deemed to have been trained sufficiently to operate an EDIBLE ARRANGEMENTS® Business.

(2)   **Ongoing Training.**  EA may require Franchisee (or its Managing Owner) and/or previously trained and experienced employees to attend and complete satisfactorily various training courses that EA periodically chooses to provide at the times and locations that EA designates. EA may charge reasonable registration or similar fees for these courses. Franchisee agrees to pay all costs to attend.

If Franchisee hires new or additional on-site managers for the Franchised Business during this Agreement's term, they must satisfactorily complete EA's then current initial training program. EA may charge reasonable fees for training new managers. Franchisee agrees

to pay all travel and living expenses which it and its employees incur during all training courses and programs.

Franchisee understands and agrees that any specific ongoing training or advice EA provides does not create an obligation (whether by course of dealing or otherwise) to continue to provide such specific training or advice, all of which EA may discontinue and modify from time to time.

**B. General Guidance**

EA will advise Franchisee from time to time regarding operation of the Franchised Business based on Franchisee's reports or EA's inspections and will guide Franchisee with respect to:

(1)    standards, specifications, and operating procedures and methods that EDIBLE ARRANGEMENTS® Businesses use;

(2)    purchasing required and authorized Operating Assets and other items and arranging for their distribution to Franchisee;

(3)    advertising and marketing materials and programs;

(4)    employee training; and

(5)    administrative, bookkeeping, accounting, and inventory control procedures.

EA will guide Franchisee in its operations manual ("Operations Manual"); in bulletins or other written materials; by electronic media; by telephone consultation; and/or at EA's office or the Franchised Business. If Franchisee requests, and EA agrees to provide, additional or special guidance, assistance, or training, Franchisee agrees to pay EA's then applicable charges, including its personnel's per diem charges and travel and living expenses.

**C. Operations Manual**

EA will loan Franchisee during the franchise term one (1) copy of its Operations Manual, which could include audiotapes, videotapes, compact disks, computer software, other electronic media, and/or written materials. The Operations Manual contains mandatory and suggested specifications, standards, operating procedures, and rules ("System Standards") that EA periodically prescribes for operating an EDIBLE ARRANGEMENTS® Business and information on Franchisee's other obligations under this Agreement. EA may modify the Operations Manual periodically to reflect changes in System Standards. Franchisee agrees to keep its copy of the Operations Manual current and in a secure location. If there is a dispute over its contents, EA's master copy of the Operations Manual controls. Franchisee agrees that the Operations Manual's

contents are confidential and that it will not disclose the Operations Manual to any person other than employees who need to know its contents. Franchisee may not at any time copy, duplicate, record, or otherwise reproduce any part of the Operations Manual. If its copy of the Operations Manual is lost, destroyed, or significantly damaged, Franchisee agrees to obtain a replacement copy at EA's then applicable charge.

EA may post some or all of the Operations Manual on a restricted Website or extranet to which Franchisee will have access.' (For purposes of this Agreement, "Website" means an interactive electronic document contained in a network of computers linked by communications software, including, without limitation, the Internet and World Wide Web home pages). If EA does so, Franchisee agrees to monitor and access the Website or extranet for any updates to the Operations Manual or System Standards. Any passwords or other digital identifications necessary to access the Operations Manual on a Website or extranet will be deemed to be part of EA's confidential information.

## 6. PROPRIETARY NAMES AND MARKS

### A. EA's Ownership of Names and Marks

Franchisee acknowledges and agrees that EA and its affiliates are the owners of the Names and Marks and Franchisee's right to use the Names and Marks is derived solely from this Agreement and limited to the conduct of business by Franchisee pursuant to and in compliance with this Agreement and all System Standards prescribed by EA from time to time during the term of this Agreement. Any unauthorized use of the Names and Marks by Franchisee is a breach of this Agreement and an infringement of the rights of EA and its affiliates in and to the Names and Marks. Franchisee acknowledges and agrees that all usage of the Names and Marks by Franchisee and any goodwill established by Franchisee's use of the Names and Marks shall inure to the exclusive benefit of EA and its affiliates and that this Agreement does not confer any goodwill or other interests in the Names and Marks upon Franchisee. Franchisee shall not, at any time during the term of this Agreement or after its termination or expiration, contest the validity or ownership, or assist another person in contesting the validity or ownership, of any of the Names and Marks. All provisions of this Agreement applicable to the Names and Marks apply to any additional trademarks, service marks, and commercial symbols authorized for use by and licensed to Franchisee by EA after the Effective Date.

### B. Franchisee's Use of Names and Marks

Franchisee shall not use any Name or Mark (1) as part of any corporate or trade name, (2) with any prefix, suffix, or other modifying words, terms, designs, or symbols or in any modified form, (3) in connection with the sale of any unauthorized product or service, (4) as part of any domain name, homepage, electronic address, or otherwise in connection with a Website (unless in connection with EA's approved Franchise System Website), or (5) in any other manner not expressly authorized in the Operations Manual or otherwise in writing by EA. Franchisee agrees to give such notices of trademark and service mark registrations as EA specifies and to obtain such fictitious or assumed name

registrations required under applicable law. Franchisee agrees that this Agreement does not convey any right or property interest in the Names and Marks licensed hereunder. Franchisee agrees to display the Names and Marks prominently as EA prescribes at all store locations and on forms, supplies, advertising, and other materials EA designates.

**C.    Unauthorized Use of Names and Marks**

Franchisee shall immediately notify EA in writing of any apparent infringement of or challenge to Franchisee's use of the Names and Marks and of any claim by any person of any right in the Names and Marks or any similar trade name, trademark, or service mark of which Franchisee becomes aware. Franchisee shall not directly or indirectly communicate with any person other than EA and its affiliates, and their counsel, in connection with any such infringement, challenge, or claim. EA and its affiliates shall have the right to take such action as they deem appropriate (including no action) and the right to control exclusively any litigation, United States Patent and Trademark Office proceeding, or other administrative proceeding arising out of such infringement, challenge, or claim or otherwise relating to the Names and Marks. Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of EA's and its affiliates' counsel, be necessary or advisable to protect and maintain the interests of EA and its affiliates in any such litigation, U.S. Patent and Trademark Office proceeding, or other administrative proceeding or otherwise to protect and maintain the interests of EA and its affiliates in the Names and Marks.

In the event that any third party makes a claim against Franchisee alleging that Franchisee's use of the Names and Marks infringes upon the rights of such third party, EA agrees to defend such claim and indemnify and hold Franchisee harmless therefrom, provided Franchisee has used the Names and Marks only as expressly authorized in this Agreement, the Operations Manual, or otherwise in writing by EA, and provided further that Franchisee shall have the duty to cooperate with EA in the defense of such claim as set forth in this paragraph and in any other manner reasonably requested by EA. The obligation of EA to defend and indemnify with respect to such claim shall not extend to other claims made by the same third party against EA and/or Franchisee arising from matters for which Franchisee is responsible under applicable law or this Agreement; as to such other claims, if any, Franchisee agrees to defend same and indemnify and hold EA harmless therefrom.

**D.    EA's Right to Modify**

If it becomes advisable at any time for EA and/or Franchisee to modify or discontinue use of the Names and Marks, and/or use one or more additional or substitute trade names, trademarks, service marks, or other commercial symbols, Franchisee agrees to comply with EA's directions within a reasonable time after notice to Franchisee by EA. EA need not reimburse Franchisee for its direct expenses of changing the signs of the Franchised Business, for any loss of revenue due to any modified or discontinued

−EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1

Name or Mark, or for Franchisee's expenses of promoting a modified or substitute trademark or service mark.

EA's rights in this subsection apply to any and all of the Names and Marks (and any portion of any Name and Mark) that EA authorizes Franchisee to use in this Agreement. EA may exercise these rights at any time and for any reason, business or otherwise, that it thinks best. Franchisee acknowledges both EA's right to take this action and Franchisee's obligation to comply with EA's directions.

**E.    EA's Right to Inspect and Audit Franchised Business**

To determine whether Franchisee and the Franchised Business are complying with this Agreement and all System Standards, EA and its designated agents or representatives may at all times and without prior notice to Franchisee:

     (1)    inspect the Franchised Business;

     (2)    photograph the Franchised Business and observe and videotape its operation for consecutive or intermittent periods EA deems necessary;

     (3)    remove samples of any products and supplies;

     (4)    interview the personnel and customers of the Franchised Business; and

     (5)    inspect and copy any books, records, and documents relating to the operation of the Franchised Business.

Franchisee agrees to cooperate with EA fully. If EA exercises any of these rights, it will not interfere unreasonably with the operation of the Franchised Business. Franchisee agrees to present to its customers the evaluation forms that EA periodically prescribes and to participate and/or request its customers to participate in any surveys performed by or for EA.

EA may at any time during Franchisee's business hours, and without prior notice to Franchisee, examine Franchisee's (if it is an entity) and the Franchised Business's business, bookkeeping, and accounting records, sales and income tax records and returns, and other records. Franchisee agrees to cooperate fully with EA's representatives and independent accountants in any examination.    If any examination discloses an understatement of the Gross Sales of the Franchised Business, Franchisee agrees to pay EA, within fifteen (15) days after receiving the examination report, the Royalty and NAF contributions due on the amount of the understatement, plus the late payment fee. Furthermore, if an examination is necessary due to Franchisee's failure to furnish reports, supporting records, or other information as required, or to furnish these items on a timely basis, or if EA's examination reveals a Royalty or NAF contribution understatement exceeding three percent (3%) of the amount that Franchisee actually reported to EA for the period examined, Franchisee agrees to reimburse EA for the costs of the examination, including, without limitation, the charges of attorneys and independent accountants and

14

the travel expenses, room and board, and compensation of EA's employees. These remedies are in addition to EA's other remedies and rights under this Agreement and applicable law.

## 7.   FRANCHISE SYSTEM WEBSITE

At EA's option, EA may establish one or more Websites to advertise, market, and promote EDIBLE ARRANGEMENTS® Businesses, the products that they offer and sell, and/or the EDIBLE ARRANGEMENTS® franchise opportunity (each a "Franchise System Website"). If EA establishes a Franchise System Website, EA may provide Franchisee with a webpage on the Franchise System Website that references the Franchised Business. Franchisee must give EA the information and materials EA requests to develop, update, and modify Franchisee's webpage. By providing the information and materials to EA, Franchisee will be representing that they are accurate and not misleading and do not infringe any third party's rights. However, EA will own all intellectual property and other rights in the Franchise System Website, Franchisee's webpage, and all information they contain (including, without limitation, the domain name or URL for Franchisee's webpage, the log of "hits" by visitors, and any personal or business data that visitors supply).

EA will maintain the Franchise System Website, including Franchisee's webpage, and may use the NAF's assets to develop, maintain, and update the Franchise System Website. EA periodically may update and modify the Franchise System Website (including Franchisee's webpage). At Franchisee's request, EA will update the information on Franchisee's webpage or add information that EA approves. Franchisee must notify EA whenever any information on its webpage changes or is not accurate. Franchisee must pay EA's then current fee to be on the Franchise System Website or to update or modify Franchisee's webpage (to the extent the NAF does not cover these costs). EA has final approval rights over all information on the Franchise System Website. EA may implement and periodically modify System Standards relating to the Franchise System Website.

