**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **EA INDEPENDENT FRANCHISEE ASSOCIATION, LLC,** | |
| **Plaintiff,** | |
| **v.** | |
| | **Case No.  3:10-cv1489 (WWE)** |
| **EDIBLE ARRANGEMENTS INTERNATIONAL, INC., EA CONNECT, INC., NETSOLACE, INC., DIPPEDFRUIT, INC. and XYZ CORPORATIONS 1-20,** | **December 6, 2010** |
| **Defendants.** | |

**DEFENDANTS' MEMORANDUM IN SUPPORT**
**OF THEIR MOTION TO DISMISS FOR LACK OF STANDING**

Defendants Edible Arrangements International, Inc. ("EAI"), EA Connect, Inc.,

Netsolace, Inc., and Dippedfruit, Inc. (collectively, "Defendants"), by their attorneys, submit this

memorandum of law in support of their motion to dismiss the Complaint filed by Plaintiff EA

Independent Franchisee Association, LLC ("EAIFA" or "the Association") for lack of standing

pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## I.    INTRODUCTION

EAIFA, an association that claims to represent roughly one-fifth of the franchisees of the

Edible Arrangements franchise system, seeks to assert claims for declaratory relief on behalf of

its franchisee members for alleged breaches of their individual franchise agreements with EAI

and violations of the Connecticut Unfair Trade Practices Act arising out of EAI's alleged failure

to properly disclose certain aspects of the Edible Arrangements franchise opportunity as well as

EAI's alleged unfair and oppressive treatment of its franchisees.

Two critical ingredients, however, are conspicuously absent from the lawsuit:  the

franchisees whose individual franchise agreements are the subject of the sought-after declaratory

relief, and the franchise agreements themselves.  The reason for their absence is readily apparent: franchisees in the Edible Arrangements system are obligated under their individual franchise agreements with EAI to arbitrate, rather than litigate, the very claims that the Association has asserted here on behalf of its member franchisees.  Franchisees are further obligated to arbitrate those claims on an individual basis and not collectively with other franchisees.  Thus, the lawsuit is nothing more than EAIFA's transparent attempt to circumvent its members' contractual obligations to arbitrate individually their contract-related disputes with EAI.  As a result, the Association lacks standing to raise those arbitrable claims on behalf of its members because their individual participation is required by their contracts.

The Association also lacks standing for three additional reasons, each of which suffices to warrant dismissal:  (1) the individual members themselves do not have standing to raise the claims asserted here for declaratory relief; (2) the nature of the claims asserted requires the individual participation of EAIFA's members; and (3) the declaratory relief sought likewise requires the participation of the individual members in the lawsuit.  For all of these reasons, the Association lacks standing to assert the claims of its franchisee members, and the case therefore should be dismissed for lack of subject-matter jurisdiction.

## II.     BACKGROUND FACTS[1]

EAI is a national franchisor of retail stores that feature uniquely designed arrangements and gift baskets whose primary ingredients are cut fresh fruit and chocolate products and that operate under the name "Edible Arrangements" and related trademarks and trade names.  (See

---

[1]     The facts set forth below are taken from the Complaint and the Declaration of Kristy Ferguson, filed concurrently with Defendants' motion to dismiss.  As discussed below, on a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, the Court may consider affidavits and other materials outside of the four corners of a complaint.

Declaration of Kristy Ferguson ["Ferguson Decl."], ¶ 3.) EAI has franchised Edible Arrangements businesses since mid-2001 and currently has 830 franchised locations throughout the United States. (*Id.,* ¶ 4.) Over that time period, the Edible Arrangements business concept has grown and evolved to meet the needs of its customers and adapt to the competitive dynamics of the retail marketplace, in particular the growth of the internet as a primary vehicle for its franchisees to transact business with their customers. (*Id.*)

The franchise relationship between EAI and each of its franchisees is governed by a written franchise agreement. (*Id*., ¶ 5.) Like the Edible Arrangements business concept, the form of franchise agreement utilized by EAI since the franchise program's inception has changed and evolved over time. On an annual basis, in conjunction with the preparation and registration of its franchise disclosure document that describes the franchise opportunity to prospective franchisees ("FDD"), EAI has changed various provisions of its standard form of franchise agreement. In some years, those changes have been fairly extensive; in other years, they have been quite modest. (*Id.*) Where appropriate, and as required by state and federal laws governing the content of the disclosures in the FDD, EAI likewise has revised the FDD to correspond to changes made in the standard form of franchise agreement for a given year. (*Id.,* ¶ 6.) The then current standard form of franchise agreement is attached as an exhibit to the FDD so that the prospective franchisee is aware of the form of franchise agreement that it will be expected to sign if it chooses to become an Edible Arrangements franchisee. (*Id.*)

Since it began franchising, EAI has made prospective franchisees aware through its FDDs of its intention and right to continuously modify the Edible Arrangements franchise system to keep abreast of new technologies, evolving customer needs and wants, and the ever-changing competitive retail landscape. (*Id.,* ¶ 7.) Likewise, from the beginning EAI has

expressly reserved a broad right in its franchise agreements to modify its franchise system, and franchisees have obligated themselves to make whatever expenditures that such modifications reasonably require.  (*Id.*)  For example, since 2003 Section 9 of EAI's franchise agreements has contained the following language regarding EAI's right to change and modify the franchise system:  "Franchisee recognizes and agrees that from time to time hereafter EA[I] may change or modify the System as presently described in the Operations Manual and the Names and Marks, including the adoption and use of new, modified, and/or substitute trade names, trademarks, service marks or copyrighted materials; new computer programs, computer hardware and systems; new equipment; or new techniques.  Franchisee will accept and use for the purposes of this Agreement any such changes in the System as if they were part of this Agreement as of the Effective Date.  Franchisee will make such expenditures as such changes or modifications in the System may reasonably require. . . . EA[I] has the right to operate, develop, and change the System in any manner that is not specifically prohibited by this Agreement."  (*Id.,* ¶ 8.)  Prior versions of EAI's franchise agreement used for franchisees who joined the system in 2001 and 2002 and early 2003 have substantially similar language.  (*Id.*)

Similarly, since 2003 Section 5.C. of EAI's franchise agreements has described EAI's store Operations Manual as containing "mandatory and suggested specifications, standards, operating procedures, and rules ("System Standards") that EA[I] periodically prescribes for operating an EDIBLE ARRANGEMENTS Business and information on Franchisee's other obligations under [the franchise agreement]," and further provides that "EA[I] may modify the Operations Manual periodically to reflect changes in System Standards."  (*Id.,* ¶ 9.)  In addition, since 2003 Section 13.B. of EAI's franchise agreements has stated that "EA[I] periodically may modify System Standards, . . . and these modifications may obligate Franchisee to invest

additional capital in the Franchised Business and/or incur higher operating costs.  Franchisee agrees to implement any changes in System Standards within the time period EA[I] requests as if they were part of this [franchise agreement] on the Effective Date."  (*Id.,* ¶ 10.)