EA will maintain Franchisee's webpage on its Franchise System Website, if any, only while Franchisee is in full compliance with this Agreement and all System Standards (including, without limitation, those relating to the Franchise System Website). If Franchisee is in default of any obligation under this Agreement or System Standards, then EA may, in addition to its other remedies, temporarily remove Franchisee's webpage from the Franchise System Website until Franchisee fully cures the default. EA will permanently remove Franchisee's webpage from the Franchise System Website upon this Agreement's expiration or termination.

All advertising, marketing, and promotional materials that Franchisee develops for the Franchised Business must contain notices of the Franchise System Website's domain name in the manner EA designates. Franchisee may not develop, maintain, or authorize any other Website that mentions or describes Franchisee or the Franchised Business or displays any of the Names and Marks.

15

## 8.   CONFIDENTIALITY OF PROPRIETARY INFORMATION

EA and its affiliates possess (and will continue to develop and acquire) certain confidential information, some of which constitutes trade secrets under applicable law (the "Confidential Information"), relating to developing and operating EDIBLE ARRANGEMENTS® Businesses, including (without limitation):

    (a)   site selection criteria;

    (b)   training and operations materials and manuals;

    (c)   methods, formats, specifications, standards, systems, procedures, food preparation techniques, sales and marketing techniques, knowledge, and experience used in developing and operating EDIBLE ARRANGEMENTS® Businesses;

    (d)   marketing and advertising programs for EDIBLE ARRANGEMENTS® Businesses;

    (e)   knowledge of specifications for and suppliers of Operating Assets, products, and supplies;

    (f)   any computer software or similar technology which is proprietary to EA or its affiliates, including, without limitation, digital passwords and identifications and any source code of, and data, reports, and other printed materials generated by, the software or similar technology;

    (g)   knowledge of the operating results and financial performance of EDIBLE ARRANGEMENTS® Businesses other than the Franchised Business; and

    (h)   graphic designs and related intellectual property.

Franchisee acknowledges and agrees that it will not acquire any interest in Confidential Information, other than the right to use it as EA specifies in operating the Franchised Business during this Agreement's term, and that Confidential Information is proprietary, includes EA's and its affiliates' trade secrets, and is disclosed to Franchisee only on the condition that Franchisee agrees, and Franchisee in fact does agree, that it:

    (i)   will not use Confidential Information in any other business or capacity;

    (ii)   will keep each item deemed to be part of Confidential Information absolutely confidential, both during this Agreement's term and then thereafter for as long as the item is not generally known in the

16

industry in which EDIBLE ARRANGEMENTS® Businesses operate;

(iii) will not make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form; and

(iv) will adopt and implement reasonable procedures to prevent unauthorized use or disclosure of Confidential Information, including, without limitation, restricting its disclosure to personnel and others and using non-disclosure and non-competition agreements with those having access to Confidential Information. EA has the right to regulate the form of agreements that Franchisee uses and to be a third party beneficiary of those agreements with independent enforcement rights.

Confidential Information does not include information, knowledge, or know-how which Franchisee can demonstrate lawfully came to its attention before EA provided it directly or indirectly; which, at the time EA disclosed it, already had lawfully become generally known, in the industry in which EDIBLE ARRANGEMENTS® Businesses operate, through publication or communication by others (without violating an obligation to EA or its affiliates); or which, after EA discloses it to Franchisee, lawfully becomes generally known, in the industry in which EDIBLE ARRANGEMENTS® Businesses operate, through publication or communication by others (without violating an obligation to EA or its affiliates). However, if EA includes any matter in Confidential Information, anyone who claims that it is not Confidential Information must prove that one of the exclusions provided in this paragraph is fulfilled.

All ideas, concepts, techniques, or materials relating to an EDIBLE ARRANGEMENTS® Business, whether or not protectable intellectual property and whether created by or for Franchisee or its owners or employees, must be promptly disclosed to EA and will be deemed to be EA's sole and exclusive property, part of the System, and works made-for-hire for EA. To the extent that any item does not qualify as a "work made-for-hire" for EA, by this paragraph Franchisee assigns ownership of that item, and all related rights to that item, to EA and agrees to take whatever action (including signing assignment or other documents) EA requests to evidence EA's ownership or to help EA obtain intellectual property rights in the item.

## 9. MODIFICATION OF THE SYSTEM AND EXERCISE OF JUDGMENT

Franchisee recognizes and agrees that from time to time hereafter EA may change or modify the System as presently described in the Operations Manual and the Names and Marks, including the adoption and use of new, modified, and/or substitute trade names, trademarks, service marks or copyrighted materials; new computer programs, computer hardware and systems; new equipment; or new techniques. Franchisee will accept and use for the purposes of this Agreement any such changes in the System as if they were part of this Agreement as of the Effective Date. Franchisee will make such expenditures as such changes or modifications in the

17

System may reasonably require. Franchisee shall not change, modify, or alter the System in any way without the prior written consent of EA.

EA has the right to operate, develop, and change the System in any manner that is not specifically prohibited by this Agreement. Whenever EA has reserved in this Agreement a right to take or to withhold an action, or to grant or decline to grant Franchisee a right to take or omit an action, EA may, except as otherwise specifically provided in this Agreement, make its decision or exercise its rights based on information readily available to EA and EA's judgment of what is in its and/or the System's best interests at the time its decision is made, without regard to either whether EA could have made other reasonable or even arguably preferable alternative decisions or whether its decision promotes its financial or other individual interest.

## 10.   ADVERTISING AND PROMOTION

Recognizing the value of advertising and the importance of the standardization of advertising and promotion to the furtherance of the goodwill and public image of the Franchised Business, Franchisee agrees as follows:

Franchisee shall place local advertising in any media it desires, provided that such advertising conforms to the standards and requirements of EA as set forth in EA's Operations Manual or otherwise designated by EA. Franchisee shall obtain EA's prior approval of all unapproved advertising and promotional plans and materials that Franchisee desires to use thirty (30) days before their intended first use. Franchisee shall submit such unapproved plans and materials to EA. Franchisee shall promptly discontinue use of any advertising or promotional plans or materials upon the request of EA. Any plans or materials submitted by Franchisee to EA which have not been approved or disapproved in writing within thirty (30) days after EA's receipt shall be deemed approved.

Further, in addition to the NAF contributions described in Section 11.C. below, Franchisee agrees to participate in any national, regional, or local advertising or promotional program that has been approved by a majority of EA's Franchisees operating within the particular geographic area and to promptly remit the required funds to an advertising account which shall be maintained by EA for such purpose.

## 11.   ONGOING FEES

The term "Gross Sales" shall mean: All revenue generated in connection with the Franchised Business, including amounts received at or away from any store location, and whether from cash, check, credit and debit card, barter exchange, trade credit, or other credit transactions, provided, however, that "Gross Sales" shall not include any sales tax or other taxes collected by the Franchised Business and paid to the appropriate taxing authority and shall be reduced by the amount of any documented refunds, credits, allowances, and charge-backs the Franchised Business in good faith gives to customers.

The Franchisee agrees to pay the fees described in the following paragraphs.

A.      **Royalty Fees**

In consideration of the Franchise granted, Franchisee agrees to pay EA a Royalty Fee of five percent (5%) of the Gross Sales from the operation of the Franchised Business, including Gross Sales from all store locations within the Territory, from all business activities in the Delivery Area, and from any other business activities in which EA allows Franchisee to engage. The Royalty Fee shall be payable as follows:

On Monday of each and every week during the term of this Agreement, Franchisee shall provide EA with a weekly report via fax, e-mail, or other electronic means by noon, Eastern Standard Time. EA shall then issue a draft against the operating account of Franchisee for five percent (5%) of the Gross Sales amount shown on the weekly report or a minimum of two hundred dollars ($200), whichever is greater. In the event that Franchisee shall fail to provide such weekly report on Monday of any week, EA shall be authorized to issue a draft against the operating account of Franchisee in an amount equal to that payable for the immediately preceding week, subject to later adjustment upon Franchisee's submission of the required report.

The minimum Royalty Fee amount of two hundred dollars ($200) required by this Agreement shall be subject to an annual adjustment as of January 1 of each year that is equal to the percentage increase since January 1 of the preceding year in the Consumer Price Index, provided that in no event shall there be a decrease in the minimum Royalty Fee amount as the result of such adjustment. As used in this Agreement, the "Consumer Price Index" shall mean the Consumer Price Index for All Urban Consumers (CPI-U), All Items, U.S. City Average 1982-84=100, as published by the United States Department of Labor. In the event that publication of said index shall be discontinued at any time during this Agreement, then a comparable index issued by the United States Department of Labor or a similar agency of the United States government shall be used for the purposes of this Agreement.

B.      **Late Payments**

If any required payment pursuant to this section of the Agreement is overdue, Franchisee shall pay to EA, immediately upon demand, the overdue amount plus a fifty dollar ($50) late fee for any payments over ten days past due. The late fees will be doubled at thirty (30) days and again every thirty (30) days thereafter, subject to the maximum rate permitted by law, whichever is less. The foregoing shall be in addition to any other remedies EA may possess. Franchisee acknowledges that this paragraph shall not constitute agreement by EA to accept such payments after same are due or a commitment by EA to extend credit to or otherwise finance Franchisee's operation of the Franchised Business. Further, Franchisee acknowledges that its failure to pay all amounts when due shall constitute grounds for termination of this Agreement, as provided in this Agreement.

19

**C.**   **National Advertising Fees**

Recognizing the value of advertising and marketing to the goodwill and public image of EDIBLE ARRANGEMENTS® Businesses, EA has established an Advertising Fund (the "NAF") for the advertising, marketing, and public relations programs and materials it deems appropriate. Franchisee agrees to contribute to the NAF the amounts that EA prescribes from time to time, not to exceed two percent (2%) of the Gross Sales of the Franchised Business, payable in the same manner as the Royalty. EDIBLE ARRANGEMENTS® Businesses that EA or its affiliates own will contribute to the NAF on the same percentage basis as franchise owners. EA has the right to collect for deposit into the NAF any advertising, marketing, or similar allowances paid by suppliers who deal with EDIBLE ARRANGEMENTS® Businesses and with whom EA has agreed that it will so deposit these allowances. (These payments are different from those which are not designated by suppliers to be used exclusively for advertising or similar purposes and which EA and its affiliates therefore may use for any purposes they deem appropriate, as provided in Section 13.D. below.)

EA will direct all programs that the NAF finances, with sole control over the creative concepts, materials, and endorsements used and their geographic, market, and media placement and allocation. The NAF may pay for preparing and producing video, audio, and written materials and electronic media; developing, implementing, and maintaining a Franchise System Website and/or related strategies; maintaining toll-free numbers; administering regional and multi-regional marketing and advertising programs, including, without limitation, purchasing trade journal, direct mail, and other media advertising and using advertising, promotion, and marketing agencies and other advisors to provide assistance; and supporting public relations, market research, and other advertising, promotion, and marketing activities. The NAF periodically will give Franchisee samples of advertising, marketing, and promotional formats and materials at no cost. EA will sell Franchisee multiple copies of these materials at its direct cost of producing them, plus any related shipping, handling, and storage charges.

EA will account for the NAF separately from its other funds and not use the NAF for any of its general operating expenses. However, EA may use the NAF to pay the reasonable salaries and benefits of personnel who manage and administer the NAF, the NAF's other administrative costs, travel expenses of personnel while they are on NAF business, meeting costs, overhead relating to NAF business, and other expenses that EA incurs in activities reasonably related to administering or directing the NAF and its programs, including, without limitation, conducting market research, public relations, preparing advertising, promotion, and marketing materials, and collecting and accounting for NAF contributions.