As time went on, EAI spelled out in more detail in its FDDs and franchise agreements various aspects of the system that were subject to modification.  In its 2006 FDD and franchise agreement, for example, EAI described its franchise system website for the first time as including a function for operating an on-line product ordering and fulfillment system, and elsewhere in that FDD and franchise agreement EAI discloses and expressly reserves the right to charge a reasonable fee (up to 20% of the cost of the order, according to the FDD) for customer orders directed to franchisees that are processed through EAI's system-wide call center or any on-line ordering or fulfillment system.  (*Id.,* ¶ 11.)  Two years later, in its 2008 FDD and franchise agreement, EAI describes the entire process of soliciting, processing, placing and referring customer orders through the EAI franchise system website or system-wide call center as encompassed within the "EACONNECT Program," and elsewhere in that year's FDD and franchise agreement expressly reserves the right to charge a fee for each customer order directed or referred to the franchisee through the EACONNECT Program.  (*Id.*, ¶ 12.)

One provision of EAI's franchise agreement that has remained essentially unchanged since shortly after EAI began franchising, however, is the arbitration provision.  That provision requires the franchisee to arbitrate virtually all disputes with EAI and EAI's affiliates arising out of or relating to the franchise agreement or the parties' franchise relationship and further requires that such arbitration be conducted on an individual basis and not collectively with other franchisees.  (*Id.*, ¶ 13.)  The relevant language from the arbitration provision is as follows: "Franchisee and EA[I] agree that, except for controversies, disputes, or claims related to or based

on improper use of the Names and Marks or Confidential Information, all controversies, disputes, or claims between EA[I] and its affiliates, and their respective shareholders, officers, directors, agents, and/or employees, and Franchisee (and/or its owners, guarantors, affiliates, and/or employees) arising out of or related to: (1) this Agreement or any other agreement between them; (2) EA[I]'s relationship with Franchisee; (3) the validity of this Agreement or any other agreement between them; or (4) any System Standard; must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association. . . . Franchisee and EA[I] agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between EA[I] . . . and Franchisee . . . may not be consolidated with any other arbitration proceeding between EA[I] and any other person." (*Id.*, ¶ 14, Ex. B.) This broad language requiring arbitration of virtually all disputes between the franchisee and EAI (and its affiliates) is contained in the franchise agreement of nearly every Edible Arrangements franchisee in the system. (*Id.*, ¶ 13.)

Despite the obligation of almost every Edible Arrangements franchisee to arbitrate its disputes with EAI on an individual basis, on September 20, 2010 EAIFA, which claims to be an association representing approximately one-fifth of the franchisees in the Edible Arrangements system, filed this action against EAI seeking relief on behalf of its members under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.,* with respect to certain of EAI's disclosure practices and EAI's performance of its obligations under its individual franchise agreements with the franchisee-members of EAIFA. As described in more detail below, all of the claims alleged by EAIFA on behalf of its franchisee members against Defendants – which include claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the Connecticut Unfair Trade Practices Act – are well within the scope of the arbitration

agreements between EAI and its franchisees.  The Complaint also asserts the same claims against three additional defendants, EA Connect, Inc., Netsolace, Inc. and Dippedfruit, Inc., all of which are alleged to be affiliates of EAI.  And since each franchisee's arbitration agreement also obligates the franchisee to arbitrate claims against EAI's "affiliates" that arise out of or relate to the franchise agreement or the parties' franchise relationship, the claims asserted against those defendants likewise are subject to arbitration.

The gist of EAIFA's Complaint is that, despite EAI's broad reservation of rights in its franchise agreements to change and adapt the franchise system, and despite the franchisees' corresponding agreement to abide by those changes and bear the reasonable costs of doing so, a number of recent system-wide changes implemented by EAI have been unfair, oppressive, unreasonable, not authorized by the parties' franchise agreements, and not disclosed to franchisees when they purchased their franchises.   EAIFA alleges that individually and collectively these recent system-wide changes have had a detrimental impact on the financial and operational condition of its members' businesses.  Specifically, the Complaint identifies six separate system-wide changes or new programs that share one or more of the characteristics just mentioned.  While Defendants vigorously dispute the truth and accuracy of the allegations in the Complaint, for purposes of evaluating EAIFA's standing to challenge those changes or programs, the allegations can be summarized as follows:

### 1.      EAConnect Program

EAI recently announced the implementation of the EAConnect Program, which is an on-line product ordering and fulfillment system operated by EAI's affiliate, EA Connect, Inc. (Complaint, ¶ 54.)  The EAConnect Program controls numerous facets of the customer order process, including all internet orders received via EAI's websites, all orders received from EAI's centralized toll-free call center, all gift card transactions, and all orders generated from

promotions or other special programs or partnerships developed by EAI.  (*Id*., ¶ 67.)  The EAConnect Program also gives EAI substantial control over the entire customer order process, from receiving orders to processing payments to paying franchisees for orders filled.  (*Id*., ¶ 66.)  In actuality the EAConnect Program is not a new program but a permutation of a prior internet order system under which franchisees were not assessed a fee or charge for its use.  (*Id*., ¶ 56.)  However, under the EAConnect Program, EAI has reserved the right to charge franchisees a fee of up to 20% per order for orders processed through the on-line system.  (*Id*., ¶¶ 58, 68.)  Prior to 2008 EAI did not disclose to prospective franchisees the existence of any fees associated with the EAConnect Program or that franchisees were required to participate in that program through an affiliate of EAI.  (*Id*., ¶ 60.)  EAI has not yet charged any per-order fees to franchisees for the use of the EAConnect Program, but it has "expressed its intent to charge these fees."  (*Id.,* ¶ 68.)

Based on these allegations, EAIFA asserts that EAI violated its disclosure obligations by failing to disclose prior to 2008 the fees associated with the EAConnect Program.  EAIFA also alleges that the nature, extent and amount of fees imposed on franchisees for participation in the EAConnect Program violate the covenant of good faith and fair dealing.  (*Id.,* ¶¶ 73-74.)

### 2.  <u>Netsolace, Inc.</u>

EAI requires each of its franchisees to enter into an annual software support services agreement (SSA) with Netsolace, Inc., an affiliate of EAI and the sole approved software vendor for the system, for a store management system software program, which requires the payment of a monthly fee to cover the support services, including all upgrades.  (*Id.,* ¶¶ 75-78.)  Despite Netsolace's obligation to provide all upgrades free of charge under the SSA, in 2009 Netsolace required franchisee subscribers to purchase an additional software program known as "NxStep," for which franchisees were required to pay a fee of $2,000 and an additional $30 per month in support fees.  (*Id.,* ¶¶ 82-83.)  In addition, in April 2010 Netsolace announced an additional

upgrade and software release for the store management system program, called SMS-X, and has demanded that franchisees pay a lump sum of $1,200 for installation of this software and is also requiring franchisees to purchase additional hardware that is compatible with the new software only from Netsolace or otherwise face additional installation fees for reconfiguring their "non-preferred vendor" computers. (*Id*., ¶¶ 84-85.)  EAI knew of Netsolace's intention to breach the terms of the SSAs by charging additional fees for the SMS-X program and also knew that Netsolace was creating incompatible software that would require franchisees to upgrade their hardware, but continued to require franchisees to purchase software only from Netsolace. (*Id*., ¶¶ 88-89.)