The NAF will not be EA's asset. Although the NAF is not a trust, EA will hold all NAF contributions for the benefit of the contributors and use contributions only for the purposes described in this Section. EA does not owe any fiduciary obligation to Franchisee for administering the NAF or any other reason. The NAF may spend in any fiscal year more or less than the total NAF contributions in that year, borrow from EA or

20

others (paying reasonable interest) to cover deficits, or invest any surplus for future use. EA will use all interest earned on NAF contributions to pay costs before using the NAF's other assets. EA will prepare an annual, unaudited statement of NAF collections and expenses and give Franchisee the statement upon written request. EA may have the NAF audited annually, at the NAF's expense, by an independent certified public accountant. EA may incorporate the NAF or operate it through a separate entity whenever EA deems appropriate. The successor entity will have all of the rights and duties specified in this subsection.

EA intends the NAF to maximize recognition of the Names and Marks and patronage of EDIBLE ARRANGEMENTS® Businesses. Although EA will try to use the NAF to develop advertising and marketing materials and programs, and to place advertising and marketing, that will benefit all EDIBLE ARRANGEMENTS® Businesses, EA need not ensure that NAF expenditures in or affecting any geographic area are proportionate or equivalent to NAF contributions by EDIBLE ARRANGEMENTS® Businesses operating in that geographic area or that any EDIBLE ARRANGEMENTS® Business benefits directly or in proportion to its NAF contribution from the development of advertising and marketing materials or the placement of advertising and marketing. EA has the right, but no obligation, to use collection agents and institute legal proceedings to collect NAF contributions at the NAF's expense. EA also may forgive, waive, settle, and compromise all claims by or against the NAF. Except as expressly provided in this subsection, EA assumes no direct or indirect liability or obligation to Franchisee for collecting amounts due to, maintaining, directing, or administering the NAF.

EA may at any time defer or reduce contributions of an EDIBLE ARRANGEMENTS® Business franchisee and, upon thirty (30) days' prior notice to Franchisee, reduce or suspend NAF contributions and operations for one or more periods of any length and terminate (and, if terminated, reinstate) the NAF. If EA terminates the NAF, EA will distribute all unspent monies to its franchisees, and to it and its affiliates, in proportion to their respective NAF contributions during the preceding twelve (12) month period.

**D.    Method of Payment of Fees**

Franchisee agrees to execute an "Automatic Draft Agreement" or an "Automatic Credit Card Authorization" which instructs its financial institution or credit card company to accept automatic drafts in order to deduct the aforementioned fees and deposit same to the account of EA each and every week for the duration of this Agreement. Franchisee further agrees to give a copy of said instructions to its financial institution or credit card company and agrees not to alter said instructions without the written prior consent of EA.

12. **ACCOUNTING AND BOOKKEEPING RECORDS**

A. **Accounting and Bookkeeping Records**

Franchisee shall maintain during the term of this Agreement, and shall preserve for a minimum of five (5) years, full, complete, and accurate records of customer inquiries, sales, marketing activities, and accounts payable in accordance with the standard accounting system described by EA in the Operations Manual or otherwise specified in writing.

B. **Submission of Financial Statements**

Franchisee shall submit to EA each calendar quarter during the term of this Agreement all report forms required by EA as outlined in the Operations Manual. Each report shall be signed by Franchisee attesting that the report is true and correct. Franchisee shall also submit to EA other forms, records, reports, information, and data as EA may reasonably require, in the form and at the times and the places reasonably required by EA, as specified from time to time in the Operations Manual or otherwise specified in writing.

C. **Entity Franchisee**

If Franchisee is a corporation, partnership, or limited liability company (LLC), the following requirements shall apply:

(1)   Franchisee shall give EA copies of Franchisee's corporate, partnership, or LLC resolution authorizing and directing its officers, directors, partners, or members, as the case may be, to enter into this Agreement;

(2)   Franchisee shall maintain a current list of all owners of record and all beneficial owners of any class of voting stock, partnership interest, or membership interest of Franchisee and shall furnish such list to EA upon its request; and

(3)   All shareholders, partners, or members of Franchisee shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of this Agreement by executing a Guaranty and Assumption of Obligations.

13. **STANDARDS OF QUALITY AND PERFORMANCE**

Franchisee shall comply with the entire EDIBLE ARRANGEMENTS® System developed by EA, including, without limitation, the following:

–EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1

A.    **Open Business in One Hundred Twenty Days**

Franchisee shall commence operation of the Franchised Business no later than one hundred twenty (120) days after the Effective Date.   Prior to such opening, Franchisee shall have installed or cause to be installed all Operating Assets and telephone service required by EA. If Franchisee for any reason fails to commence operations as herein provided, unless Franchisee is precluded from doing so by war or civil disturbance, natural disaster, or labor dispute, such failure shall be considered a default, and EA may terminate this Agreement as herein provided.

B.    **Image of Franchised Business**

Franchisee agrees to maintain the condition and appearance of all store locations comprising the Franchised Business consistent with EA's standards for the image of an EDIBLE ARRANGEMENTS® Business as an attractive, pleasant, and comfortable business. Franchisee agrees to effect such reasonable maintenance of the Franchised Business as is from time to time required to maintain the equipment or improve the appearance and efficient operation of the Franchised Business, including replacement of Operating Assets. If at any time in EA's judgment the general state of repair or the appearance of store locations comprising the Franchised Business, or their Operating Assets, uniforms of service personnel, or décor, do not meet EA's standards, EA shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate and complete within thirty (30) days after receipt of such notice a bona fide program to complete any required maintenance, EA shall have the right, in addition to all other remedies, to enter upon the premises of the Franchised Business and effect such maintenance on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand. Franchisee's obligation to initiate and continue any required maintenance shall be suspended during any period in which such maintenance is impractical due to war, civil disturbance, natural disaster, labor dispute, or other event beyond Franchisee's reasonable control.

EA periodically may modify System Standards, which may accommodate regional or local variations, and these modifications may obligate Franchisee to invest additional capital in the Franchised Business and/or incur higher operating costs. Franchisee agrees to implement any changes in System Standards within the time period EA requests as if they were part of this Agreement on the Effective Date. However, except for changes in the Computer System and signage and logo (the amounts for which are not limited), EA will not obligate Franchisee, unless the expenditure is required by a lease or applicable law, to make any capital modifications during the first two (2) years of this Agreement's term or to make capital modifications the costs of which exceed Ten Thousand Dollars ($10,000) during any single year during this Agreement's term, unless the capital modifications are in connection with Franchisee's acquisition of a renewal franchise.

23

**C.**   **Approved Manufacturers, Suppliers and Distributors**

From time to time, EA may provide to Franchisee a list of approved manufacturers, printers, suppliers, and distributors for all products and services necessary to operate the Franchised Business. EA may revise the approved list of manufacturers, printers, suppliers, and distributors from time to time as it deems best. EA also may limit the sources of required Operating Assets, products, materials, and supplies to certain unaffiliated designated vendors, or to EA and/or its affiliates, in which case Franchisee would be required to acquire such items only from the unaffiliated designated vendors, or EA and/or its affiliates, at the prices they decide to charge. EA has the absolute right to limit the suppliers with whom Franchisee may deal.

**D.**   **Authorized Materials and Supplies**

All purchases of products and other materials used in the operation of the Franchised Business shall conform to the specifications and quality standards established by EA from time to time. Franchisee may use only such products and related items which meet EA's specifications and quality standards. If Franchisee proposes to use in the operation of the Franchised Business any products, equipment, or materials which are not approved by EA as meeting its minimum specifications and quality standards, or to purchase any product from a supplier that is not designated by EA as an approved supplier, Franchisee shall first notify EA and shall, upon request by EA, submit samples and such other information as EA requires for examination and/or testing or to otherwise determine whether such equipment, product, material or supply, or such proposed supplier, meets its specifications and quality standards. A charge not to exceed the actual cost of testing may be made by EA and shall be paid by Franchisee. EA shall notify Franchisee within fifteen (15) days after receipt of such a request and all required information whether it approved such equipment, product, material or supply, and/or such supplier, by being listed on EA's approved list. EA need not approve Franchisee's request, especially if EA already has limited sources to certain unaffiliated designated vendors or to EA and/or its affiliates. EA and its affiliates have the right to receive payments from suppliers on account of their actual or prospective dealings with Franchisee and other franchisees and to use all amounts they receive without restriction (unless EA and its affiliates agree otherwise with the supplier) for any purposes they deem appropriate. Franchisee also understands that, if EA or its affiliates sell items to Franchisee, they expect to make a reasonable profit on the items.

**E.**   **Specifications, Standards and Operating Procedures**

Franchisee agrees to fully comply with all System Standards in effect from time to time relating to:

    (1)    use of any trademarked items or copyrighted materials;

    (2)    procedures and techniques regarding sales and operations;

24

(3)     required, authorized, and prohibited products and services to be offered by the Franchised Business, which EA may modify from time to time as it deems best;

(4)     training, dress, general appearance and demeanor of Franchised Business employees;

(5)     advertising and promotional programs;

(6)     type, quantity and variety of products and materials, printing, trademarked items and copyrighted materials;

(7)     use of signs, posters, advertising pieces, displays and similar items;

(8)     identification of Franchisee as the owner of the Franchised Business;

(9)     the handling of customer complaints;

(10)    the maintenance of an "e-mail" communication ability;

(11)    use of the Franchise System Website;

(12)    maximum prices that Franchisee may charge for its products and services; and

(13)    any other aspects of operating and maintaining the Franchised Business that EA determines to be useful to preserve or enhance the efficient operation, image, or goodwill of the Names and Marks and EDIBLE ARRANGEMENTS® Businesses.

System Standards prescribed from time to time by EA in the Operations Manual or otherwise communicated to Franchisee in writing shall constitute provisions of this Agreement as if fully set forth herein. All references herein to this Agreement shall include all such System Standards.

### F.      Franchises, Permits and Certificates

Franchisee shall secure and maintain in force all required licenses, permits and certificates relating to the operation of the Franchised Business and shall operate the Franchised Business in full compliance with all applicable laws, ordinances and regulations, workmen's compensation and unemployment insurance requirements, and withholding and payment of federal and state income, social security, sales, use, and property taxes.

25

**G.   Names and Marks**

Franchisee shall use only displays, labels, forms and other paper products imprinted with the Names and Marks and colors as prescribed from time to time by EA in the operation of the Franchised Business.

**H.   Supervision of Franchised Business**

The Franchised Business shall at all times be under the direct, on-premises supervision of Franchisee (or its Managing Owner) or a trained and competent employee acting as full-time manager.   Franchisee shall keep EA informed at all times of the identity of any employee(s) acting as manager(s) of the Franchised Business.   EA shall make training available, as is reasonable and necessary, for all managers designated by Franchisee, all of whom must complete such training before they begin working at the Franchised Business as a manager.   EA may provide such training at the then-current rates charged by EA.   Franchisee agrees that it will at all times faithfully, honestly and diligently perform its obligations hereunder and that it will not engage in any business or other activities that will conflict with its obligations hereunder.

**I.   Maintenance of Highest Moral Standards**

Franchisee agrees that the Franchised Business shall at all times maintain a requirement of its employees, agents and affiliates to maintain the highest moral standards of the community and the standards of EDIBLE ARRANGEMENTS® as set forth by EA.