Based on these allegations, EAIFA asserts that Netsolace's decision to charge an additional fee for the SMS-X software constitutes a breach of the SSAs with EAI's franchisees, and that EAI's awareness and endorsement of Netsolace's intention to breach the terms of the SSAs and EAI's refusal to permit franchisees to buy software or hardware from alternative vendors are breaches of its implied duty of good faith and fair dealing. (*Id*., ¶¶ 87, 92.)

### 3.    Extended Hours Mandate

In early March 2010, EAI implemented a policy requiring all of its franchised stores to remain open seven days a week, including Sundays. (*Id*., ¶ 93.)  This policy was contrary to the expectations that franchisees had formed about the business hours they would be required to keep when they joined the Edible Arrangements system.  Those expectations were based on statements made by EAI's CEO and other representatives of EAI when franchisees purchased their businesses that the operation of their stores from 8:00 a.m. to 5:00 p.m. Monday through Friday, and from 8:00 a.m. to 3:00 p.m. on Saturday, was "efficient, effective and profitable" and was a "sound and ideal" business model for the franchisee's typical customer base. (*Id*., ¶¶ 95-96.)  The new extended hours of operation materially changes the cost of operating a franchised

store and "negatively affects each franchisees' [sic] profit margins." (*Id.*, ¶ 98.)  "In certain instances," franchisees who did not comply with the extended hours requirement were not allowed to fill orders received through EAI's website. (*Id.*, ¶ 100.)  In addition, EAI has not been uniformly enforcing the extended hours requirement, granting exemptions to some franchisees whose religious observance falls on Saturday and denying exemptions to other franchisees who observe on Sunday. (*Id.*, ¶¶ 103-04.)

Based on these allegations, EAIFA asserts that implementation of the extended hours requirement is a breach of EAI's duty of good faith and fair dealing under its franchise agreement. (*Id.*, ¶ 105.)

### 4. <u>Enhanced Fresh Program Mandate</u>

In early 2010, EAI implemented a new policy, known as the "Enhanced Fresh Program," under which it required all of its franchisees to purchase produce products from a limited group of vendors selected by EAI. (*Id.*, ¶ 106.)  The requirement to purchase from only selected produce vendors was not properly disclosed in EAI's FDDs or contained in the franchise agreements signed by most, if not all, of EAIFA's members in 2009 and prior years. (*Id.*, ¶ 107.)  Franchisees have protested the implementation of this new policy, claiming that it hampers their ability to run profitable stores, in particular because they can obtain produce "far more quickly, efficiently and economically and of higher quality" from alternative local vendors. (*Id.*, ¶ 108.)  EAI has not uniformly enforced the Enhanced Fresh Program mandate throughout the system, citing "certain, but not all," of EAI's franchisees for their failure or refusal to abide by the terms of the mandate, while other franchisees who continue to use alternative vendors "have not been cautioned, cited or threatened by EAI in any way." (*Id.*, ¶ 110.)  Similarly, EAI "has threatened interim relief against some, but not all, 'non-compliant' franchisees" by suspending the referral of orders through the EAI website, or by ordering produce from designated suppliers on behalf of

franchisees without notifying them and debiting their accounts, or by requiring franchisees to complete mandatory training classes.  In addition, EAI has threatened to "default, terminate or otherwise sanction only certain of its franchisees" for failure to abide by the Enhanced Fresh Program mandate.  (*Id*., ¶¶ 113-14.)

Based on these allegations, EAIFA asserts that EAI has abused its discretion to make system-wide changes in breach of the franchise agreements with EAIFA's members and failed to properly disclose that franchisees could be required to purchase from only a limited number of approved produce vendors.  (*Id*., ¶¶ 107, 116.)

### 5.   Store 98

EAI has been improperly competing with "certain, but not all, of [its] franchisees, including members of the Association," by rerouting product orders from certain corporate customer national accounts through a mechanism known as "Store 98."  (*Id*., ¶¶ 117, 123.)  Store 98 is not a company-owned store with a physical address, but rather a "phantom" store that does business solely through EAI's centralized internet order processing system by directing orders from corporate national account customers to franchisees for fulfillment and charging a 20% commission for each order referred.  (*Id*., ¶¶ 118, 121.)  In some cases, those corporate customers were previously serviced directly by the same franchisee but without the requirement that the franchisee pay a 20% commission to EAI.  (*Id*., ¶ 119.)  This commission was never properly disclosed to EAIFA's members in EAI's FDDs between 2003 and 2009 and is also not permitted under the franchise agreements, which only authorize a 5% royalty on all sales.  (*Id*., ¶¶ 122, 128.)  EAI has also used funds contributed by franchisees to EAI's National Advertising Fund (NAF) to acquire a list of businesses in order to identify potential corporate national account customers, contrary to the purposes for which those contributions are to be used as set forth in the franchise agreement.  (*Id*., ¶¶ 124-27.)

Based on these allegations, EAIFA asserts that EAI has breached the franchise agreement and the covenant of good faith and fair dealing as well as violated the franchise disclosure laws. (*Id*., ¶¶ 122, 128-29.)

### 6.     Dippedfruit.com

EAI recently developed a website known as dippedfruit.com through which it sells certain "dipped fruit" products that are also sold in most, if not all, Edible Arrangements stores, as well as other products that are sold exclusively through the dippedfruit.com website.  (*Id*. ¶ 130.)  EAI represents to its franchisees that an order placed through the dippedfruit.com website will be filled by an Edible Arrangements store that is closest in proximity to the customer or the zip code selected for delivery, provided that the zip code is serviced by an existing Edible Arrangements store.   (*Id*.,  ¶  134.)    However,  EAI  permits  only  certain  selected "dippedfruit.com.-approved"  franchisees  to  fill  customer  orders  placed  through  the dippedfruit.com  website,  even  where  the  franchisee  that  is  selected  to  fill  the  order  is encroaching on the exclusive territory of a non-dipped.fruit.com-approved franchisee.  (*Id*., ¶ 137.)  In addition, EAI has routinely used its franchisees' NAF contributions to promote, advertise  and  further  develop  the  dippedfruit.com  concept  and  website,  even  though  the dippedfruit.com website and the products offered through it do not uniformly benefit all Edible Arrangements  franchisees,  and  even  though  the  dippedfruit.com  brand  lacks  any  apparent affiliation with the Edible Arrangements brand and is actually a new franchise concept.  (*Id*., ¶¶ 138-39.)

Based  on  these  allegations,  EAIFA  asserts  that  EAI's  use  of  franchisees'  NAF contributions to promote "an entirely different concept" at the expense of its franchisees constitutes a misuse of those contributions, a breach of the franchise agreement and a breach of the implied covenant of good faith and fair dealing.  (*Id*., ¶ 140.)

The Complaint contains a single count for a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*  Based on the allegations described above, the Complaint seeks a declaration that, among other things, (1) EAI's implementation of the EAConnect program and its associated fees is not permitted under one or more unspecified versions of EAI's franchise agreement, and was an abuse of EAI's discretion under the franchise agreements, was implemented in bad faith, and is a violation of the implied covenant of good faith and fair dealing; (2) EAI's implementation of the other changes to its franchise system, including the extended hours requirement, the Enhanced Fresh Program, the Store 98 commission, and the dippedfruit.com concept, also was an abuse of its discretionary authority under the franchise agreements, was done in bad faith, and is a violation of the implied covenant of good faith and fair dealing; (3) Netsolace breached its contractual obligations to EAI franchisees under their SSAs, and EAI's requirement that all franchisees continue to use Netsolace in light of this contractual breach was a violation of EAI's implied duty of good faith and fair dealing; (4) EAI's conduct in implementing the various changes to its system was in violation of CUTPA; and (5) EAI's right to modify its operations manual to reflect changes to its system standards does not permit EAI to implement the various programs and changes challenged in the Complaint.  (*Id*., ¶ 151.)