**J.   Use of Advertising and Promotional Claims**

All sales activities conducted by the Franchised Business in any medium shall be conducted in a dignified manner and shall accurately promote, describe and otherwise represent the services of the Franchised Business.   Franchisee agrees to refrain from any sales practice which is unethical or may be injurious to the business of EA and/or other franchised businesses or the goodwill associated with the Names and Marks.

**K. ·   Notice of Legal Proceedings**

Franchisee shall notify EA in writing within five (5) days after the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental agency, which may adversely affect the operation or financial condition of the Franchised Business.

**14.   INSURANCE**

**A.   Overall Coverage Required**

Franchisee shall procure, prior to opening the Franchised Business, and shall maintain in full force and effect during the term of this Agreement, at Franchisee's

26

expense, an insurance policy or policies protecting EA, and the shareholders, officers, directors, partners and employees of both EA and Franchisee, against any loss, liability, personal injury, death, property damage or expense whatsoever arising or occurring upon or in connection with operating the Franchised Business. EA shall be named as an additional insured on all such policies.

**B.    Qualified Insurance Carrier**

All insurance policies required under this Agreement shall be written by an insurance company satisfactory to EA. The coverage will be provided in accordance with standards and specifications set forth in the Operations Manual or otherwise specified in writing by EA. The coverage shall include, at minimum (except as additional coverage and higher policy limits may reasonably be specified from time to time by EA), limits at least equal to those shown for the categories of required insurance:

    (1)    Comprehensive general liability insurance: one million dollars ($1,000,000) limit minimum;

    (2)    Liability for owned, hired, and non-owned automobiles or other vehicles: five hundred thousand dollars ($500,000) limit minimum;

    (3)    Property damage liability insurance covering at a minimum the perils of fire and extended coverage and vandalism;

    (4)    Workers' compensation and employer's liability insurance as prescribed by state law;

    (5)    Such other insurance that may be required by EA or by the statutes or other laws of the state in which the Franchised Business is located and operated; and

    (6)    An umbrella insurance policy to provide excess limits over the above liability policies.

**C.    No Limitations on Coverage**

Franchisee's obligations to obtain and maintain the foregoing insurance policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by EA, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in this Agreement. Franchisee may maintain such additional insurance as it may consider advisable.

**D.    Evidence of Coverage**

Upon obtaining the insurance required by this Agreement and on each policy renewal date thereafter, Franchisee shall promptly submit evidence of satisfactory insurance and proof of payment to EA, together with, upon request, copies of all policies,

27

policy amendments and endorsements. The evidence of insurance shall include a statement by the insurer that the policy or policies will not be canceled or materially altered without giving at least thirty (30) days' prior written notice to EA.

### E. EA May Procure Insurance Coverage

Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as described from time to time by the Operations Manual or otherwise in writing, EA shall have the right and authority (but no obligation) to procure such insurance and to charge same to Franchisee. Such charges, together with a reasonable fee for EA's expenses in so acting, shall be payable by Franchisee immediately upon notice from EA.

## 15. TERMINATION OF FRANCHISE

### A. By Franchisee

If Franchisee and its owners are fully complying with this Agreement and EA materially fails to comply with this Agreement and does not correct the failure within thirty (30) days after Franchisee delivers written notice of the material failure to EA or, if EA cannot correct the failure within thirty (30) days, does not give Franchisee within thirty (30) days after its notice reasonable evidence of EA's effort to correct the failure within a reasonable time, Franchisee may terminate this Agreement effective an additional thirty (30) days after Franchisee delivers to EA written notice of termination. (The time period during which EA may cure any material failure to comply with this Agreement after receiving notice from Franchisee is called the "Cure Period.") However, if EA sends Franchisee written notice during the Cure Period indicating either that (1) EA does not agree that it has materially failed to comply with this Agreement or (2) EA has fully corrected the failure, then Franchisee may not terminate this Agreement; instead, if Franchisee disagrees with EA's position, it agrees to submit the dispute to arbitration in accordance with Section 20.F. below. This Agreement will remain in full force and effect during these arbitration proceedings (unless EA terminates it under subsection B below). If the arbitrator determines that EA is materially failing to comply with this Agreement, or that EA did not fully correct a material failure to comply, then EA will have an additional thirty (30) days following the arbitrator's decision to correct the failure. If EA fails to do so, then Franchisee may terminate this Agreement effective an additional thirty (30) days after Franchisee delivers to EA written notice of termination.

Franchisee's termination of this Agreement other than according to this Section 15.A. will be deemed a termination without cause and a breach of this Agreement.

### B. By EA

EA may terminate this Agreement, effective upon delivery of written notice of termination to Franchisee, if:

28

(1)      Franchisee (or any of its owners) has made or makes any material misrepresentation or omission in acquiring the franchise or operating the Franchised Business;

(2)      Franchisee does not commence operating the Franchised Business within one hundred twenty (120) days after the Effective Date;

(3)      Franchisee (or its Managing Owner) does not satisfactorily complete initial training;

(4)      Franchisee abandons or fails actively to operate the Franchised Business for three (3) or more consecutive business days, unless it closes the Franchised Business for a purpose EA approves or because of casualty or government order;

(5)      Franchisee surrenders or transfers control of the operation of the Franchised Business without EA's prior written consent;

(6)      Franchisee (or any of its owners) is or has been convicted by a trial court of, or pleads or has pleaded no contest to, a felony;

(7)      Franchisee fails to maintain the insurance EA requires and does not correct the failure within ten (10) days after EA delivers written notice of that failure to Franchisee;

(8)      Franchisee (or any of its owners) engages in any dishonest or unethical conduct which, in EA's opinion, adversely affects the reputation of the Franchised Business or the goodwill associated with the Names and Marks;

(9)      Franchisee (or any of its owners or, if one or more of its owners is an entity, the owner of a controlling interest in that entity) makes or attempts to make an unauthorized assignment of this Agreement, an ownership interest in Franchisee (or its owner), or the Franchised Business;

(10)      Franchisee (or any of its owners) knowingly makes any unauthorized use or disclosure of any part of the Operations Manual or any other Confidential Information;

(11)      Franchisee violates any health, safety, or sanitation law, ordinance, or regulation, or operates the Franchised Business in an unsafe manner, and does not begin to cure the violation immediately, and correct the violation within seventy-two (72) hours, after Franchisee receives notice from EA or any other party;

(12) Franchisee fails to pay EA (or its affiliates) any amounts due and does not correct the failure within ten (10) days after EA delivers written notice of that failure to Franchisee;

(13) Franchisee fails to pay when due any federal or state income, service, sales, or other taxes due on the operation of the Franchised Business, unless Franchisee is in good faith contesting its liability for these taxes;

(14) Franchisee understates the Gross Sales of the Franchised Business three (3) times or more during this Agreement's term or by more than five percent (5%) on any one occasion;

(15) Franchisee (or any of its owners) (a) fails on three (3) or more separate occasions within any twelve (12) consecutive month period to comply with this Agreement, whether or not EA notifies Franchisee of the failures, and, if EA does notify Franchisee of the failures, whether or not Franchisee corrects the failures after EA's delivery of notice; or (b) fails on two (2) or more separate occasions within any six (6) consecutive month period to comply with the same obligation under this Agreement, whether or not EA notifies Franchisee of the failures, and, if EA does notify Franchisee of the failures, whether or not Franchisee corrects the failures after EA's delivery of notice;

(16) Franchisee makes an assignment for the benefit of creditors or admits in writing its insolvency or inability to pay its debts generally as they become due; Franchisee consents to the appointment of a receiver, trustee, or liquidator of all or the substantial part of its property; the Franchised Business is attached, seized, subjected to a writ or distress warrant, or levied upon, unless the attachment, seizure, writ, warrant, or levy is vacated within thirty (30) days; or any order appointing a receiver, trustee, or liquidator of Franchisee or the Franchised Business is not vacated within thirty (30) days following the order's entry; or

(17) Franchisee (or any of its owners) fails to comply with any other provision of this Agreement or any System Standard and does not correct the failure within thirty (30) days after EA delivers written notice of the failure to Franchisee.

## C.   Assumption of Management

EA has the right (but not the obligation), under the circumstances described below, to assume the Franchised Business's management (or to appoint a third party to assume its management) for any period of time it deems appropriate. If EA (or a third party) assumes the Franchised Business's management under subparagraphs (1) and (2) below, Franchisee agrees to pay EA (in addition to the Royalty, NAF contributions, and other amounts due under this Agreement) Four Hundred Dollars ($400) per day, plus

30

EA's (or the third party's) direct out-of-pocket costs and expenses, for up to sixty (60) days after EA assumes management. If EA (or a third party) assumes the Franchised Business's management, EA (or the third party) will have a duty to utilize only reasonable efforts and will not be liable to Franchisee or its owners for any debts, losses, or obligations the Franchised Business incurs, or to any of Franchisee's creditors for any supplies, products, or other assets or services the Franchised Business purchases, while EA (or the third party) manages it.

EA (or a third party) may assume the Franchised Business's management under the following circumstances: (1) if Franchisee abandons or fails actively to operate the Franchised Business; (2) if Franchisee fails to comply with any provision of this Agreement or any System Standard and does not cure the failure within the time period EA specifies in its notice to Franchisee; or (3) if this Agreement expires or is terminated and EA is deciding whether to exercise its option to purchase the Franchised Business under Section 16.D. below. If EA exercises its rights under subparagraphs (1) or (2) above, that will not affect EA's right to terminate this Agreement under Section 15.B. above.

## 16.   FRANCHISEE'S OBLIGATIONS UPON TERMINATION OR EXPIRATION

### A.   Payment of Monies Owed to EA

Franchisee shall pay to EA, within fifteen (15) days after the effective date of termination or expiration of this Agreement, such Royalty Fees, NAF contributions, and other sums owed to EA or approved suppliers and vendors by Franchisee which are then unpaid.

### B.   Marks

When this Agreement expires or is terminated:

(1)   Franchisee may not directly or indirectly at any time or in any manner identify itself or any business as a current or former EDIBLE ARRANGEMENTS® Business or as one of EA's current or former franchisees; use any Name and Mark, any colorable imitation of a Name and Mark, or other indicia of an EDIBLE ARRANGEMENTS® Business in any manner or for any purpose; or use for any purpose any trade name, trade or service mark, or other commercial symbol that indicates or suggests a connection or association with EA;

(2)   Franchisee agrees to take the action required to cancel all fictitious or assumed name or equivalent registrations relating to its use of any Name and Mark;

(3)   Franchisee agrees to deliver to EA at no cost within thirty (30) days all signs, sign-faces, sign-cabinets, marketing materials, forms, and other materials containing any Name and Mark or otherwise identifying or

31

relating to an EDIBLE ARRANGEMENTS® Business that EA requests and allow EA, without liability to Franchisee or third parties, to remove these items from the Franchised Business;

(4) if EA does not exercise an option to purchase the Franchised Business, Franchisee agrees promptly and at its own expense to make the alterations EA specifies in its Operations Manual (or otherwise) to distinguish the Franchised Business clearly from its former appearance and from other EDIBLE ARRANGEMENTS® Businesses in order to prevent public confusion;

(5) Franchisee agrees to notify the telephone company and all telephone directory publishers of the termination or expiration of its right to use any telephone, facsimile, or other numbers and telephone directory listings associated with any Name and Mark; to authorize the transfer of these numbers and directory listings to EA or at its direction; and/or to instruct the telephone company to forward all calls made to Franchisee's numbers to numbers EA specifies.  If Franchisee fails to do so, EA may take whatever action and sign whatever documents it deems appropriate on Franchisee's behalf to effect these events; and

(6) Franchisee agrees to give EA, within thirty (30) days after the expiration or termination of this Agreement, evidence satisfactory to EA of Franchisee's compliance with these obligations.