The Complaint does not allege that EAIFA has standing on its own to assert the claims alleged but rather that it has associational standing to bring claims on behalf of its members.  To that end, the Complaint alleges that "at least one of [EAIFA's] members (indeed, all of its members) will suffer injury in fact by the real and immediate threatened harm from defendants' conduct."  (*Id*., ¶ 21.)  The Complaint further alleges that the interests sought to be protected by the lawsuit are germane to EAIFA's purposes, which are set forth in its By-Laws.  (*Id*., ¶¶ 23-

24.)  Lastly, the Complaint alleges that neither the claims asserted nor the relief requested will require the participation of EAIFA's individual members because the claims for breach of contract and statutory violations can be proven through EAI's own internal documents and data as well as through expert testimony and will not require determination on an individual franchisee-by-franchisee basis, and that because only declaratory relief is sought, there are no potentially differing claims for money damages.  (*Id.*, ¶ 25.)

Significantly, the Complaint also asserts that the franchise agreements executed by EAI's franchisees are "substantially similar in form and substance," (*id.,* ¶ 9), and throughout the Complaint there are references to "the franchise agreement" (singular) as containing certain provisions or EAI's conduct being in breach of "the franchise agreement" (singular).  (*See, e.g., id.,* ¶¶ 48-53, 54, 72, 105, 129, 140.)   In fact, EAIFA attaches only one version of the EAI franchise agreement as an exhibit to the Complaint – a version used for franchisees who joined the system from approximately April 2004 through early 2006.  (*Id.,* ¶ 48 and Ex. A attached thereto.)

## III.    PLAINTIFF HAS NOT ESTABLISHED THE ELEMENTS OF ASSOCIATIONAL STANDING.

### A.    Plaintiff's Allegations of Standing are not Entitled to a Presumption of Truth.

A challenge to a plaintiff's standing to raise claims is a challenge to the court's subject-matter jurisdiction and thus is "an important component of the Article III jurisdictional limit of federal courts to decide 'cases' or 'controversies'."  *Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006).  While ordinarily a court considering a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) must accept as true all material factual allegations in the complaint, the Second Circuit has observed that "when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be

shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (citing *Norton v. Larney*, 266 U.S. 511 (1925)).  Moreover, because federal courts are courts of limited jurisdiction, the party asserting federal jurisdiction bears the burden of proof on that issue.  *See, e.g., Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996).   In making its determination under Rule 12(b)(1), a court may consider affidavits and other materials outside the pleadings.  *See, e.g., Robinson v. Government of Malaysia,* 269 F.3d 133, 141 (2d Cir. 2001).

**B.**     **Plaintiff Must Establish Three Elements to Satisfy Associational Standing.**

The doctrine of standing "embraces both 'constitutional' and 'prudential' requirements." *Center for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 195-96 (2d Cir. 2002) (quoting *Sullivan v. Syracuse Hous. Auth.,* 962 F.2d 1101, 1106 (2d Cir. 1992)).  The "irreducible constitutional minimum" of standing contains three elements:  "(1) the plaintiff must have suffered an 'injury-in-fact,' meaning an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent, and not conjectural or hypothetical; (2) there must be a 'causal connection' between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable ruling." *Alliance for Open Society Int'l, Inc. v. United States Agency for Int'l Dev.*, 570 F. Supp. 2d 533, 539 (D. Conn. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Ordinarily, "a litigant 'must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties.'"  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 715 (2d Cir. 2004) (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)).  However, the doctrine of associational standing "carves <u>only a narrow exception</u> from [this] ordinary rule." *Bano*, 361

F.3d at 715 (emphasis added).  An association has standing to bring suit on behalf of its members only if it satisfies a three-part test set forth by the United States Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977):

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343*; accord Bano*, 361 F.3d at 713-16 (applying *Hunt*'s associational standing test).  In this case, EAIFA has not met its burden of establishing the third prong of the *Hunt* test and therefore lacks standing to maintain this action.[2]

---

[2] In fact, it is doubtful that EAIFA has alleged sufficient facts to meet the first prong of the *Hunt* test – that at least one member of the Association satisfies the constitutional standing requirements of injury-in-fact, causation and redressability.  EAIFA alleges, in entirely conclusory fashion, that "[a]t least one of its members (indeed, all of its members) will suffer injury in fact by the real and imminent threatened harm from Defendants' conduct." (Complaint, ¶ 21.)  However, it does not identify a single member who has suffered an injury-in-fact caused by any one of the six alleged new EAI programs challenged in the Complaint – let alone all six of them.  Moreover, the Complaint simply assumes that all of EAIFA's members – and indeed, all Edible Arrangements franchisees – are similarly situated for purposes of the new initiatives that the Association seeks to challenge, including the extended hours requirement and the Enhanced Fresh Program mandate.  However, that assumption is simply not plausible, since there are certainly some franchisees, and perhaps some EAIFA members as well, for whom the requirements to be open for business on Sunday and to purchase produce from only certain approved vendors have resulted in more satisfied customers, higher quality merchandise for sale and higher profits.  Moreover, with regard to the Store 98 and dippedfruit.com programs, EAIFA readily admits in the Complaint that not all franchisees, including its members, are similarly situated with regard to these issues because only "certain, but not all, of EAI's franchisees, including members of the Association," have exclusive or protected territories that were allegedly violated as a result of EAI's operation of the Store 98 program and the dippedfruit.com concept.  (Complaint, ¶¶ 123, 137.)  As a result, and to comply with its obligation to plead facts that are plausible on their face and not simply legal conclusions, *see Ashcroft v. Iqbal*, -- U.S. -- , 129 S. Ct. 1937, 1949 (2009), EAIFA is required to specifically identify one or more of its members who have suffered an injury-in-fact as a result of the implementation of each EAI initiative under attack in order to satisfy its burden of establishing the standing of its individual members.  Finally, as discussed in more detail below (pp. 32-33), the Complaint is devoid of any allegations – or even plausible inferences from any allegations – that the EAIFA members'

*(footnote continued to next page)*

### C.     <u>Plaintiff has Failed to Establish that the Participation of Individual Members Will Not be Necessary.</u>

Under the third prong of the *Hunt* test, EAIFA must establish that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.  Although *Hunt's* third prong is a prudential rather than a constitutional requirement for standing, *see United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 557 (1996), the Second Circuit has observed that there is "no reason to relax [that requirement] where, in order for the [association] to succeed in the lawsuit, there must be participation by the members themselves."  *Bano*, 361 F.3d at 715.  Moreover, while courts are more inclined to grant associational standing where an association requests equitable relief such as a declaration or an injunction rather than damages, an association does not automatically satisfy the third prong of *Hunt* simply by requesting only equitable relief.  *See Bano*, 361 F.3d at 714.  Rather, an association lacks standing to assert claims for equitable relief on behalf of its members where "the fact and extent" of the injury that gives rise to the claim for equitable relief "would require individualized proof," *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975), or where the "relief requested [would] require [ ] the participation of individual members in the lawsuit," *Hunt*, 432 U.S. at 343.  Moreover, the question of whether the participation of individual members is required does not focus exclusively, or even primarily, on the nature of the remedy sought, but also turns on the nature of the claims asserted and, specifically, whether the elements of those claims can be proven by reference to the defendant's conduct alone or