## C.    **Confidential Information**

Franchisee agrees that, when this Agreement expires or is terminated, Franchisee will immediately cease using any of EA's Confidential Information (including computer software or similar technology) in any business or otherwise and return to EA all copies of the Operations Manual and any other confidential materials that EA has loaned Franchisee.

## D.    **EA Purchase of Inventory and Equipment**

EA shall have the right (but not the duty), to be exercised by notice of intent to do so within thirty (30) days after termination or expiration of this Agreement, to purchase any or all equipment, supplies, and other items used in operating the Franchised Business (other than items bearing the Names and Marks, which Franchisee must return to EA as provided in Section 16.B.(3) above) at fair market value (less the amount of any outstanding liens or encumbrances).  If the parties cannot agree on a fair market value within a reasonable time, an independent appraiser shall be designated by EA, and the appraiser's determination shall be binding.  If EA elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee, and the cost of the appraisal, if any, against any payment otherwise due.

32

**E.**   **Liquidated Damages**

Upon EA's termination of this Agreement according to its terms and conditions or Franchisee's termination of this Agreement without cause, Franchisee agrees to pay EA within fifteen (15) days after the effective date of this Agreement's termination, in addition to the amounts owed under Paragraph A of this Section, liquidated damages equal to the product of (1) the Royalties that Franchisee was obligated to pay EA on the Franchised Business's Gross Sales during the twelve (12) months of operation preceding the effective date of termination (2) multiplied by two (2) (unless there are less than two (2) years remaining in this Agreement's term at the time of termination, in which case the Royalties will be multiplied by the number of years, or portions of years, remaining). EA and Franchisee (and its owners) acknowledge and agree that it would be impracticable to determine precisely the damages EA will incur from this Agreement's termination and the loss of cash flow from Royalty payments due to, among other things, the complications of determining how much the Royalty payments would have grown over what would have been the following two (2) year period and beyond. EA and Franchisee and its owners consider this liquidated damages provision to be a reasonable, good faith preestimate of those damages.

The liquidated damages provision above covers only EA's damages from the loss of cash flow from the Royalty. It does not cover any other damages to which EA might be entitled as a result of Franchisee's actions or inaction. Franchisee and its owners agree that this liquidated damages provision does not give EA an adequate remedy at law for any default under, or for the enforcement of, any provision of this Agreement other than the Royalty section.

**17.**   **COVENANTS**

**A.**   **In-Term**

Franchisee acknowledges that EA has granted it the franchise in consideration of and reliance upon Franchisee's agreement to deal exclusively with EA. Franchisee therefore agrees that, during this Agreement's term, neither Franchisee, any of its owners, nor any of its or its owners' spouses will:

    (1)   have any direct or indirect controlling interest as an owner – whether of record, beneficially, or otherwise – in a Competitive Business, wherever located or operating;

    (2)   have any direct or indirect non-controlling interest as an owner – whether of record, beneficially, or otherwise – in a Competitive Business, wherever located or operating (except that equity ownership of less than five percent (5%) of a Competitive Business whose stock or other forms of ownership interest are publicly traded on a recognized United States stock exchange will not be deemed to violate this subparagraph);

33

(3)    perform services as a director, officer, manager, employee, consultant, representative, or agent for a Competitive Business, wherever located or operating;

(4)    recruit or hire any person then employed, or who was employed within the immediately preceding twenty-four (24) months, as a manager or assistant manager at an EDIBLE ARRANGEMENTS® Business operated by EA, any of its affiliates, or a franchisee without obtaining the employer's prior written permission;

(5)    divert or attempt to divert any actual or potential business or customer of the Franchised Business to a Competitive Business; or

(6)    engage in any other activity which might injure the goodwill of the Marks and EDIBLE ARRANGEMENTS® franchise system.

The term "Competitive Business" means (i) any business involving the preparation and/or sale of fresh fruit products, or (ii) any business granting franchises or licenses to others to operate such a business (other than an EDIBLE ARRANGEMENTS® Business operated under a franchise agreement with EA). Franchisee agrees to obtain similar covenants from the personnel EA specifies, including officers, directors, managers, and other employees attending EA's training program or having access to Confidential Information. EA has the right to regulate the form of agreement that Franchisee uses and to be a third party beneficiary of that agreement with independent enforcement rights.

**B.**    <u>Post-Term</u>

Upon

(1)    EA's termination of this Agreement according to its terms and conditions,

(2)    Franchisee's termination of this Agreement without cause, or

(3)    expiration of this Agreement (if EA offers, but Franchisee elects not to acquire, a renewal franchise, or if EA does not offer Franchisee a renewal franchise due to its failure to satisfy the conditions for a renewal franchise),

Franchisee and its owners agree that, for two (2) years beginning on the effective date of termination or expiration or the date on which all persons restricted by this subsection begin to comply with this subsection, whichever is later, neither Franchisee nor any of its owners will have any direct or indirect (e.g., through a spouse) interest as an owner (whether of record, beneficially, or otherwise), investor, partner, director, officer, employee, consultant, representative, or agent in any Competitive Business (defined above) located or operating:

(a)    within the Territory or Delivery Area;

34

(b)    within the franchised territories of any other EDIBLE ARRANGEMENTS® Businesses in operation on the Effective Date; or

(c)    within the franchised territories of any other EDIBLE ARRANGEMENTS® Businesses in operation on the later of the effective date of the termination or expiration of this Agreement or the date on which all persons restricted by this subsection begin to comply with this subsection.

These restrictions also apply after transfers. If any person restricted by this subsection refuses voluntarily to comply with these obligations, the two (2) year period for that person will commence with the entry of a court order enforcing this provision. Franchisee and its owners expressly acknowledge that they possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, EA's enforcing the covenants made in this subsection will not deprive them of their personal goodwill or ability to earn a living.

## 18.   ASSIGNMENT

### A.   By EA

Franchisee acknowledges that EA maintains a staff to manage and operate the franchise system and that staff members can change as employees come and go. Franchisee represents that it has not signed this Agreement in reliance on any particular shareholder, director, officer, or employee remaining with EA in that capacity. EA may change its ownership or form and/or assign this Agreement and any other agreement to a third party without restriction. After our assignment of this Agreement to a third party who expressly assumes the obligations under this Agreement, we no longer will have any performance or other obligations under this Agreement.

### B.   By Franchisee

Franchisee understands and acknowledges that the rights and duties this Agreement creates are personal to Franchisee (or, if Franchisee is an entity, to Franchisee's owners) and that EA has granted Franchisee the franchise in reliance upon its perceptions of Franchisee's (or its owners') individual or collective character, skill, aptitude, attitude, business ability, and financial capacity. Accordingly, neither this Agreement (or any interest in this Agreement), the Franchised Business or substantially all of its assets, any ownership interest in Franchisee (regardless of its size), nor any ownership interest in any of Franchisee's owners (if such owners are legal entities) may be transferred without EA's prior written approval. A transfer of the Franchised Business's ownership, possession, or control, or substantially all of its assets, may be made only with a transfer of this Agreement. Any transfer without EA's approval is a breach of this Agreement and has no effect. In this Agreement, the term "transfer"

~EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1

includes a voluntary, involuntary, direct, or indirect assignment, sale, gift, or other disposition of any interest in:

    (1)    this Agreement;

    (2)    Franchisee;

    (3)    the Franchised Business or substantially all of its assets; or

    (4)    Franchisee's owners (if such owners are legal entities).

An assignment, sale, gift, or other disposition includes the following events:

    (a)    transfer of ownership of capital stock, a partnership or membership interest, or another form of ownership interest;

    (b)    merger or consolidation or issuance of additional securities or other forms of ownership interest;

    (c)    any sale of a security convertible to an ownership interest;

    (d)    transfer of an interest in Franchisee, this Agreement, the Franchised Business or substantially all of its assets, or Franchisee's owners in a divorce, insolvency, or entity dissolution proceeding or otherwise by operation of law;

    (e)    if Franchisee, one of its owners, or an owner of one of its owners dies, a transfer of an interest in Franchisee, this Agreement, the Franchised Business or substantially all of its assets, or Franchisee's owner by will, declaration of or transfer in trust, or under the laws of intestate succession; or

    (f)    pledge of this Agreement (to someone other than EA) or of an ownership interest in Franchisee or its owners as security, foreclosure upon the Franchised Business, or Franchisee's transfer, surrender, or loss of the Franchised Business's possession, control, or management. Franchisee may grant a security interest (including a purchase money security interest) in the Franchised Business's assets (not including this Agreement) to a lender that finances its acquisition, development, and/or operation of the Franchised Business without having to obtain EA's prior written approval as long as Franchisee gives EA ten (10) days' prior written notice.

~EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1

**C.    Conditions For Approval of Transfer**

If Franchisee (and its owners) are fully complying with this Agreement, then, subject to the other provisions of this Section, EA will approve a transfer that meets all of the requirements in this subsection.  A non-controlling ownership interest in Franchisee or its owners (determined as of the date on which the proposed transfer will occur) may be transferred if the proposed transferee and its direct and indirect owners (if the transferee is an entity) are of good character and meet EA's then applicable standards for EDIBLE ARRANGEMENTS® Business franchise owners (including no ownership interest in or performance of services for a Competitive Business).  If the proposed transfer is of this Agreement or a controlling ownership interest in Franchisee or one of its owners, or is one of a series of transfers (regardless of the time period over which these transfers take place) which in the aggregate transfer this Agreement or a controlling ownership interest in Franchisee or one of its owners, then all of the following conditions must be met before or concurrently with the effective date of the transfer:

(1)    the transferee has sufficient business experience, aptitude, and financial resources to operate the Franchised Business;

(2)    Franchisee has paid all Royalties, NAF contributions, and other amounts owed to EA, its affiliates, and third party vendors; has submitted all required reports and statements; and has not violated any provision of this Agreement or any other agreement with EA during both the sixty (60) day period before Franchisee requested EA's consent to the transfer and the period between Franchisee's request and the effective date of the transfer;

(3)    neither the transferee nor its owners (if the transferee is an entity) or affiliates have an ownership interest (direct or indirect) in or perform services for a Competitive Business;

(4)    the transferee (or its managing owner) and its manager (if different from the Franchised Business's manager) satisfactorily complete EA's training program;

(5)    Franchisee's landlord(s) allows it to assign or sublease store locations to the transferee;

(6)    the transferee shall (if the transfer is of this Agreement), or Franchisee shall (if the transfer is of a controlling ownership interest in Franchisee or one of its owners), sign EA's then current form of franchise agreement and related documents, any and all of the provisions of which may differ materially from any and all of those contained in this Agreement, provided, however, that the Royalty and NAF contributions in the new franchise agreement will be the same as those contained in this Agreement;

37

(7)    Franchisee or the transferee pays EA a transfer fee of Seven Thousand Five Hundred Dollars ($7,500), one-half (½) of which is due when Franchisee requests approval of the transfer and is nonrefundable, whether or not the transfer actually occurs. However, no transfer fee is due if, upon a spouse's death, that spouse's interest in this Agreement and the Franchised Business, or ownership in Franchisee, is transferred to the surviving spouse;

(8)    Franchisee (and its transferring owners) signs a general release, in a form satisfactory to EA, of any and all claims against EA and its shareholders, officers, directors, employees, and agents;

(9)    EA has determined that the purchase price and payment terms will not adversely affect the transferee's operation of the Franchised Business;

(10)    if Franchisee or its owners finance any part of the purchase price, they agree that all of the transferee's obligations under promissory notes, agreements, or security interests reserved in the Franchised Business are subordinate to the transferee's obligation to pay Royalties, NAF contributions, and other amounts due to EA, its affiliates, and third party vendors and otherwise to comply with this Agreement;

(11)    Franchisee and its transferring owners (and their spouses) will not, for two (2) years beginning on the transfer's effective date, engage in any of the activities proscribed in Section 17.B. above; and

(12)    Franchisee and its transferring owners will not directly or indirectly at any time or in any manner (except with respect to other EDIBLE ARRANGEMENTS® Businesses they own and operate) identify themselves or any business as a current or former EDIBLE ARRANGEMENTS® Business or as one of EA's franchisees; use any Name and Mark, any colorable imitation of a Name and Mark, or other indicia of an EDIBLE ARRANGEMENTS® Business in any manner or for any purpose; or utilize for any purpose any trade name, trade or service mark, or other commercial symbol that suggests or indicates a connection or association with EA.