---

*(footnote continued from previous page)*

injury will "likely" be redressed by a favorable ruling on its claim for declaratory relief, because declaratory relief will neither redress any historical breaches of contract or statutory violations that may have resulted in damages to individual franchisees, nor will it prevent similar conduct from occurring in the future.

require evidence from individual members.  *See, e.g., Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (observing that "the relief sought is only half of the story" under the *Hunt* test, and that the claims asserted must also be examined to determine whether they require individual participation of members).  In this case, both the nature of the claims asserted by EAIFA and the nature of the remedy it seeks require the participation of individual franchisee members; therefore, the third prong of *Hunt* is not satisfied.

The vast majority of associational standing cases arise in the context of a challenge to a statute, regulation or ordinance, and the court is often able to resolve the underlying issue – for example, the constitutionality of a statute – as a matter of law.  *See, e.g., DDFA of South Florida, Inc. v. Dunkin' Donuts, Inc.*, 2002 WL 1187207 at * 7 (S.D. Fla. May 22, 2002).  However, where an association brings a claim for breach of contract or statutory violations based on prohibited conduct, courts have largely rejected associational standing.  *See Dalworth Oil Co., Inc. v. Fina Oil & Chem. Co.*, 758 F. Supp. 410, 413 (N.D. Tex. 1991) (holding that an association's suit on behalf of a group of wholesale motor fuel distributors against an oil company for breach of contract and violations of state deceptive trade practices statute must be dismissed for lack of standing because individual participation by members would be required to determine the contractual claims involved, despite the fact that contracts of the various association members were similar); *Rent Stabilization Ass'n,* 5 F.3d at 596-97 (holding that an association representing landlords lacked standing to claim that application of city's rent control scheme violated constitutional principles because court could not assess whether a member had a claim for relief without "delving into individual circumstances" to determine whether there had been a taking of property); *Friends for American Free Enterprise Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575 (5th Cir. 2002) (holding that association lacked standing to seek injunctive relief

for tortious interference claims because case required participation of individual members of association whose contracts differed); *Rockford Principals and Supervisors Ass'n, v. Board of Education of Rockford School District No. 205*, 721 F. Supp. 948 (N.D. Ill. 1989) (denying association's standing to bring breach of contract claim because individualized proof of contractual obligations was necessary).

Similarly, in the franchise context, where franchisee associations have brought claims for breach of franchise agreements or statutory violations, the vast majority of courts have found that the associations lacked associational standing because construction of the franchise agreements necessarily requires the participation of individual franchisees. For example, in *DDFA of South Florida v. Dunkin' Donuts*, a regional association of franchisees brought suit for a declaration of rights on behalf of its members, claiming that the franchisor had breached the franchise agreement by increasing advertising fees and using part of the increase to fund a national advertising program. The court granted Dunkin Donuts' motion to dismiss for lack of standing, finding that the complaint did not involve a "pure question of law" but rather set forth allegations of tortious conduct and breach of contract that would require the court to make individual determinations as to whether Dunkin Donuts committed various torts against various of the plaintiff-association's members and whether Dunkin Donuts and the franchisees themselves complied with the provisions of the franchise agreement. *See DDFA*, 2002 WL 1187207 at *7-8. The court reached this conclusion despite the fact that the franchise agreements at issue in that case were uniform in nature. *See id.* at * 1.

Likewise, in *Dealer Store Owners Association, Inc. v. Sears, Roebuck & Co.*, 2006 WL 91335 (D. Minn. Jan. 12, 2006), an association of Sears dealers sought a declaratory judgment that Sears had breached its agreements with its dealers by selling Sears-branded products in K-

Mart stores.  In dismissing the case on standing grounds, the court held that "[a]ssociational standing is not appropriate where a plaintiff seeks a declaration of rights on a group of contracts that are not uniform."  *Id.* at *5.  The court noted that "[a]n individual inquiry into each Dealer's Agreement needs to be undertaken to determine whether any breach or threatened breach has occurred.  It is not enough to allege that "many" or "most" of the issues apply to the Dealers, particularly given the allegation that communications outside the written agreement must be considered as part of the Agreement."  *Id.* at *4.

Other courts likewise have denied standing to franchisee associations asserting breach of contract or statutory claims.  *See Dunkin' Donuts Franchised Restaurants LLC v. Shrijee Inv., Inc.*, 2008 WL 5384077 at *11-12 (E.D. Mich. Dec. 23, 2008) (finding that franchisee association lacked standing because "[t]o the extent that the terms of the franchise agreements and the individual circumstances of the franchisees vary one from another, the [association's] claims that Dunkin' breached its contracts with each of the [association's] members are ill suited to mass adjudication," and because "[t]here simply is too great a risk that the divergences in the franchisees' contracts, or in Dunkin's actions towards each of them, will create corresponding incongruities in the facts that the Court will be required to consider, the aspects of the case that each franchisee will wish to stress, and the ultimate question whether each franchisee was actually harmed. . . . [A]n umbrella organization such as a franchisee association simply is not in as good a position to present such subtleties to a Court."); *Michigan Dairy Queen Operators' Ass'n v. International Dairy Queen, Inc.*, 2008 WL 2566547 at *1-5 (W.D. Mich. June 9, 2008) (holding that franchisee association lacked standing to sue where court could not meaningfully construe contracts involving parties not before the court); *S.N.D.A. v. Sonitrol Corp.*, 2009 WL 6522485 (Cal. Super. Dec. 22, 2009) (granting summary judgment dismissing franchisee

association's breach of contract claims because differences in forms of franchise agreement at issue required participation of individual franchisee members); *see also Jon Swierzewski, Standing in Franchise Disputes:  Check the Invitations, Not Every Party Gets Inside*, 26 Franchise L.J. 107, 111-12 (2007) (observing that franchisee associations claiming breach by a franchisor of their members' franchise agreements "rarely, if ever, can satisfy the requirements of *Warth" v. Seldin*); *William B. Steele III and A. Darby Dickerson, Standing Issues Related to Franchisee Associations,* 12 Franchise L.J. 99, 101-02 (1993).[3]

### (a)  Plaintiff's claims by their nature require the participation of individual member-franchisees

The most compelling and obvious reason why participation of EAIFA's individual members is necessary in this case is that all of the claims asserted fall squarely within the scope of the individual arbitration agreements that exist between EAI and its franchisees, including EAIFA members.  As noted above, since shortly after EAI began franchising in 2001, its standard form of franchise agreement has included a very broad arbitration clause requiring franchisees to arbitrate all "controversies, disputes, or claims between EA[I] and its affiliates, . . . and Franchisee . . . arising out of or related to: (1) this [franchise] Agreement or any other