EA may review all information regarding the Franchised Business that Franchisee gives the transferee, correct any information that it believes is inaccurate, and give the transferee copies of any reports that Franchisee has given EA or EA has made regarding the Franchised Business.

### D.   Transfer to a Wholly-Owned Corporation or Limited Liability Company

Despite subsection C above, if Franchisee is fully complying with this Agreement, it may transfer this Agreement to a corporation or limited liability company

which conducts no business other than the Franchised Business and, if applicable, other EDIBLE ARRANGEMENTS® Businesses, in which it maintains management control, and of which it owns and controls one hundred percent (100%) of the equity and voting power of all issued and outstanding ownership interests, provided that all of the Franchised Business's assets are owned, and the Franchised Business is conducted, only by that single corporation or limited liability company. The corporation or limited liability company must expressly assume all of Franchisee's obligations under this Agreement. Transfers of ownership interests in the corporation or limited liability company are subject to subsection C above. Franchisee agrees to remain personally liable under this Agreement as if the transfer to the corporation or limited liability company did not occur.

E. **Franchisee's Death or Disability**

(1) **Transfer Upon Death or Disability**. Upon Franchisee's or its Managing Owner's death or disability, Franchisee's or the Managing Owner's executor, administrator, conservator, guardian, or other personal representative must transfer Franchisee's interest in this Agreement, or the Managing Owner's ownership interest in Franchisee, to a third party (which may be Franchisee's or the Managing Owner's heirs, beneficiaries, or devisees). That transfer must be completed within a reasonable time, not to exceed nine (9) months from the date of death or disability, and is subject to all of the terms and conditions in this Section 18. A failure to transfer Franchisee's interest in this Agreement or the Managing Owner's ownership interest in Franchisee within this time period is a breach of this Agreement. The term "disability" means a mental or physical disability, impairment, or condition that is reasonably expected to prevent or actually does prevent Franchisee or the Managing Owner from supervising the management and operation of the Franchised Business.

(2) **Operation Upon Death or Disability**. If, upon Franchisee's or the Managing Owner's death or disability, a certified manager is not managing the Franchised Business, Franchisee's or the Managing Owner's executor, administrator, conservator, guardian, or other personal representative must within a reasonable time, not to exceed fifteen (15) days from the date of death or disability, appoint a manager. The manager must complete EA's standard training program at Franchisee's expense. A new Managing Owner acceptable to EA also must be appointed within thirty (30) days. If, in EA's judgment, the Franchised Business is not being managed properly any time after Franchisee's or the Managing Owner's death or disability, EA may, but need not, assume the Franchised Business's management (or appoint a third party to assume its management). All funds from the Franchised Business's operation while it is under EA's (or the third party's) management will be kept in a separate account, and all expenses will be charged to this account. EA may charge Franchisee (in addition to the Royalty, NAF contributions, and

other amounts due under this Agreement) Four Hundred Dollars ($400) per day, plus EA's (or the third party's) direct out-of-pocket costs and expenses, if EA (or a third party) assumes the Franchised Business's management under this subparagraph. EA (or a third party) has a duty to utilize only reasonable efforts and will not be liable to Franchisee or its owners for any debts, losses, or obligations the Franchised Business incurs, or to any of Franchisee's creditors for any products, other assets, or services the Franchised Business purchases, while EA (or a third party) manages it.

### F.     Effect of Consent to Transfer

EA's consent to a transfer of this Agreement and the Franchised Business, or any interest in Franchisee or its owners, is not a representation of the fairness of the terms of any contract between Franchisee and the transferee, a guarantee of the Franchised Business's or transferee's prospects of success, or a waiver of any claims EA has against Franchisee (or its owners) or of EA's right to demand the transferee's full compliance with this Agreement.

### G.     EA's Right of First Refusal

If Franchisee (or any of its owners) at any time determines to sell or transfer for consideration an interest in this Agreement and the Franchised Business, or an ownership interest in Franchisee (except to or among its current owners, which is not subject to this subsection), in a transaction that otherwise would be allowed under subsections B and C above, Franchisee (or its owners) agrees to obtain from a responsible and fully disclosed buyer, and send EA, a true and complete copy of a bona fide, executed written offer (which may include a letter of intent) relating exclusively to an interest in Franchisee or in this Agreement and the Franchised Business. The offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price. To be a valid, bona fide offer, the proposed purchase price must be in a dollar amount, and the proposed buyer must submit with its offer an earnest money deposit equal to five percent (5%) or more of the offering price. The right of first refusal process will not be triggered by a proposed transfer that would not be allowed under subsections B and C above. EA may require Franchisee (or its owners) to send it copies of any materials or information sent to the proposed buyer or transferee regarding the possible transaction.

EA may, by written notice delivered to Franchisee or its selling owner(s) within thirty (30) days after it receives both an exact copy of the offer and all other information EA requests, elect to purchase the interest offered for the price and on the terms and conditions contained in the offer, provided that:

(1)     EA may substitute cash for any form of payment proposed in the offer (such as ownership interests in a privately-held entity);

40

(2)    EA's credit will be deemed equal to the credit of any proposed buyer (meaning that, if the proposed consideration includes promissory notes, EA or its designee may provide promissory notes with the same terms as those offered by the proposed buyer);

(3)    EA will have an additional thirty (30) days to prepare for closing after notifying Franchisee of its election to purchase; and

(4)    EA must receive, and Franchisee and its owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the ownership interests in a legal entity, as applicable, including, without limitation, representations and warranties regarding:

(a)    ownership and condition of and title to ownership interests and/or assets;

(b)    liens and encumbrances relating to ownership interests and/or assets; and

(c)    validity of contracts and the liabilities, contingent or otherwise, of the entity whose assets or ownership interests are being purchased.

If EA exercises its right of first refusal, Franchisee and its selling owner(s) agree that, for two (2) years beginning on the closing date, they will be bound by the non-competition covenant contained in Subsection 17.B. above. EA has the unrestricted right to assign this right of first refusal to a third party, who then will have the rights described in this subsection.

If EA does not exercise its right of first refusal, Franchisee or its owners may complete the sale to the proposed buyer on the original offer's terms, but only if EA otherwise approves the transfer in accordance with, and Franchisee (and its owners) and the transferee comply with the conditions in, subsections B and C above. This means that, even if EA does not exercise its right of first refusal (whether or not it is properly triggered as provided above), if the proposed transfer otherwise would not be allowed under subsections B and C above, Franchisee (or its owners) may not move forward with the transfer at all.

If Franchisee does not complete the sale to the proposed buyer within sixty (60) days after EA notifies it that EA does not intend to exercise its right of first refusal, or if there is a material change in the terms of the sale (which Franchisee agrees to tell EA promptly), EA or its designee will have an additional right of first refusal during the thirty (30) day period following either the expiration of the sixty (60) day period or EA's receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at EA's or its designee's option.

41

**H.**   **Public Offerings**

Despite any other provisions in this Agreement, Franchisee (and its owners) may not, without EA's prior written consent, which EA may grant or withhold for any or no reason, attempt to raise or secure funds by selling or offering to sell any ownership interest in Franchisee (including, without limitation, common or preferred stock, bonds, debentures, membership interests, or general or limited partnership interests) in a public offering for which a registration statement must be filed with the Securities Exchange Commission or with any similar state regulatory authority having jurisdiction over the sale of securities where registration is required as a condition of the sale of securities in that state.

**19.**   **RELATIONSHIP OF THE PARTIES/INDEMNIFICATION**

**A.**   **Independent Contractors**

Franchisee and EA understand and agree that this Agreement does not create a fiduciary relationship between them, that they are and will be independent contractors, and that nothing in this Agreement is intended to make either of them a general or special agent, joint venturer, partner, or employee of the other for any purpose. Franchisee agrees to identify itself conspicuously in all dealings with customers, suppliers, public officials, Franchised Business personnel, and others as the Franchised Business's owner under a franchise EA has granted and to place notices of independent ownership on the forms, business cards, stationery, advertising, and other materials EA requires from time to time.

**B.**   **No Liability for Acts of Other Party**

Franchisee and EA may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other or represent that their relationship is other than franchisor and franchise owner. EA will not be obligated for any damages to any person or property directly or indirectly arising out of the Franchised Business's operation or the business Franchisee conducts under this Agreement.

**C.**   **Taxes**

EA will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property, or other taxes, whether levied upon Franchisee or the Franchised Business, due to the business Franchisee conducts (except for EA's income taxes). Franchisee is responsible for paying these taxes and must reimburse EA for any taxes that EA must pay to any state taxing authority on account of Franchisee's operation or payments that Franchisee makes to EA.

**D.**  **Indemnification**

(1)     Franchisee agrees to indemnify, defend, and hold harmless EA, its affiliates, and their respective shareholders, directors, officers, employees, agents, successors, and assignees (the "Indemnified Parties") against, and to reimburse any one or more of the Indemnified Parties for, all claims, obligations, and damages directly or indirectly arising out of the Franchised Business's operation, the business Franchisee conducts under this Agreement, or Franchisee's breach of this Agreement, including, without limitation, those alleged to be or found to have been caused by the Indemnified Party's negligence or willful misconduct, unless (and then only to the extent that) the claims, obligations, or damages are determined to be caused solely by EA's gross negligence or willful misconduct in a final, unappealable ruling issued by a court or arbitrator with competent jurisdiction. For purposes of this indemnification, "claims" include all obligations, damages (actual, consequential, or otherwise), and costs that any Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration, or alternative dispute resolution, regardless of whether litigation, arbitration, or alternative dispute resolution is commenced. Each Indemnified Party may defend any claim against it at Franchisee's expense and agree to settlements or take any other remedial, corrective, or other actions. This indemnity will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination. An Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against Franchisee under this subparagraph. Franchisee agrees that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from Franchisee under this subparagraph.

(2)     EA agrees to indemnify, defend, and hold harmless Franchisee and its shareholders, directors, officers, employees, agents, successors, and assignees (the "Franchise Owner Indemnified Parties") against, and to reimburse them for, all claims (as defined in subparagraph (1) above) that they incur in an action or proceeding asserted by a third party as a result of EA's contract defaults with or intentional misconduct toward that third party. A Franchise Owner Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against EA under this subparagraph. EA agrees that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that a Franchise Owner Indemnified Party may recover from EA under this subparagraph.