---

[3]    A recent decision from the Southern District of Florida, in a case involving a franchisee association's challenge to Burger King's maximum pricing policy for certain menu items, is readily distinguishable.  *See National Franchisee Ass'n v. Burger King Corp.,* 715 F. Supp. 2d 1232 (S.D. Fla. 2010).  In that case, the court rejected a standing challenge because (i) there was only one form of franchise agreement at issue, (ii) the issue for determination – whether Burger King exercised its discretion in good faith in imposing a maximum price on a particular menu item – was focused primarily on Burger King's decision-making process and not its effect on individual franchisees, and (iii) the court accepted the association's representation, at least "at this stage of the litigation," that it would prove bad faith by reference to Burger King's own internal documents and data, as well as expert testimony, and not through the testimony of individual franchisees.  *Id.* at 1240.  The court later dismissed the association's claims on the merits and thus will not have an opportunity to revisit the standing issue.  *See National Franchisee Ass'n v. Burger King Corp.,* 2010 WL 481922 (S.D. Fla. Nov. 19, 2010).

agreement between them; (2) EA[I]'s relationship with Franchisee; (3) the validity of this [franchise] Agreement or any other agreement between them; or (4) any System Standard." (Ferguson Decl. ¶ 14, Ex. B.)   The claims advanced by EAIFA on behalf of its franchisee members for breach of contract, breach of the covenant of good faith and fair dealing and violations of CUTPA based on EAI's disclosure practices and implementation of alleged new initiatives in the franchise system fall well within the broad scope of those arbitration agreements.   As such, franchisees of EAI who choose to assert these types of claims against EAI or its affiliates must do so in an arbitration proceeding in accordance with the terms of the arbitration provisions in their individual franchise agreements.

The members of EAIFA, however, have attempted to skirt their obligation to arbitrate by advancing their claims through an association that has no right or obligation to arbitrate against EAI on behalf of its members.   This is a blatant misuse of the associational standing doctrine and flies in the face of the strong federal policy favoring enforcement of agreements to arbitrate.   *See, e.g., Connecticut State Medical Society v. Oxford Health Plans (CT), Inc.*, 272 Conn. 469, 480, 863 A.2d 645, 651 (2005) (finding that plaintiff association did not have standing to assert claims of its members who were parties to arbitration agreements with defendant because to do so "would be to countenance an end run around those arbitration provisions, a result that is incompatible with the express agreements of the parties to those contracts"); *Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*, 2000 WL 33365907 at * 7 (W.D. Pa. Mar. 24, 2000) (observing that "avoidance of an arbitration provision by suing through a surrogate is simply not an appropriate use of associational standing," and that an arbitration agreement which binds the individual members of an association would likewise be binding upon an association suing in a representational capacity), *rev'd on other grounds,* 280 F.3d 278

(3d Cir. 2002); *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 713 F. Supp. 2d 734, 744 (N.D. Ill. 2010) (finding that association of chiropractic physicians lacked standing under the third element of the *Hunt* test because "the participation of individual members is required to determine whether which if any of their claims are subject [to] arbitration"); *In re Managed Care Litigation*, 2003 WL 22410373 at *9 (S.D. Fla. Sept. 15, 2003) (finding that the participation of association's individual members bound by agreements to arbitrate was unavoidable under *Hunt* since they would need to defend against motion to compel arbitration, and observing that "[a]ssociations suing in a representative capacity are generally  bound by the same limitations and obligations as the members that they represent").   Thus, because the individual members of EAIFA all agreed to arbitrate their disputes with EAI and its affiliates, the participation of those members in resolving disputes in accordance with their arbitration agreements is required under *Hunt*.   Anything less would undermine the strong federal policy favoring arbitration by permitting EAIFA members to use a surrogate organization to disregard their arbitration agreements and pursue claims in court that should be resolved only through arbitration.[4]

    While the obligation of each EAIFA member to arbitrate its disputes with EAI is a sufficient reason, without more, to deny standing in this case, a closer look at the individual claims asserted by EAIFA demonstrates all the more conclusively that participation of individual franchisee members is required.

---

[4]  In fact, EAIFA lacks standing to enforce the franchise agreements of its members in any forum because there is no allegation or evidence that it was ever assigned the right to pursue these contract claims by its individual members.  *See Council of Hygiene Franchisees v. Swisher Hygiene Franchise Corp.*, No. CV-02-6136 (C.D. Cal. May 30, 2003) (dismissing franchisee association's complaint for lack of standing because there was no proof that association "has been expressly granted the authority by assignment, agreement or otherwise to bring suit under the individual contracts in issue") (attached hereto as Exhibit A).

### (i) **EAConnect Program**

As noted above, EAIFA alleges that EAI committed disclosure violations, and hence violated CUTPA, by failing to properly disclose the fees it is entitled to charge under the EAConnect Program and also violated the franchise agreements and the covenant of good faith and fair dealing by imposing or reserving the right to impose those fees.  (Complaint, ¶¶ 73-74.) However, contrary to EAIFA's allegation that the franchise agreements at issue "are substantially similar in form and substance" (*id.*, ¶ 9), with respect to the issue of EAI's ability to charge franchisees a fee under the EAConnect Program for referring them orders through its website or call center, there are at least three significantly different versions of the franchise agreement at issue and at least as many different versions of FDDs.  (Ferguson Decl., Exs. C-F, I-J.)  While EAI believes that under all of the relevant versions of its franchise agreement and FDD it has the right to charge a fee for referral of on-line or call center orders to franchisees, the Court will have to construe the various forms of franchise agreements and FDDs at issue in order to declare the rights of the parties under each form of franchise agreement and evaluate EAI's disclosure under each form of FDD.  That undertaking, in turn, will require each individual member of EAIFA to establish which form (or forms) of FDD it received and which version of the franchise agreement it executed.

Furthermore, because EAI's disclosure practices and conduct under the franchise agreements with respect to the EAConnect Program – and, indeed, with respect to all of the initiatives challenged in the Complaint – are alleged to give rise to violations of CUTPA, individual franchisee participation will be required to establish standing under CUTPA.  That statute requires a plaintiff to establish an "ascertainable loss of money or property" as a result of the challenged action of the defendant, even in cases where only declaratory relief is sought. Conn. Gen. Stat. § 42-110g; *see, e.g., Parker v. Shaker Real Estate, Inc.*, 47 Conn. App. 489,

496, 705 A.2d 210 (1998).  This required showing of an ascertainable loss will depend not only on the form of FDD received by each franchisee but also on each franchisee's individual circumstances establishing a loss of money or property as a result of the alleged improper disclosure of EAI's right to charge a fee on internet or call center orders.

Another reason why EAIFA's claims relating to the EAConnect Program require the participation of individual franchisees is that EAIFA alleges that, under the program, EAI is able to "exert unfettered corporate control over all facets of customer orders," and that this level of control is unreasonable and contrary to the franchisees' expectations when they joined the Edible Arrangements system.  (Complaint, ¶¶ 64-65).  However, to the extent that individual franchisees generate the bulk of their business through walk-in trade or customers directly contacting their stores rather than placing orders through the EAI website or call center, those franchisees would be far less adversely impacted by the EAConnect Program insofar as their ability to control product sales is concerned.  Thus, proof of individual impact on franchisees will be necessary for EAIFA to prevail on its claim that the EAConnect Program represents an unreasonable imposition on its members' control over their businesses.