43

20. **ENFORCEMENT**

A. **Severability and Substitution of Valid Provisions**

Except as expressly provided to the contrary in this Agreement, each section, paragraph, term, and provision of this Agreement is severable, and if, for any reason, any part is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency, or tribunal with competent jurisdiction, that ruling will not impair the operation of, or otherwise affect, any other portions of this Agreement, which will continue to have full force and effect and bind the parties.

If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable if modified, Franchisee and EA agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity.

If any applicable and binding law or rule of any jurisdiction requires more notice than this Agreement requires of this Agreement's termination or of EA's refusal to grant a renewal franchise, or some other action that this Agreement does not require, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any System Standard is invalid, unenforceable, or unlawful, the notice and/or other action required by the law or rule will be substituted for the comparable provisions of this Agreement, and EA may modify the invalid or unenforceable provision or System Standard to the extent required to be valid and enforceable or delete the unlawful provision in its entirety. Franchisee agrees to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement.

B. **Waiver of Obligations**

Franchisee and EA may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice to the other or another effective date stated in the notice of waiver. Any waiver granted will be without prejudice to any other rights they have, will be subject to continuing review, and may be revoked at any time and for any reason effective upon delivery of ten (10) days' prior written notice.

Franchisee and EA will not waive or impair any right, power, or option this Agreement reserves (including, without limitation, EA's right to demand exact compliance with every term, condition, and covenant or to declare any breach to be a default and to terminate this Agreement before its term expires) because of any custom or practice at variance with this Agreement's terms; their failure, refusal, or neglect to exercise any right under this Agreement or to insist upon the other's compliance with this

44

Agreement, including, without limitation, any System Standard; EA's waiver of or failure to exercise any right, power, or option, whether of the same, similar, or different nature, with other EDIBLE ARRANGEMENTS® Businesses; the existence of franchise agreements for other EDIBLE ARRANGEMENTS® Businesses which contain provisions different from those contained in this Agreement; or EA's acceptance of any payments due from Franchisee after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to EA will be a waiver, compromise, settlement, or accord and satisfaction. EA is authorized to remove any legend or endorsement, which then will have no effect.

Neither Franchisee nor EA will be liable for loss or damage or be in breach of this Agreement if its failure to perform its obligations results from: (1) compliance with the orders, requests, regulations, or recommendations of any federal, state, or municipal government; (2) acts of God; (3) fires, strikes, embargoes, war, acts of terrorism or similar events, or riot; or (4) any other similar event or cause. Any delay resulting from any of these causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that these causes will not excuse payments of amounts owed at the time of the occurrence or payment of Royalties or NAF contributions due afterward.

**C.    Costs and Attorneys' Fees**

If EA incurs costs and expenses due to Franchisee's failure to pay when due amounts owed to EA, to submit when due any reports, information, or supporting records, or otherwise to comply with this Agreement, Franchisee agrees, whether or not EA initiates a formal legal proceeding, to reimburse EA for all of the costs and expenses that EA incurs, including, without limitation, reasonable accounting, attorneys', arbitrators', and related fees.

**D.    Franchisee May Not Withhold Payments Due to EA**

Franchisee agrees that it will not withhold payment of any amounts owed to EA on the grounds of EA's alleged nonperformance of any of its obligations under this Agreement or for any other reason, and Franchisee specifically waives any right it may have at law or in equity to offset any funds or to fail or refuse to perform any of its obligations under this Agreement. Franchisee agrees to submit all claims, unless otherwise resolved by the parties' mutual agreement, to arbitration as provided in subsection F below.

**E.    Rights of Parties are Cumulative**

Franchisee's and EA's rights under this Agreement are cumulative, and their exercise or enforcement of any right or remedy under this Agreement will not preclude their exercise or enforcement of any other right or remedy which they are entitled by law to enforce.

45

### F.   Arbitration

Franchisee and EA agree that, except for controversies, disputes, or claims related to or based on improper use of the Names and Marks or Confidential Information, all controversies, disputes, or claims between EA and its affiliates, and their respective shareholders, officers, directors, agents, and/or employees, and Franchisee (and/or its owners, guarantors, affiliates, and/or employees) arising out of or related to:

    (1)    this Agreement or any other agreement between them;

    (2)    EA's relationship with Franchisee;

    (3)    the validity of this Agreement or any other agreement between them; or

    (4)    any System Standard;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association ("AAA"). The arbitration proceedings will be conducted by one arbitrator and, except as this Subsection otherwise provides, according to the AAA's then current commercial arbitration rules. All proceedings will be conducted at a suitable location chosen by the arbitrator which is within ten (10) miles of EA's then current principal business address. All matters relating to arbitration will be governed by the United States Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator has the right to award or include in his or her award any relief which he or she deems proper, including, without limitation, money damages, specific performance, injunctive relief, and attorneys' fees and costs, provided that the arbitrator may not declare any Name and Mark generic or otherwise invalid or, except as expressly provided in subsection I below, award any punitive or exemplary damages against either party (Franchisee and EA hereby waiving to the fullest extent permitted by law, except as expressly provided in subsection I below, any right to or claim for any punitive or exemplary damages against the other).

Franchisee and EA agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. They further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the United States Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either party.

Franchisee and EA agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between EA and its affiliates, and their respective shareholders, officers, directors, agents, and/or employees, and

Franchisee (and/or its owners, guarantors, affiliates, and/or employees) may not be consolidated with any other arbitration proceeding between EA and any other person.

Despite Franchisee's and EA's agreement to arbitrate, they each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that they must contemporaneously submit their dispute for arbitration on the merits as provided in this subsection.

The provisions of this subsection are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

## G.   Governing Law

ALL MATTERS RELATING TO ARBITRATION WILL BE GOVERNED BY THE UNITED STATES FEDERAL ARBITRATION ACT (9 U.S.C. §§ 1 ET SEQ.). EXCEPT TO THE EXTENT GOVERNED BY THE FEDERAL ARBITRATION ACT, THE UNITED STATES TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. SECTIONS 1051 ET SEQ.), OR OTHER UNITED STATES FEDERAL LAW, THIS AGREEMENT, THE FRANCHISE, AND ALL CLAIMS ARISING FROM THE RELATIONSHIP BETWEEN EA AND FRANCHISEE WILL BE GOVERNED BY THE LAWS OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO ITS CONFLICT OF LAWS RULES, EXCEPT THAT ANY CONNECTICUT LAW REGULATING THE SALE OF FRANCHISES OR BUSINESS OPPORTUNITIES OR GOVERNING THE RELATIONSHIP OF A FRANCHISOR AND ITS FRANCHISEE WILL NOT APPLY UNLESS ITS JURISDICTIONAL REQUIREMENTS ARE MET INDEPENDENTLY WITHOUT REFERENCE TO THIS PARAGRAPH.

## H.   Consent to Jurisdiction

SUBJECT TO SUBSECTION F ABOVE AND THE PROVISIONS BELOW, FRANCHISEE AND ITS OWNERS AGREE THAT ALL ACTIONS ARISING UNDER THIS AGREEMENT OR OTHERWISE AS A RESULT OF THE RELATIONSHIP BETWEEN FRANCHISEE AND EA MUST BE COMMENCED IN A COURT OF GENERAL JURISDICTION IN CONNECTICUT, AND FRANCHISEE (AND EACH OWNER) IRREVOCABLY SUBMITS TO THE JURISDICTION OF THAT COURT AND WAIVES ANY OBJECTION IT (OR THE OWNER) MIGHT HAVE TO EITHER THE JURISDICTION OF OR VENUE IN THAT COURT. NONETHELESS, FRANCHISEE AND ITS OWNERS AGREE THAT EA MAY ENFORCE THIS AGREEMENT AND ANY ARBITRATION ORDERS AND AWARDS IN THE COURTS OF THE STATE OR STATES IN WHICH FRANCHISEE IS DOMICILED OR THE FRANCHISED BUSINESS IS OPERATED.

~EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1

**I.**   **Waiver of Punitive Damages and Jury Trial**

EXCEPT FOR FRANCHISEE'S OBLIGATION TO INDEMNIFY EA FOR THIRD PARTY CLAIMS UNDER SUBSECTION 19.D., AND EXCEPT FOR PUNITIVE DAMAGES AVAILABLE TO EITHER PARTY UNDER UNITED STATES FEDERAL LAW, EA AND FRANCHISEE (AND ITS OWNERS) WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THD OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN THEM, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

FRANCHISEE AND EA IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM.

**J.**   **Binding Effect**

This Agreement is binding upon Franchisee and EA and their respective executors, administrators, heirs, beneficiaries, permitted assigns, and successors in interest. Subject to EA's right to modify the Operations Manual and System Standards, this Agreement may not be modified except by a written agreement signed by Franchisee's and EA's duly-authorized officers.

**K.**   **Limitations of Claims**

Except for claims arising from Franchisee's non-payment or underpayment of amounts it owes EA, any and all claims arising out of or relating to this Agreement or the parties' relationship will be barred unless a judicial or arbitration proceeding is commenced within eighteen (18) months from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claims.

**L.**   **Construction**

The preambles and exhibits are a part of this Agreement which, together with the System Standards contained in the Operations Manual (which may be periodically modified), constitutes Franchisee's and EA's entire agreement, and there are no other oral or written understandings or agreements between Franchisee and EA, or oral or written representations by EA, relating to the subject matter of this Agreement, the franchise relationship, or the Franchised Business (any understandings or agreements reached, or any representations made, before this Agreement are superseded by this Agreement). Any policies that EA adopts and implements from time to time to guide it in its decision-making are subject to change, are not a part of this Agreement, and are not binding on EA. Except as otherwise provided in this Agreement, nothing in this Agreement is intended or deemed to confer any rights or remedies upon any person or legal entity not a party to this Agreement.

48

Except where this Agreement expressly obligates EA reasonably to approve or not unreasonably to withhold its approval of any of Franchisee's actions or requests, EA has the absolute right to refuse any request Franchisee makes or to withhold its approval of any of Franchisee's proposed, initiated, or completed actions that require EA's approval. The headings of the sections and paragraphs are for convenience only and do not define, limit, or construe the contents of these sections or paragraphs.

References in this Agreement to EA, with respect to all of EA's rights and all of Franchisee's obligations to EA under this Agreement, include any of EA's affiliates with whom Franchisee deals. The term "affiliate" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling Franchisee or EA. "Control" means the power to direct or cause the direction of management and policies.

If two or more persons are at any time the owners of the franchise, whether as partners or joint venturers, their obligations and liabilities to EA will be joint and several. References to "owner" mean any person holding a direct or indirect ownership interest (whether of record, beneficially, or otherwise) or voting rights in Franchisee (or a transferee of this Agreement and the Franchised Business or an ownership interest in Franchisee), including, without limitation, any person who has a direct or indirect interest in Franchisee (or a transferee), this Agreement, the Franchise, or the Franchised Business and any person who has any other legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in their revenue, profits, rights, or assets. References to a "controlling ownership interest" in Franchisee or one of its owners (if an entity) mean the percent of the voting shares or other voting rights that results from dividing one hundred percent (100%) of the ownership interests by the number of owners. In the case of a proposed transfer of an ownership interest in Franchisee or one of its owners, the determination of whether a "controlling ownership interest" is involved must be made as of both immediately before and immediately after the proposed transfer to see if a "controlling ownership interest" will be transferred (because of the number of owners before the proposed transfer) or will be deemed to have been transferred (because of the number of owners after the proposed transfer). "Person" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative, or other legal or functional entity. Unless otherwise specified, all references to a number of days shall mean calendar days and not business days.