### (ii) <u>Netsolace</u>

EAIFA alleges that EAI's refusal to permit franchisees to buy software or hardware from vendors other than its affiliate Netsolace was a breach of the franchise agreement and EAI's implied duty of good faith and fair dealing.  (Complaint, ¶ 92.)  EAIFA also alleges that the relationship between EAI and Netsolace as well as their common ownership was not properly disclosed to prospective franchisees. (*Id.*, ¶ 76.)  As just discussed, there are multiple versions of the franchise agreement and FDD at issue, and individual franchisee participation therefore will be necessary to establish which version of the franchise agreement each franchisee executed and which version of the FDD each franchisee received.  In addition, for purposes of establishing a

CUTPA violation, each franchisee will need to demonstrate an ascertainable loss of money or property from the alleged lack of proper disclosure of the Netsolace-EAI relationship or from the inability to purchase software or hardware from another vendor, which many franchisees may not be able to demonstrate depending on the other sources of hardware or software available to them, as well as whether and to what extent they were experiencing "glitches" in the Netsolace software. (*Id.*, ¶ 86).

### (iii)  Extended Hours Mandate

EAIFA's challenge to the extended hours requirement likewise will require the participation of individual franchisee members to establish that claim.  One provision of the franchise agreement that speaks to this issue, and appears in each franchise agreement version at issue, permits EAI to "change and modify the System" and obligates the franchisee to "make such expenditures as such changes or modifications in the System may reasonably require." (Ferguson Decl., ¶ 8.)  While EAI believes that its policy requiring franchisees to be open for limited Sunday hours and bear whatever incremental increase in operating costs that policy entails falls well within the parameters of "reasonableness" under the franchise agreements, the individual circumstances of EAIFA's members in remaining open on Sundays are likely to vary widely depending on their particular operational experience and cost structure and the amount of additional business generated as a result of staying open the additional hours.  Since EAIFA is challenging this requirement on the grounds of reasonableness, proof of whether the extended hours requirement is reasonable will necessitate individual proof from each franchisee as to the effect of that requirement on its business and whether it was actually harmed as a result.  *See Rent Stabilization Ass'n*, 5 F.3d at 597 (observing that associational standing is lacking under *Hunt's* third prong where "it is impossible to discern the identity of the aggrieved parties without delving into individual circumstances").

In addition, EAIFA alleges that the extended hours requirement violates the franchisees' expectations of how much time they would have to devote to their businesses based on certain representations made to them by EAI's CEO and other EAI representatives at the time they entered into their franchise agreements. (Complaint, ¶¶ 95-96.) As a result, testimony from each individual franchisee will be necessary to establish whether such representations were in fact made, what expectations were formed as a result of those representations, whether those expectations were reasonable, and whether the extended hours requirement is a violation of those expectations. *See, e.g., Dealer Store Owners Ass'n,* 2006 WL 91335 at * 4 (finding that the participation of individual franchisees was necessary because allegations of the complaint made representations outside the four corners of the franchise agreements relevant to determination of declaratory judgment claims).

Finally, EAIFA alleges that EAI has not uniformly enforced the extended hours requirement, in "certain instances" depriving franchisees of their internet ordering capabilities and granting exemptions to some franchisees but not others for religious purposes (Complaint, ¶¶ 100, 103-104.) EAIFA points to this "arbitrary and capricious" unequal treatment of franchisees as further evidence that the extended hours requirement is an abuse of EAI's discretion to make changes to the system. (*Id.* ¶¶ 104-05.) Clearly, then, individual franchisees will need to testify regarding this alleged disparate treatment.

### (iv) Enhanced Fresh Program Mandate

EAIFA alleges that EAI did not properly disclose its program to require all franchisees to purchase produce products from a limited group of approved vendors and did not have the right under the franchise agreement to mandate purchases of produce from these vendors. (Complaint, ¶¶ 106-07.) As mentioned above, since there are various versions of the FDDs and franchise agreements at issue during the relevant time period, individual franchisee participation will be

necessary to establish which version of the FDD each franchisee received and which version of the franchise agreement each franchisee executed.

In addition, EAIFA alleges that franchisees could receive produce orders "far more quickly, efficiently, [ ] economically and of a higher quality" by using alternative produce suppliers rather than those designated by EAI under the new program. (*Id.*, ¶ 108.) However, each individual franchisee's experience will necessarily vary widely with respect to its ability to obtain produce more quickly, more cheaply and of a higher quality, which will require each franchisee's individual testimony.

Finally, EAIFA alleges that the Fresh Program Mandate has not been uniformly enforced throughout the EAI system, with "certain, but not all, of EAI's franchisees" allegedly cited for noncompliance, "some, but not all, 'non-compliant' franchisees" having their internet order capabilities suspended or being shipped product that they did not order, and "only certain" of the franchisees threatened with default and termination or other sanctions. (*Id.*, ¶¶ 110-13.) Again, EAIFA cites these instances of disparate treatment as "further evidence of the arbitrary and capricious manner in which EAI has imposed and continues to impose [the Enhanced Fresh Program] and other mandates discussed herein." (*Id.*, ¶ 111.) Individual franchisee testimony will therefore be necessary to establish all of these alleged instances of unequal and non-uniform enforcement of the Enhanced Fresh Program Mandate.

### (v) Store 98

EAIFA alleges that EAI failed to properly disclose that it would charge a 20% commission on orders from corporate customer national accounts referred to franchisees for fulfillment through its "Store 98" program, and that the 20% commission charge also violated the covenant of good faith and fair dealing in EAI's franchise agreement. (*Id.*, ¶¶ 122, 129.) Once again, because there are various forms of FDDs and franchise agreements at issue, and

some of the latter expressly refer to corporate customer national accounts and EAI's ability to charge up to a 20% commission for national account orders referred to franchisees inasmuch as those orders are processed through the EAConnect Program, individual franchisee participation in the lawsuit will be necessary to establish which version of the FDD each member of EAIFA received and which version of the franchise agreement each member executed.  Furthermore, EAIFA alleges that "certain, but not all, of EAI franchisees, including members of [EAIFA]," were granted exclusive territories in their franchise agreements, and that EAI is encroaching on these territories by directly soliciting corporate customer orders from within these exclusive territories.  (*Id.*, ¶ 123.)  As such, testimony from individual franchisees will be essential to establish the nature and extent of their claimed territorial exclusivity as well as EAI's conduct in allegedly directly soliciting corporate account orders from customers residing in those exclusive territories.

Finally, EAIFA alleges that EAI's use of its members' NAF contributions to purchase a list of businesses for soliciting potential corporate accounts is a violation of the franchise agreement, which restricts the use of those contributions for certain enumerated promotional and marketing purposes.  (*Id.*, ¶¶ 124-27.)  As a result, individual franchisees will need to testify regarding the particular form of franchise agreement they executed to establish whether that version prohibited the alleged use of NAF contributions to purchase the list of businesses for soliciting corporate accounts.