The term "Franchised Business" includes all of the assets of the EDIBLE ARRANGEMENTS® Business Franchisee operates under this Agreement, including its revenue. All references to "Dollars" mean United States Dollars.

This Agreement may be executed in multiple copies, each of which will be deemed an original.

49

21.   **NOTICES AND PAYMENTS**

All written notices, reports, and payments permitted or required to be delivered by this Agreement or the Operations Manual will be deemed to be delivered:

        (a)   at the time delivered by hand;

        (b)   at the time delivered via computer transmission and, in the case of the Royalty, NAF contributions, and other amounts due, at the time EA actually receives payment via the automatic draft;

        (c)   one (1) business day after transmission by facsimile or other electronic system if the sender has confirmation of successful transmission;

        (d)   one (1) business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery; or

        (e)   three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid;

and must be addressed to the party to be notified at its most current principal business address of which the notifying party has notice. Any required payment or report which EA does not actually receive during regular business hours on the date due (or postmarked by postal authorities at least two (2) days before then) will be deemed delinquent.

22.   **VARYING STANDARDS**

Because complete and detailed uniformity under many varying conditions may not be possible or practical, EA specifically reserves the right and privilege, as it may deem in the best interests of all concerned in any specific instance, to vary standards for any franchisee based upon the peculiarities of a particular location or circumstance, density of population, business potential, population or trade area, existing business practices, or any other condition which EA deems to be of importance to the successful operation of such franchisee's business. Franchisee shall not have any right to complain about a variation from System Standards granted to any other franchisee and shall not be entitled to require EA to grant to Franchisee a like or similar variation.

23.   **SPECIAL REPRESENTATIONS**

Franchisee and each partner, shareholder, or member if Franchisee is a partnership, corporation, or limited liability company hereby represent as follows:

        (a)   That they have independently investigated the EDIBLE ARRANGEMENTS® Business franchise opportunity and

50

recognize that, like any other business, the nature of the business an EDIBLE ARRANGEMENTS® Business conducts may, and probably will, evolve and change over time.

(b). That an investment in an EDIBLE ARRANGEMENTS® Business involves business risks that could result in the loss of a significant portion or all of their investment.

(c) That their business abilities and efforts are vital to their success.

(d) That attracting customers for their EDIBLE ARRANGEMENTS® Business will require them to make consistent marketing efforts through various methods, including media advertising, direct mail advertising, and couponing.

(e) That retaining customers for their EDIBLE ARRANGEMENTS® Business will require them to have a high level of customer service and to adhere strictly to the franchise system and EA's System Standards and that they are committed to maintaining System Standards.

(f) That they have not received from EA, and are not relying upon, any representations or guarantees, express or implied, as to the potential volume, sales, income, or profits of an EDIBLE ARRANGEMENTS® Business, that any information they have acquired from other EDIBLE ARRANGEMENTS® Business franchise owners regarding their sales, profits, or cash flows was not information obtained from EA, and that EA makes no representation about that information's accuracy.

(g) That in all of their dealings with Franchisee, EA's officers, directors, employees, and agents act only in a representative, and not in an individual, capacity and that business dealings between Franchisee and them as a result of this Agreement are deemed to be only between Franchisee and EA.

(h) That they have represented to EA, to induce EA's entry into this Agreement, that all statements they have made and all materials they have given EA are accurate and complete and that they have made no misrepresentations or material omissions in obtaining the Franchise.

(i) That they have read this Agreement and EA's Franchise Offering Circular and understand and accept that this Agreement's terms and covenants are reasonably necessary for EA to maintain its high standards of quality and service, as well as the uniformity of those

51

standards at each EDIBLE ARRANGEMENTS® Business, and to protect and preserve the goodwill of the Names and Marks.

(j)     That EA has not made any representation, warranty, or other claim regarding this EDIBLE ARRANGEMENTS® Business franchise opportunity, other than those made in this Agreement and its Franchise Offering Circular, and that Franchisee has independently evaluated this opportunity, including by using its business professionals and advisors, and has relied solely upon those evaluations in deciding to enter into this Agreement.

(k)     That they have been afforded an opportunity to ask any questions they have and to review any materials of interest concerning the EDIBLE ARRANGEMENTS® Business franchise opportunity.

(l)     That they have been afforded an opportunity, and have been encouraged by EA, to have this Agreement and all other agreements and materials EA has given or made available to Franchisee reviewed by an attorney and have either done so or waived their right to do so.

(m)     That they have a net worth which is sufficient to make the investment in the EDIBLE ARRANGEMENTS® Business franchise opportunity represented by this Agreement and will have sufficient funds to meet all of their obligations under this Agreement.

**[Signature Page follows as next page]**

~EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1

**IN WITNESS WHEREOF**, the parties hereto have duly executed, sealed and delivered this Agreement this _____ of _____ 200___ but to be effective as of the Effective Date.

**EDIBLE ARRANGEMENTS FRANCHISE GROUP, INC. :**

By:_____    Witness:_____

Title:_____

By:_____    Witness:_____

Title:_____    Date:_____

**FRANCHISEE:**_____

By:_____    Witness:_____

Title:_____

By:_____    Witness:_____

Title:_____    Date:_____

53

## · EXHIBIT "A"
## TO FRANCHISE AGREEMENT

This is Exhibit "A" to the Franchise Agreement executed by EDIBLE ARRANGEMENTS FRANCHISE GROUP, INC. ("EA") and _____ _____ ("Franchisee") on _____, _____ .

1.   Franchisee's "Territory" shall be defined as follows: _____

_____

_____

2.   Franchisee's "Delivery Area" shall be defined as follows: _____

_____

_____

If the Territory and/or Delivery Area is identified by counties or other political subdivisions, political boundaries shall be considered fixed as of the Effective Date and shall not change, notwithstanding a political reorganization or change to such boundaries or regions. If the Territory and/or Delivery Area is identified specifically by zip codes ("Main Zip Codes"), the Territory and/or Delivery Area shall include all geographic areas covered by such Main Zip Codes as of the Effective Date, as well as all geographic areas covered as of the Effective Date by zip codes located within the Main Zip Codes. If the geographic area covered by a Main Zip Code changes (by expanding or contracting) during the term of the Franchise Agreement, Franchisee shall be required to obtain EA's approval (which EA is not obligated to grant), in accordance with EA's policies and procedures then in effect, before Franchisee may accept and fulfill orders for delivery to customers and/or recipients located (a) in the portion of the geographic area comprising the reconstituted Main Zip Code that was not within the Territory or Delivery Area as of the Effective Date, or (b) in the portion of the geographic area that was within the Territory or Delivery Area as of the Effective Date but no longer is within the Territory or Delivery Area after the Effective Date as a result of the reconstituted Main Zip Code.

**[Signature Page follows as next page]**

A-1

## EDIBLE ARRANGEMENTS FRANCHISE GROUP, INC. :

By:_____     Witness:_____

Title:_____

By:_____     Witness:_____

Title:_____     Date:_____


## FRANCHISEE:_____

By:_____     Witness:_____

Title:_____

By:_____     Witness:_____

Title:_____     Date:_____

A-2

**EXHIBIT "B"**
**TO THE FRANCHISE AGREEMENT**
**BETWEEN EDIBLE ARRANGEMENTS FRANCHISE GROUP, INC.**
**AND**

DATED _____, 200__

Effective Date:  This Exhibit A is current and complete
as of _____, 200__

**Franchisee and Its Owners**

1.  **Form of Owner.**

   (a)  **Individual Proprietorship.**  Franchisee's owner(s) (is) (are) as follows:

   _____

   _____

   _____

   (b)  **Corporation, Limited Liability Company, or Partnership.**  Franchisee was
incorporated or formed on _____ , under the laws of the State of
_____ .  It has not conducted business under any name other than its
corporate, limited liability company, or partnership name and
_____ .  The following is a list of its
directors, if applicable, and officers as of the effective date shown above:

| Name of Each Director/Officer | Position(s) Held |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

B-1

2.   **Owners**.  The following list includes the full name of each person who is one of Franchisee's owners (as defined in the Franchise Agreement), or an owner of one of Franchisee's owners, and fully describes the nature of each owner's interest (attach additional pages if necessary).

| **Owner's Name** | **Description of Interest** |
|---|---|
| (a) _____ | _____ |
| (b) _____ | _____ |
| (c) _____ | _____ |
| (d) _____ | _____ |

**EDIBLE ARRANGEMENTS FRANCHISE GROUP, INC. :**

By:_____          Witness:_____

Title:_____

By:_____          Witness:_____

Title:_____          Date:_____

**FRANCHISEE:**_____

By:_____          Witness:_____

Title:_____

By:_____          Witness:_____

Title:_____          Date:_____

--EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1

## EXHIBIT "C"

## GUARANTY AND ASSUMPTION OF OBLIGATIONS

THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS is given this \_\_\_\_\_
day of _____, 200 \_\_, by _____

_____

_____

· In consideration of, and as an inducement to, the execution of that certain Franchise Agreement (the "Agreement") on this date by **EDIBLE ARRANGEMENTS FRANCHISE GROUP, INC.** ("us," "we," or "our"), each of the undersigned personally and unconditionally (a) guarantees to us and our successors and assigns, for the term of the Agreement (including extensions) and afterward as provided in the Agreement, that _____ ("Franchisee") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement (including any amendments or modifications of the Agreement) and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement (including any amendments or modifications of the Agreement), both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including the non-competition, confidentiality, transfer, and arbitration requirements.

Each of the undersigned consents and agrees that: (1) his or her direct and immediate liability under this Guaranty will be joint and several, both with Franchisee and among other guarantors; (2) he or she will render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon our pursuit of any remedies against Franchisee or any other person; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which we may from time to time grant to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims (including the release of other guarantors), none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement (including extensions), for so long as any performance is or might be owed under the Agreement by Franchisee or its owners, and for so long as we have any cause of action against Franchisee or its owners; and (5) this Guaranty will continue in full force and effect for (and as to) any extension or modification of the Agreement and despite the transfer of any interest in the Agreement or Franchisee, and each of the undersigned waives notice of any and all renewals, extensions, modifications, amendments, or transfers.

Each of the undersigned waives: (i) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty; and (ii) acceptance and notice of acceptance by us of his or her undertakings under this Guaranty, notice of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest

C-1

and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices to which he or she may be entitled.

If we are required to enforce this Guaranty in a judicial or arbitration proceeding, and prevail in such proceeding, we shall be entitled to reimbursement of our costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether incurred prior to, in preparation for, or in contemplation of the filing of any such proceeding. If we are required to engage legal counsel in connection with any failure by the undersigned to comply with this Guaranty, the undersigned shall reimburse us for any of the above-listed costs and expenses we incur.

**IN WITNESS WHEREOF,** each of the undersigned has affixed his or her signature on the same day and year as the Agreement was executed.

GUARANTOR(S)

PERCENTAGE OF OWNERSHIP IN FRANCHISEE

| | |
|---|---|
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |

~EDIBLE ARRANGEMENTS® FA 2004
CHGO1:30424135.v1