### (vi) Dippedfruit.com

Similar to its contentions regarding the Store 98 concept, EAIFA alleges that EAI's implementation of its dippedfruit.com program encroaches on the exclusive territories of certain Edible Arrangements franchisees who have been given exclusive rights to deliver the very same products available through the dippedfruit.com website to customers residing in those exclusive

territories, and that EAI is improperly using NAF contributions to market and promote the dippedfruit.com program, in violation of the restrictions in the franchise agreement on the use of those funds.   (*Id.*, ¶¶ 137-40.)   Therefore, testimony from individual franchisees will be necessary to establish their unique areas of exclusivity under their franchise agreements as well as EAI's purported conduct in breaching that exclusivity by permitting other, dipped.fruit.com-approved franchisees to fill orders for customers residing in those exclusive territories.   In addition, individual franchisee participation will be required to establish the terms of the individual franchise agreements relating to the use of NAF contributions.

(b)   <u>Plaintiff's requested declaratory relief requires the<br>participation of individual member-franchisees</u>.

EAIFA also cannot meet its burden of proving under the third prong of the *Hunt* standing test that "the relief requested" does not require "the participation of individual members in the lawsuit."   *Hunt*, 432 U.S. at 333.   As noted above, the extent of the relief that EAIFA seeks is a declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.,* that EAIFA has breached the terms of its franchise agreements with EAIFA's members and violated CUTPA by engaging in the various types of conduct described in the Complaint.

This Court's jurisdiction over declaratory judgment actions is discretionary, not mandatory.   *See, e.g., Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 495 (1942); *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).   As the Second Circuit stated in *Dow Jones v. Harrods*:

> The Declaratory Judgment Act by its express terms vests a district court with discretion to determine whether it will exercise jurisdiction over a proposed declaratory action or not.  The statute reads, 'In a case of actual controversy within its jurisdiction . . . any court of the United States . . . <u>may</u> declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  28 U.S.C. § 2201(a) (emphasis added).  Courts have consistently interpreted

> this permissive language as a broad grant of jurisdiction over a declaratory action that they would otherwise be empowered to hear.

346 F.3d at 359.

The Second Circuit has adopted a five-factor test for district courts to use in determining whether to exercise jurisdiction over a declaratory judgment action. *See id.* at 359-60. Those factors are:

(1.)   whether the judgment will serve a useful purpose in clarifying or settling the issues involved;

(2.)   whether a judgment would finalize the controversy and offer relief from uncertainty;

(3.)   whether the proposed remedy is being used merely for "procedural fencing" or a "race to res judicata";

(4.)   whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and

(5.)   whether there is a better or more effective remedy.

*See id.*

This Court will have no meaningful way of applying the *Dow Jones* factors in deciding whether to exercise its discretion without taking evidence from individual franchisees relating to the various factors, particularly the first, second and fifth factors. Despite seeking declaratory relief related to the franchise agreements, the gist of EAIFA's Complaint is not that the parties differ in their *interpretation* of specific contract language that could usefully be resolved through the issuance of a declaratory judgment by the Court. Rather, the primary focus of the Complaint

is on the various breaches of contract and statutory violations that EAI allegedly has committed

by implementing the programs challenged in the Complaint.  As the court in *DDFA of South*

*Florida v. Dunkin' Donuts* observed in concluding under similar circumstances that declaratory

relief was inappropriate in that case:

> Questions regarding whether torts have been committed or a
> contract has been adequately performed require individual
> determinations of conduct with respect to an unknown number of
> unnamed franchises.  As such, DDFA alleges an array of tortious
> acts and breach of contract claims, which cannot be addressed by a
> declaration of the parties' respective rights and obligations under
> the contract.  Accordingly, the court finds that DDFA has not
> sufficiently alleged a basis upon which declaratory relief would be
> useful in clarifying the legal relations in issue or would resolve
> uncertainty regarding the controversy giving rise to the
> proceedings.

*DDFA of South Florida*, 2002 WL 1187207 at *6.  Likewise, in this case, the Court will need to

make individual determinations regarding whether EAI breached its franchise agreements with

each of EAIFA's members and committed statutory violations against each of them by engaging

in the alleged wrongful conduct described in the Complaint.  Thus, this case is particularly

unsuitable for declaratory relief.

Moreover, because EAIFA is not seeking either damages or injunctive relief in

conjunction with its request for a declaratory judgment, the Court will need to hear testimony

from each individual franchisee establishing that, if the Association were to prevail on its claims,

a declaration would "settle the issues involved" and would "finalize the controversy," and that

the franchisee would not have a "more effective remedy" by seeking damages and/or injunctive

relief in an individual arbitration proceeding.  *See, e.g., Michigan Dairy Queen Operators' Ass'n*

*v. International Dairy Queen, Inc.*, 2008 WL 2566547 at *3-4 (denying standing to franchisee

association because association's breach of franchise agreement case was being used more as a

"negotiating lever" than a way to finally resolve the parties' controversy and because individual franchisees had a more effective remedy by bringing individual claims for breach of contract).

It is beyond dispute that EAIFA's members are not at all similarly situated regarding the impact of EAI's alleged wrongful conduct or their desire or wherewithal to pursue additional relief if EAIFA is successful on its claims. As a result, this Court cannot properly weigh the discretionary factors in *Dow Jones* without taking into account the individual circumstances of each franchisee member in determining whether a declaratory judgment will "settle the issues" and "finalize the controversy," and whether there is a "better or more effective remedy" for the individual members to pursue. If EAIFA prevails on its claims for declaratory judgment, some of its members will be content with that result. Other members, however, especially those who believe they have sustained significant harm as a result of the claimed breaches or statutory violations, undoubtedly will want to pursue individual claims for damages. Still other members will want to pursue individual claims for injunctive relief to prevent continuing breaches or statutory violations. The point is that this Court cannot determine in the abstract and from EAIFA's vantage point alone whether declaratory relief will provide sufficient finality or be an effective remedy for individual members of the Association. Indeed, given the widely differing circumstances in which the members of an association of this purported size find themselves, the presumption is that declaratory relief would be a particularly poor substitute for individual arbitration proceedings as required under the members' franchise agreements. As a result, EAIFA has not met its burden of proving that its request for declaratory relief will not require the participation of individual franchisees under *Hunt.*

IV.      **CONCLUSION**

For all of the reasons set forth above, Defendants respectfully request that this Court grant their motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and dismiss this action without leave to amend for lack of subject-matter jurisdiction.

THE DEFENDANTS,
EDIBLE ARRANGEMENTS
INTERNATIONAL, INC., EA CONNECT, INC.,
NETSOLACE, INC. AND DIPPEDFRUIT, INC.


By:   /s/James T. Shearin
      James T. Shearin, Esq. (ct 01326)
      Pullman & Comley, LLC
      850 Main Street, P.O. Box 7006
      Bridgeport, CT  06601-7006
      Juris No. 47892
      Phone:  (203) 330-2000
      Facsimile (203) 576-8888
      E-mail:  jshearing@pullcom.com


By:   /s/John F. Verhey
      John F. Verhey, Esq.
      DLA Piper LLP (US)
      203 North LaSalle Street, Suite 1900
      Chicago, IL  60601-1293
      Phone:  (312) 368-4044
      Facsimile:  (312) 251-2194
      E-Mail:  john.verhey@dlapiper.com

## <u>CERTIFICATION</u>

I hereby certify that on December 6, 2010, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/John F. Verhey
*Admitted Pro Hac Vice*