# GROUP EXHIBIT A

Westlaw

Slip Copy, 2011 WL 63992 (D.Conn.)
**(Cite as: 2011 WL 63992 (D.Conn.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
PHOENIX SURGICALS, LLC, Plaintiff,
v.
BLACKSTONE MEDICAL, INC. d/b/a Orthofix
Spinal Implants, Defendant.

No. 3:10-CV-1643 (WWE).
Jan. 3, 2011.

Adam T. Boston, Dominic Fulco, III, Reid & Riege, P.C., Hartford, CT, for Plaintiff.

Brian J. Hurst, J. Brent Alldredge, Baker & McKenzie, Dallas, TX, Richard P. Colbert, Day Pitney LLP, Stamford, CT, for Defendant.

### *MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR RECONSIDERATION*

WARREN W. **EGINTON**, Senior District Judge.
*1 Plaintiff Phoenix Surgicals, LLC moves (Doc. # 24) for the Court to reconsider its ruling dismissing this action against defendant Blackstone Medical, Inc., d/b/a Orthofix Spinal Implants ("Orthofix") pursuant to Federal Rule of Civil Procedure 12(b)(3). For the following reasons, the motion for reconsideration will be granted and, upon reconsideration, the Court will vacate the judgment previously entered and grant defendant's motion to dismiss in part.

### BACKGROUND
The underlying facts and the identities of the parties are set forth in the Court's memorandum of decision issued on November 17, 2010 (Doc. # 21). For the ease of the reader, the Court will restate the relevant forum selection clause contained in the parties' agreement. It provided:

The validity, interpretation, performance and en-

forcement of this Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas. All disputes which arise in connection with, or are related to this Agreement or any breach thereof, shall be resolved, if not settled, by litigation only in Collin County, Texas or Dallas County, Texas or the Federal Court otherwise having territorial jurisdiction over such counties and subject matter jurisdiction over the dispute, and not elsewhere. To this end, [Phoenix] waives any rights it may have to insist that litigation to which it is a party be had in any other venue other than above court, and covenants not to sue [Orthofix] in any court other than the above-referenced court. Should this provision be void pursuant to applicable State law, all other provisions in this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

In its previous decision, the Court dismissed this action because of the forum selection clause in the parties' sales representative agreement. Plaintiff filed the instant motion on November 22, 2010 (Doc. # 24) seeking reconsideration of the Court's ruling.

### DISCUSSION
A **motion** for reconsideration may be based solely upon "matters or controlling decisions which counsel believes the Court overlooked in the initial decision or order." Local R. Civ. P. 7(c)(1). Such a motion should be granted only where the Court has overlooked facts or precedents which might have "materially influenced" the earlier decision. *Park South Tenants Corp. v. 200 Cent. Park South Assocs. L.P.*, 754 F.Supp. 352, 354 (S.D.N.Y.1991). The movant's burden is made weighty to avoid "wasteful repetition of arguments already briefed, considered and decided." *Weissman v. Fruchtman*, 124 F.R.D. 559, 560 (S.D.N.Y.1989).

In ruling on a motion under Rule 12(b)(3), the plaintiff bears the burden of showing that the venue

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 63992 (D.Conn.)
**(Cite as: 2011 WL 63992 (D.Conn.))**

is proper. *Indymac Mortg. Holdings, Inc. v. Reyad,* 167 F.Supp.2d 222, 237 (D.Conn.2001). If venue is improper, the court may dismiss or transfer the case to any district in which the action could have originally been brought. *Johnsen, Fretty & Co. v. Lands S., LLC,* 526 F.Supp.2d 307, 310 (D.Conn.2007).

*\*2* A forum selection clause "made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason ... [,] should be honored by the parties and enforced by the courts." *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). So long as the plaintiff was not inappropriately induced into entering into the agreement, the forum selection clause will be enforced. *Effron v. Sun Line Cruises. Inc.,* 67 F.3d 7, 9-10 (2d Cir.1995); *S & L Birchwood, LLC v. LFC Capital, Inc.,* 2010 U.S. Dist. LEXIS 109435, 2010 WL 4052187 (E.D.N.Y. Oct. 13, 2010) (finding venue not proper where forum selection clause was mandatory and provided alternative forum).

Determining whether a forum selection clause is enforceable requires a four-step analysis:

The first inquiry is whether the clause was reasonably communicated to the party resisting enforcement. The second step requires us to classify the clause as mandatory or permissive, i.e., to decide whether the parties are required to bring any dispute to the designated forum or simply permitted to do so. Part three asks whether the claims and parties involved in the suit are subject to the forum selection clause.... The fourth, and final, step is to ascertain whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.

*Phillips v. Audio Active, Ltd.,* 494 F.3d 378, 383-84 (2d Cir.2007). Enforcement is unreasonable

if: (1) its incorporation into the agreement was the result of fraud or overreaching; (2) plaintiff will for all practical purposes be deprived of its day in court due to the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive plaintiff of a remedy; or (4) the clause contravenes a strong public policy of the forum state. *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.1993).

Defendant argues that the choice of forum provision in the parties' agreement means that this Court provides an improper venue for this action. Plaintiff contends that the Connecticut Franchise Act ("CFA") bars enforcement of the forum selection clause contained in the parties' agreement. The CFA states that "any waiver of the rights of a franchisee under sections 42-133f or 42-133g which is contained in any franchise agreement ... shall be void." Conn. Gen.Stat. § 42-133f(f). Relying on this provision, plaintiff argues that the forum selection clause is unreasonable and void.

In its previous ruling, the Court relied upon the Supreme Court's opinion in *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 32, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988), for the proposition that when a federal court sits in diversity, as the Court does now, the validity of a forum selection clause is determined based on federal law, not state law. *Stewart,* however, is not applicable to this case, and the Court should not have relied upon it. *Stewart* addressed the transfer of a case for improper venue, not the dismissal. When reviewing a motion under Rule 12(b)(3), the Court's analysis should be guided by *M/S Bremen* and *Phillips. See Phillips,* 494 F.3d at 384-85 ("[I]t is well established in this Circuit that the rule set out in *M/S Bremen* applies to the question of enforceability of an apparently governing forum selection clause, irrespective of whether a claim arises under federal or state law."); *Jones v. Weibrecht,* 901 F.2d 17, 19 (2d Cir.1990) ( "A motion to transfer an action to another federal district pursuant to section 1404(a) calls for an individualized, case-by-case consideration of convenience

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 63992 (D.Conn.)
**(Cite as: 2011 WL 63992 (D.Conn.))**

and fairness. The same broad-based balancing is not appropriate where, as here, a party seeks to have an action dismissed or remanded to state court, rather than transferred, on the basis of a forum selection clause that purports to preclude litigation from a venue other than a specific state court."). State law on the enforceability of a forum selection clause remains applicable.

**\*3** The only relevant consideration before the Court is the public policy of the state of Connecticut as expressed by the anti-forum selection clause provision of the CFA. Courts have recognized the strong public policy of the state of Connecticut against the enforcement of forum-selection clauses in franchise agreements. *See Sherman St. Assocs., LLC v. JTH Tax, Inc.,* 2009 U.S. Dist. LEXIS 13105, \*8, 2009 WL 426469 (D.Conn. Feb. 20, 2009) (" *Sherman II* ") ("Connecticut has a strong public policy, demonstrated by the CFA and its 'remedial purpose' of preventing a franchisor from unfairly exerting its economic leverage to take advantage of a franchisee, that weighs against allowing a Connecticut franchisee to waive its right to the protections of the CFA."); *Sherman St. Assocs., LLC v. JTH Tax, Inc.,* 2004 U.S. Dist. LEXIS 21102, \*28, 2004 WL 2377227 (D.Conn. Sept. 30, 2004); *Pepe v. GNC Franchising, Inc.,* 46 Conn.Supp. 296, 750 A.2d 1167 (2000).

Defendant relies on *Roby* and *Timberland Machs., & Irrigation, Inc. v. Echo, Inc.,* 2009 U.S. Dist. LEXIS 31035, 2009 WL 996044 (D.Conn. Apr. 13, 2009), to support its view that the Court should give no effect to the state's public policy. In *Roby,* the Court of Appeals found that the plaintiffs had failed to establish a sufficiently strong public policy that would rebut the presumption of enforceability. *See S.K.I. Beer Corp. v. Baltika Brewery,* 612 F.3d 705, 711-12 (2d Cir.2010). In *Timberland,* the Court addressed a motion to transfer, which, as noted earlier, requires a different analysis than a motion to dismiss. The strong public policy underlying the CFA is sufficient to find that the forum selection clause is unreasonable under *Roby.*

In light of the clear public policy of the CFA, the forum selection clause of the parties' agreement is unenforceable by this Court because it is unreasonable. Therefore, the Court will grant plaintiff's **motion for reconsideration,** and, upon **reconsideration,** vacate its previous ruling dismissing this action.[FN1]

> FN1. Defendant has asserted that the CFA provision should also not apply because the parties' relationship was not a franchisor-franchisee relationship. Defendant relies on the language of the parties' agreement for this proposition. This argument should be addressed pursuant to Rule 12(b)(6) because it goes to whether plaintiff has properly asserted a claim for a violation of the CFA. On the Court's reading of the complaint, it is apparent that plaintiff has sufficiently stated a claim that it was a franchisee to defendant franchisor. *See* Conn. Gen.Stat. § 42-133e (defining "franchise," "franchisor" and "franchisee"); *see also Ashcroft v. Iqbal,* 556 U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (stating standard on Rule 12(b)(6) motion). Therefore, the Court will not dismiss the CFA claim for failure to state a claim.

Plaintiff's complaint contained two counts. The first was the claim under the CFA; the second was a claim for a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). Because the Court found the forum selection clause enforceable, it dismissed the whole action without addressing how the forum selection clause would affect the CUTPA claim. Now that the Court is reinstating this action, it will review the arguments made in the parties' initial papers and papers on the **motion** for **reconsideration** regarding the CUTPA claim.

The second count of the complaint asserts that Orthofix violated CUTPA by (1) terminating plaintiff's franchise without cause; (2) failing to cooperate with Phoenix in violation of the parties'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 63992 (D.Conn.)
**(Cite as: 2011 WL 63992 (D.Conn.))**

agreement; and (3) failing to deal fairly and in good faith with Phoenix. Section 42-133f(f) provides that a "waiver of the rights of a franchisee under sections 42-133f or 42-133g which is contained in any franchise agreement" is void. The legislature chose this limited language and did not extend its reach to other statutory or common law claims that may be related to a CFA claim. *See Pepe,* 46 Conn.Supp. at 300, 750 A.2d 1167; *see also Sherman II,* 2009 U.S. Dist. LEXIS 13105 at *7-8, 2004 WL 2377227. Therefore, the Court does not have jurisdiction to entertain plaintiff's CUTPA claim, and it must be dismissed. Plaintiff's plea to not dismiss this claim is misplaced. Based on the parties' forum selection clause, this Court is not the appropriate venue for the CUTPA claim. Should plaintiff desire to try all of its claims together, it would be necessary to do so in Texas as contemplated by the parties' agreement.

### CONCLUSION

**\*4** For the foregoing reasons, the Court GRANTS plaintiff's **motion for reconsideration** (Doc. # 24). Upon reconsideration, the Court vacates the judgment it previously entered and grants defendant's motion to dismiss in part. Plaintiff's CFA claim is reinstated, and its CUTPA claim is dismissed. The Clerk is instructed to reopen this case.

D.Conn.,2011.
Phoenix Surgicals, LLC v. Blackstone Medical, Inc.
Slip Copy, 2011 WL 63992 (D.Conn.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2000 WL 33365907 (W.D.Pa.)
**(Cite as: 2000 WL 33365907 (W.D.Pa.))**

►

Only the Westlaw citation is currently available.

United States District Court, W.D. Pennsylvania.
PENNSYLVANIA PSYCHIATRIC SOCIETY,
Plaintiff,
v.
GREEN SPRING HEALTH SERVICES, INC.,
Magellan Health Services, Inc., Highmark, Inc.,
Keystone Health Plan West, Inc., Keystone Health
Plan Central, Inc., and Keystone Health Plan East,
Inc., Defendants.
**No. CIV. A. 99-937.**

March 24, 2000.

George M. Medved, Esquire, Pepper Hamilton,
Pittsburgh.

Phillip H. Lebowitz, Esquire, John A. Valentine,
Esquire, Pepper Hamilton, Philadelphia.

John R. Leathers, Esquire, Sheila Smith DiNardo,
Esquire, Buchanan Ingersoll, Pittsburgh.

Joseph Friedman, Esquire, Stephen F. Ban, Esquire,
Gerri L. Sperling, Esquire, Springer Bush & Perry,
Pittsburgh.

Carleton O. Strouss, Esquire, Patricia C. Camvel,
Esquire, Kirkpatrick & Lochhart, Harrisburg.

Thomas S. Biemer, Esquire, John J. Higson, Es-
quire, Laura E. Vendzules, Esquire, Dilworth Pax-
son, Philadelphia.

MEMORANDUM ORDER

LANCASTER, District J.

**\*1** On June 16, 1999, this case was referred to
United States Magistrate Judge Kenneth J. Benson
for pretrial proceedings in accordance with the Ma-
gistrates Act, 28 U.S.C. § 636(b)(1)(A) and (B),

and Local Rule 72.1.3.

The magistrate judge's report and recommendation,
filed on February 15, 2000, recommended that de-
fendants' motions to dismiss the amended com-
plaint (Docket # 33 and # 36) be granted, and that
plaintiff's motion for preliminary injunction
(Docket # 42) be denied as moot. The parties were
allowed ten (10) days from the date of service to
file objections. Service was made on all counsel by
first-class mail on February 15, 2000. Objections
were filed by plaintiff on March 2, 2000 (Docket #
50), and on March 15, 2000, defendants filed a joint
response to plaintiff's objections (Docket # 52).
After *de novo* review of the pleadings and docu-
ments in the case, together with the report and re-
commendation, objections and response thereto, the
following order is entered:

AND NOW, this 24th day of March, 2000,

IT IS HEREBY ORDERED that defendants' mo-
tions to dismiss the amended complaint (Docket #
33 and Docket # 36) are granted, and that plaintiff's
motion for preliminary injunction (Docket # 42) is
denied as moot.

The report and recommendation of United States
Magistrate Judge Kenneth J. Benson, dated Febru-
ary 15, 2000 (Docket # 49), is adopted as the opin-
ion of the court.

MAGISTRATE JUDGE'S REPORT AND RE-
COMMENDATION

*I. RECOMMENDATION*

It is respectfully recommended that defendant's mo-
tions to dismiss the amended complaint (Docket # s
33 and 36) be granted, and that plaintiff's motion
for preliminary injunction (Docket # 42) be denied
as moot.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33365907 (W.D.Pa.)
**(Cite as: 2000 WL 33365907 (W.D.Pa.))**

## II. *REPORT*

This is an action filed by a non-profit, voluntary association, the Pennsylvania Psychiatric Society (PPS), which has as its members certain licensed psychiatrists who practice in the Commonwealth of Pennsylvania. PPS purports to sue on behalf of some of its members who have, it is alleged, been damaged by the actions of defendants. PPS also asserts claims on behalf of patients, and potential patients, of its member psychiatrists.

Defendant Green Spring Health Services (Green Spring) provides a network of psychiatrists and administrative services to managed health care plans. Magellan Health Services (Magellan) is the corporate parent of Green Spring. Defendants Highmark Inc., Keystone Health Plan West, Inc., Keystone Health Plan Central, Inc., and Keystone Health Plan West, Inc. (collectively referred to as the "HMOs") are health management organizations which contract with Green Spring for the provision of mental health and substance abuse related benefits.

The contractual relationships among the parties are as follows. The HMOs provide health care benefits primarily through employee benefit plans. Green Spring administers the provision of behavioral health and substance abuse services under contract to the HMOs, and provides a network of psychiatrists to service the mental health/substance abuse components of health plans (the Provider Network). The contracts between the HMOs and Green Spring are known as Managed Care Service Agreements. Individual psychiatrists contract with Green Spring pursuant to Provider Participation Agreements through which individual psychiatrists agree to render mental health and/or chemical dependency treatment service to individuals covered by benefit plans. The subscribers to HMO plans receive treatment from the psychiatrists through the plan offered by their HMO, as administered by Green Spring.

*2 The amended complaint in this case sets forth several allegedly improper actions taken by Green Spring and the HMOs which, it is alleged, are de-

signed to maximize their profits at the expense of PPS members and of the HMO subscribers. PPS alleges that this profit maximization is accomplished by the following means: "(1) refusing to credential physician applicants [to the Provider Network], or creating insurmountable obstacles to physician credentialing ( [Amended Complaint] ¶¶ 38-44); (2) imposing overly-burdensome administrative requirements that make providing timely, medically appropriate treatment to patient-subscribers virtually impossible (*Id.,* ¶¶ 45-48, 63-65); (3) failing to pay PPS-member psychiatrists for services rendered, or delaying payments for 'clean claims' beyond the 45-day time limit imposed by section 2166 of the Quality Health Care Accountability and Protection Act (¶¶ 49-51); (4) interfering directly with physician-patient relations (*Id.* ¶¶ 52-53, 74-76); (5) impermissibly discriminating against PPS-member psychiatrists based on profit-driven criteria, their practice specialty, and their geographic location (*Id.* ¶¶ 54-62, 77-79); (6) giving overly-restrictive treatment authorizations that undermine the quality of care received by patient-subscribers (¶¶ 63-70); and (7) making determinations concerning the level and quality of care received by patient-subscribers based on arbitrary criteria that are not based upon medical necessity. (¶¶ 71-73)." (Docket # 39 at 6-7). PPS further alleges that these administrative practices have placed some patient-subscribers in mortal danger, and caused needless suffering by others. PPS further alleges that its members have suffered "financial and professional detriment" from Green Spring's alleged practices. PPS seeks equitable relief to "reform defendants' flawed policies" and "ancillary damages" suffered by PPS members and patient-subscribers (Docket # 39 at 7).

The amended complaint is in eight counts. In Count I, PPS alleges that defendants have breached their contractual obligation to authorize and provide reimbursement for medically necessary and appropriate treatment by directly refusing to provide such authorization, and by imposing administrative burdens that prevent the provision of such care. PPS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33365907 (W.D.Pa.)
**(Cite as: 2000 WL 33365907 (W.D.Pa.))**

seeks a declaration that defendants have violated the terms of the Provider Agreements, and also seeks monetary damages.

Counts II and III also allege breaches of the Provider Agreements. In Count II, PPS alleges that defendants have interfered with PPS-member psychiatrists' obligation to render services "within the applicable standard of care" (Docket # 39 at 8). In Count III, a breach is alleged due to the termination of certain PPS-members in a manner inconsistent with the Provider Agreements. PPS seeks declaratory relief with at both counts, but monetary damages only at to Count II.

PPS alleges a breach of the contractual duty of good faith and fair dealing in taking the above-described actions, and seeks both declaratory and monetary relief.

*3 In Count V, PPS alleges that defendants interfered with its members' relationships with their clients. Count VI is a claim of tortious interference with the physician-client relationship in that defendants have attempted to influence the subscribers' willingness to seek treatment from PPS member psychiatrists. PPS seeks declaratory and monetary relief at Counts V and VI.

PPS alleges in Count VII that defendants fraudulently misrepresented both the quality and level of care available under their plans. These misrepresentations were allegedly made to both patient-subscribers and to PPS-member psychiatrists who joined the Provider Network. Declaratory and injunctive relief is requested on behalf of PPS members and patient-subscribers, as well as monetary damages.

The final count, Count VIII, is brought on behalf of patient-subscribers for false representations which, it is alleged, violate the provisions of Pennsylvania Unfair Trade Practices and Consumer Protection Law "UTPCPL", 73 P.S. § 201-1. PPS seeks damages on behalf of the patient-subscribers.

Defendants filed motions to dismiss asserting that PPS lacks standing, and that the claims must be heard in arbitration as set forth in the Provider Agreements (Docket # s 19, 21, 23, and 25). PPS filed an amended complaint (Docket # 29) which the court concluded mooted these motions. Defendants have again filed motions to dismiss (Docket # s 33 and 36), this time addressed to the amended complaint, and again raising the same standing and arbitration arguments. Defendants have also filed briefs in support of their motions (Docket # s 34 and 37). PPS has responded (Docket # 39), the motions were argued, and the motions are now ripe for disposition.

### STANDING TO MAKE CLAIMS FOR PPS MEMBERS

The initial question posed by defendants' motions to dismiss is whether PPS has standing to raise the claims presented in this case. PPS does not allege that it has suffered harm and, hence, it may sue only if it satisfies the test set forth in *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343 (1977):

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

For purposes of the motions to dismiss, defendants concede that the first two prongs of the *Hunt* test are met. Defendants assert, however, that the amended complaint fails to allege facts which would permit a court to find that PPS has standing to assert claims on behalf of its members. In this respect, the court is obligated to apply the familiar standard for Rule 12(b)(6) review, i .e., the court must accept as true all material allegations and construe the compliant in the light most favorable to the complaining party. *Hospital Council of Western*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33365907 (W.D.Pa.)
(Cite as: 2000 WL 33365907 (W.D.Pa.))

*Pennsylvania v. City of Pittsburgh,* 949 F.2d 83, 86 (3d Cir.1991).

**\*4** The third prong of the test for associational standing can be broken down into two parts. The first part addresses the need for participation by association members in proving the claims, while the second part is addressed to involvement by individual association members in establishing damages. "[C]laims for monetary relief necessarily involve individualized proof and thus the individual participation of association members, thereby running afoul of the third prong of the *Hunt* test." *United Union of Roofers, Waterproofers, and Allied Trades No. 40 v. Insurance Corporation of America,* 919 F.2d 1398, 1400 (9th Cir.1990). Indeed, courts have routinely held that associations may not bring claims for monetary relief on behalf of their members. *Sanner v. Board of Trade of City of Chicago,* 62 F.3d 918, 923 (7th Cir.1995) (collecting cases). In this case, PPS seeks monetary damages on behalf of its members with respect to the claims made in Counts I, II, IV, V and VI. Each of these claims necessarily will involve individual proof of damage and, hence, each claim runs afoul of the third prong of the *Hunt* test.[FN1]

> FN1. PPS notes that the third prong of the *Hunt* test has been deemed "jurisprudential" rather than being of "constitutional magnitude" as are the first two prongs. *Food and Commercial Workers v. Brown Group, Inc.,* 517 U.S. 544, 556-58 (1996). In *Brown Group,* this conclusion permitted a finding that Congress was able to, and did, abrogate this requirement with respect to WARN Act claims brought by Unions on behalf of their members. Here, however, PPS makes claims sounding in breach of contract and tort as to which no Congressional abrogation of the final prong of the *Hunt* test has occurred. Hence, PPS's reliance upon *Brown Group* is misplaced.

PPS argues that individual participation in the proof of breach of contract and damages can be presented without participation by individual PPS members. The court disagrees. Accepting as true the allegations of the complaint that certain types of claims are systematically rejected or are systematically approved for less treatment than is called for by the applicable standard, this inquiry will necessarily involve descriptions of the particular diagnoses and treatment which are assertedly being denied by defendants.

Further, it is not enough for PPS to argue, as it does, that the claims for monetary relief are "secondary" or "ancillary" to the requests for declaratory and injunctive relief. This is so because even if the sole claims made by PPS sought non-monetary relief, the third prong would nonetheless prevent PPS from making its member's claims for them.

Where an association's request for declaratory or injunctive relief does not require participation by its members, the courts have allowed the claims to be made by an association. *Hospital Council,* 949 F.2d at 89. In fact, in *Hospital Council,* the Court of Appeals for the Third Circuit rejected an argument premised upon the third prong of the *Hunt* test because "[n]either the district court nor the defendants have explained why the declaratory and injunctive relief sought by the Council in this case would have required participation by individual Council members." *Id.* Thus, the mere fact that monetary damages are not at issue is not enough, of itself, to satisfy the third prong. "Even when an association requests an injunction, the claim it asserts may be such that it cannot be resolved on an association-wide basis." *NACS v. Cambridge University Press,* 990 F.Supp. 245, 248 (S.D.N.Y.1997).

In this case, PPS asserts a variety of alleged breaches of the contracts between its members and the defendants. It is alleged that defendants have: refused to credential physician applicants; created insurmountable obstacles to physician credentialing; imposed overly-burdensome administrative requirements; failed to timely pay PPS-member psy-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33365907 (W.D.Pa.)
(Cite as: 2000 WL 33365907 (W.D.Pa.))

chiatrists for services rendered; interfered directly with physician-patient relations; discriminated against PPS-member psychiatrists based on profit-driven criteria; given overly-restrictive treatment authorizations; and made determinations concerning the level and quality of care received by patient-subscribers based on criteria other than medical necessity. Each of these asserted improper actions on the part of defendants requires particidation by the individual PPS member who applied for credentialing, made the diagnosis for which treatment was not approved, or applied for benefits which were not timely paid. It may be, as PPS asserts, that it seeks "broad-based changes" in the procedures utilized by Green Springs. In order, however, to prove that such "broad based" changes are warranted, PPS will have to establish that the alleged abuses occurred. To do this, proof of specific instances of the types of asserted improper conduct will be necessary. Hence, PPS lacks standing to sue on behalf of its members, since proof of the claims, and of the damages suffered, will necessarily entail the involvement in this litigation of PPS members.

### STANDING TO MAKE CLAIMS ON BEHALF OF PATIENTS

*5 Defendants also challenge PPS's standing to assert claims on behalf of patients who have been treated by, or who may in the future be treated by, PPS's member psychiatrists. In this respect, it would be inappropriate to apply the test for associational standing since none of the patients is a member of PPS. *Amnesty America v. County of Allegheny*, 822 F.Supp. 297 (W.D.Pa.1993)(no associational standing where alleged injured parties are not members of plaintiff association); *Pharmaceutical Association v. Commonwealth of Pennsylvania, DPW*, 542 F.Supp. 1349 (W.D.Pa.1982) (association of pharmacists could not make claims on behalf of member's customers). PPS defines the individuals it purports to represent as "persons who subscribed to managed care plans offered in the Commonwealth of Pennsylvania, which are admin-

istered by Green Spring and Magellan, and/or who are patients of PPS-member psychiatrists." (Docket # 39 at 4). The court interprets this as including patients or potential patients of PPS members who are subscribers to HMOs which utilize Green Spring as a managed care provider. As set forth above, PPS purports to raise claims of fraud under both common law and pursuant to the UTPCPL on behalf of these "patient-subscribers."

Third-party standing exists when the plaintiff itself has suffered concrete injury, and consideration of other factors weigh in favor of permitting the plaintiff to raise claims on behalf of a non-litigant. *Amato v. Wilentz*, 952 F.2d 742, 749 (3d Cir.1991). The "concrete injury" requisite satisfies Article III requirements, while the remaining considerations are prudential in nature, and are weighed in a balancing test. *Wheeler v. Travelers Insurance Co.*, 22 F.3d 534, 537 (3d Cir.1994) (standing involves both the "case and controversy" requirements of Article III and other prudential concerns). These factors are: (1) the potential conflicts of interest between the litigant and the third party; (2) any obstacles to suit by the third party; and (3) the closeness of the relationship between the litigant and the third party. *Id.*

In this case, PPS does not allege that it has itself suffered concrete injury. PPS alleges, instead, that its members have suffered such injury. Thus, at most, PPS has alleged that its individual members may meet the concrete injury requirement for third-party standing with respect to their patients. PPS has not, however, alleged facts from which the court can find that PPS itself has such standing. Thus, PPS cannot meet the preliminary requirement for third party standing, and the claims made on behalf of the patient-subscribers must be dismissed.

Even, however, if the court proceeded to the balancing test for third party standing, this would not benefit PPS. Although there are no apparent conflicts of interest between PPS and the patient-subscribers it seeks to represent, there appears to be no impediment to the patients seeking to enforce their legal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33365907 (W.D.Pa.)
**(Cite as: 2000 WL 33365907 (W.D.Pa.))**

claims themselves. Individual patients who believe that they are not receiving the benefits for which they have contracted are faced with no "affirmative obstacle to suing" and, further, they have "practical incentive to sue" since it is they who suffer the alleged denial of needed treatment. *Amato,* at 751. [FN2]

> FN2. PPS asserts that patients seeking mental health and/or drug abuse treatment will be reluctant to sue due to the stigma attached to mental health and substance abuse problems. This, however, is not the type of "affirmative obstacle" to which the *Amato* court is referring. There is no legal impediment to suit by the patients. Nor is the stigma attached to the type of treatment sought an "affirmative obstacle" to suit. Instead, it is, at most, a disincentive to suit. The court finds this argument unpersuasive, particularly since PPS alleges that defendants have placed some patients in mortal danger. *See, e.g., Amato,* 952 F.2d at 751 (disincentive to sue must be overwhelming to equal "affirmative obstacle" to suit).

*6 Further, the court finds that the "relationship" between PPS and the patient-subscribers is so attenuated as to weigh against permitting PPS to bring suit on behalf of persons with which it has no direct relationship. PPS has no standing to litigate any claims on behalf of patients of PPS-member psychiatrists.

### PRUDENTIAL STANDING

Defendants assert that principles of prudential standing, considered apart from the existence of Article III standing, also support their motion to dismiss. "No single formula is capable of answering every prudential standing question." *Conte Brothers Automotive, Inc. v. Quaker State-Slick 50, Inc.,* 165 F.3d 221, 225 (3d Cir.1998). There are three considerations which are "typically invoked"

in considering whether a party has satisfied the test for prudential standing: "(1) that a litigant 'assert his own legal interests rather than those of third parties,' (2) that courts 'refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances,' and (3) that a litigant demonstrate that the asserted interests are arguably within the 'zone of interests' intended to be protected by the statute, rule or constitutional provision on which the claim is based." *Id* ., at 226. *Citing, Wheeler, supra,* 22 F.3d at 538.

First, with respect to the entire lawsuit, defendants argue that PPS is attempting to litigate the rights of third parties, and not rights which it possesses. The court agrees. "[T]he first step in satisfying prudential standing is for the litigant to demonstrate that it has asserted its own legal interests rather than those of third parties." *UPS Worldwide Forwarding v. United States Postal Service,* 66 F.3d 621, 627 (3d Cir.1995). In this case, PPS has no legal right of its own which it seeks to vindicate. Thus, even if the requirements of Article III were satisfied, prudential considerations would mandate that the motions to dismiss be granted in this case.

Further, even if PPS and some interest of its own upon which it was suing, it would not meet the "zone of interest" test identified above with respect to the claims asserted on behalf of patient-subscribers. Here, the "rule or statute" sued upon with respect to the subscribers in Count VII is a common law fraud claim. PPS is not within the "zone of interests" which the common law seeks to protect by granting to patient-subscribers a claim of fraud against defendants. This conclusion applies as well to the claim in Count VIII premised upon Pennsylvania's UTPCPL. Nothing in that statute grants to PPS any interest whatsoever. Hence, no interest of PPS may be said to be within the zone of interests protected by the common or statutory law relied upon. [FN3]

> FN3. The UTPCPL provides that suit may be filed by a "person who purchases or leases goods or services". 73 Pa.C.S. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33365907 (W.D.Pa.)
(Cite as: 2000 WL 33365907 (W.D.Pa.))

201-9.2. Here, the persons entitled to sue under the statute are clearly the patients who subscribed to the HMO. No Pennsylvania court has permitted a non-party to a contract to sue on behalf of consumers under the UTPCPL. PPS's argument that Pennsylvania law permits suit on behalf of consumers by a party with "valid representative capacity" proves too much. PPS cites to *Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.,___ Pa.Super. ___, 574 A.2d 641, 645 (1990).* In *Forge Towers,* a condominium association itself contracted with the defendant on behalf of its members. Hence, the condominium association had standing since it was a party to the contract. Here, no comparable situation exists.

The court is not convinced that PPS has brought claims which are mere "generalized grievances." While this case is pregnant with issues constituent to the ongoing public debate concerning managed health care, it is framed upon the contractual relationship between PPS members and the defendants. Hence, the court cannot, on the face of the pleadings, determine that the true issue here is a generalized grievance concerning managed care.

## MANDATORY ARBITRATION

*7 Defendants also assert that each of the claims raised by PPS would be the subject of mandatory arbitration if brought by individual PPS members. Hence, the individual members of the Provider Network should not be permitted to circumvent the arbitration provision by having their claims brought by an association of which they are members, but which itself is not party to the Provider Agreements. The court notes at the outset that avoidance of an arbitration provision by suing through a surrogate is simply not an appropriate use of associational standing. "Under the Federal Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." *Moses H. Cone Memorial Hospital v Mercury Construction Corporation,* 460 U.S. 1, 20 (1983). *See also, Isidor Paiewonsky v. Sharp Properties,* 998 F.2d 145, 155 (3d Cir.1993) (citing cases where arbitration agreement upheld even though rights of non-parties to arbitration would be effected). Here, it cannot be more clear that any arbitration agreement which binds the individual members of PPS would likewise be binding upon PPS suing in a representational capacity.

The Provider Agreements pursuant to which PPS members participate in Green Spring's Provider Network each contain an identical arbitration provision:

Resolution of Disputes. In the event that a dispute between Green Spring and Provider arises out of or is related to this Agreement, the parties to the dispute agree to negotiate in good faith to attempt to resolve the dispute. In the event the dispute is not resolved within 30 days of the date one party sent written notice of the dispute to the other party, and if any party wishes to pursue the dispute, it shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association.... If the dispute pertains to a matter which is generally administered in accordance with Green Spring's procedures involving, for example, credentialing or quality assurance, the procedures set forth by Green Spring must be fully exhausted by Provider before Provider may invoke its right to arbitration under this Section. Provider acknowledges that the recommendation and determination of whether Health Services are Medically Necessary shall be made in accordance with Green Spring's policies and procedures and shall not be subject to this Section 10.

(Docket # 29, Exhibit D at § 10.1(a)).

The arbitration provision, by its express terms, applies to all manner of credentialing disputes, as well as to matters involving quality of care. Likewise, issues of payment to providers are matters which necessarily fall within the provision as involving mat-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33365907 (W.D.Pa.)
(Cite as: 2000 WL 33365907 (W.D.Pa.))

Page 8

ters arising from the contract. Thus, PPS may not raise any claims premised upon these matters in this court. Instead, PPS members must proceed to arbitration on such claims.

PPS makes several arguments against application of the arbitration provision. First, PPS argues that the provision was not meant to encompass "broad-based, systemic challenges" to defendants' policies, procedures and practices. The claims in this case, however, sound in breach of contract and tort. The arbitration provision expressly includes disputes arising under the Provider Agreements. Further, the tort claims raised in this case may fairly be said to relate to the performance, or not, of the parties' contractual obligations. Thus, all of the claims raised by PPS relate to and arise under the Provider Agreements. Hence, this argument is not persuasive.

*8 Second, PPS argues that matters concerning the determination of medical necessity are not included within the arbitration provision. While this is true, this case also involves claims premised upon late payments, credentialing and (for want of a better term) administrative requirements which manifestly do not involve determinations of medical necessity. Again, this court cannot address claims which, at least in part, must first proceed to arbitration.

Third, PPS argues that it brings claims on behalf of members who have been refused credentialing and, hence, who are not parties to a Provider Agreement. The court has been informed by the parties during a status conference that each of the PPS members who had difficulty with Green Springs' credentialing process have now been credentialed and approved by Greens Springs. This argument appears to be moot.

Fourth, PPS argues that resort to Green Springs' internal review process for medical necessity claims would be futile since those claims could not be brought collectively as they have been here, but would instead be reviewed on a case-by-case basis. There is no allegation in the amended complaint

that any PPS member has in fact resorted to Green Springs' review procedure and found that procedure unavailing. Allegations of futility in this case cannot be credited. Indeed, PPS does not argue that its members are unable to raise their claims, instead, PPS argues that each claim will be addressed individually during the review procedures, and that PPS would prefer to bring them collectively in this forum. Perceived convenience in one forum is not proof of futility in another.

Finally, PPS asserts that the contract is one of adhesion because PPS-member psychiatrists had no choice but to enter into the agreement to arbitrate, and that they "cannot exercise their right to arbitrate for fear of retaliatory termination by Green Spring." Thus, it is further asserted that the arbitration clause provides a "sham" remedy, and that this court can choose not to enforce it. The court has the power to invalidate an agreement to arbitrate where the party challenging the contract lacked a meaningful choice in accepting the provision and the arbitration provision unreasonably favors the party asserting it. *Harris v. Green Tree Financial Corporation*, 183 F.3d 173, 181 (3d Cir.1999). PPS has alleged facts sufficient to establish the first prong of the test, but fails to do so with respect to the second.

The arbitration provision is, on its face, neither more nor less favorable to Green Springs than it is to PPS members. PPS seeks to establish the second prong of the test by alleging that Green Spring's right to terminate provider agreements with 90 days notice and without cause [FN4] makes the arbitration provision a sham since Green Springs can terminate any provider who actually pursues his or her right to arbitration. PPS does not allege, however, that any such terminations have either occurred or been threatened. The court will not assume, as it has been invited to do, that a party to a contract will exercise its rights thereunder in a vindictive fashion, and will not invalidate an arbitration agreement on the basis that such action is possible.

FN4. The Provider Agreements give both

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33365907 (W.D.Pa.)
**(Cite as: 2000 WL 33365907 (W.D.Pa.))**

Green Springs and the provider the right to
so cancel the agreement.

### CONCLUSION

*9 Wherefore, on the basis of the foregoing, it is re-
spectfully recommended that defendants' motions to
dismiss the amended complaint (Docket # s 33 and
36) be granted, and that plaintiff's subsequently
filed motion for preliminary injunction (Docket #
42) be denied as moot.

In accordance with the Magistrate's Act, 28 U.S.C.
Section 636(b)(1)(B) and (C), and Local Rule
72.1.4 B, the parties are allowed ten (10) days from
the date of service to file written objections to this
report. Any party opposing the objections shall
have seven (7) days from the date of service of ob-
jections to respond thereto. Failure to timely file
objections may constitute a waiver of any appellate
rights.

W.D.Pa.,2000.
Pennsylvania Psychiatric Soc. v. Green Spring
Health Services, Inc.
Not Reported in F.Supp.2d, 2000 WL 33365907
(W.D.Pa.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Florida.
In re: MANAGED CARE LITIGATION

No. 00-MD-1334.
Sept. 15, 2003.

Marty L. Steinberg, Samuel A. Danon, Hunton & Williams, Mellon Financial Center, Miami, FL, John G. Harkins, Jr., Eleanor Morris Illoway, Marianne Consentino, Barbara Brigham Denys, Harkins Cunningham, Philadelphia, PA, David A. Bono, Harkins Cunningham, Washington, DC, for Defendants Cigna Corporation Cigna HealthCare of St. Louis, Inc. and Cigna HealthCare of Texas, Inc.

*ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO COMPEL ARBITRATION*
MORENO, J.
    **\*1** THIS DOCUMENT RELATES TO PROVIDER TRACK CASES

    Defendant managed care companies [FN1] seek to compel Plaintiff health care providers [FN2] to arbitrate all of their claims. Most of the Defendants have previously sought arbitration, and the Court has twice determined which claims had to be resolved through arbitration. *In re Managed Care Litig.,* 143 F.Supp.2d 1371 (S.D.Fla.2001); *In re Managed Care Litig.,* 132 F.Supp.2d 989 (S.D.Fla.2000). These decisions were affirmed in their entirety by the United States Court of Appeals for the Eleventh Circuit. *In re Humana Inc. Managed Care Litig.,* 285 F.3d 971 (11th Cir.2002). However, the Supreme Court reversed in part, concluding that arbitration should be compelled despite certain contractual provisions prohibiting the arbitral award of punitive damages. *PacifiCare Health Sys., Inc. v.. Book,* 538U.S. 401, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003). More specifically, the Supreme Court held that Providers could be com-

pelled to arbitrate their claims under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), even though certain arbitration agreements could be construed to limit the arbitrator's authority to award treble damages. While the First and Second Arbitration Orders were up on appeal, Providers filed a Second Amended, Consolidated Class Action Complaint (D.E. No. 1607) (the "Complaint") modifying their claims and adding new Defendants in the "Main Track." [FN3] The new Defendants seek arbitration while the past Defendants renew their motions to compel arbitration. For the reasons outlined *infra,* the various motions to compel arbitration are GRANTED in part and DENIED in part consistent with this opinion.

    FN1. The managed care companies include: UnitedHealthcare, Inc. and United-Health Group Incorporated f/k/a United HealthCare Corporation ("United"), PacifiCare Health Systems, Inc. ("PacifiCare"), Health Net, Inc. f/k/a Foundation Health Systems, Inc. ("Health Net"), WellPoint Health Networks, Inc. ("WellPoint"), The Prudential Insurance Company of America, Humana, Inc., Humana Health Plan, Inc., Coventry Health Care, Inc. and Anthem, Inc. (collectively referred to as "Defendants" or "HMOs").

    FN2. The health care providers include: Doctors Charles B. Shane, Jeffrey Book, Michael Burgess, Edward L. Davis, Lance R. Goodman, H. Robert Harrison, Glenn L. Kelly, Leonard J. Klay, Eugene Mangieri, Kevin Molk, Martin Moran, Manuel Porth, Thomas Backer, David Boxstein, Susan Hansen, Andres Taleisnik, Julio Talcisnik, Roger Wilson and Navid Ghalambor, as well as Medical Associations from California, Texas, Georgia, Florida, Louisiana and Denton County [Texas] (collectively referred to as "Plaintiffs" or "Providers").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

FN3. There also are numerous "tag along" cases that have been transferred to this Court by the Judicial Panel on Multi-District Litigation. All such tag-along cases are temporarily stayed pending disposition of dispositive motions in the Main Track. *See* Order Staying Provider Track Tag-Along Cases (D.E. No. 2264), filed on *August 21, 2003.*

## I. INTRODUCTION
### A. The Complaint

The Complaint alleges ten separate causes of action: (i) conspiracy to commit RICO violations, 18 U.S.C. § 1962(d); (ii) aiding and abetting RICO violations, 18 U.S.C. § 2((i) and (ii) collectively referred to as "derivative RICO claims"); (iii) so-called "direct" RICO violations, 18 U.S.C. § 1962(a) & (c); (iv) RICO declaratory and injunctive relief, 18 U.S.C. § 1964(a); (v) breach of contract; (vi) unjust enrichment/constructive contract; (vii) violation of various state prompt pay statutes; (viii) violation of the California Business & Professions Code § 17200; (ix) violation of the Connecticut Unfair Trade Practices Act; and (x) violation of the New Jersey Consumer Fraud Act.

### B. Procedural Background

The complaint at the time of the appeal as well as this Court's prior rulings were succinctly summarized by the Eleventh Circuit:

In this case, a group of doctors, acting on behalf of themselves and others similarly situated, have sued several HMOs on various grounds-including RICO, ERISA, quantum meruit, breach of contract, federal clean claim payment regulations, unjust enrichment, and state prompt pay statutes. The suit is made particularly complicated by the wide array of different relationships among the various parties in the action, relationships that we need not elaborate here beyond noting the following: some of the doctors had contracts with some of the HMOs; some of those contracts had arbitration clauses; and some of those arbitration clauses placed limitations on the

sort of damages an arbitrator may award. The task facing the district court was, in short, to determine which of the various legal claims must be resolved through arbitration.

*2 The district court made four rulings related to this appeal. First, the court held that claims between plaintiffs and defendants who are both signatories to contracts containing enforceable arbitration clauses must be arbitrated. Second, relying primarily on our opinion in *Paladino v. Avnet Computer Technologies, Inc.,* 134 F.3d 1054 (11th Cir.1998), the court found that those arbitration clauses that exclude punitive damages are unenforceable in this suit because they preclude recovery of treble damages under RICO; therefore, an HMO may not compel arbitration of a RICO suit under such an arbitration clause. Third, the court determined that an HMO may not invoke its arbitration clause to compel arbitration of an aiding-and-abetting charge regarding a doctor's contractual rights with a different HMO. Fourth, the court held that exceptions to the general rule that a non-party to a contract may not invoke the contract-exceptions we described in *MS Dealer Corp. v. Franklin,* 177 F.3d 942 (11th Cir.1999)-do not apply in the present case; thus an HMO that is not a signatory to a particular contract may not invoke that contract's arbitration clause to compel arbitration.

*In re Humana Inc. Managed Care Litig.,* 285 F.3d at 973.[FN4]

FN4. While United argues that the Court's previous ruling that it may not compel arbitration of derivative RICO claims that stem from contractual relationships with other managed care companies was based *solely* on the perceived infirmities arising from remedial limitations, the Court did not need to reach the broader issue as to United at that time. Regardless, the rationale of the broader ruling applicable to the other Defendants, as reaffirmed in the Second Arbitration Order, is equally ap-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

plicable to United.

The Court also made several additional rulings in the First and Second Arbitration Orders that are relevant to resolution of the instant disputes. First, arbitration generally is limited to claims made pursuant to particular contracts during the effective dates of those contracts. *In re Managed Care Litig.,* 143 F.Supp.2d at 1374. Second, a physician whose contract with a company's subsidiary contains an arbitration agreement must arbitrate any claims against the parent company even though the physician's direct contractual relationship is with the subsidiary. *In re Managed Care Litig.,* 132 F.Supp.2d at 996-97, 1000 n. 3, 1002 n. 6, 1005 n. 9. Similarly, a physician whose work was performed through a separate practice group must arbitrate any claims made pursuant to the group's contract with the health plan.[FN5] *Id.* Third, cost distribution provisions are not a sufficient hurdle to enforcement of arbitration clauses executed by "sophisticated groups of doctors" like Providers who "contract to provide health care to large groups of patients." *Id.* at 998. Finally, a one year statute of limitations to bring claims in arbitration upon written notice is not alone enough to preclude arbitration. *See id.* at 1000-01. Furthermore, as discussed more fully *infra* in Sections II and III(A)(2), *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002), probably requires both notice and cost distribution provisions to be construed by an arbitrator in the first instance, since such clauses implicate questions of procedural not substantive arbitrability.

> FN5. The First Arbitration Order bound physicians to arbitration agreements executed by affiliated practice groups. The Court now reaches the same conclusion as to hospital, foundation and other similar agreements by logical extension.

## II. LEGAL STANDARD

The Federal Arbitration Act (the "FAA") extends to the furthest reaches of Congress's Commerce Power and is applicable as long as the contract at issue *affects* interstate commerce. 9 U.S.C. § 2 ("contract evidencing a transaction involving commerce"); *Allied-Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 273-74, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *Toledo v. Kaiser Permanente Med. Group,* 987 F.Supp. 1174, 1180 (N.D.Cal.1997) (applying applicable standard in managed care context). There is no dispute that the contracts at issue affect interstate commerce.

*3 "A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement.... [T]he court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. The FAA establishes a strong federal policy, even a presumption, in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Contr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). If Providers' allegations "touch matters" covered by the relevant arbitration agreements, then those claims must be arbitrated, irrespective of how the allegations are labeled. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625 n. 13, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Whether a matter is within the scope of an arbitration provision is a matter of the parties' intent, and "those intentions are generously construed as to issues of arbitrability." *Id.* at 626. Courts decide this threshold issue of substantive arbitrability unless there is "clear and unmistakable evidence" that the parties intended to submit such questions to an arbitrator. *Dean Witter Reynolds, Inc. v. Fleury,* 138 F.3d 1339, 1342-43 (11th Cir.1998) (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)).

Even though there is a strong federal policy favoring it, arbitration is a matter of contract, and parties can only be required to submit disputes to arbitration if they agreed to do so. *First Options,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

514. U.S. at 942-43; *AT&T Techs., Inc. v. Communications Workers of Am.,* 475. U.S. 643, 648-49, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). An arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[A]lthough federal law establishes the enforceability of arbitration agreements, a court must construe that agreement according to generally applicable principles of state law." *In re S.E. Banking Corp.,* 156 F.3d 1114, 1121 n. 9 (11th Cir.1998) (citing *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)); *Eassa Props. v. Shearson Lehman Bros., Inc.,* 851 F.2d 1301, 1304 n. 7 (11th Cir.1988) ("While federal law may govern the interpretation and enforcement of a valid arbitration agreement, state law governs the question of whether such an agreement exists in the first instance."). Accordingly, "courts are not to twist the language of the contract to achieve a result which is favored by the federal policy but contrary to the intent of the parties. *Goldberg v. Bear Sterns & Co.,* 912 F.2d 1418, 1419-20 (11th Cir.1990).

Therefore, the Court must determine whether an applicable agreement to arbitrate exists and, if so, whether the disputes at issue are within the scope of the parties' agreement to arbitrate. 9 U.S.C. § 4; *Howsam,* 537 U.S. at 83-85; *Mitsubishi,* 473 U.S. at 626-28. All other issues should be resolved by the arbitrator in the first instance, including the impact of any notice provisions, statutes of limitation, cost distribution provisions or remedial limitations. *PacifiCare,* 538 U.S. at ---- ----, 123 S.Ct. at 1535-36; *Howsam,* 537 U.S. at 83-85.

### III. DISCUSSION

*4 The Court previously has issued two arbitration orders in the Provider Track as well as one arbitration order in the related Subscriber Track. [FN6] At the risk of falling into the category of which Ralph Waldo Emerson wrote about when he stated

that "a foolish consistency is the hobgoblin of small minds," the Court will not re-examine its previous rulings, except to the extent that they are decisively impacted by the Supreme Court's decisions this past term in *PacifiCare* and *Howsam,* significant new facts or altered circumstances. As detailed below, the Court finds that *PacifiCare* and *Howsam,* as well as the purported fundamentally different allegations in the latest Complaint, do not require the Court to digress from any of its previous rulings, the lone exception being the impact of potential remedial limitations on the arbitrability of RICO claims. For instance, and perhaps most importantly, the Court declines to reconsider its decision not to apply the principles of *MS Dealer* to Providers' derivative RICO claims. This ruling was affirmed by the Eleventh Circuit and the "new" allegations in the Complaint as well as the new argument proffered by both old and new Defendants does not alter the result. PacifiCare is the most vociferous proponent of a reexamination of the applicability of *MS Dealer.* However, the Court rejects the argument that the balance of equities has changed with the filing of the final Complaint and that entities that have only marginal connection to PacifiCare should not be able to thwart arbitration by alleging a unitary conspiracy.

> FN6. The Subscriber Track involves related claims of Defendants' insureds. All claims in the Main Subscriber Track have been dismissed, and only one Subscriber Track tag-along case remains pending for adjudication before this Court.

In addition to affirming the applicability of its previous rulings to all Defendants, both old and new, the Court also must consider several new issues and arguments. The Court first addresses certain general topics relevant to most, if not all, Defendants, including: (i) the arbitrability of "direct" RICO claims after *PacifiCare;* (ii) the continued nonarbitrability of derivative RICO claims under the Complaint; (iii) the fate of non-participating provider claims ("non-par claims"); (iv) the viabil-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

ity of claims asserted by medical associations; and (v) the impact of certain broad arbitration provisions on claims not made pursuant to the particular agreements containing such clauses. Second, the Court briefly addresses the applicability of these general rulings to the individual Defendants. To this end, the Court incorporates by reference four "arbitration charts" filed by the parties and sets out a supplemental briefing schedule concerning the applicability of the Court's rulings to the specific parties, claims and contracts remaining in the Main Track. Finally, the Court summarily considers the numerous motions to stay or dismiss pending arbitration.

A. *Topics Common to Multiple Defendants*
1. *Remedial Limitations Clauses*

*Paladino* is no longer authoritative as to direct RICO claims after the Supreme Court's decisions in *PacifiCare* and *Howsam*. Thus, all direct RICO claims that stem from contractual relationships subject to arbitration must be arbitrated, notwithstanding any clauses limiting the availability of punitive, exemplary or extra-contractual damages. It is for the arbitrator to decide in the first instance whether any applicable provisions improperly limit the availability of treble damages. This ruling also necessarily applies to derivative RICO claims that stem from contractual relationships with the target Defendant, as opposed to contractual relationships with other managed care companies. Moreover, such logic also extends to state law causes of action that support recovery of punitive, exemplary, extra-contractual or treble damages. *See also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 58, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) ; *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1192 n. 6 (11th Cir.1995); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1387 n. 16 (11th Cir.1988). Thus, all remedial limitations provisions must be construed by arbitrators in the first instance.

2. *Derivative RICO Claims*
**\*5** While Providers' focus undoubtedly has

morphed over time, this category of claims remains largely shielded from arbitration. The Court previously held that derivative RICO claims against a particular Defendant based upon contractual relationships with other managed care companies are not subject to arbitration. The Court also previously held that Defendants may not borrow co-Defendants' arbitration clauses under the principles of *MS Dealer*. The Eleventh Circuit has affirmed both holdings. As discussed more fully below, the Court finds that neither *PacifiCare* or *Howsam* nor the alleged changed circumstances require the Court to amend its previous rulings.

Defendants first argue that *PacifiCare* mandates arbitration of these claims. However, contrary to Defendants' pleas, *PacifiCare* does not directly require arbitration of Providers' RICO conspiracy and aiding and abetting claims that stem from contractual relationships with other managed care companies. Even though the Supreme Court did not differentiate between direct and derivative RICO claims in its introductory description, its substantive analysis only expressly addresses the impact of United and PacifiCare's remedial limitations. Moreover, the question framed by the Supreme Court militates in favor of the Court's conclusion: "In this case, we are asked to decide whether respondents can be compelled to arbitrate claims arising under [RICO], notwithstanding the fact that the parties' arbitration agreements may be construed to limit the arbitrator's authority to award damages under that statute." *PacifiCare,* 538 U.S. at ----, 123 S.Ct. at 1533. Simply put, the Supreme Court never separately analyzed the fate of Defendants' derivative RICO claims. While Defendants' requested ruling certainly may be a logical *extension* of the Supreme Court's decision, the Court cannot depart from its previous rulings without express direction from an appellate court. Finally, the Court declines the parties' invitations to divine from the appellate "litigation history" rulings beyond those contained within the four corners of the opinions from the Eleventh Circuit and the Supreme Court.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

Page 6

Defendants also argue that *Howsam* calls into question the Court's decision as to derivative RICO claims. The Court again disagrees. *Howsam* addressed the question of who should decide whether a claim was barred by the limitation provisions of the National Association of Securities Dealers Code of Arbitration. The Supreme Court held that gateway questions that grow out of the dispute itself and bear upon its final disposition should be decided by arbitrators (*e.g.* statute of limitations), but that true questions of substantive arbitrability relating to whether the parties contractually agreed to arbitrate the dispute (*e.g.* existence of a contract) are for the court to decide. *Howsam,* 537 U.S. at 84-85. Thus, questions concerning whether a nonsignatory can invoke an arbitration agreement, or whether a given dispute is within the scope of a particular arbitration clause, are for the district court to decide. Notwithstanding the above, the Court acknowledges that *Howsam* eliminates any lingering doubt as to who should decide the effect of notice provisions, statutes of limitation and cost distribution provisions.

*6 Third, in light of the specific allegations cited and the new Defendants named in the Complaint, Defendants argue that certain arbitration provisions are broad enough to capture particular Provider's derivative RICO claims that stem from contractual relationships with other managed care companies. This argument is premised upon the "touch matters" standard articulated by relevant arbitration case law. *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648-49, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625 n. 13, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). So the argument goes, because the Court cannot determine with "positive assurance" that such arbitration clauses are not susceptible to an interpretation that covers the asserted disputes, it has no choice but to compel arbitration of these claims. Defendants assert that there is no

exception to the mandated inquiry for conspiracy allegations. *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 321-22 (4th Cir.1988). They argue that claims may simultaneously "touch matters" within the scope of an arbitration agreement and "stem from" agreements with other Defendants.

Defendants further maintain that the Complaint clarifies that *all* RICO claims are predicated on proof that each HMO committed direct RICO violations and that the most recent complaints differ "dramatically" from previous versions considered by the Court. For instance, Defendants assert that it is now clear that all RICO claims are inextricably intertwined, because the "new" allegations clarify that Defendants needed to act in concert for their fraudulent schemes to be successful and that the goal of the conspiracy is to keep one's own doctors under contract, as opposed to an altruistic motive to help another Defendant. *See* Complaint ¶ 118 ("[F]or the fraudulent schemes described above to be successful, each Defendant and other members of the conspiracy had to agree to enact and utilize the same devices and fraudulent tactics against the Plaintiffs and the members of the class. If only one Defendant engaged in these activities, physicians would and could refuse to do business with that Defendant, but together Defendants have the power and influence necessary to effect and perpetuate their scheme."). While Defendants insist that this type of language simply was not present when the Court issued the First Arbitration Order, the Court notes that the Second Arbitration Order considered similar language in the Amended, Class Action Consolidated Complaint ¶¶ 198-201.

The Eleventh Circuit addressed this issue when it stated that "an HMO may not invoke its arbitration clause to compel arbitration of an aiding-and-abetting charge regarding a doctor's contractual rights with a different HMO." *In re Humana Inc. Managed Care Litig.,* 285 F.3d at 973. Even if the Eleventh Circuit had not addressed this issue, the Court finds that the "new" allegations do not re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

quire alteration of its previous decision. It is undisputed that the basic conspiracy allegations have been in the complaint since the beginning of this case, *i.e.* that each Defendant agreed with each other to develop and deploy certain automated processing techniques to cheat doctors and agreed to use it on their own doctors. Simply put, the "new" allegations differ more in degree than kind. Also, Paragraph 118 of the Complaint can be construed merely as an allegation of motive, as opposed to a core allegation of conspiracy.

*7 Moreover, the Court believes that even the broadest of arbitration provisions at issue in this case, *i.e.* those covering "all grievances and disputes" and claims "related to" the contract, do not contemplate the capture of the contracting Defendants' conspiracy with or aid to another Defendant's violation of its contractual agreements. A common sense interpretation of the arbitration clauses at issue limits them to disputes over the practices of the contracting parties, not the contracting Defendants' assistance with other Defendants' breaches, even if one of the motives was to preserve their own ability to harm the contracting Providers. While noteworthy, the alleged interconnected nature of the claims is not dispositive. *See Hill v. G.E. Power Sys., Inc.,* 282 F.3d 343, 347 (5th Cir.2002); *see also Howsam,* 537 U.S. at 83-84; *Mitsubishi,* 473 U.S. at 627-28; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

3. *Non-Par Claims*

The prior complaints did *not* include claims by non-participating providers. Non-participating providers, by definition, do not have a written contractual relationship with the target HMO. To complicate matters, Providers allege that some doctors have both contract and non-contract claims (*i.e.* are both participating and non-participating providers) as to some Defendants. The primary question concerns whether these claims are legally linked to assignments of the underlying subscriber claims for benefits. If so, the assignee-providers "stand in the

shoes" of the assignor-subscribers, including their obligation to arbitrate. *Misic v. Building Serv. Employees Health & Welfare Trust,* 789 F.2d 1374, 1378 (9th Cir.1986); *see also Cagle v. Bruner,* 112 F.3d 1510, 1514-15 (11th Cir.1997). These claims can be divided into two camps: claims by doctors that have *no* contractual relationship with the target Defendant and those by doctors that do have such a contractual relationship, but also allege non-par claims.

As for the latter, Defendants again advance their scope argument. In those circumstances in which there is a contract between a Provider and a particular Defendant establishing a commercial relationship, Defendants argue that the scope of that contractual agreement combined with its arbitration clause is sufficient to encompass whatever non-par claims for payment that same Provider may be bringing as to that Defendant. *AT & T,* 475 U.S. at 648-49; *Mitsubishi,* 473 U.S. at 625 n. 13; *Cone,* 460 U.S. at 24-25. While several Defendants advance isolated provisions of particular contracts that they claim evidence that the scope of these contracts with their arbitration clauses are broader than the particular subscribers, networks, plans or covered services specifically addressed, the Court again finds that a common sense interpretation of these contracts limits their applicability to such specific subscribers, networks, plans and services. While recognizing that this is a closer question than in the derivative RICO claim context, the Court nonetheless finds that even the broadest arbitration clauses at issue are limited to claims made pursuant to the contracts in which such clauses are con-tained.

*8 The presence of a boilerplate integration clause does not alter this analysis. For instance, if a contract covers the rendition of services to particular subscribers for particular services, even the broadest arbitration clauses ("all grievances and disputes" or "related to" language) do not encompass non-par or other out-of-network claims, regardless of whether such claims arose before or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

Page 8

after the effective date of the contract at issue. While Defendants assert that such niceties are for the arbitrator to decide under *Howsam,* the Court believes that this inquiry is within the core substantive arbitrability determination for the Court. This finding is consistent with the Court's previous rulings limiting the scope of arbitration clauses to the particular contracts in which they are contained when a doctor has multiple contracts with a particular Defendant.

In the alternative, and as to those doctors without any enforceable arbitration clauses or without arbitration clauses of sufficient scope to encompass non-par claims with a particular Defendant, Defendants argue that Providers are bound by the terms of the evidence of coverage or other operative contract between the patient and the insurer, including any arbitration clauses. In support of this assertion, Defendants cite "hornbook" contract law, *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411 (4th Cir.2000) and *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753 (11th Cir.1993), *cert. denied,* 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994) (finding that a claim which presumes the existence of a licensing agreement subject to arbitration must be submitted to arbitration even if it does not rely exclusively upon the licensing agreement).

Defendants argue that Providers are seeking to advance claims that are necessarily derivative of, inextricably intertwined with, or presume the existence of a contract, be it through assignment, beneficiary principles or estoppel principles. Therefore, any claim for payment is necessarily derivative of the patient's insurance rights, especially since Providers are only asserting claims for covered services. *See* Complaint ¶ 4 ("The fundamental premise of the relationship between the Defendants and the doctors who treat their insureds, either pursuant to or without contract, is that the doctors will be paid in a timely manner for the *covered* medically necessary services that they render.") (emphasis added).

This issue can be divided into those claims based on assignment theory and those asserted on non-contract grounds. In practice, doctors either (i) accept assignments and attempt to get payment directly from the insurance company, or (ii) administer claims paperwork as a courtesy but continue to hold patients liable for payment. As to assignment-based claims, there is no dispute that such claims must be arbitrated if the underlying subscriber is subject to an applicable and enforceable arbitration clause. Under this theory, Providers' claims only exist based upon the contractual right of the subscriber to seek benefits for the Providers' services. *Weiner v. Klais & Co.,* 108 F.3d 86, 92 (6th Cir.1997). Thus, if the subscriber-assignor is subject to mandatory arbitration, the provider-assignee is required to submit such claims to arbitration. *Bel-Ray Co. v. Chemrite, Ltd.,* 181 F.3d 435, 444-46 (3d Cir.1999); *Fisser v. Int'l Bank,* 282 F.2d 231, 233 n. 6 (2d Cir.1960); *see also Banque de Paris et des Pays-Bas v. Amoco Oil Co.,* 573 F.Supp. 1464, 1469-70 (S.D.N.Y.1983). Otherwise, an assignor could give greater rights than they owned and deprive the other original party of contractual arbitration rights.

*9 The inquiry is more difficult in the absence of an assignment theory. As correctly pointed out by Providers, these claims theoretically are independent of any contractual obligations of subscribers, since the relevant causes of action include unjust enrichment and various federal and state statutory claims. *Media Servs. Group, Inc. v. Bay Cities Communications, Inc.,* 237 F.3d 1326, 1330-31 (11th Cir.2001); *In re De Laurentiis Entm't Group, Inc.,* 963 F.2d 1269, 1272 (9th Cir.1992), *cert. denied,* 506 U.S. 918, 113 S.Ct. 330, 121 L.Ed.2d 249 (1992). While Defendants point out that recovery is only possible for services covered under subscriber contracts, and that such contract reliance necessarily requires adherence to any requisite alternative dispute mechanisms, Providers clearly attempt to articulate claims independent of *any* contractual relationship. They assert that HMOs, which cannot have doctors in every geo-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

graphic location and in every specialty, make it known through various sources that doctors will be reimbursed if they provide medically necessary services to their patients, even if they do not have a contract with the HMO. Moreover, such treatment often occurs in contexts where inspection of the coverage scope of applicable subscriber contracts is not feasible. Accordingly, the Court declines to compel arbitration of these non-par claims that are purportedly advanced independent of the particular subscriber contracts. While Defendants also argue that Providers lack standing to assert such claims, and that such claims are in any event preempted by ERISA, the Court will embark on that journey in the context of the various pending motions to dismiss.

Therefore, the Court will not compel non-par claims to arbitration in the absence of an agreement to do so. Any Provider claims that are based upon assignments from subscribers with arbitration clauses must be arbitrated. Moreover, any Provider claims that necessarily rely upon subscriber contracts with arbitration clauses also must be arbitrated. All other Provider claims that rely upon non-contractual or quasi-contractual state statutes or common law theories of recovery, and that are independent of any subscriber contractual relationship, are not arbitrable. As mentioned above, the Court will further examine the viability of such causes of action in the context of the pending motions to dismiss.

### 4. Medical Associations

The next important decision concerns the fate of the claims pressed by the various Plaintiff medical associations. These medical associations have brought suit for declaratory and injunctive relief both individually and on behalf of their respective memberships. Analysis of this issue can be neatly divided into alleged direct and derivative claims.

Associations suing in a representative capacity generally are bound by the same limitations and obligations as the members that they represent. *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333,

342-43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (citing *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *Communications Workers of Am. v. AT & T Co.*, 40 F.3d 426, 434 n. 2, 435 (D.C.Cir.1994) (dismissing union's claims because its members did not exhaust administrative remedies or submit dispute to mandatory arbitration). In fact, Defendants argue that associations are bound by the greatest commitments of the least of their physicians; otherwise, it would permit those physicians to escape their commitments merely by having a representative sue on their behalf. *Crow Tribe of Indians v. Campbell Farming Corp.*, 828 F.Supp. 1468, 1478 (D.Mont.1992), *aff'd*, 31 F.3d 768 (9th Cir.1994), *cert. denied*, 514 U.S. 1018, 115 S.Ct. 1362, 131 L.Ed.2d 218 (1995). However, because numerous associational members are not bound by enforceable arbitration clauses with respect to the claims brought, Providers attempt to bring suit only on behalf of their members that are not bound by enforceable arbitration clauses. In support, Providers argue that the *Hunt* standing factors are the sole requirements in this context and that they need only identify one member with standing. *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir.1998).

*10 Nonetheless, the Court finds that the issue of standing is at least partially distinct from whether the association must arbitrate its representative claims. Associations may not pick and chose the members that they represent; otherwise, they *de facto* avoid the requirements of Fed.R.Civ.P. 23. *See Crow Tribe*, 828 F.Supp. at 1478. Moreover, the logic of *Warth* is that prospective relief is the only remedy that "will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515. An association that abandons some of its allegedly injured members no longer purports to be a "representative" of its membership. Instead, it attempts to act as a *de facto* class aggregator of selected members and seek prospective injunctive relief that would benefit all of its membership.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

Furthermore, partial representation would violate the prudential standing requirements articulated in the third prong of the *Hunt* test. *Hunt*, 432 U.S. at 343 (holding that claims asserted and relief requested must not require individual participation in the lawsuit); *see also Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir.1993). The Article III requirement that at least one association member must have individual standing is separate from the prudential requirement that an association can only sue when it can obtain prospective relief on behalf of all of its allegedly injured members. *United Food & Comm. Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555-57, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). In the instant case, participation of individual members is unavoidable. The only way for the Court to determine which members have claims not subject to arbitration and what prospective relief might be appropriate for those members is for each member to participate and defend against a motion to compel arbitration. *See generally Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Serv.*, 958 F.2d 1018, 1022-23 (10th Cir.1992).

Because the Court has ruled that many of the pending claims of individual Providers must be submitted to arbitration, it is inevitable that certain of each of the associations' members are required to arbitrate the claims raised on their behalf. The Court also notes that Providers have made no attempt to distinguish which associational members are free from enforceable arbitration clauses. Accordingly, all arbitrable claims asserted on behalf of memberships at least partially subject to enforceable arbitration clauses must be submitted to arbitration. Of course, any nonarbitrable claims brought derivatively by medical associations, including the derivative RICO and non-par claims addressed *supra* in Section III(A)(2) and (3), remain pending before this Court.

Several associations also contend that they have standing in their own right to bring the asserted claims. *Conn. St. Med. Soc'y v. Connecticare,*

*Inc.*, No. X01 CV 010165649S, 2002 WL 725510 (Conn.Super.Ct. Apr.1, 2002) (finding that a medical society had independent standing to bring claims for injunctive relief under state unfair trade practices statute). "An organization also has standing to sue for relief from injury to its own interests, apart from any injury to its members, since standing may be established in an individual or representative capacity." *Id.* at *3 (quotations omitted); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Associations generally have independent standing if they have direct injury. *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904-05 (2d Cir.1993); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990), *cert. denied*, 498 U.S. 980 (1990), 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991); *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir.1990); *Pac. Legal Found. v. Goyan*, 664 F.2d 1221, 1224 (4th Cir.1981). In short, these associations argue that they have expended their own resources to fight Defendants' alleged unlawful practices and have lost members due to these practices. Because the associational Defendants themselves are not subject to enforceable arbitration clauses, this issue will best be resolved in the context of motions to dismiss for standing, not motions to compel arbitration.

### 5. Multiple Contracts and Effective Dates

*11 Finally, the Court examines Defendants' argument that certain arbitration clauses, most notably those that apply to "all grievances or disputes" or anything that "relates to" the particular contract, are broad enough to engulf claims not made or brought pursuant to the particular contracts containing these clauses. The Court hereby incorporates its rulings articulated *supra* in Section III(A)(2) and (3) as to Defendants' scope argument in the context of derivative RICO and non-par claims. In this vein, the Court also incorporates its previous ruling that arbitration generally is limited to claims arising under or made pursuant to particular contracts during the effective date of those contracts. *In re Managed Care Litig.*, 143 F.Supp.2d at 1374. Most not-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

ably, this issue arises in the context of claims by physicians having multiple contracts with particular Defendants and claims arising before or after the effective dates of particular contracts.

For instance, certain Defendants, including Health Net and WellPoint, seek to impose arbitration on claims performed pursuant to contracts without arbitration clauses and even outside the scope of *any* contract. Similarly, Anthem argues that Dr. Shane must arbitrate both claims arising *before* and after execution of his contracts. In support, these Defendants cite extremely broad arbitration clauses that purport to apply to "all grievances and disputes" between the parties or any claims "related to" the applicable agreements. Admittedly, some courts have held that broad arbitration clauses can cover claims arising under other agreements lacking arbitration provisions. *ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1462 (10th Cir.1995), *cert. denied,* 525 U.S. 822, 119 S.Ct. 65, 142 L.Ed.2d 51 (1998); *Associated Brick Mason Contractors of Greater N.Y., Inc. v. Harrington,* 820 F.2d 31, 35-36 (2d Cir.1987); *see also Inland-boatmens Union of Pac. v. Dutra Group,* 279 F.3d 1075, 1080 (9th Cir.2002). Other courts have held that broad arbitration agreements can cover disputes that arose prior to execution of the agreement. E.g., *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 13 F.3d 330, 332 (10th Cir.1993); *Mail-Well Envelope v. Int'l Ass'n of Machinists & Aerospace Workers,* 916 F.2d 344, 346-48 (6th Cir.1990); *Beneficial Nat'l Bank v. Payton,* 214 F.Supp.2d 679, 689-90 (S.D.Miss.2001); *Spurlock v. Life Ins. Co. of Va.,* No. CIV.A.98-D-222-N, 2000 WL 1785300, *8 (M.D.Ala. Oct.31, 2000); *but see Peerless Imps., Inc. v. Wine, Liquor & Distillery Workers Union Local One,* 903 F.3d 924, 927-28 (2d Cir.1990); *Armada Coal Exp., Inc. v. Interbulk, Ltd.,* 726 F.2d 1566, 1567-68 (11th Cir.1984).

However, arbitration clauses cannot be extended beyond the context that the parties intended. *ITT Hartford Life & Annuity Ins. Co. v. Amerishare Invests., Inc.,* 133 F.3d 664, 669-70 (8th Cir.1998)

(refusing to compel arbitration of suit to enforce guarantees via clause in separate agreement establishing underlying business relationship); *see also Frank v. Am. Gen. Fin., Inc.,* 23 F.Supp.2d 1346, 1349 (S.D.Ala.1998). Recognizing that this is a close call, the Court finds, consistent with its previous rulings and the analysis set forth above, that even the broadest arbitration clauses at issue do not contemplate claims not brought pursuant to the particular contract containing such clauses. A common sense interpretation of these provisions limits their application to the particular services specifically addressed by the heart of the contract, since the agreements as a whole relate to and concern the rights and liabilities of the parties within the context of that particular contractual relationship. Moreover, many of these contracts contain other clauses that appear to further restrict the scope of arbitrable disputes. Accordingly, the Court finds that the scope of the arbitration clauses at issue is limited to claims made pursuant to the particular contract containing such clauses. Finally, while Defendants continue to argue that arbitrators must decide these issues in the first instance, such scope determinations implicate substantive arbitrability and are therefore for the Court to decide.

*B. Application to Individual Defendants*

**\*12** The Court declines at this time to painstakingly apply its previous rulings in the First and Second Arbitration Orders (as modified by *PacifiCare* ) as well as its new rulings in this Order to the numerous parties, claims and contracts remaining in this case. In response to the Court's previous rulings and the Supreme Court's *PacifiCare* decision, Providers voluntarily dismissed certain claims subject to arbitration. *See* Notice of Dismissal of Arbitrable Claims (D.E. No. 1637), filed on *October 10, 2002;* Supplemental Notice of Dismissal of Arbitrable Claims (D.E. No. 1720), filed on *November 15, 2002;* Notice of Dismissal of Arbitrable Direct RICO Claims Against PacifiCare and United (D.E. No.1945), filed on *April 18, 2003;* Second Supplemental Notice of Dismissal of Arbitrable Claims (D.E. No. 2281), filed on *August 26,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

*2003.* At oral argument the parties also confirmed that "all direct claims that have been raised by a physician as to services performed pursuant to a contract with a Defendant containing an [enforceable] arbitration clause ... includ[ing] any conspiracy or aiding and abetting claims as to that Defendant with respect to services performed under that contract ... are dismissed." The Court anticipates further dismissals based upon this Order.

Accordingly, the Court reserves decision on the application of all relevant rulings to the particular parties, claims and contracts remaining in this case until further consultation and briefing by the parties. The Court also attaches and incorporates by reference four "arbitration charts" filed by the parties in an attempt to organize the remaining parties, claims and contracts containing arbitration provisions. *See* Providers' Main Track Arbitration Status Report (D.E. No. 2278), filed on *August 26, 2003* ("Appendix 1"); Defendants' Arbitration Chart Responsive to Court's 8/21/03 Order (D.E. No. 2279), filed on *August 26, 2003* ("Appendix 2"); Defendant Health Net, Inc.'s Notice of Supplemental Fling to Defendants' Arbitration Chart Responsive to Court's 8/21/03 Order (D.E. No. 2280), filed on *August 26, 2003* ("Appendix 3"); Providers' Notice of Filing Corrected Main Track Arbitration Chart (D.E. No. 2323), filed on *September 8, 2003* ("Appendix 4"). Thus, the parties are hereby directed to file supplemental briefing applying the relevant arbitration rulings to the remaining parties, claims and contracts outlined in the attached arbitration charts, including any argument as to the enforceability of pertinent contracts. Defendants shall file initial briefing by no later than *September 29, 2003.* Providers shall file responsive briefing by no later than *October 15, 2003.* Defendants may reply by no later than *October 24, 2003.*

### C. *Motions to Stay*

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceedings is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. Thus, all arbitrable claims are stayed pending adjudication in arbitration or dismissal by Providers. *Kotam Elecs., Inc. v. JBL Consumer Prods., Inc.,* 93 F.3d 724, 728 (11th Cir.1996), *cert. denied,* 519 U.S. 1110, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997).

**\*13** On the other hand, all claims not subject to arbitration remain active before this Court. The Court has repeatedly refused to stay claims, as opposed to *issues,* not subject to arbitration. Simply put, the parties have not provided any new facts or argument that counsel against continued consistency with the Court's previous orders. Moreover, neither the Eleventh Circuit nor the Supreme Court has addressed the Court's refusal to stay nonarbitrable claims. Besides, Providers are not pursuing arbitrable claims, so no duplication of effort or preclusive effect is foreseeable, and the Court previously ruled that Defendants may not pursue dismissed claims under the guise of declaratory relief or otherwise. *See* Order Granting Plaintiffs' Motion to Enjoin Arbitration (D.E. No. 1705), filed on *November 6, 2002;* Order Denying United's Motion to Strike Plaintiffs' Notice of Dismissal and for Involuntary Dismissal with Prejudice of Arbitrable Claims (D.E. No. 1748), filed on *November 25, 2002.*

### IV. CONCLUSION

THIS MATTER came before the Court upon Defendant PacifiCare Health Systems, Inc. and PacifiCare Operations, Inc.'s Notice of Renewal of Motions (D.E. No. 693), filed on *December 1, 2000,* Defendant PacifiCare Health Systems, Inc.'s Motion to Compel Arbitration as to Newly Added Plaintiffs (D.E. No. 1130), filed on *April 26, 2001,* Defendant The Prudential Insurance Company of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

America's Motion to Compel Plaintiffs to Arbitrate their Claims (D.E. No. 1137), filed on *April 27, 2001,* Defendant WellPoint Health Networks, Inc.'s Motion to Compel Arbitration (D.E. No. 1158), filed on *April 30, 2001,* Defendant Health Net, Inc,'s Motion to Compel Arbitration (D.E. No. 1165), filed on *April 30, 2001,* Defendant Humana Inc. and Humana Health Plan Inc.'s Motion to Compel Arbitration (D.E. No. 1171), filed on *April 30, 2001,* Defendant United's Motion to Compel Plaintiffs to Arbitrate their Claims and to Stay Proceedings Pending Arbitration (D.E. No. 1182), filed on *May 2, 2001,* Defendant PacifiCare Health Systems, Inc.'s Motion to Compel Arbitration of Plaintiffs' Conspiracy and Aiding-and-Abetting Claims based on their Arbitration Commitments with Other Defendants (D.E. No. 1193), filed on *May 4, 2001,* the Order to Show Cause Directed to Dr. Kelly (D.E. No. 1199), filed on *May 4, 2001,* Defendant Health Net, Inc.'s Motion to Reconsider this Court's Order of April 26, 2001, that Modified its Arbitration Order of December 11, 2000, Concerning Defendant Health Net (D.E. No. 1207), filed on *May 10, 2001,* Defendant Coventry Health Care, Inc.'s Motion to Compel Arbitration (D.E. No. 1249), filed on *June 8, 2001,* Defendant PacifiCare Health Systems, Inc.'s Motion to Compel Arbitration as to Plaintiffs Ghalambor and Hansen (D.E. No. 1296), filed on *June 26, 2001,* Defendant Health Net, Inc.'s Motion to Compel Arbitration of the Claims Asserted by Navid Ghalambor, M.D. as a Participating Provider (D.E. No. 1557), filed on *August 16, 2002,* Defendant Health Net, Inc.'s Motion to Compel Arbitration of Any Claims Plaintiffs Navid Ghalambor, M.D., Susan Hansen, M.D., Andres Taleisnik, M.D., Julio Taleisnik, M.D., or Roger Wilson, M.D., may be Asserting Regarding Services Performed as Nonparticipating Providers (D.E. No. 1558), filed on *August 16, 2002,* Defendant PacifiCare Health Systems, Inc.'s Supplemental Motion to Compel Arbitration as to Plaintiffs Boxstein, Breen, Ghalambor, Klay, A. Taleisnik, J. Taleisnik and Wilson (D.E. No. 1564), filed on *August 16, 2002,* Defendant PacifiCare Health Systems, Inc.'s Joinder in Motion to Compel Arbitra-

tion of Co-Defendants (D.E. No. 1565), filed on *August 16, 2002,* Defendants UnitedHealthcare Inc. and UnitedHealth Group Incorporated's Motion to Strike Portions of Plaintiffs' Consolidated Amended Class Action Complaint Relating to Plaintiff Navid Ghalambor or, in the Alternative, Motion to Compel Arbitration as to Plaintiff Navid Ghalambor (D.E. No. 1570), filed on *August 16, 2002,* Defendants United Healthcare, Inc., UnitedHealth Group Incorporated f/k/a United HealthCare Corporation, United HealthCare Insurance Company, United HealthCare of Georgia, Inc., UnitedHealthcare of New Jersey, Inc., UnitedHealthcare of New York, Inc. And United HealthCare of Tennessee, Inc.'s Joinder in Motion to Compel Arbitration of Co-Defendants (D.E. No. 1571), filed on *August 16, 2002,* Defendant Coventry Health Care, Inc.'s Second Motion to Compel Arbitration (D.E. No. 1649), filed on *October 17, 2002,* Defendant Health Net, Inc.'s Notice of Renewal of its Motions to Compel Arbitration (D.E. No. 1651), filed on *October 18, 2002,* Defendants UnitedHealthcare, Inc. and UnitedHealth Group Incorporated f/k/a United HealthCare Corporation's Supplemental Motion to Dismiss and Notice of Renewal of its Motions to Compel Arbitration and to Stay Proceedings Pending Arbitration (D.E. No. 1657), filed on *October 18, 2002,* Defendant WellPoint Health Networks, Inc.'s Motion to Compel Arbitration (D.E. No. 1659), filed on *October 18, 2002,* Defendant Anthem, Inc.'s Motion to Compel Arbitration (D.E. No. 1666), filed on *October 18, 2002,* Defe@ndants Humana, Inc. and Humana Health Plan, Inc.'s Renewed Motion to Compel Arbitration (D.E. No. 1668), filed on *October 18, 2002,* Defendant PacifiCare Health Systems, Inc.'s Contingent Motion to Compel Arbitration (D.E. No. 1717), filed on *November 15, 2002,* Defendants United Healthcare, Inc. and UnitedHealth Group Incorporated f/k/a United HealthCare Corporation's Joinder in Defendant PacifiCare Health Systems, Inc.'s Contingent Motion to Compel Arbitration (D.E. No. 1808), filed on *December 18, 2002,* Defendants UnitedHealth Group Incorporated, UnitedHealthcare, Inc., and PacifiCare Health Systems, Inc.'s

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

Renewal of their Motions to Compel Arbitration and to Stay Proceedings (D.E. No.1943), filed on *April 17, 2003*, Defendants PacifiCare Health Systems, Inc., The Prudential Insurance Company · of America, UnitedHealthcare, Inc., UnitedHealth Group Incorporated, Humana, Inc., Humana Health Plan, Inc., Health Net, Inc., Coventry Health Care, Inc., Anthem, Inc. and WellPoint Health Networks, Inc.'s Alternative Supplemental Motion to Dismiss Any Conspiracy or Aiding-and-Abetting Theories Related to the Direct RICO Claims that Plaintiffs have Renounced-or may be Expected to Renounce (D.E. No.1948), filed on *April 21, 2003*, the Notice of Joinder of Defendants Anthem, Inc., Coventry Health Care, Inc., Health Net, Inc., Humana, Inc., Humana Health Plan, Inc., Prudential Insurance Company of America and WellPoint Health Networks, Inc. to UnitedHealth Group Incorporated, UnitedHealthcare, Inc. and PacifiCare Health Systems, Inc.'s Renewal of their Motions to Compel Arbitration (D.E. No.1956), filed on *April 25, 2003*, and Defendants Humana, Inc. and Humana Health Plan, Inc.'s Corrected Renewed Motion to Compel Arbitration (D.E. No. 2247), filed on *August 13, 2003*.[FN7]

> FN7. The Court noticed oral argument on all pending motions to compel arbitration for August 14, 2003. *See* Order Setting Hearing and Requiring Notice of Pending Motions to Compel Arbitration (D.E. No. 2122), filed on *July 15, 2003*. The Court advised the parties that any Main Track motions to compel arbitration not brought to the attention of the Court by July 24, 2003, would be denied without prejudice as abandoned. In accordance with that Order, all Main Track motions to compel arbitration not listed above are DENIED *without prejudice* as abandoned.

*14 THE COURT has considered the motions, the notices, the Order, the responses and the pertinent portions of the record, and being otherwise fully advised in the premises and in open court, it is

ADJUDGED that the motions to compel arbitration and motions to stay are GRANTED in part and DENIED in part consistent with the above opinion.

APPENDIX 1
MAIN TRACK ARBITRATION STATUS CHART
The following chart sets forth the claims each Plaintiff has remaining against each Defendant after this Court's affirmed Arbitration Orders and after Plaintiffs' dismissal of various claims as to which this Court has not ruled but which Plaintiffs agree should be arbitrable by logical extension of this Court's Arbitration Orders.

Claims will be designated by Count number only, as follows:

Count I-RICO Conspiracy

Count II-Aiding and Abetting RICO Violations

Count III-RICO Violations

Count IV-Declaratory and Injunctive Relief Under 18 U.S.C. § 1964(a)

Count V-Breach of Contract

Count VI-Constructive Contract/Unjust Enrichment

Count VII-Prompt Pay Violations

Count VIII-Violation of California Business and Professions Code § 17200

Count X-Violation of New Jersey Consumer Fraud Act

Count IX, which was asserted only against Aetna, is not included in the chart because of the proposed Aetna settlement. No claims against Aetna are addressed in the chart.

All doctors continue to have Conspiracy (Count I), Aiding & Abetting (Count II) and Injunctive Relief Claims (Count IV) against all De-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22410373 (S.D.Fla.)
(Cite as: 2003 WL 22410373 (S.D.Fla.))

Page 15

fendants regardless of arbitration agreements. As to Defendants with whom they have enforceable arbitration agreements (Signatory Defendants), each Plaintiff may assert against the Signatory Defendant conspiracy and aiding and abetting claims stemming from contractual relationships with other Defendants. Each Plaintiff may also sue other Non-Signatory Defendants under theories of conspiracy and aiding and abetting for the injury and damage he suffered as a result of the RICO violations of the Signatory Defendant. Thus, every Plaintiff, after this Court's affirmed arbitration rulings, retains conspiracy and aiding and abetting claims against all Defendants. Each Plaintiff also has Count IV injunctive relief claims against all Defendants, because injunctive relief can be premised on RICO conspiracy and aiding and abetting as well as direct RICO violations.

Other minor clarification points will be made in the chart as they occur.

As to Defendants' 103 page arbitration chart, which Plaintiffs received at 7:46 pm on August 26, Plaintiffs have not had the opportunity to review the chart in detail, but make the following comments:

a) Generally, the Defendants seem to have accurately set forth the arbitration language from the contracts they claim compel arbitration of certain claims. In many instances, however, the chart inadequately sets forth any relationship between the parties to the contract and the Plaintiff alleged to be bound by the contract, so that there can be no assumption that the Plaintiff is bound by the proffered contract.[FN1]

FN1. See, e.g. p. 79, where United argues

that Dr. Book is bound by an agreement between United and Southwest Florida Physician Hospital Organization, with which United says Dr. Book was "associated." What does this allegation mean? That Dr. Book saw one emergency patient at the hospital, or something more?

*15 b) Many times, Defendants' descriptions of the claims dismissed is confusing or misleading, giving the impression, for instance, that all conspiracy and aiding and abetting claims arising from services performed pursuant to contracts with Signatory Defendants are dismissed, when of course these claims remain active against Non-Signatory Defendants.[FN2]

FN2. See, e.g., p. 79, "Counts 'Dismissed' "

c) Because Plaintiffs have not yet received the August 14 hearing transcript, and cannot review the various concessions and stipulations the Defendants refer to, they cannot respond to the statements that certain claims have been dismissed by stipulation or concession, except to say that Defendants' representations on this point seem exaggerated.

d) Defendants appear to have accurately set forth what arbitration motions are pending.

The following Plaintiffs' chart is an attempt to simply and accurately summarize what counts of the Second Amended, Consolidated Complaint Class Action remain before the Court.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
(Cite as: 2009 WL 855963 (S.D.Fla.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. Florida,
Miami Division.
In re MANAGED CARE LITIGATION.
Blue Springs Internal Medicine, P.C., et al.,
Plaintiffs,
v.
Blue Cross and Blue Shield of Kansas City, et al.,
Defendants.

Master File No. 00-1334-MD.
Tag-Along Case No. 05-23326-CIV.
March 30, 2009.

West KeySummary**Alternative Dispute Resolu-
tion 25T ⟲134(6)**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(B) Agreements to Arbitrate
      25Tk131 Requisites and Validity
        25Tk134 Validity
          25Tk134(6)   k.   Unconscionability.
Most Cited Cases
    The parties were compelled to arbitration
where the arbitration clause contained in the agree-
ments was not unconscionable. The agreements
were between physicians and managed care com-
panies. The court found that physicians are sophist-
icated parties and there was no evidence that the
agreements were unconscionable.

*ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION AND
COMPELLING ARBITRATION*
FEDERICO A. MORENO, District Judge.
    *1 THE MATTER was referred to the Honor-
able Edwin G. Torres, United States Magistrate
Judge for a Report and Recommendation on the De-
fendants' Motion to Compel Arbitration (**D.E. No.
49**). The Magistrate Judge filed a Report and Re-
commendation (**D.E. No. 89**) on *March 4.2009*.

The Court reviewed the entire file and record. The
Court has made a *de novo* review of the issues that
the Magistrate Judge's Report and Recommendation
presents, and notes that the parties never objected
to the Report and Recommendation. Thus, in view
of this failure to respond to the Report and Recom-
mendation, and also considering the merits of the
issues raised, it is

    **ADJUDGED** that United States Magistrate
Judge Edwin G. Torres's Report and Recommenda-
tion (**D.E. No. 89**) on *March 4, 2009* is AF-
**FIRMED** and **ADOPTED**. It is undisputed that the
underlying insurance contracts require arbitration,
and the Plaintiffs failed to demonstrate that the con-
tracts themselves should be disregarded as uncon-
scionable. Accordingly, it is

    **ADJUDGED** that:

    (1) the Defendants' Motion to Compel Arbitration
is GRANTED;

    (2) The Clerk of this Court shall mark this cause
as closed for statistical purposes and place the
matter in a civil suspense file;

    (3) All of Plaintiffs' claims against Blue Cross
and Blue Shield of Kansas City and Good Health
HMO, Inc. are STAYED pending the final out-
come of arbitration;

    (4) The Court shall retain jurisdiction and the
case shall be restored to the active docket upon
motion of a party if circumstances change so that
this action may proceed to final disposition.

    (5) All other pending motions are DENIED as
moot.

    DONE AND ORDERED in Chambers at
Miami, Florida, this *26th* day of March, 2009.

*REPORT AND RECOMMENDATION ON MO-
TION TO COMPEL ARBITRATION*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
(Cite as: 2009 WL 855963 (S.D.Fla.))

EDWIN G. TORRES, United States Magistrate Judge.

This matter is before the Court upon Defendants,' Blue Cross & Blue Shield of Kansas City and Good Health HMO, Inc., Motion to Compel Arbitration [D.E. 49], filed April 16, 2008, and Plaintiffs' Memorandum in Opposition [D.E. 60], filed May 15, 2008. After careful consideration of the motion, response, reply, relevant authority, and being otherwise fully advised in the premises, Defendants' Motion to Compel Arbitration should be Granted.

## I. BACKGROUND

This action was originally a class action filed by Plaintiffs Steven Buie, M.D., a healthcare provider, and Hickman Mills Clinic in the Circuit Court of Jackson County, Missouri on February 17, 2005, against various insurers, on behalf of all licensed physicians and physician associations practicing in the State of Missouri. The complaint asserted five separate state law claims: quantum meruit, breach of contract, unjust enrichment, violation of Missouri "prompt pay" statutes, and violation of Mo.Rev.Stat. § 354.606. Plaintiffs amended their complaint on March 2, 2005 to include three additional state law claims of (1) negligent misrepresentation, (2) fraud, and (3) civil conspiracy.

*2 Contending that Plaintiffs' claims were in reality federal claims (implicating ERISA, FEHBA, and RICO violations) masquerading as state law claims, Defendants removed the action to the United States District Court for the Western District of Missouri on June 9, 2005. Contemporaneously, Defendants requested a ruling by the Judicial Panel on Multidistrict Litigation (JPML) that the claims be transferred to the Southern District of Florida based on identical or common questions pending in the cases consolidated in *In re Managed Care Litig.*, 294 F.Supp.2d 1259 (S.D.Fla.2003) (MDL No. 1334). Defendants sought to stay the matter while the JPML decided whether to transfer the case to Florida. The JPML ultimately granted Defendants' request that the case be transferred to this Court for inclusion in the centralized pretrial

proceedings then currently underway before Judge Federico Moreno. The case was transferred to this Court on October 20, 2005.

Following transfer, Judge Moreno placed this action in the civil suspense file on January 5, 2006, with leave to restore it to the active docket upon a party's motion. After status hearings held in 2006 and 2007, the case was lifted from civil suspense and reopened on June 14, 2007.[FN1] On October 15, 2007, Judge Moreno entered an Order to Show Cause Regarding All MDL Tag-Along Actions. Pursuant to that Order, these moving Defendants re-filed [FN2] their Motion to Compel Arbitration and to Dismiss or Stay Proceedings Pending Arbitration on November 9, 2007. On February 19, 2008, Judge Moreno issued an Order denying all pending motions with leave to re-file in cases that participated in the February 12, 2008 status conference. Plaintiffs filed their Amended Complaint on March 12, 2008. Defendants then timely filed their pending Motion to Compel Arbitration on April 16, 2008. Plaintiffs' Response and Memorandum in Opposition followed on May 15, 2008, and Defendants filed their Reply on June 2, 2008.

> FN1. Simultaneously, Judge Moreno granted Plaintiffs Buie and Hickman Mill's Motion to Substitute Class Representative Plaintiffs, to Amend Complaint by Interlineation, and Partial Motion to Dismiss with Prejudice, seeking to substitute the following new class representatives in place of the original class representatives: Blue Springs Internal Medicine, P.C.; Carandolet Orthopaedic Surgeons, P.A.; Cockerell & McIntosh Pediatrics, P. C.; Consultants in Gastroenterology; Dickson-Diveley Midwest Orthopaedic Clinic, Inc.; Drisko Fee & Parkins, P.C.; Head and Neck Surgery of Kansas City; Kansas City OB-GYN Physicians, P.C.; Kansas City Urology Care, P.A.; Midwest Neurosurgery Associates, P.A.; Northland General Surgery, P.C.; Rockhill Orthopaedics, P.C.;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
(Cite as: 2009 WL 855963 (S.D.Fla.))

Specialty Physician's Alliance. L.L.C.; and The ; Doctor's Office of Kansas City, L.L.C., d/b/a/ Soper Medical Group.

FN2. Defendants' original Motion to Compel Arbitration was filed on August 12, 2005 in the United States District Court for the Western District of Missouri.

This matter is thus ripe for disposition. Judge Moreno referred the motion to the undersigned for a Report and Recommendation. [D.E. 73].

## II. ANALYSIS

### A. The Agreements

Defendants base their Motion to Compel Arbitration on Physician Participation Agreements, Physician Network Agreements, Physician Group Participation Agreements, and Physician Group Network Agreements they entered into with Plaintiffs between 1998 and 2001. These agreements set forth the terms for the repayment of fees and reimbursement by Defendants to Plaintiffs for medical services provided. The Physician Participation Agreements,[FN3] (hereinafter "Agreements") in pertinent part, state:

FN3. The Provisions in the Physician Network Agreements and the Group Agreements are nearly identical. The few differences that do exist have no effect on the resolution of the matter before the Court.

9.6 *Resolution of Contractual Disputes.* In the event of a dispute between BCBSKC [FN4] and Physician, the parties agree that they shall abide by the procedures, processes and remedies set forth in this Agreement or otherwise established by BCBSKC for disputes of that type. Any and all disputes between Physician and BCBSKC shall be conducted between such parties and shall at no time involve Covered Individuals unless and until the parties agree that such involvement is necessary to the resolution of the dispute. If, following complete exhaustion of such procedures and processes, the dispute remains unre-

solved, the parties agree that they shall engage in binding arbitration in lieu of pursuing a remedy in any court of law or equity. The parties agree on the following procedures and limitations of the arbitration process:

FN4. Blue Cross and Blue Shield of Kansas City.

*3 9.6.1. The party invoking the right to arbitration shall, no less than thirty (30) days prior to commencing arbitration proceedings, give written notice to the other party of the precise nature of the dispute. If the dispute remains unresolved, *and if the dispute does not involve an allegation of medical malpractice or professional negligence of a party,* it shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association or other national ADR association acceptable to BCBSKC. In no event may arbitration be initiated more than one year following the sending of written notice of the dispute.

9.6.2. Any arbitration proceeding under this Agreement shall be conducted in Kansas City, Missouri before three arbitrators. Each party may select one arbitrator from an approved list provided by the association. The two arbitrators so chosen shall select a third arbitrator, who shall be an individual knowledgeable about the health care industry.

...

9.6.4. The arbitrators are not authorized to award consequential, special, punitive or exemplary damages. The arbitrators may, in their discretion, award some or all of the reasonable and actual expenses of arbitration, including witness and attorney's fees, to the prevailing party. The parties shall share equally the expenses of arbitration, except as otherwise ordered by the arbitrator(s).
*See* Blue Cross and Blue Shield of Kansas City Physician Participation Agreement ("Participation Agreement") at 20-21 [D.E.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
(Cite as: 2009 WL 855963 (S.D.Fla.))

50-3] (emphasis in original). In addition, the following provision, in bold caps, is stated at the end of the Agreements just above the signature line: **THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.** *Id.* at 24.

The overall crux of the Plaintiffs' Complaint is that Defendants systematically deny, delay, and diminish payments to healthcare providers like them. The broad scope of the arbitration agreement undoubtedly encompasses Plaintiffs' claims, as it mandates binding arbitration for "[a]ny and all disputes" between the parties. Plaintiffs do not deny that their claims fall within the scope of the arbitration agreements, but instead argue that the provisions are unenforceable because they are unconscionable under the agreed-upon law that governs the agreement, Missouri law. Defendants do not challenge the application of Missouri contract principles to this issue, but conclude that Plaintiff's unconscionability argument fails.

### B. Unconscionability

There is no dispute that a court of law may refuse to enforce an unconscionable agreement. *See, e.g., U.S. v. Bethlehem Steel Corp.* ., 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855 (1942) (refusing to enforce a loan agreement where the defendant demanded an "exorbitant sum in consideration for his services in procuring a loan"); *State ex rel. Vincent v. Schneider,* 194 S.W.3d 853, 858 (Mo.2006) ("An unconscionable contract or clause of a contract will not be enforced."). Likewise, arbitration provisions may be found unconscionable. *See, e.g., Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 555-56, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) ("[A]n arbitration clause may be invalid ... if, for example, it is procured through fraud or forgery; there is a mutual mistake or impossibility; the provision is unconscionable ...."); *Whitney v. Alltell Comms., Inc.,* 173 S.W.3d 300, 310 (Mo.Ct.App.2005) ( [A]n arbitration agreement may be invalidated on the basis of such contract de-

fenses as fraud, duress, or unconscionability.").

\*4 It is the burden of the party challenging a facially valid arbitration agreement to demonstrate that the agreement is in fact unconscionable. *In re Managed Care Litig.,* 132 F.Supp.2d 989, 1000 (S.D.Fla.2000) (plaintiffs must establish unconscionability); *Reeves v. Chase Bank, USA, NA,* No. 4:07CV1101 HEA, 2008 WL 2783231, at \*4 (E.D.Mo. July 15, 2008) (same). Plaintiffs rely on a Missouri appellate decision, *Whitney,* to demonstrate that the arbitration agreements are both procedurally and substantively unconscionable. Specifically, Plaintiffs contend that the agreements are unconscionable because (1) they are offered to Plaintiffs on a "take-it-or-leave-it" basis, (2) they use printed form or boilerplate language drawn skillfully by the party in the strongest economic position, (3) they are conspicuously hidden in the document, (4) there exists an inequality of bargaining power between the parties, (5) they give the arbitrator the discretion to award arbitration expenses to the prevailing party, and (6) they preclude the recovery of certain types of damages. Each of these contentions will be addressed in turn.

### 1. Enforcing Arbitration Provisions: Sophisticated Party v. The Average Consumer

We agree with Defendants that Plaintiffs' reliance on *Whitney* and its progeny in support of their argument that the provisions are unconscionable is misplaced. *Whitney* involved a consumer challenging an arbitration provision located in a wireless telephone contract. This and other courts, when considering the conscionability of contract provisions, have consistently noted a distinction between the average consumer and more sophisticated contracting parties. In ruling on a similar issue, Judge Moreno previously found that "doctors are sophisticated individuals, not consumers," and found "the relationship between sophisticated groups of doctors and managed care companies, where the doctors contract to provide health care to large groups of patients, quite distinguishable" from the "small consumer" context. *In re Managed Care Litig.,* 132

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
(Cite as: 2009 WL 855963 (S.D.Fla.))

F.Supp.2d at 998; *see also Randolph v. Green Tree Fin. Corp.-Alabama,* 178 F.3d 1149, 1159 (11th Cir.1999) (distinguishing arbitration agreements entered into in the small consumer transaction/employment agreement context from those in the commercial franchise agreement "sophisticated party" context).

Because courts distinguish between an average consumer and more sophisticated parties when determining whether an arbitration agreement should be enforced, we initially view the Plaintiffs' claims with some skepticism. That is not to say that a physician's signature acquiescing to arbitration is dispositive of the matter simply because he is a "sophisticated party," but absent clear and convincing evidence that the agreements are unconscionable (and in light of federal law's preference for enforcement of valid arbitration agreements [FN5]), we are compelled to enforce them.

> FN5. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (The goal of the Federal Arbitration Act is to "reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts.")

#### 2. Procedural Unconscionability

**\*5** Plaintiffs' first argument that the arbitration agreements are unconscionable, because they are offered to Plaintiffs on a "take-it-or-leave-it" basis, fails. Plaintiffs have not offered any evidence that they opposed the provision before the commencement of proceedings, that they attempted to negotiate for the omission of that provision, or that Defendants refused to consider an alternative to the existing provision. Even if we were to concede that the arbitration provisions were offered on a "take-it-or-leave-it" basis, Plaintiffs did not show *any* desire or inclination to "leave it." In fact, the first showing of dissatisfaction with the provision did not arise until the rather opportune moment for the filing of motions with this Court came to bear.

Furthermore, Courts that have invalidated provisions of a contract because they were offered on a "take-it-or-leave-it" basis have done so only because "the adhering party ... enter[ed] into [the contract] without manifesting knowing and voluntary consent to all [its] terms." *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 600, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). Furthermore, Plaintiffs here have not offered any evidence showing that their consent to the arbitration provision was not "knowing and voluntary." [FN6]

> FN6. Given that the contracts contain an arbitration notice in bold and all caps just above the signature line, and the fact that Plaintiffs-as sophisticated, practicing physicians-have undoubtedly dealt with numerous contracts that contain binding arbitration agreements, we are compelled to find, absent evidence to the contrary, that Plaintiffs' consent to the arbitration provision was, in fact, knowing and voluntary.

Likewise, Plaintiffs' second unconscionability argument, that Defendants use printed form or boilerplate language drawn skillfully by the party in the strongest economic position, fails as well. Courts around the country have recognized that the need for pre-printed form contracts is a stark reality of today's mass-production/consumer culture. *See, e.g., Swain v. Auto Servs., Inc.,* 128 S.W.3d 103, 107 (Mo.Ct.App.2003) ("Because the bulk of contracts signed in this country are form contracts ... any rule automatically invalidating adhesion contracts would be completely unworkable."); *Vincent,* 194 S.W.3d at 857 (same) .[FN7] Despite even severe disparities in bargaining power, these agreements are most often enforced, at least as long as they comport with the reasonable expectations of the parties. *See, e.g., Greenpoint Credit, L.L.C. v. Reynolds,* 151 S.W.3d 868, 874-75 (Mo.Ct.App.2004) (despite disparate bargaining power, pre-printed form contracts are enforceable as long as an "average member of the public who accepts [such a contract] would reasonably expect

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
(Cite as: 2009 WL 855963 (S.D.Fla.))

Page 6

disputes involving whether either party was in default under its terms to be subject to arbitration rather than litigation."); *Swain,* 128 S.W.3d at 107 ("[A]n average person would reasonably expect that disputes arising out of an arrangement like this might have to be resolved in arbitration.") A contrary rule would slow commerce to a crawl.

> FN7. *See also In re Knepp,* 229 B.R. 821, 838 (Bankr.N.D.Ala.1999) ( [C]ontracts containing these provisions appear with increasing frequency in today's marketplace."); *Southwest Pet Prods., Inc. v. Koch Inds., Inc.,* 107 F.Supp.2d 1108, 1114 (D.Ariz.2000) ( "Standardized contracts are a reality of today's business arena and a necessary component of the fast-paced world of commerce. It is not the place of the judicial system to rewrite contract terms for *sophisticated business entities caught unaware by unfavorable provisions that they failed to read and negotiate.* " ) (emphasis added); *Goodwin v. Ford Motor Credit Co.,* 970 F.Supp. 1007, 1015 (M.D.Ala.1997) ("[The] standardization of forms for contracts is a rational and economically efficient response to the rapidity of market transactions and the high costs of negotiations ....").

Plaintiffs' third claim of procedural unconscionability, that the arbitration provisions should be invalidated because they are conspicuously hidden in the document, requires little attention. Plaintiffs claim that "[n]one of the provisions highlight or otherwise attempt to call the signing physician's 'attention to their waiver' of certain rights through bold letters, underlining, or any other device *in the actual arbitration clause of the contract.*" *See* Plaintiffs' Memorandum in Opposition at 10 [D.E. 60] (emphasis added). While it may be true that the Agreements do not contain such emphasis in the actual arbitration clauses, such omission is inapposite. As mentioned above, an arbitration notice was included just above the signature

line in bold and all caps. Plaintiffs' claim that the provision is conspicuously hidden is belied by the fact it was placed in one of the most conspicuous spots on the Agreement. *See Purell Tire & Rubber Co. v. Exec. Beechcraft, Inc.,* 59 S.W.3d 505 (Mo.2001) ("The liability limitation here does not violate public policy, because it is clear, unambiguous, unmistakable, *and conspicuously located directly above the signature line."* ) (emphasis added); *Funding Sys. Corp. v. King Louie Int'l, Inc.,* 597 S.W.2d 624 (Mo.Ct.App.1979) ("There can be no claim of surprise on the part of King Louie in light of the very prominent and conspicuous nature of the written disclaimer on the face of the lease agreement.").[FN8]

> FN8. Though we have already declared our position that cases involving claims of unconscionability made in the regular consumer context (as opposed to the sophisticated party context) are inapposite to the case at bar, even these cases demonstrate that courts regularly bind unsophisticated parties to "hard-to-miss" arbitration provisions. Recognizing that Plaintiffs here are sophisticated parties, they will not be held to a lower standard than unsophisticated parties.

*6 Plaintiffs' final argument of procedural unconscionability, that the provisions should not be enforced because there exists an inequality of bargaining power between the parties, also lacks merit. In order for a court to rescind an agreement based on a claim of unconscionability due to an inequality in bargaining power, the moving party must demonstrate that, due to its diminished bargaining power, it had no choice but to sign the agreement (i.e., that they were unable to contract with other health insurance companies). *See, e.g., Robin v. Blue Cross Hosp. Servs., Inc.,* 637 S.W.2d 695, 697 (Mo.1982) (refusing to rescind health insurance contract where "there are literally hundreds of health insurance plans available to the consumer [and t]here is no evidence that appellant was unable to contract indi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
**(Cite as: 2009 WL 855963 (S.D.Fla.))**

vidually for medical care protection"); *Gilmer,* 500 U.S. at 33 (refusing to rescind arbitration clause of contract where "[t]here is no indication ... that [Plaintiff], an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause"); *Finnie v. H & R Block Fin. Advisors, Inc.,* No. 07-429-CV-W-NKL, 2007 WL 2908756, at *3 (W.D.Mo. Oct.7, 2007) (refusing to rescind arbitration provision of employment contract, despite inequality in bargaining power, where Plaintiff "was put on notice of the arbitration provision before she accepted employment [and] so the obligation was not unexpected" where Plaintiff presented no evidence that she was without any other meaningful option, and where there was no evidence "that she even tried to eliminate the arbitration provision" before signing), *rev'd on other grounds,* No. 07-3526, 2009 WL 56971 (8th Cir. Jan.12, 2009).

Plaintiffs here broadly assert "Defendant BCB-SKC controls a considerable amount of the local health insurance market. Unequal bargaining power is manifest." However, Plaintiffs offer no evidence to verify these claims. [FN9] They have failed to establish that their bargaining power is unequal to Defendants', or that they had no choice but to sign the agreement.

> FN9. The only evidence of "manifest unequal bargaining power" offered by Plaintiffs relates to United Healthcare, a non-party to the present motion. Further, Plaintiffs ask us to take judicial notice of the fact that Defendant United is "an extremely large enterprise." Plaintiffs, however, fail to explain the nexus between an insurance provider's successful yearly earnings and a healthcare provider's inability to deal fairly with that insurance provider. If we were to find, as Plaintiffs would have us do, that a contract between an insurance provider and a Physician's Group is unconscionable simply because the former commands billions of dollars a year in net earnings and the latter has few-

er than ten members, the health insurance industry would grind to a halt.

In short, Plaintiffs' argument for avoiding their agreement to arbitrate based on procedural unconscionability is rejected.

### 3. Substantive Unconscionability

Plaintiffs then challenge the arbitration provisions as unenforceable because they give the arbitrator the discretion to award arbitration expenses to the prevailing party has no merit. Plaintiffs offer no reason as to why such an expense-granting provision is unconscionable, nor do they cite to a single authority that supports this position. Furthermore, Plaintiffs have not demonstrated that they are likely to incur the costs of arbitration or that they would be unable to pay the costs of arbitration, should they be awarded to Defendant. *Green Tree Fin. Corp.-Alabama v. Randolph,* 531 U.S. at 92 ("[W]here ... a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."); *Sprague v. Household Intern.,* 473 F.Supp.2d 966, 975 (W.D.Mo.2005) ("The burden of showing that arbitrator's fees will be cost-prohibitive falls on the party seeking to avoid arbitration .... [T]he party seeking to avoid arbitration must show more than just a hypothetical inability to pay .... [It] should present specific evidence of likely arbitrators' fees and its financial [in]ability to pay those fees ....") (internal citations and marks omitted).

*7 Absent record evidence "specific to the circumstances indicat[ing] that fees are cost-prohibitive and [will therefore] preclude the vindication of statutory rights in an arbitral forum," *id.,* this Court (and others) have consistently upheld such clauses in arbitration agreements. *Id.; see also In re Managed Care Litig.,* 132 F.Supp.2d at 1002 (enforcing arbitration provision that provided that "[c]osts are split between the parties, unless assessed differently by an arbitrator"); *E.E.O.C. v. Woodmen of World Life Ins. Soc.,* 479 F.3d 561

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
(Cite as: 2009 WL 855963 (S.D.Fla.))

(8th Cir.2007) (upholding fee-sharing provision of arbitration agreement, despite Plaintiff's current inability to afford arbitration costs, where circumstances at the time of signing were such that a fee-sharing arrangement was not fundamentally unfair). [FN10] This case does not merit a different conclu- sion.

> FN10. *See also Quinn v. EMC Corp.,* 109 F.Supp.2d 681, 685 (S.D.Tex.2000) ("The mere possibility that a plaintiff may have to share in the payment of the arbitrator's fees, without more, is not a sufficient reason to invalidate the arbitration agreement."); *Gill v. Jim Walters Home of Louisiana, Inc.,* 187 F.Supp.2d 618, 623 (W.D.La.2002) (same) (citing *Williams v. Cigna Fin. Advisors,* 197 F.3d 752, 764-65 (5th Cir.1999)).

Second, Plaintiffs' contention that the provisions are unenforceable because they preclude the recovery of certain types of damages fails as well. As Defendants have aptly pointed out, this Court has previously addressed this exact issue in *In re Managed Care Litig.,* No. 00-MD-1334, 2003 WL 22410373 (S.D.Fla. Sept.15, 2003), where Judge Moreno determined that all state law causes of action "that stem from contractual relationships subject to arbitration must be arbitrated, *notwithstanding any clauses limiting availability of punitive, exemplary, or extra-contractual damages.* It is for the arbitrator to decide in the first instance whether any applicable provisions improperly limit the availability of ... damages." *Id.* at \*4 (emphasis added). *See also Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) ("Arbitration under the [Federal Arbitration] Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted.") (internal citations and quotations omitted); *Davis v.*

*Prudential Secs., Inc.,* 59 F.3d 1186, 1193 n. 6 (11th Cir.1995) ("[P]arties wishing to avoid the imposition of punitive damages in arbitration may simply expressly exclude punitive damages in the arbitration agreement."); *Bonar v. Dean Witter Reynolds, Inc.,* 835 F.2d 1378, 1387 n. 16 (11th Cir.1988) ("Of course [sic], the [Federal] Arbitration Act would not override a clear provision in a contract prohibiting arbitrators from awarding punitive damages.")

Plaintiffs' reliance on *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), in support of their claim that an arbitration provision may not preclude the award of certain types of damages, is misplaced. It is true, as Plaintiffs contend, that *Mitsubishi* declared that an agreement to arbitrate a statutory claim does not forego the substantive rights afforded by the statute. *Id.* at 628. However, immediately following this declaration, the Court stated, "[w]e must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history. Having made the bargain to arbitrate, the party should be held to it *unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.*" *Id* . (emphasis added). Plaintiffs here have made no showing, by reference to text or legislative history, that Congress intended to preclude the waiver of judicial remedies at issue here. Having made the bargain to arbitrate all claims arising out of their relationship with Defendants, Plaintiffs will be held to their agreement.

## C. Arbitrability of Claims

\*8 Plaintiffs argue that if they are compelled to submit their claims to arbitration, only those claims arising during the contract period are arbitrable. Defendants do not deny that only those claims arising during the contract period are subject to arbitration, but rather insist that this particular argument does not have any relevance to their claims.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
(Cite as: 2009 WL 855963 (S.D.Fla.))

We agree.

Plaintiffs executed their agreements with Defendants between September 1998 and January 2001. Plaintiffs filed their Complaint in February of 2005. Accordingly, all claims arising subsequent to the individual Plaintiffs' date of signing the Agreements are subject to arbitration. Conversely, all claims arising prior to that date are not subject to arbitration, as they arose before the applicable contract period. Therefore, the only claims not subject to arbitration are those that arose prior to the respective dates of signing and for which the statute of limitations was not yet expired as of the time of filing the Complaint.[FN11] That the arbitration provisions do not apply retroactively is of no consequence, for Plaintiffs have not identified a single claim that arose prior to their respective signing dates and for which the statute of limitations was not yet expired as of February 2005.

> FN11. Plaintiffs filed their Complaint on February 17, 2005.

**D. Non-Signatories**

Plaintiffs assert that the Physician's Group and Independent Practice Associations ("IPAs") cannot be bound by the arbitration provisions because they are not signatories to the Physician Agreements. While it is ordinarily true that non-signatories to an arbitration agreement will not be bound to it, courts have regularly recognized that claims arising out of enforceable arbitration agreements, whether brought by the signatory doctors or a group that represents them, must be arbitrated. *See, e.g., AT & T Tech., Inc. v. Comm. Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *see also In re Managed Care Litig.,* 2003 WL 22410373, at *10 (determining that claims asserted by medical associations on behalf of their member-doctors which are subject to enforceable arbitration agreements must be submitted to arbitration). Though not binding on this Court, the Connecticut Superior Court, in addressing a similar issue, persuasively reasoned that:

It is illogical to assume that the representative or agent of a party that has agreed to arbitration may enforce that agreement but not itself be subject to the duty to arbitrate ... To hold otherwise would be to defeat the enforceability of arbitration agreements, as a party that had agreed to arbitrate could sidestep that obligation merely by having a surrogate, whether an association or an assignee, bring the suit on its behalf, depriving the other party to the contract of the benefit of the provisions of the contract.

*Conn. State Med. Soc'y v. Oxford Health Plans ( CT), Inc.,* No. X01CV0165664S, 2001 WL 1681903, at * 6 ( Conn.Super.Ct. Dec. 13, 2001); *cf. Randolph-Sheppard Vendors of Am. v. Weinberger,* 795 F.2d 90 (D.C.Cir.1986) (requiring associational plaintiffs to exhaust administrative remedies under designated system, as individual member plaintiffs would have been required, before seeking remedy in court).

*9 The Physician's Groups and IPAs are also bound to the arbitration agreements through common law principles of agency and contract. *See, e.g., World Rentals and Sales, LLC v. Volve Constr. Equip. Rents, Inc.,* No. 06-16352, 2008 WL 466127, at *3 (11th Cir. Feb.22, 2008) ("[C]ommon law principles of contract and agency law allow a signatory ... to bind a non-signatory ... to an arbitration agreement under any of five distinct theories: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter-ego; and (5) estoppel.") (internal citations and quotations omitted); *Regent Seven Seas Cruises, Inc. v. Rolls Royce, PLC,* No. 06-22347-CIV, 2007 WL 601992, at *7 (S.D.Fla. Feb.21, 2007) (same); *Foster v. Sears, Roebuck and Co.,* 837 F.Supp. 1006, 1008 (W.D.Mo.1993) ("[N]onsignatories to a contract containing an arbitration clause may be deemed parties thereto, through ordinary contract principles, for purposes of determining whether they should be compelled to arbitrate a dispute.") (citations omitted). The claims raised by the Physi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
(Cite as: 2009 WL 855963 (S.D.Fla.))

cian's Groups and the IPAs are based in the Physician Agreements. Though themselves non-signatories, they have clearly sought to benefit from the Agreements by joining the instant action and previously collecting payments under the Agreements. Having sought that remedy under the Agreements, the Physician Groups and IPAs have assumed the obligation to resolve the dispute through the contracted arbitration procedure. *See, e.g., id.* ("[A] party cannot have it both ways; it cannot rely on the contract when it works to its advantage and then repute it when it works to its disadvantage.").

**E. Dismissal or Stay of Proceedings**
    Defendants seek to dismiss or, in the alternative, stay the proceedings pending arbitration. Plaintiffs, for their part, argue that a stay of their non-arbitrable claims is inappropriate. In support of their argument, Plaintiffs cite to a number of authorities that support the proposition that non-arbitrable claims may be bifurcated from arbitrable ones so as to allow proceedings in different fora to continue uninterrupted. *See* Plaintiffs' Memorandum in Opposition at 15 [D.E. 60] (citing *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (courts have a duty to "rigorously enforce an agreement to arbitrate, even if the result is piecemeal litigation"); *Coors Brewing Co. v. Molsen Breweries,* 51 F.3d 1511, 1517 (10th Cir.1995) ("Coors may litigate antitrust claims not related to the licensing agreement just as anyone else with standing may."); *Coffman v. Provost * Umphrey Law Firm, L.L.P.,* 161 F.Supp.2d 720, 729-30 (E.D.Tex.2001) ( "[A]rgument that the court should not bifurcate [non-arbitrable] claims because it would result in inefficient adjudication in different forums is unavailing.")).

    This argument, however, is inconsequential. Plaintiffs have not shown, or even argued, that any of their claims fall outside the scope of the arbitration agreements. As mentioned above, the Agreements are very broad, and require that "any and all disputes ... not involv[ing] an allegation of medical

malpractice or professional negligence of a party ... shall be submitted to binding arbitration ...." *See* Participation Agreement at 24. As Plaintiffs have no non-arbitrable claims or theories of recovery, there are no non-arbitrable claims to bifurcate, and all proceedings against the moving Defendants should therefore, at a minimum, be stayed.

    **\*10** In response to Defendants' primary requested relief, a dismissal of the Plaintiffs' claims against them, Plaintiffs respond in opposition that a dismissal of those claims that are arbitrable is inconsistent with the Federal Arbitration Act ("FAA"). The FAA states, in pertinent part:

    If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

    9 U.S.C. § 3.

    Plaintiffs conclude that dismissing the proceedings would inhibit judicial economy, as any award granted through arbitration would have to be confirmed by a court, in accordance with Section 9 of the FAA, in order to form a binding judgment enforceable by law. 9 U.S.C. § 9. A dismissal, Plaintiffs argue, would simply require this (or some other) court to re-open the case.

    Defendants reply that judicial economy is best served by dismissing the claims, for they may voluntarily pay any award that is granted through arbitration; and in any event, confirmation of an arbitration award would require the drafting of an entirely new complaint. This does not persuade us. This Court is intimately familiar with the case at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)
**(Cite as: 2009 WL 855963 (S.D.Fla.))**

bar. Although it is possible that the role this Court is to play in this dispute, pending arbitration, may be over, there is no reason to potentially start the process anew. As to Defendants' argument that a dismissal would be entirely consistent with the FAA, despite the support they provide,[FN12] the language of FAA Section 3 is clear and unambiguous: this Court *"shall* on application of one of the parties stay the trial of the action until such arbitration has been had." Plaintiffs request that this "action [be left] open pending a final arbitrator's award so the award can be confirmed ...." *See* Plaintiffs' Memorandum in Opposition at 17.

> FN12. In *Samadi v. MBNA Am. Bank, N.A.,* 178 Fed Appx. 863, 866 (11th Cir.2006), that panel decision did in fact affirm a District Court's dismissal of a case because all of the Plaintiff's claims were subject to arbitration. The court did not, however, reconcile that outcome with the text of Section 3 of the FAA. We can only surmise that a dismissal was appropriate, perhaps, because neither of the parties applied for a stay or challenged the dismissal remedy itself.

Accordingly, we find that an outright dismissal is not warranted; instead, a stay of the proceedings pending arbitration should be entered.

### *III. CONCLUSION*
Based on the foregoing, the undersigned Judge recommends that Defendants' Motion to Compel Arbitration [D.E. 49] be **GRANTED** and that all of Plaintiffs' claims against Blue Cross and Blue Shield of Kansas City and Good Health HMO, Inc. be **STAYED** pending the final outcome of arbitration.

Pursuant to Local Magistrate Rule 4(b), the parties have ten days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the parties from a *de*

*novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993); *LoConte v. Dugger,* 847 F.2d 745 (11th Cir.1988); *Nettles v. Wainwright,* 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc).

**\*11 DONE AND SUBMITTED** in Chambers at Miami, Florida this 4th day of March, 2009.

S.D.Fla.,2009.
In re Managed Care Litiation
Not Reported in F.Supp.2d, 2009 WL 855963 (S.D.Fla.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

.

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

MARYLAND OPTOMETRIC          *
ASSOCIATION,
                             *
     Plaintiff,
                             *

                             *
v.                           *     CIVIL NO.: WDQ-04-02153

DAVIS VISION, INC., et al.,
     Defendants.             *

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION AND ORDER

     The Maryland Optometric Association ("MOA") sued

Davis Vision, Inc. ("Davis Vision"), CareFirst, Inc.,

CareFirst of Maryland, Inc., and CareFirst Blue Choice, Inc.

(collectively, "CareFirst") for violations of the Sherman Act,

the Maryland Antitrust Act, and various common law torts[1].

Pending are Davis Vision and CareFirst's motions to dismiss

for lack of subject matter jurisdiction.  For the following

reasons, both motions to dismiss will be granted.

          I.   BACKGROUND

     MOA is a nonprofit association whose membership

consists of over 350 independent, community-based optometrists

---

[1]     MOA alleges that the defendants engaged in unfair
        competition, civil conspiracy and malicious
        interference with business.

1

located in Maryland.  Complaint at ¶ 4. Its purpose is to "provide assistance to optometrists to enable them to deliver the highest standard of professional care to the citizens of the state of Maryland." *Id.*  Davis Vision is one of the largest managed vision and eye care providers in the country, selling and manufacturing prescription eyeglasses. *Id.* at ¶ 5. CareFirst, Inc., CareFirst of Maryland, Inc., and CareFirst Blue Choice, Inc. are Maryland health insurers or health maintenance organizations offering various vision plans. *Id.* at ¶¶6-8.  Davis Vision administrates CareFirst's vision plans and supplies prescription eyeglasses dispensed under those plans. *Id.* at ¶42.  Providers contract with Davis Vision to join a provider network offering eye examinations and/or prescription eyeglasses under the plans administered by Davis Vision (the "Davis Agreement"). *Id.* at ¶ 39.

MOA alleges that the Davis Agreement gives certain providers an unlawful competitive advantage over MOA members. *Id.* at ¶¶1, 10, 33,43 and 44.  At least 54 MOA members are parties to the Davis Agreement which requires all disputes to be resolved through arbitration. *See* Defs. Mot. Dism. Ex. 1.

On July 14, 2004, MOA filed this suit for monetary

and equitable relief.[2]

## II. LEGAL DISCUSSION

A.   Motion to Dismiss

    1.   Standard of Review

        In a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), defendant may argue either that the complaint fails to allege facts upon which subject matter may be based, or that the jurisdictional facts alleged are untrue. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). When the allegations in the complaint are assumed to be true, the court will consider the motion as one brought under Rule 12(b)(6). *Id.* Unlike a Rule 12(b)(6) motion, however, in ruling on a Rule 12(b)(1) motion, the court may consider exhibits outside the pleadings without converting the motion to one for summary judgment. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

        Under Rule 12(b)(6), dismissal of a complaint is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46

---

    [2]     In its opposition, MOA conceded that as a matter of law, associations may only seek equitable relief on behalf of its members. *See* MOA Opp. at p. 13.

(1957).   A Rule 12(b)(6) motion tests the legal sufficiency of
the complaint, not the facts that support it.   *Dist. 28, United
Mine Workers of Am., Inc. v. Wellmore Coal Co.*, 609 F.2d 1083,
1086 (4th Cir. 1979).   Thus, a complaint may be dismissed only
"if it lacks a cognizable legal theory, or it alleges
insufficient facts under a cognizable legal theory."   *Mates v.
N. Am. Vaccine, Inc.*, 53 F. Supp. 2d 814, 822 (D. Md. 1999).
The court must accept the well-pled material allegations as
true, viewing the facts and the reasonable inferences drawn
therefrom in the light most favorable to the plaintiff.
*Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 334 (4th Cir.
1996).   The court, however, is "not bound to accept as true a
legal conclusion couched as a factual allegation."   *Papasan v.
Allain*, 478 U.S. 265, 286 (1986).

    2.   Court's Lack of Subject Matter Jurisdiction

        Article III of the Constitution requires an actual case
or controversy for federal subject matter jurisdiction.   Standing
is an "essential and unchanging part of the case-or-controversy
requirement of Article III."   *Lujan v. Defenders of Wildlife*, 504
U.S. 555, 560 (1992).   As MOA's complaint fails to sufficiently
allege that MOA suffered individual harm, MOA lacks individual
standing to bring suit.   *See Valley Forge Christian College v.*

4

*Americans United for Separation of Church and State, Inc.*, 454
U.S. 464, 472 (1982).  However, an association has standing to
bring suit on behalf of its members when: (a) its members would
otherwise have standing to sue in their own right; (b) the
interests it seeks to protect are germane to the organization's
purpose; and (c) neither the claim asserted nor the relief
requested requires the participation of individual members in the
lawsuit.  *Hunt v. Washington State Apple Advertising Commission*,
432 U.S. 333, 344 (1977).  Davis Vision and CareFirst argue that
MOA's members could not individually bring this action because
the arbitration provision in the Davis Agreement precludes its
members' suits.    Accordingly,  MOA's  complaint  should  be
dismissed.

(i)  Arbitration Agreement

        MOA suggests that the Court should not give effect to
the arbitration provision because the defendants did not move
to compel arbitration.  Parties are allowed to exercise their
rights under the Federal Arbitration Act, 9 U.S.C. §§1-16
(2004), by filing motions to dismiss for lack of subject matter
jurisdiction.  *See Nova CTI Caribbean v. Edwards, No. CIV. A.
03-5319, 2004 WL 35759,* at *2 *(E.D.Pa. Jan 8, 2004); Thompson
v. Nienaber*, 239 F.Supp. 2d 478, 482 (D.N.J. 2002); *Morrison v.
Colo. Permanente Med. Group*, 983 F.Supp. 937, 944 (D.Colo.

                                    5

1997); *Hunt v. Up North Plastics, Inc.*, 980 F.Supp. 1046, 1047

(D.Minn. 1997).  By seeking enforcement of the arbitration

clause in its motion to dismiss, a party has sufficiently

"invoked the full spectrum of remedies under the FAA."  *Choice*

*Hotels Int'l Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707,

710 (4th Cir. 2001).[3]

        MOA also contends that the arbitration provision is

irrelevant to its Article III standing.  However, associations

suing in a representative capacity are generally bound by the

same limitations and obligations as the members that they

represent.  *See Hunt, 432 U.S. at 342-43 (citing Warth v.*

*Seldin, 422 U.S. 490, 511 (1975))*.  Therefore, if the Court

lacks subject matter jurisdiction over the individual member

claims, the Court may not hear the association claims. *See*

*Communications Workers of Am. v. AT&T Co., 40 F.3d 426, 434*

*(D.C. Cir. 1994)* (dismissing union's claims because its members

did not exhaust administrative remedies or submit to mandatory

arbitration).

        The   Federal   Arbitration   Act   does   not   "mandate

arbitration

---

[3]Both defendants are entitled to enforce the arbitration
provision of the agreement. Davis Vision is a party to the
agreement and CareFirst is a third-party beneficiary entitled
to enforce all terms of the agreement.

6

of all claims, but merely the enforcement ... of privately negotiated arbitration agreements." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985). There is a "healthy regard for the federal policy favoring arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Co.*, 460 U.S. 1, 24 (1983). When the scope of the arbitration clause is open to question, a court must decide in favor of arbitration. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).

The arbitration clause in the Davis Agreement provides that "*any controversy or claim arising out of or relating to this Agreement or the breach* thereof will be settled by arbitration...." *See* Def. Mot. Dismiss Exs. A and B (emphasis added). Arbitration agreements containing language such as "arising out of" or "relating to" are construed broadly and therefore all matters or claims independent of the contract or collateral thereto are arbitrable. *See J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile,* 863 F.2d 315, 321 (4th Cir. 1988). In analyzing whether a claim falls within the scope of an arbitration provision, the "focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys.,*

7

*Inc.*, 247 F.3d 44, 55 (3d Cir. 2001). MOA's claims are based upon the Davis Agreement, therefore, all the claims are subject to arbitration. Because the individual MOA members could not pursue this action on their own behalf, they may not circumvent this provision by suing through an association. *See Moses H. Cone Memorial Hospital*, 460 U.S. at 20. *See also Isidor Paiewonsky Assoc. Inc., v. Sharp Properties, Inc.*, 998 F.2d 145, 155 (3d Cir. 1993) (under the Federal Arbitration Act, arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to arbitration agreement).

Alternatively, MOA argues that because many of its members are not subject to arbitration, it may seek relief solely on their behalf. See *Hunt*, 432 U.S. at 342 (allowing associations to allege that any one of their members has standing). Although MOA is only required to identify one member with standing, MOA is not entitled to pick and choose the members that they represent. *See In re Managed Care Litigation*, No. 00-MD-1334, 2003 WL 22410373,at *10 (S.D. Fla. Sept. 15, 2003), aff'd by *Klay v. Pacificare Health Sys. Inc.*, 389 F.3d 1191 (11th Cir. 2004). Injunctive relief inures to the benefit of those members of the association actually injured. *Warth*, 422 U.S. at 511. MOA

alleges that the Davis Agreement harms all of its members. *See*
MOA Opp. at pp. 11-12.   If   MOA abandons its allegedly injured
members who are subject to the arbitration provision, it no
longer   represents   its   membership.   *See   Managed   Care
Litigation*, 2003 WL 22410373, at *10.  Rather, MOA is acting as a
*de   facto*   class   aggregator   of   selected   members   and   seeks
injunctive relief that would benefit all of its membership.  *Id.*
 Accordingly, if MOA wishes to represent its members, it must
arbitrate these claims.

>          As MOA's claims are subject to arbitration, dismissal
>               is

warranted.   *See Silkworm Screen Printers, Inc., v. Abrams, No.*
*91-1631, slip. op. at *17 (4th Cir. 1992), available at 1992 U.S.*
*App. LEXIS 28843; Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d
1161, 1164 (5th Cir. 1992).  Accordingly, the Plaintiff's complaint
against Davis Vision and CareFirst will be dismissed.

CONCLUSION

For the reasons discussed above, Davis Vision and Care First's motion to dismiss will be granted.

December 21, 2004                  _____/s/_____
Date                              William D. Quarles, Jr.
                                  United States District Judge

10

Westlaw.

Not Reported in A.2d, 2001 WL 1681903 (Conn.Super.)
**(Cite as: 2001 WL 1681903 (Conn.Super.))**

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.
CONNECTICUT STATE MEDICAL SOCIETY,
v.
OXFORD HEALTH PLANS (CT), INC.

No. X01CV0165664S.
Dec. 13, 2001.

MEMORANDUM OF DECISION ON DEFEND-
ANT'S MOTION TO DISMISS OR STAY PRO-
CEEDINGS
HODGSON, J.
*1 The defendant, Oxford Health Plans (CT),
Inc. ("Oxford") has moved to dismiss, or, altern-
atively, to stay the above-captioned action on two
grounds: (1) that the plaintiff lacks standing to as-
sert the claims therein on its own behalf, and (2)
that the plaintiff may not pursue on behalf of its
members claims that the members have a contractu-
al duty to arbitrate.

The court conducted a hearing, and the parties
have filed both pre-and post-hearing briefs concern-
ing the issues raised in the motion.[FN1]

> FN1. The court is dismayed by the tone
> and wording of the movant's briefs, espe-
> cially the reply brief. To cite just a few ex-
> amples, the movant characterizes the cita-
> tion of a case as "parroting," an opponent's
> reasoning as "feeble," and the opponent it-
> self as "self-righteous." An air of high
> dudgeon and a supercilious, disrespectful
> tone toward an adversary do not add any
> weight to legal arguments and merely evid-
> ence a regrettable lapse from the civility
> with which the court hopes the remainder
> of this case will be pursued.

The court finds that the Society lacks standing
to assert the claims of its members because all of
those claims are issues that the members are re-
quired by the provisions of written contracts to ar-
bitrate with the plaintiff. The court finds that the
Society has sufficiently alleged a direct injury to it-
self to have standing to pursue that injury.

*Claims made*
In its amended complaint, the plaintiff, Con-
necticut State Medical Society ("Society") alleges
that it is "a federation of eight county medical asso-
ciations and a constituent entity of the American
Medical Association" with membership of over
7,000 physicians. The Society alleges that its
"philosophy and purpose ... is to promote the
highest standards of medical care in the State of
Connecticut, to work to preserve the integrity and
independence of physicians, and to support the
sanctity of the physician-patient relationship for the
benefit of the public by, among other things, facilit-
ating and assisting its physician members in provid-
ing top quality care to patients, providing them with
a unified voice and enabling them to take concerted
action on behalf of their profession and of their pa-
tients, and acting and advocating on their behalf to
preserve the ability, independence and freedom of
physicians to render the best possible care to every
patient." (Amended complaint, para. 2.)

The Society alleges that it has been injured and
that its members have also been injured by certain
practices and actions of Oxford.[FN2] It seeks in-
junctive relief against practices "which are de-
signed to delay, deny, impede and reduce lawful re-
imbursement to [Society member] physicians who
are participating physicians in defendant's network
and who have rendered medically necessary health
care service to members of defendant's managed
care plans." (Amended complaint, para. 5.)

> FN2. At paragraph 11 of the amended
> complaint, the Society refers to injury to
> consumers resulting from the claimed un-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1681903 (Conn.Super.)
(Cite as: 2001 WL 1681903 (Conn.Super.))

fair trade practices engaged in with regard to the physicians who are members of the Society. The Society has not alleged that it represents consumers, and it has not claimed in its briefs that it has standing to represent the interests of consumers of medical services.

The Society alleges that it does not bring the action as an assignee of enrollees' right to benefits. (Amended complaint, para. 5.)

The foregoing summary is the Society's own characterization of the claim that is set forth in the paragraphs of its amended complaint that begin at paragraph 12 of the amended complaint. In those factual allegations, the Society alleges that Oxford insures Connecticut residents who select health care providers from a network of participating physicians who enter into written agreements with Oxford. These agreements contain terms governing the fees that physicians will be paid for treating Oxford enrollees.

*2 The sole cause of action alleged by the Society is that the acts and practices alleged constitute unfair and deceptive trade practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42-110a et seq.

The Society limits the remedies it seeks to injunctive relief against continuation of the practices claimed to violate CUTPA, and also statutory attorneys fees and costs. The Society does not seek money damages.

### Evidence presented

Because one of the grounds advanced as a reason to dismiss the case is the existence of an arbitration provision in the provider agreements between members of the Society and Oxford, an evidentiary hearing was necessary. Oxford submitted without objection an affidavit signed by Barbara J. Davis, Vice President for Medical Delivery at Oxford. In an uncontradicted statement, Ms. Davis averred that each Connecticut physician who is part of the network of providers for Oxford enrollees has signed either a Primary Care Physician Agreement or a Consulting Physician Agreement. Both varieties of agreement are referred to as "provider agreements," and both varieties provide, at paragraph 11, that "[n]o civil action concerning any dispute arising under this Agreement shall be instituted before any court, and all such disputes shall be submitted to final and binding arbitration in Connecticut, pursuant to the rules of the American Arbitration Association with one arbitrator."

Ms. Davis stated at paragraph 6 of her affidavit that "[n]o physicians in Connecticut covered by Provider Agreements with Oxford have filed for arbitration concerning the matters set forth in the Connecticut State Medical Society's Amended Complaint dated June 28, 2001." She further stated that physicians are free to contract with other networks if they contract with Oxford, and that approximately 5,000 out of an estimated 10,340 physicians in Connecticut are covered by provider agreements with Oxford.

The defendant presented evidence, in the form of other paragraphs of Ms. Davis' affidavit, to the effect that physicians located in Connecticut who have signed provider agreements with Oxford treat patients who reside in other states and that some administrative reviews and functions of Oxford at issue in the complaint are performed in states other than Connecticut.

The Society presented no evidence but apparently takes the position that the issue of its standing to allege a direct injury to itself, as opposed to injuries to its members, is to be determined on the basis of the allegations of the amended complaint.

### The claims made in the amended complaint

The plaintiff Society sues in two capacities: as a representative of its members and on its own behalf.

In its amended complaint, the Society alleges that Oxford denies and/or delays payments to its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1681903 (Conn.Super.)
**(Cite as: 2001 WL 1681903 (Conn.Super.))**

physician members who have entered into provider agreements with Oxford and who perform medically necessary health care services to Oxford enrollees. The plaintiff further alleges that Oxford codes members' services in ways that result in lower compensation than is warranted, denies payment for multiple services performed in the same visit, fails to apply upward adjustments for complicated cases that require additional expenditure of time by physicians, makes determinations concerning medical necessity that are not in accordance with applicable medical and legal standards, and fails to provide adequate staffing to process required approvals. (Amended complaint, paras. 10-39.)

*3 As a separate claim, the Society asserts that Oxford's practices regarding Society members' provision of services to Oxford enrollees constitute unfair trade practices in violation of CUTPA.

The Society also alleges that "Oxford's wrongful conduct also causes direct injury to [the Society] because [the Society] has been, and continues to be, frustrated by defendant's practices in its efforts to achieve its purpose and [the Society] has been required to devote significant resources to dealing with the issues concerning defendant's unfair practices." (Amended complaint, paras. 10, 40.) At paragraph 48 of the amended complaint, the Society alleges that "[a]mong other things, defendant's unfair and/or deceptive course of conduct and business practices have forced [the Society] to devote significant resources to handle physician inquiries and counsel physicians in an effort to identify and counteract the harm caused by defendant as set forth in the Complaint."

### Standard of review

The claim that a party may not bring a civil suit because of a written agreement to arbitrate is to be adjudicated by finding whether such an obligation has been proven. Conn. Gen.Stat. § 52-408; *Bennett v. Meader,* 208 Conn. 352 (1988).

A claim of lack of standing is, by contrast, not to be decided on the basis of the evidence in support of the claim, but on the basis of the allegation of a direct injury in the pleadings. As the Connecticut Supreme Court has repeatedly stated, the requirement that a claimant have standing "is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decision which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." *Maloney v. Pac,* 183 Conn. 313, 320 (1981); accord, *Connecticut Associated Builders & Contractors v. Hartford,* 251 Conn. 169, 178 (1999); *Gay & Lesbian Law Students Assn. v. Board of Trustees,* 236 Conn. 453, 463 (1996); *Unisys Corp. v. Dept. of Labor,* 220 Conn. 689, 693 (1991).

The Court has ruled that the dual objectives of standing, namely, "concrete adverseness" and diligent advocacy, "are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity." *Maloney v. Pac, supra,* 183 Conn. 321. The injury need not be economic in nature and it may be extremely small. *Id.*

With regard to the standing of an association such as the plaintiff Society to assert harm to its members, the Connecticut Supreme Court stated in *Gay & Lesbian Law Students Assn. v. Board of Trustees, supra,* 236 Conn. 464, that it has adopted the federal standard of associational standing as set forth in *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). That standard is as follows:

*4 An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1681903 (Conn.Super.)
(Cite as: 2001 WL 1681903 (Conn.Super.))

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.; Gay & Lesbian Law Students Assn. v. Board of Trustees, supra,* 236 Conn. 464.

An organization also has standing to sue for relief from injury to itself apart from any injury to its members, since standing may be established "in an individual or representative capacity." *Warth v. Seldin,* 422 U.S. 490, 511 (1975); *Maloney v. Pac, supra,* 183 Conn. 121.

The issue of standing is to be decided by inspecting the allegations of the complaint and determining whether those allegations are facially sufficient to state a claim based either on direct injury to the association or injury to its members. In *Connecticut Association of Health Care Facilities, Inc. v. Worrell,* 199 Conn. 609, 618 (1986), the Supreme Court reversed a dismissal based on a finding that the plaintiff association lacked, noting that "[t]he allegations in the plaintiffs' complaints are sufficient to confer standing." The federal courts similarly rule that a determination of standing is not to be made on the basis of evidence of the direct harm to the association, but only on the allegations of the complaint. The United States Supreme Court has ruled that the issue on a question of the standing of an association to assert a direct injury to itself is "the same inquiry as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction?" (Internal quotation marks and citations omitted.) *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 377, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 261, 50 L.Ed.2d 450; 97 S.Ct. 555 (1977); *Baker v. Carr,* 369 U.S. 186, 204, 7 L.Ed.2d 663, 82 S.Ct. 691 (1962). The United States Supreme Court ruled in *Warth v. Seldin, supra,* 422 U.S. 501, that for purposes of ruling on a motion to dismiss for lack of standing, the trial court must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party.[FN3]

> FN3. Some federal court rulings finding that standing has been alleged contain somewhat skeptical references to the ability of the plaintiff association to prove the alleged direct harm to itself at trial. *Havens Realty Corp. v. Coleman, supra,* 455 U.S. 379 n. 21; *id.,* 384 ("Liberal pleading rules have both their merit and their price") (Powell, J, concurring); *Spann. v. Colonial Village, Inc.,* 899 F.2d 24, cert. denied, 498 U.S. 980, 112 L.Ed.2d 521; 111 S.Ct. 509 (D.C.Cir.1990).

Connecticut procedure likewise requires that a court considering an issue of standing raised by a motion to dismiss must construe the allegations of the complaint in favor of the pleader. *Ganim v. Smith & Wesson Corp.,* 258 Conn. 313, 348 (2001); *Cummings v. Tripp,* 204 Conn. 67, 75 (1987); *Brewster v. Brewster,* 152 Conn. 228, 233 (1964).

*Does its members' obligation to arbitrate bar the Society's claims on their behalf?*
The Society asserts that both Connecticut law concerning arbitrations and the Federal Arbitration Act, 9 U.S.C. § 1 through 16, require dismissal of the Society's claims that are based on allegations of violation of contractual duties owed to those physicians by Oxford. The parties have referred to these claims as "representative" claims, referring to the fact that the Society seeks to represent its member physicians in asserting claims of breach of the letter or spirit of the provider agreements. The Society acknowledges that it makes some claims as a representative of its physician members and other claims on its own behalf.

**\*5** In *Connecticut Associated Builders & Contractors v. Hartford,* 251 Conn. 169, 185 (1999), the Connecticut Supreme Court ruled that an association has standing to bring suit for the benefit of its members if it meets the test for representational standing articulated in *Hunt v. Washington State*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1681903 (Conn.Super.)
(Cite as: 2001 WL 1681903 (Conn.Super.))

*Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The Connecticut Supreme Court noted that what it termed "representational" or "surrogate" standing has both substantive and procedural aspects. *Connecticut Associated Builders & Contractors v. Hartford, supra,* 251 Conn. 169.

In the case before this court, the facts demonstrate that all physicians who affiliate with Oxford sign provider agreements in which the physicians agree that they will arbitrate their disputes arising under the agreement with Oxford as a condition precedent to bringing a civil action. The facts do not demonstrate that the Society signed any agreement to arbitrate any disputes it has with Oxford concerning direct harm to itself.

Connecticut General Statutes § 52-408 provides that a written agreement to arbitrate "shall be valid, irrevocable and enforceable ." The extent and scope of the obligation to arbitrate is defined by the language of the parties' agreement to arbitrate. "Arbitration is a creature of contract. It is the province of the parties to set the limits of the authority of the arbitrators, and the parties will be bound by the limits they have fixed." *Success Centers, Inc. v. Huntington Learning Centers, Inc.,* 223 Conn. 761, 772 (1992). A party can be compelled to arbitrate a dispute "only if, to the extent that, and in the manner in which, he has agreed to do so." *White v. Kampner,* 229 Conn. 465, 471 (1994).

Where the contractual provision defining the scope of the disputes that the parties have agreed to arbitrate is not entirely clear, the rule of construction to be applied to the words of the contract is the "positive assurance test." *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1049 (1960); *White v. Kampner, supra,* 229 Conn. 472-73. Under this test, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be

resolved in favor of coverage." *White v. Kampner, supra,* 229 Conn. 473, quoting *Board of Education v. Frey,* 174 Conn. 578, 582 (1978); see also *John A. Errichetti Associates v. Boutin,* 183 Conn. 481, 489 (1981); *Green v. Connecticut Disposal Service, Inc.,* 62 Conn.App. 83, 87-88 n. 4, cert. denied, 256 Conn. 912 (2001).

All of the claims that the Society seeks to assert as a representative of its members are claims arising under the provider agreements. The Society claims that Oxford uses various administrative requirements and schemes to delay and deny full payments due to Society members under the provider agreements, and that it fails to provide staffing adequate to fulfill the administrative needs of the physicians. Applying the positive assurance test, this court finds that such claims are within the universe of claims that the physicians who are parties to provider agreements with Oxford have agreed to arbitrate as a condition precedent to filing suit.

*6 As this court has recently held in *McIntosh v. Oxford Health Plans,* Superior Court, judicial district of Waterbury, Docket Number X01 CV 01 0165663, physicians who have contracted with Oxford may not, under the terms of their contracts, institute civil actions concerning claims arising under the contracts unless and until they have arbitrated those disputes. The agent or representative of a party that has agreed to arbitrate a particular dispute is also subject to the terms of the arbitration agreement. *Levine v. Advest, Inc.,* 244 Conn. 732, 758-61 (1998) (university for whose benefit donor established scholarship fund account was entitled to enforce the arbitration agreement in the brokerage account in which the fund was managed); *Berlin v. Nobel Insurance Co.,* 60 Conn.App. 56, 62 (2000) (party that had taken over rights and obligations of a contractor was bound by arbitration provision in contract entered into by contractor).

It is illogical to assume that the representative or agent of a party that has agreed to arbitration may enforce that agreement but itself be subject to the duty to arbitrate. An association whose mem-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1681903 (Conn.Super.)
(Cite as: 2001 WL 1681903 (Conn.Super.))

bers cannot, for such procedural reasons, bring suit on their own behalf, has no standing to bring the same suit on its members' behalf. To hold otherwise would be to defeat the enforceability of arbitration agreements, as a party that had agreed to arbitrate could sidestep that obligation merely by having a surrogate, whether an association or an assignee, bring the suit on its behalf, depriving the other party to the contract of the benefit of the provisions of the contract. The rulings in *Levine v. Advest, supra,* 244 Conn. 732, and *Berlin v. Noble Insurance Co., supra,* 60 Conn.App. 56, signal that a surrogate or representative stands in the same position with regard to an arbitration agreement as the party whose interest it has adopted or that it represents.

The Society argues that even if the agreement to arbitrate applies to the Society as the representative of its members, CUTPA claims are outside the realm of disputes which its members have agreed to submit to arbitration. The issue whether a party is obligated to arbitrate a particular dispute depends on the wording of the arbitration clause: Is the dispute at issue within the scope of the subject matter that a party agreed to arbitrate rather than litigate? As this court has ruled in *McIntosh v. Oxford Health Plans (CT), Inc.,* Docket No. X01 01 0165663, a claim that a party's method of doing business under a contract violates CUTPA is a dispute that arises under the contract. Contrary to the Society's assumption, the courts have not decided that there are some statutory causes of action that are exempt from arbitration even if the parties have agreed to broad terms that include such statutory claims within the scope of the agreement to arbitrate. Legal issues as well as factual issues may come within the scope of an agreement to arbitrate. *Garrity v. McCaskey,* 223 Conn. 1, 8 (1992). In *Success Centers, Inc. v. Huntington Learning Centers, Inc., supra,* 223 Conn. 773, the Connecticut Supreme Court noted that the plaintiff had not directed its attention to any authority that prohibits the arbitration of CUTPA claims, but stated that if an arbitrator had improperly decided a CUTPA claim, the issue could be raised in a motion to vacate the

arbitrator's award. A CUTPA claim was the subject of an arbitration in *Saturn Construction Co. v. Premier Roofing Co.,* 238 Conn. 293 (1996), and the confirmation of the award by the Superior Court was upheld in the face of a challenge to the arbitrator's legal determinations, including an award of attorneys fees authorized by CUTPA.

*7 As an alternative to its position that claims of CUTPA violations cannot in general be construed to be within the scope of their agreement to arbitrate disputes, the plaintiff asserted at oral argument that the wording of the arbitration provision in the agreement its members signed does not evince an agreement to arbitrate such a claim. The plaintiff contends that the CUTPA claim is not a dispute "arising under" the provider agreements. In *Fink v. Golenbock,* 238 Conn. 183, 196-97 (1996), the court found the term "arising under" used in an arbitration clause to be "all-embracing, all-encompassing and broad" enough to include CUTPA claims.

The conduct that the Society disputes is Oxford's manner of performing or failing to perform its obligations under the provider agreements. In its representational claims the Society asserts, in essence, that Oxford has so grossly perverted its performance that its conduct constitutes an unfair trade practice. These claims appear to this court, applying the "positive assurance" test identified above, to "arise under" the provider agreements, as they are directed to the manner of performance of obligations under that agreement.

The Society further argues that even if it may not assert as a representative claim that its members could not themselves assert in a civil action, its members should be relieved of their obligation to arbitrate because arbitrators may not be able to grant full relief, particularly, injunctive relief. The sole case on which the Society relies on this issue is *Broughton v. CIGNA Healthplans of California,* 988 P.2d 67 (Ca.1999). In that case, the California Supreme Court held that a plaintiff had an enforceable duty to arbitrate his claim for damages under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1681903 (Conn.Super.)
(Cite as: 2001 WL 1681903 (Conn.Super.))

the California Legal Remedies Act, Cal. Civ.Code §
1750 et seq., but that he need not arbitrate his claim
for injunctive relief brought not on his own behalf
but as a private attorney general acting on behalf of
consumers in general to enjoin unfair or deceptive
practices.

In this case, it has not been demonstrated that if
a physician brought a CUTPA claim in an arbitra-
tion, an arbitrator could not issue an order prohibit-
ing Oxford from engaging in any practices the ar-
bitrator found to be unfair or deceptive. Connecti-
cut law contains a provision, Conn. Gen.Stat. §
52-417, by which a party may move that a court
confirm the award, thus securing the mechanisms of
enforcement by the court. This court is, moreover,
required to follow the ruling of the Connecticut Su-
preme Court in *Fink v. Golenbock, supra,* 238 Conn
183, which, unlike the California ruling, holds that
CUTPA claims are subject to arbitration.

For reasons of procedure deriving from its
members' agreements to pursue arbitration as a con-
dition precedent to civil suit, the association lacks
standing to bring representational claims. The mo-
tion to dismiss the Society's claims made on behalf
of its members is therefore granted.

*Does the Society have standing to pursue the claims
on its own behalf?*

**\*8** The movant presented no evidence of any
agreement by the Society itself to arbitrate its dis-
putes with Oxford that relate to allegations of direct
injury to itself, rather than injury to its members.
Oxford asserts, however, that the Society has failed
to allege sufficiently a direct injury to itself and
therefore lacks standing to assert such claims. Un-
like the plaintiffs in *United States v. SCRAP,* 412
U.S. 669, 687, 37 L.Ed.2d 254, 93 S.Ct. 2405
(1973), and *Warth v. Seldin, supra,* 422 U.S. 499,
the Society does not allege merely a philosophical
interest in a matter of public concern, but an actual
injury to itself.

The movant has cited a number of federal trial
court rulings in which the trial courts have either
found the allegations of the complaint alleged a
"generalized concern" rather than the "concrete and
demonstrable injury" found in *Havens Realty Corp.
v. Coleman, supra,* 455 U.S. 363; see *National
Congress for Puerto Rican Rights v. City of New
York,* 75 F.Sup.2d 154, 165 (1999); or decided that
the alleged direct interest was not proven. *American
Medical Association v. United Healthcare,* 2001
U.S. Dist. Lexis 10818 (S.D.N.Y.).

In *Project Sentinel v. Evergreen Ridge Apart-
ments,* 40 F.Sup.2d 1136 (N.D.Cal.1999), the trial
court noted an important distinction in its ruling
granting dismissal on the basis of an insufficient al-
legation of an actual injury to a direct interest of the
plaintiff association. The court found that where the
only diversion of resources alleged was a reference
to the resources devoted to the law suit at issue, the
requirements for standing were not met. The court
explained that "[i]n other words, an organization
establishes an Article III injury if it alleges that un-
lawful action has increased the resources the group
must devote to programs independent of its suit
challenging the unlawful action." (Emphasis ad-
ded.) *Project Sentinel v. Evergreen Ridge Apart-
ments, supra,* 40 F.Sup. 1138.

In another case cited by the movant, the de-
termination of lack of standing was made not on a
motion to dismiss but on appeal, and the appellate
court had an opportunity to review not only plead-
ings but evidence in concluding that "[t]here is no
evidence that [the statute being challenged by the
association] has subjected NTU to operational costs
beyond those normally expended to review, chal-
lenge, and educate the public about revenue-related
legislation." *National Taxpayers Union, Inc. v.
United States,* 68 F.3d 1428, 1434 (D.C.Cir.1995).
The claims of the associations that were co-
plaintiffs in *Guckenberger v. Boston University,*
957 F.Sup. 306, 320 (D.Mass.1997), were dis-
missed because the claims of direct injury made in
their brief were not pleaded as allegations of injury
in the complaint, which contained allegations only
that they expected to expend resources to challenge

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1681903 (Conn.Super.)
(Cite as: 2001 WL 1681903 (Conn.Super.))

the defendant's policy at issue in the suit. The dismissal of the association's direct claim in *Risinger v. Concannon*, 117 F.Sup.2d 61, 68 (D.Me .2000), was the result of the fact that "the First Circuit has promulgated a heightened pleading requirement for the purposes of standing, requiring a plaintiff to 'set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing.' " *U.S. v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir.1992).

*9 The pleading rules applicable to the present motion are those supplied not by the First Circuit but by the Connecticut Practice Book. Under those provisions, if the movant had desired a more specific statement of the claims of direct injury to the Society, it could have filed a request to revise. Where no such request has been filed, pursuant to *Ganim v. Smith & Wesson Corp.*, 258 Conn. 348, and *Cummings v. Tripp, supra*, 204 Conn. 67, the court construes the allegations of the complaint in the manner most favorable to the pleader, and there is no basis for dismissal for failure to plead to a level of detail that the movant has not requested.

The appellate rulings counsel that standing is not to be determined by whether the injury an association alleges that it has suffered the same injury at issue in *Havens Realty Corp. v. Coleman, supra*, 455 U.S. 363, but only whether the association alleges in the complaint that it has suffered some injury that is not merely a blow to its philosophical position on an issue. See *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir.1993).

The Society has alleged that because of the defendant's practices, it has had to devote resources not simply to challenging the defendant's perceived misconduct in this lawsuit, but to "hand[ling] physician inquiries and counsel [ing] physicians" not only to identify but to "counteract" the claimed harm. Though it is possible that at trial it may emerge that these efforts are actually part of the Society's litigation to challenge the defendant's practices, the court has no way of knowing whether this is so. The rather general allegations might refer, for

example, to operating a consultation service to resolve ethical quandaries of physicians confronted by what they may feel to be competing obligations to the defendant and to their patients.

In stating what the direct injuries to the associations were in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, and *Ragin v. Harry Macklowe Real Estate Co., supra*, 6 F.3d 898, it does not appear at all likely that the federal courts were limiting standing to those associations that allege only the same injuries as the association in those cases. The Society alleges more than an abstract or philosophical interest, and more than the need to spend money to pursue this suit in order to attempt to obtain relief for its members. Read in the required manner, these allegations assert a direct injury to the Society sufficient to allege standing.

Because this case is now before the court not after trial on the merits but only on a motion to dismiss, a setting in which the allegations of the complaint must be construed in favor of the pleader, *Ganim v. Smith & Wesson Corp., supra*, 258 Conn. 348; *Cummings v. Tripp, supra*, 204 Conn. 75; *Brewster v. Brewster, supra*, 152 Conn. 233; and it would be inappropriate for this court to delve into the ability or inability of the Society to prove particular diversions of resources caused by Oxford's alleged unfair trade practices, the court finds that the Society has sufficiently alleged direct injury to itself, and that it has standing to bring suit to address that injury.

### Conclusion

*10 The motion to dismiss the claims asserted by the Society as a representative of its member physicians is granted. The motion to dismiss the claim of the Society that it has suffered a direct injury to itself as a result of the defendant's actions and practices is denied. The movant has demonstrated no reason to stay the latter claim, and the motion to stay is denied.

Conn.Super.,2001.
Connecticut State Medical Soc. v. Oxford Health

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1681903 (Conn.Super.)
**(Cite as: 2001 WL 1681903 (Conn.Super.))**


Plans (CT), Inc.
Not Reported in A.2d, 2001 WL 1681903
(Conn.Super.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 4793729 (D.Conn.)
(Cite as: 2008 WL 4793729 (D.Conn.))

Page 1

C
Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
GRANITE COMMUNICATION, INC., on behalf
of itself and all others similarly situated, Plaintiff,
v.
ONE COMMUNICATIONS CORP., Defendant.
Civil No. 3:07cv01354 (PCD).

Oct. 31, 2008.

West KeySummary
Telecommunications 372 ☞916(2)

372 Telecommunications
   372III Telephones
     372III(F) Telephone Service
      372k912 Civil Liabilities and Actions
        372k916 Actions
          372k916(2) k. Persons Entitled to
Sue. Most Cited Cases
A telecommunications system seller/installer lacked
standing to bring a claim against a telecommunica-
tions system provider for loss of billable hours the
seller/installer allegedly suffered. The seller/in-
staller contracted with the provider to use the pro-
vider's dial-tone service for its customer's new tele-
phone system and the customer immediately had
problems. Although the seller/installer interacted
with the provider in an attempt to resolve the cus-
tomer's issues, it made the decision to contract with
the provider and it was the customer who suffered
the direct injury.

James E. Miller, Patrick A. Klingman, Shepard,
Finkelman, Miller & Shah, LLP, Chester, CT, for
Plaintiff.

Brad N. Mondschein, Michael Alan Kurs, Pullman
& Comley, LLC, Hartford, CT, James T. Shearin,
Pullman & Comley, Bridgeport, CT, Mark S. Res-
nick, The Resnick Law Group, P.C., Boston, MA,
for Defendant.

***RULING ON DEFENDANT'S MOTION TO DIS-
MISS***

PETER C. DORSEY, District Judge.

**\*1** Plaintiff Granite Communications, Inc. brings
this action pursuant to Connecticut's Unfair Trade
Practices Act, Conn. Gen Stat. § 42-110a *et seq*
("CUTPA"), along with claims of Unjust Enrich-
ment and a breach of the Implied Covenant of Good
Faith and Fair Dealing. [Doc. No. 1]. On April 7,
2008, Defendant One Communications Corp. filed
a Motion to Dismiss pursuant to Rules 12(b)(1) and
12(b)(6) of the Federal Rules of Civil Procedure
[Doc. No. 29]. For the reasons stated herein, this
motion is **granted.**

## I. BACKGROUND

Plaintiff brings a class action on behalf of itself and
all other similarly situated entities and persons
residing or located in the State of Connecticut.
Plaintiff, Granite Communications ("Granite"), is a
resident of the State of Connecticut. Defendant,
One Communications Corp. ("OCC"), is a
Delaware Corporation.

Plaintiff is a telecommunications company in Con-
necticut. It sells and installs telecommunications
systems-i.e. telephone equipment and related ac-
cessories-to other businesses. (Def.'s Mot. at 3;
Compl. ¶ 11.) Defendant is a local and long dis-
tance telecommunications company that provides
dial-tone as well as internet service. (Def.'s Mot. at
3.) Plaintiff asserts that before the incidents leading
to this complaint it had a successful "working rela-
tionship" with Defendant and its predecessor com-
panies. (Compl.¶ 9.) In late 2006, Granite was hired
by a new customer, West Haven Lumber ("West
Haven"). Plaintiff was to sell and install equipment
for an integrated digital telephone system at West
Haven's place of business. Plaintiff alleges that it
approached Defendant to provide the dial-tone ser-
vice for West Haven's new telephone system.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4793729 (D.Conn.)
**(Cite as: 2008 WL 4793729 (D.Conn.))**

(Compl.¶ 12.) Defendant agrees that it sold dial-tone telephone service to West Haven Lumber. (Def.'s Mot. at 4.) Plaintiff itself, however, did not purchase any services from Defendant.

Granite installed the new system it had sold to West Haven on November 13, 2006, at West Haven's place of business. (Compl.¶ 14 .) Plaintiff alleges that West Haven immediately had problems with dropped calls and improper routing. (Id.) On behalf of West Haven, Granite informed OCC of these problems. OCC responded that the cause resided with Granite's hardware, not the dial-tone service it provided. (Id. ¶ 15.) Granite then "trouble-shooted" all the equipment it had installed and obtained the assistance of Iwatsu (brand of telephone equipment) engineers to check for problems in the hardware it had sold to West Haven. (Id. ¶ 15-16.) Plaintiff claims that its technicians found that West Haven's problems were caused by OCC's provision of service. Granite therefore notified OCC's technical support of West Haven's continuing issues. Plaintiff alleges that Defendant still responded that the problem was caused by Granite's hardware. (Id. ¶ 15-18.) For several weeks, Granite continued to work on West Haven's system, replacing some hardware, reprogramming the system and devoting its lead technician to working on-site at West Haven. (Id. ¶ 20-23.)

*2 Plaintiff asserts that it made "repeated efforts" on behalf of itself and West Haven. However, Plaintiff also admits that it was "essentially acting as a broker for the provision of telecommunications services between OCC and West Haven." (Pl.'s Mem. at 3.) Therefore, any efforts made by Granite to contact or work with OCC were on behalf and for the benefit of Plaintiff's customer, not itself. Plaintiff alleges that it had to wait on hold for forty-five minutes each time it contacted Defendant on behalf of West Haven and that the problems with West Haven's system were not resolved until February 7, 2007, when Defendant finally tested its own equipment and replaced its circuit. (Id. ¶ 26.) Plaintiff complains that even after this date, it has

had to work with its customer to develop solutions "in the face of OCC's continued failure and refusal to address the legitimate needs of the customer." (Id. ¶ 27.) Plaintiff, however, has not explained why it provided this "broker" service to West Haven if it was not "billable work." It is also unclear why Granite continued to work on behalf of West Haven once Granite determined that its customer's problem was not due to the hardware it had installed.

Plaintiff alleges that it suffered the direct loss of hundreds of hours of billable work that could have been performed for other customers and that its relationship with West Haven was strained as a result of Defendant's wrongful conduct. (Id. ¶ 23-39.) It further alleges that Defendant's customer service practices are devised to discourage parties from raising legitimate grievances. (Id. ¶ 3 1).

## II. STANDARD OF REVIEW

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. See Fed.R.Civ.P. 12(b)(1). Plaintiff, as the party asserting subject matter jurisdiction, has the burden of establishing by a preponderance of the evidence that it exists, *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996), and the court should not draw argumentative inferences in its favor. *Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l,* 968 F.2d 196, 198 (2d Cir.1992); *see also Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994) (The court will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations" but "will not draw argumentative inferences in the plaintiff's favor.").

Unlike with a Rule 12(b)(6) motion, a court resolving a Rule 12(b)(1) motion for lack of subject matter jurisdiction may refer to evidence outside the pleadings. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4793729 (D.Conn.)
(Cite as: 2008 WL 4793729 (D.Conn.))

); *see also Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000) (in resolving a Rule 12(b)(1) motion, district courts may "resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing"). A court must "look to the substance of the allegations to determine jurisdiction." *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1019 (2d Cir.1993).

**\*3** A motion to dismiss for lack of standing is made pursuant to Rule 12(b)(1). *Alliance for Environmental Renewal, Inc.,* 436 F.3d 82, 88 (2d Cir.2006). In deciding a motion to dismiss, "standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *Spencer v. Kemma,* 523 U.S. 1, 11, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

Where, as here, a party moves to dismiss pursuant to Rule 12(b)(1) in addition to other bases, "the court should consider the Rule (12)(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined ." *Rhulen Agency, Inc. v. Alabama Ins. Guaranty Ass'n,* 896 F.2d 674, 678 (2d Cir.1990).

In deciding Defendant's motion to dismiss, the Court accepts as true the material facts alleged in the Complaint and draws all reasonable inferences in Plaintiff's favor. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995) *citing Hill v. City of New York,* 45 F.3d 653, 657 (2d Cir.1995).

## III. DISCUSSION

### A. Standing

Where, as here, jurisdiction is predicated on diversity of citizenship, a plaintiff must have standing under both Article III of the Constitution and applicable state law. *Mid-Hudson Catskill Rural Mi-*

*grant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 173 (2d Cir.2005). Defendant argues that Plaintiff lacks standing under federal and state law, claiming that Plaintiff did not suffer a "direct injury."

In *Gamin v. Smith & Wesson Corp.,* 258 Conn. 313, 780 A.2d 98 (Conn.2001) (holding that the Mayor and City of Bridgeport do not have standing to sue handgun manufacturers for harm to the city), the Supreme Court of Connecticut adopted the federal test for standing from *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229 (2d Cir.1999). Therefore, standing under Article III and applicable state law can be considered together.

The parties dispute whether Plaintiff has alleged a direct injury, usually necessary for standing. "Where a plaintiff complains of injuries that are wholly derivative of harm to a third party, plaintiff's injuries are generally deemed indirect and as a consequence too remote, as a matter of law, to support recovery." *Id.* at 236-37. Plaintiff asserts that Defendant's wrongful conduct was directed at Plaintiff and that Plaintiff sustained damages caused directly by this conduct. Plaintiff argues that its injuries are direct as Defendant failed to respond to its requests when Plaintiff interacted with Defendant. (Pl.'s Mem. at 2.) However, Defendant correctly counters that because its contract was only with West Haven, any injury to Plaintiff was indirect. Plaintiff admits that it was "essentially acting as a broker for the provision of telecommunications services between OCC and West Haven." (*Id.* at 3.) Even though it may have interacted with Defendant, Plaintiff did so on behalf of West Haven and therefore any wrongful failure to provide customer service or a working product could not have been directed at Plaintiff.

**\*4** As a "broker," any injuries sustained by Plaintiff were necessarily derivative of injuries to its customer, West Haven. Without injury to the customer, Plaintiff would not have incurred increased costs for time spent aiding the customer and "trouble-shooting" the problem. Therefore, "being

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4793729 (D.Conn.)
(Cite as: 2008 WL 4793729 (D.Conn.))

purely contingent on harm to third parties, these injuries are indirect." *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 239 (2d Cir.1999). Plaintiff argues that Defendant's failure to provide timely and responsible technical assistance directly injured Plaintiff. (Pl.'s Mem. at 7.) However, West Haven experienced problems with the service they had contracted to buy from OCC. Although Granite then interacted with Defendant concerning these problems, the injury was originally to West Haven. As Defendant contends, West Haven Lumber was the party purchasing services from and in contract with Defendant. Defendant's alleged failure to provide reasonable assistance only injured Granite because it absorbed some of the increased costs to its customer. Plaintiff's injuries are therefore derivative.

Plaintiff relies on *United Steel, Inc. v. Spiegel, Zamecnik & Shah, Inc.,* 2007 WL 1532726 (Conn.Super.2007) (holding that even without privity of contract, plaintiff contractor had standing to sue defendant architect based on architect's negligence.) However, in *United Steel,* 2007 WL 1532726 at *2, the defendant's conduct *directly* harmed the plaintiff. Furthermore, the architect's contract with the University of Connecticut was based on an understanding that the plaintiff contractors were to rely on the architect's plans. In contrast, even if Granite helped broker the contract between West Haven and OCC, there was no actual understanding that Granite was also to rely on OCC's provision of services. Once Granite had successfully installed the new system it sold to West Haven, West Haven could have worked with and contacted OCC directly. Under the circumstances, there was no reason for OCC to assume that Granite would rely on their provision of services to a mutual customer. The relationship between Plaintiff and Defendant is not analogous to a contractor that must follow an architect's design.

Furthermore, even if Plaintiff's injury is qualitatively different from any injury suffered by West Haven, Plaintiff's injury is still indirect because it

derives from an injury to its customer. *See Pagan v. Calderon,* 448 F.3d 16, 30 (1st Cir.2006) *citing Bellows v. Amoco Oil Co.,* 118 F.3d 268, 276-77 (10th Cir.2002) ("It is not enough for the agent to allege an injury that is qualitatively different from that suffered by the principal; rather, the agent must allege an injury that does not derive from the injury to the principal.") Although Plaintiff might have different damages than its customer, the source of the injury is the quality of Defendant's performance on its contract with West Haven. Any damages suffered by Plaintiff are the costs of West Haven's injury that came to be absorbed by Plaintiff. Therefore, Plaintiff's injury is derivative even if its damages are unique.

*5 However, the inquiry does not end there. Both the Connecticut and Second Circuit courts employ a three part policy analysis to decide if plaintiffs with indirect injuries lack standing to sue, as the "United States Supreme Court noted the impossibility of articulating a black-letter rule capable of dictating a result in every case." *Connecticut State Medical Soc. v. Oxford Health Plans (CT), Inc.,* 272 Conn.469, 478, 863 A.2d 645 (Conn.2005). "First, the more indirect an injury is, the more difficult it becomes to determine the amount of the plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary when there are directly injured parties who can remedy the harm without these attendant problems." *Gamin v. Smith & Wesson Corp.,* 258 Conn. 313, 353, 780 A.2d 98 (Conn.2001) *quoting Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229 (2d Cir.1999).

In assessing the first factor, it is important to note that although there is not a lengthy factual chain leading to Plaintiff's damages, Plaintiff itself is one

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4793729 (D.Conn.)
(Cite as: 2008 WL 4793729 (D.Conn.))

of the intervening factors in its injury. Although the chain is shorter than in *Gamin* or *Vacco v. Microsoft Corp.*, 260 Conn. 59, 793 A.2d 1048 (Conn.2002), there are actors besides Defendant to whom the injury must be partially attributed. Here, the independent factor is Plaintiff's intervention on behalf on West Haven. Plaintiff claims that it was "Defendant's response to the defective telephone circuitry and switches that caused Plaintiff's injuries." (Pl.'s Mem. at 12.) However, Plaintiff's characterization misses a link the factual chain. It was Plaintiff's business decision-either voluntary for good will or because of the contract it negotiated with West Haven-to become West Haven's broker with Defendant, combined with Defendant's response, that caused Plaintiff's injuries.

The second factor addresses the court's concerns about multiple recoveries from different Plaintiffs along the factual chain. In *Vacco*, 260 Conn. at 59, 793 A.2d 1048, an indirect purchaser of Microsoft's software was denied standing to pursue a claim of monopoly and price fixing. Here, Plaintiff is not even an indirect purchaser, it is not a purchaser of Defendant's services at all. As in *Vacco*, Plaintiff has no contract with Defendant and did not purchase goods or services directly from Defendant. Unlike in *Vacco*, the Plaintiff here did interact with the Defendant. However, as discussed above, Plaintiff suffered indirect injuries when some portion of West Haven's costs were shifted to Plaintiff. All damages were originally to West Haven and therefore recovery by Plaintiff would involve either the apportionment of damages or the risk of multiple recoveries.

*6 The third factor weighs in favor of the Defendants, as West Haven, the directly injured party, could bring suit. In *Connecticut State Medical Soc.,* the court found that plaintiff medical **association** lacked **standing** to bring a claim against defendant health insurer, as the association's members could bring the claim. In addition, the members had **arbitration** agreements with the Defendant. Therefore, allowing the suit would have "countenanced

an end run around those arbitration provisions." *Connecticut State Medical Soc. v. Oxford Health Plans (CT), Inc.*, 272 Conn.469, 479-80, 863 A.2d 645 (Conn.2005). Here, the contract between West Haven and OCC has a provision disclaiming warranties and liabilities. Allowing this suit would "countenance an end run around" those provisions and decisions concerning their validity.

Furthermore, This case is analogous to *Sotirio v. Washington Mutual Bank*, 2002 WL 31957490 (Conn.Super.2002). In *Sotirio*, Washington Mutual erroneously failed to release a mortgage. Counsel for the mortgagor, the subsequent purchaser of the property and his counsel sought compensation for the time they expended to remedy Washington Mutual's error. However, the court held that only the mortgagor had standing. Counsel did not have standing to sue for time spent working on behalf of a client, even when that time was necessary because of the wrongdoing of a third party. Just as in this case, counsels' injuries were only derivative of their clients'. The apportionment of costs between client and counsel or customer and "broker" should be negotiated between those parties.

· 

In sum, the three part test weighs against granting Plaintiff standing to bring this claim for their indirect injury. Although Plaintiff may have incurred expenses, the injury was West Haven's. As the Second Circuit noted, there must be "judicial tools" to "limit a person's responsibility for the consequences of that person's own acts.... For this reason, a plaintiff who complains of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts is generally said to stand at too remote a distance to recover." *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235 (2d. Cir.1999); *citing Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

**B. Good Faith and Fair Dealing**

Plaintiff bases its claim of a violation of the Coven-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4793729 (D.Conn.)
**(Cite as: 2008 WL 4793729 (D.Conn.))**

ant of Good Faith and Fair Dealing on the theory that it was an intended beneficiary of the contract between OCC and West Haven. The contract is governed by Massachusetts law. (Def.'s Mot. Ex. A. p. 2.) Under both Massachusetts and Connecticut law, in order to prevail as a third party beneficiary the plaintiff must show that the contracting parties "intended to give [the plaintiff] the benefit of the promised performance." *Anderson v. Fox Hill Village Homeowners Corp.,* 424 Mass. 365, 366-67, 676 N.E.2d 821 (Mass.1997); *Gazo v. City of Stamford,* 255 Conn. 245, 261, 765 A.2d 505 (Conn.2001). Intent is determined by looking to the language and circumstances of the contract. *Id.*

*7 Plaintiff bases this claim on a line in the OCC/ West Haven Service Agreement: "equipment provided ... and placed at Customer's site in connection with the Services." (Pl.'s Mem. at 19; Def's. Mot. Ex. A.) Plaintiff argues that this line shows an intent that Granite install OCC's equipment at West Haven's place of business. However, this line gives no indication of an intent to make Granite a third party beneficiary of the contract. The contract does not refer to Granite or any need for a third party to complete installation. Granite was not hired pursuant to the OCC/West Haven contract to install Defendant's equipment. West Haven contracted with Granite for the sale and installation of Granite's own equipment. Even if Granite also installed some hardware provided by Defendant, this alone does not illustrate an intent by the contracting parties to make Plaintiff a beneficiary. There is simply no evidence showing that West Haven and OCC intended other parties to be involved in or benefit from OCC's provision of service to West Haven.

Under Massachusetts law, "the intent must be clear and definite." *Anderson v. Fox Hill Village Homeowners Corp.,* 424 Mass. 365, 367, 676 N.E.2d 821 (Mass.1997). However, not only is there no clear and definite statement here, but there is no indication at all that Plaintiff was an intended beneficiary of the contract. Therefore, it is not necessary to address Plaintiff's contention that it need

not show a "clear and definite" intent.

## C. CUTPA and Unjust Enrichment

Privity of contract is not required to bring a claim under the Connecticut Unfair Trade Practices Act. Conn. Gen.Stat. § 42-110g provides: "any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action." In 1979, the Connecticut Legislature amended CUTPA, deleting all references to "purchasers, sellers, lessors, or lessees." *Vacco v. Microsoft Corp.,* 260 Conn. 59, 88, 793 A.2d 1048 (Conn.2002). However, "not withstanding the broad language and remedial purpose of CUTPA, we have applied traditional common-law principles of remoteness and proximate causation to determine whether a party has standing to bring an action under CUTPA." *Id* . "We therefore reject the plaintiff's claim that the elimination of CUTPA's privity requirement from § 42-110g(a) a fortiori compels us to conclude that the plaintiff, as an indirect purchaser, has standing to pursue his CUTPA claims arising out of the defendant's allegedly anti-competitive conduct." *Id.* at 87, 793 A.2d 1048. In *Vacco,* the court then used the three factor test from *Gamin* to decide standing under CUTPA. The Court has already shown above that under the three factor *Gamin* test, Plaintiff does not have standing. Therefore, Plaintiff is not the proper party to assert this CUTPA claim.

Furthermore, although privity of contract is not necessary to state a claim for unjust enrichment, *Coastal, Inc. Plumbing-Heating v. TP Builders, Inc.,* 2005 WL 1089920 (Conn.Super.2005), Plaintiff must still meet general standing requirements to bring this claim. As discussed above, Plaintiff does not have standing to bring its indirect claims against Defendant. As just discussed in relation to CUTPA, even for a claim that does not require privity of contract, Plaintiff does not have standing as its claims are too indirect.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4793729 (D.Conn.)
**(Cite as: 2008 WL 4793729 (D.Conn.))**

**\*8** Finally, Plaintiff's assertion that it was
"effectively in the same position as a subcontract-
or" (Pl.'s Mem. at 21) and therefore has standing to
assert a claim of unjust enrichment is incorrect.
Plaintiff and Defendant had a mutual customer to
which they provided related, but distinct, services.
Plaintiff was not hired by Defendant or by West
Haven to complete a portion of Defendant's job.

**IV. CONCLUSION**

Defendant's Motion to dismiss is granted. Plaintiff's
request for limited discovery on the directness of its
injury is denied. Plaintiff should not need discovery
to prove a direct injury and this matter has been re-
solved as a matter of law.

For the foregoing reasons, Defendant One Commu-
nication Corp.'s Motion to Dismiss [Doc. No. 29] is
**granted.**

SO ORDERED.

D.Conn.,2008.
Granite Communication, Inc. v. One Communica-
tions Corp.
Not Reported in F.Supp.2d, 2008 WL 4793729
(D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

.

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DOCTOR'S ASSOCIATES, INC.,  :
      Plaintiff,  :
                                  :      Case No. 3:06-cv-1170 (PCD) (Lead Case)
      v.  :      (Consolidated Cases)
                                    :
FREDERICK W. DOWNEY, et al.,  :
      Defendants.  :

## RULING ON PLAINTIFF'S PETITIONS TO COMPEL ARBITRATION
## AND MOTIONS FOR PRELIMINARY INJUNCTION

_____In July and August, 2006, Plaintiff Doctor's Associates, Inc. ("DAI") petitioned this

Court to compel arbitration [Doc. No. 1] against Defendants Frederick W. Downey, Alan D.

Becker, Kevin F. Brough, David B. Wehr, James A. Prouse, Keith H. Bruns, Bobby J. Hook,

Keith R. Miller, Rajender K. Pannu, and Lyle M. Scott.  DAI also filed Motions for Preliminary

Injunction [Doc. Nos. 2, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 23], asking this Court to enjoin

the Defendants, nonparty North American Association of Subway Franchisees ("NAASF"),

and/or any third party from prosecuting the action pending in the Connecticut Superior Court,

North American Association of Subway Franchisees, Inc. v. Doctor's Associates, Inc., Docket

No. CV-06-4021494-S, and to enjoin Defendants and the NAASF from filing any other action

that arises out of or relates to the franchise agreements between DAI and Defendants.  For the

reasons stated herein, Plaintiff's Petition to Compel Arbitration is **granted**, and Plaintiff's

Motions for Preliminary Injunction are **granted.**

## I.    BACKGROUND[1]

    Plaintiff DAI, a Florida corporation, is the national franchisor of Subway sandwich shops.

---

[1] The facts described herein are based upon the undisputed facts presented in Petitioner's
Motions to Compel Arbitration and the parties' subsequent briefs.

Defendants are each Subway franchisees.  DAI entered into standard written franchise

agreements with each Defendant, permitting them to operate Subway shops.  The standard

franchise agreement contains an arbitration clause (¶ 10a) which provides that "[a]ny dispute,

controversy or claim arising out of relating to this Agreement or the breach thereof shall be

settled by arbitration." (Pl.'s Pet. to Compel Arbitration, Ex. A, August 31, 2004 Franchise

Agreement, ¶ 10a.)  The standard franchise agreement also contains a provision that amends all

other franchise agreements between DAI and the franchisee to contain substantially the same

material terms as the most-recently executed franchise agreement between the parties.  (Id. ¶ 14.)

Defendants are all members of the Board of Directors of the North American Association

of Subway Franchisees, Inc. ("NAASF"), an organization that represents approximately 5,285

present and prospective Subway franchisees in North America who collectively own

approximately 14,560 Subway restaurants.  (Pl.'s Pet. to Compel Arbitration, Ex. B, NAASF

Compl. ¶ 3.)  On July 14, 2006, NAASF filed an action, pursuant to Conn. Practice Book § 17-54

et seq. and Conn. Gen. Stat. § 52-29, in the Superior Court for the Judicial District of New

Haven, North American Association of Subway Franchisees, Inc. v. Doctor's Associates, Inc.,

Docket No. CV-06-4021494-S ("the NAASF lawsuit"), against DAI on behalf of "its members

who have an actual controversy with DAI." (Pl.'s Pet. to Compel Arbitration, Ex. B, NAASF

Compl. ¶ 6.)  NAASF requests the state court to "declare the rights and legal obligations that its

members and DAI have pursuant to the applicable agreements." (Id.)  Specifically, NAASF

seeks a declaratory judgment that DAI's newest franchise agreement (the "2006 Franchise

Agreement"), and DAI's requirement that any person renewing a current franchise agreement or

acquiring a new or existing Subway franchise sign the 2006 Franchise Agreement, will cause

DAI to breach its obligations as set forth in the current form of the franchise agreement and/or its agreement with the Board of Directors of the Subway Franchisee Advertising Fund Trust ("SFAFT"). (Id. ¶ 2.) SFAFT is a trust created by DAI in 1990 for the purpose of funding group advertising and promotion of Subway shops. (Id. ¶¶ 13, 14.) According to NAASF, the 2005 Franchise Agreement, as well as many of its predecessors, provided that a franchisee would pay 4.5% of its actual gross sales into the SFAFT. (Id. ¶ 13.) The 2006 Franchise Agreement requires a franchisee to instead pay 4.5% of its actual gross sales directly to DAI and authorizes DAI to require a franchisee to place an additional $10,000 into a marketing assistance fund controlled by DAI. (Id. ¶ 22.) NAASF alleges that a series of other provisions in the 2006 Franchise Agreements change the terms of prior agreements, and NAASF claims that these changes constitute breaches of DAI's prior agreements with its franchisees and DAI's agreement with SFAFT. (See id. ¶¶ 16, 23-27, 40, 41.)

After NAASF sued DAI in state court, DAI brought eleven actions in this Court under Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, to compel Defendants to arbitrate any claims they may have against DAI. DAI also moved to enjoin the NAASF lawsuit. These cases were consolidated under the lead case, 3:06cv1170 Doctor's Associates, Inc. v. Downey.[2] This matter is another in a long series of disputes between DAI and various Subway franchisees

---

[2] The following cases were consolidated: 3:06cv1170 Doctor's Assocs., Inc. v. Downey; 3:06cv1180 Doctor's Assocs., Inc. v. Brough; 3:06cv1193 Doctor's Assocs., Inc. v. Becker; 3:06cv1201 Doctor's Assocs., Inc. v. Wehr; 3:06cv1199 Doctor's Assocs., Inc. v. Prouse; 3:06cv1188 Doctor's Assocs., Inc. v. Bruns; 3:06cv1179 Doctor's Assocs. Inc. v. Hook; 3:06cv1120 Doctor's Assocs., Inc. v. Miller; 3:06cv1189 Doctor's Assocs., Inc. v. Pannu; 3:06cv1194 Doctor's Assocs., Inc. v. Scott. Since the commencement of this action, Defendant franchisee Resley withdrew his involvement from NAASF and therefore was dismissed from this action, 3:06cv1190 Doctor's Assocs., Inc. v. Resley.

regarding their obligation to arbitrate under the franchise agreement.  The latest wrinkle introduced by franchisees' counsel is that a membership association, representing the interests of franchisees members, filed the state court action against DAI without naming individual franchisees as parties.  DAI protests that NAASF's lawsuit is simply a device enabling Defendant franchisees to avoid their obligations to arbitrate.  Defendants argue in turn that DAI is the party trying to evade a suit through artful pleading by filing petitions to compel arbitration against only the NAASF board members who are diverse with DAI.  (See Defs.' Resp. to Mot. for Prelim. Inj. at 2, n.1.)  Defendants claim that this Court lacks subject matter jurisdiction because no amount in controversy in excess of $75,000 exists for each petition to compel arbitration. Defendants further oppose DAI's motions to compel arbitration on the grounds that none of the Defendants has asserted claims on his or her own behalf in the NAASF lawsuit and NAASF is not a party to a Franchise Agreement with the arbitration clause.  They oppose DAI's preliminary injunction motions on the grounds that Rule 65(d) does not authorize the Court to enjoin a non-party such as NAASF and the Anti-Injunction Statues does not authorize the Court to enjoin a state court proceeding.

## II.   DISCUSSION

### A.   Petitions to Compel Arbitration

#### 1.   Subject Matter Jurisdiction

Defendants maintain that this Court lacks subject matter jurisdiction over DAI's petitions to compel arbitration.  Section 4 of the Federal Arbitration Act ("FAA") grants this Court jurisdiction to hear petitions to compel arbitration if the Court "would have jurisdiction under Title 28, in a civil action ... of the subject matter of the suit arising out of the controversy

between the parties...." 9 U.S.C. § 4. Accordingly, "there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue." Doctor's Assocs., Inc. v. Distajo, 66 F.3d 438, 444 (2d Cir. 1995) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n.32 (1983)). In this case, DAI asserts diversity jurisdiction pursuant to 28 U.S.C. § 1332. For the Court to have diversity jurisdiction over a claim brought pursuant to Section 4 of the FAA, there must be complete diversity of citizenship and an amount in controversy in excess of $75,000. 28 U.S.C. § 1332(b). Accordingly, DAI must allege an amount in controversy in excess of $75,000 for each of the eleven Defendants named in each of its eleven petitions to compel arbitration. "[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear *to a legal certainty* that the claim is really for less than the jurisdictional amount to justify a dismissal." A.F.A. Tours v. Whitchurch, 937 F.2d 82, 87 (2d Cir. 1991) (citation and internal quotation marks omitted).

Plaintiff alleges that the matter in controversy exceeds the value of $75,000 required for diversity jurisdiction under 28 U.S.C. § 1332 (see Pl.'s Pet. to Compel Arbitration ¶ 13), and Defendants have not shown to a legal certainty that the value at stake is actually less than the requisite amount. To determine the amount in controversy in the context of a petition to compel arbitration, the Court considers the value of the award that would be sought in the desired arbitration. "The amount in controversy is the difference between winning and losing the underlying arbitration." Doctor's Assocs., Inc. v. Hollingsworth, 949 F. Supp. 77, 82 (D. Conn. 1996) (citations omitted). See also Doctor's Assocs., Inc. v. Hamilton, 150 F.3d 157, 160 (2d Cir. 1998) (citing Davenport v. Procter & Gamble Mfg. Co., 241 F.2d 511, 514 (2d Cir. 1957)) (district courts must "look through to the possible award resulting from the desired arbitration,

-5-

since the petition to compel arbitration is only the initial step in a litigation which seeks as its goal a judgment affirming the award."). The amount in controversy is "calculated from the plaintiff's standpoint," and "the value of the suit's intended benefit or the value of the right being protected or the injury being averted constitutes the amount in controversy when damages are not requested." Kheel v. Port of N.Y. Auth., 457 F.2d 46, 49 (2d Cir. 1972) (citations omitted).

Here, the cost of winning or losing the desired arbitration turns on the value of the relief sought in the NAASF lawsuit. In the NAASF lawsuit, NAASF moved the state court to enjoin DAI from causing the franchisees' payments to the Subway Franchisee Advertising Fund Trust (SFAFT) to be reduced or redirected elsewhere and to order the placement of all advertising monies collected by DAI pursuant to the 2006 Franchise Agreement into a constructive trust for the benefit of the SFAFT trustees and NAASF. (See NAASF Compl. at 50.) In its petitions to compel arbitration, DAI alleges that the franchisees' contributions to SFAFT are approximately $500 million. (Pl.'s Pet. to Compel Arbitration ¶ 13.) This amount, far in excess of that required for diversity jurisdiction, may be considered the value of the object of the underlying litigation on which this action is based. Defendants contend that the SFAFT issue in the NAASF lawsuit does not concern the amount of franchisees' advertising payments but rather the destination of such payments, either to DAI or to SFAFT for the benefit of the franchisees. From the standpoint of the Plaintiff, however, the resolution of the issue of the payments' destination may mean the difference of $500 million in payments to DAI. One object of the NAASF lawsuit, insofar as DAI is concerned, is its winning or losing $500 million in advertising payments, an amount in controversy which more than satisfies the diversity jurisdiction requirement.

NAASF also seeks an order from the State Court rescinding all 2006 Franchise

Agreements and allowing the franchisees the right to replace the 2006 Franchise Agreement with an agreement substantially similar to the 2005 Franchise Agreement. (See NAASF Compl. at 50.) According to DAI, based on start-up investments and total gross sales historically earned in each store, a constructive termination of any one of the 69 franchises owned by the eleven Defendants would cost DAI far more than $75,000. (Pl.'s Reply at 4; Affidavit of William A. Darrin, Jr. ("Darrin Aff.") ¶¶ 6, 7.) Furthermore, DAI has executed 819 new agreements and amended 1859 existing agreements for a total of 2,678 franchise contracts executed in the 2006 form, with franchise fees ranging from $6,000 to $12,500 for each agreement. DAI has collected anywhere from $4.9 million to $10.2 million in franchise fees on the 819 new agreements, and it will collect annual royalties and advertising contributions amounting to approximately $35.8 million under the new agreements. (Pl.'s Reply at 5; Darrin Aff. ¶¶ 10, 11.) The prospect of rescinding the 2006 Franchise Agreement therefore puts a substantial amount of DAI's investments and fees in jeopardy and, accordingly, establishes an amount in controversy in excess of the requisite $75,000. Although the value of forcing DAI to rescind all of its 2006 Franchise Agreements cannot be precisely measured at this time, the Court may accept Plaintiff's assertions that diversity jurisdiction exists where "it is impossible to conclude to a legal certainty on the current record that the amount in controversy is less than the jurisdictional amount." Hollingsworth, 949 F. Supp. at 83.

Defendants' other arguments contesting subject matter jurisdiction are unavailing. Defendants maintain that the Court lacks jurisdiction because the NAASF lawsuit seeks a declaration of rights and legal obligations, not damages, and so the underlying state action would not result in damages in excess of $75,000 to satisfy diversity jurisdiction. (Defs.' Resp. at 7.)

However, as stated above, federal district courts have diversity jurisdiction over actions seeking declaratory relief where the object of the underlying litigation exceeds $75,000, even where parties do not seek monetary damages. "[T]he amount in controversy, in an action for declaratory ... relief, is the value of the right to be protected or the extent of the injury to be prevented." Doctors Assocs. v. Hollingsworth, 949 F. Supp. at 82 (internal citations omitted). See also Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 347 (1977) ("In actions seeking declaratory or injunctive relief it is well established that the amount in controversy is measured by the value of the object of the litigation."); AFA Tours, 937 F.2d at 87. Defendants also maintain that the amount in controversy cannot be met with respect to Defendants Becker and Miller because their franchise agreements prohibit damages claims in excess of $50,000. However, not only is the damages cap irrelevant where NAASF is not suing for damages, but the allegations in the Complaint control the calculation of the amount in controversy even where the franchise agreement has a damages cap. See, e.g., Doctor's Assocs., Inc. v. Hamilton, 150 F.3d 157, 160-61 (2d Cir. 1998).

Accordingly, this Court has subject matter jurisdiction pursuant to § 1332 to review the Plaintiff's petitions to compel arbitration.

### 2.    Compelling Arbitration of NAASF's Claims

DAI petitions the Court to compel arbitration on the basis that NAASF is pursuing its claims in state court only in its representative capacity on behalf of the individual Defendant franchisees, all of whom are bound by the arbitration clause of the Franchise Agreements. DAI alleges that Defendants are using this "surrogate association" that they control as a means of avoiding their obligation to arbitrate under the Franchise Agreements. (Pl.'s Mem. in Supp. of

-8-

Mot. for Prelim. Inj. at 2.)  According to DAI, allowing the NAASF lawsuit to proceed rather than compelling Defendants to arbitrate would contradict the Federal Arbitration Act, 9 U.S.C. § 1 et seq.  Defendants maintain that, because NAASF is not a party to a Franchise Agreement with the arbitration clause, DAI is not an "aggrieved party" who can compel arbitration under Section 4.  Defendants also contend that, because the Defendants did not assert claims in state court, they cannot be compelled to arbitrate.

A strong federal policy exists requiring rigorous enforcement of agreements to arbitrate, see Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1996); Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 55-56 (1995), and the FAA provides that arbitration agreements in contracts involving interstate commerce are presumptively "valid, irrevocable, and enforceable." 9 U.S.C. § 2.  As a matter of law, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25). See also Conntech Dev. Co. v. Univ. of Conn. Educ. Props., Inc., 102 F.3d 677, 684 (2d Cir. 1996).  In this case, the Franchise Agreement obligates franchisees to arbitrate "any controversy or claim arising out of or relating to [the franchise] Agreement or the breach thereof." (2006 Franchise Agreement ¶ 10a.)  This broad language requires arbitration when the allegations in the underlying claims "'touch matters' covered by the parties' ... agreements ..., whatever the legal labels attached to them." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 846 (2d Cir. 1987) (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 613, 624 n.13 (1985).

The salient issue in a petition to compel arbitration is not whether the persons involved

are parties to the arbitration agreement but whether the claims in dispute are covered by the arbitration agreement. Section 3 of the FAA "plainly requires that a district court stay litigation where issues presented in the litigation are the subject of an arbitration agreement." Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 984 (2d Cir. 1996) (citing Kroll v. Doctor's Assocs., Inc., 3 F.3d 1167, 1171 (7th Cir. 1993)). The issues presented in the NAASF lawsuit appear to be the subject of the arbitration clause of the Franchise Agreements. See Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d at 19. NAASF alleges that the 2006 Franchise Agreement, and DAI's requirement that franchisee members of NAASF sign the 2006 Franchise Agreement when renewing their franchise agreements or opening new stores, will cause DAI to breach its obligations set forth in the current form of the franchise agreement. (NAASF Compl. ¶ 2.) This claim is clearly subject to the arbitration provision requiring arbitration of any claim "arising out of or relating to" the Franchise Agreement or breach thereof. (2006 Franchise Agreement ¶ 10a.) NAASF's claims regarding DAI's alleged violations of the SFAFT agreement also sufficiently relate to the Franchise Agreement to fall within the scope of the arbitration provision. See Doctor's Assocs., Inc. v. Hollingsworth, 949 F. Supp. at 84 ("the SFAFT is directly related to the Franchise Agreement," and claims regarding the handling of SFAFT, "created in connection with the Franchise Agreement," arise out of and relate to the Franchise Agreement and are therefore subject to arbitration.). The claims in the NAASF lawsuit are therefore subject to arbitration pursuant to Section 4 of the FAA and Paragraph 10a of the Franchise Agreements.

The fact that the NAASF lawsuit plaintiff is not itself a party to the Franchise Agreement does not alter the Court's determination that the NAASF claims are subject to arbitration. Defendants maintain that compelling arbitration requires the Court to impute the actions of

NAASF to the Defendants, a move that is contrary to the claims in the NAASF lawsuit and to the

underlying law related to associational standing. To support their position, Defendants cite case

law granting standing to associations to sue on behalf of their members.  However, NAASF's

standing to pursue its claims in state court, or to pursue claims in federal court, for that matter, is

not at issue here.  Rather, the issue before the Court is whether the arbitration clause that

obligates Defendants to pursue their disputes with DAI in arbitration also obligates the

membership association representing Defendants' interests in a state court action against DAI.

The resolution of this issue is clear: "Associations suing in a representative capacity generally are

bound by the same limitations and obligations as the members that they represent." In re

Managed Care Litigation, No. 00-MD-1334, 2003 WL 22410373, at *9 (S.D. Fla. Sept. 15,

2003).  See also Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. at 342-43; Warth v.

Seldin, 422 U.S. 490, 511 (1975); Penn. Psychiatric Soc'y v. Green Spring Health Servs. Inc.,

No. Civ. A. 99-937, 2000 WL 33365907, at *7 (W.D. Pa. March 24, 2000), rev'd on other

grounds, 280 F.3d 278 (3d Cir. 2002).  "[I]t cannot be more clear that any arbitration agreement

which binds the individual members of [the membership association] would likewise be binding

upon [the association] suing in a representational capacity." Id.  Defendants' obligations to

arbitrate their disputes with DAI therefore obligates NAASF to arbitrate disputes with DAI raised

on Defendants' behalf.  To hold otherwise would violate the arbitration clause and undermine the

federal policy favoring arbitration by permitting Defendants to use a surrogate organization to

bypass their arbitration agreements and pursue claims in court that should be resolved through

litigation.  "[A]voidance of an arbitration provision by suing through a surrogate is simply not an

appropriate use of associational standing." Id.  A district court must compel arbitration even in

disputes concerning persons who are not parties to the arbitration agreement "if the litigation is

an attempt to evade the agreed-upon resolution of their disputes in the arbitration forum by

introducing the identical controversy against a party who is ultimately liable for the arbitrating

party's acts." Kroll v. Doctor's Assocs., Inc., 3 F.3d at 1171 (internal citations omitted). See

also Doctor's Assocs., Inc. v. Hollingsworth, 949 F. Supp. at 83 ("[T]he acts of employees of a

party to an arbitration agreement are arbitrable as long as the challenged acts fall within the scope

of the customer agreement."); Doctor's Assocs., Inc. v. Stuart, 85 F.3d at 985 (upholding district

court's injunction of state court action against DAI and its owners that was "a bald attempt to

evade its duty to arbitrate with DAI."); Mosca v. Doctor's Assocs., Inc., 852 F. Supp. 152, 155

(E.D.N.Y. 1993) ("This court will not permit Plaintiffs to avoid arbitration simply by naming

individual agents of the party to the arbitration clause and suing them in their individual

capacity."). Accordingly, the claims in the NAASF lawsuit "arise out of" and "relate to" the

franchise agreement and are therefore subject to arbitration.

### B.    Motions for Preliminary Injunction

Plaintiff DAI moves pursuant to Fed. R. Civ. P. 65 for an injunction enjoining

Defendants, NAASF, and any third party from prosecuting the NAASF lawsuit until further order

of the Court and enjoining Defendants and NAASF from filing any other action that arises out of

or relates to the Franchise Agreements. Defendants objects on the ground that an injunction

against the State Court lawsuit would not be proper under either Rule 65(d) or the Anti-

Injunction Act.

DAI moves the Court to enjoin the NAASF lawsuit in its entirety, even though

Defendants are not named parties in that action and NAASF is not compelled to arbitrate its

claims.  Rule 65(d) provides that an order granting an injunction is binding on all others with

notice of the order who are "in active concert or participation with" the parties to the action."

Fed. R. Civ. P. Rule 65(d).  DAI argues that because NAASF does not raise claims in state court

on its own behalf but only asserts claims on behalf of its members, among whom are Defendants,

NAASF is therefore necessarily "in active concert or participation" with Defendants.  The fact

that NAASF has associational standing to sue on behalf of Defendants and its other members

does not alone confer a connection between Defendants and NAASF for purposes of compelling

arbitration or enjoining the action.  See Davis Vision, Inc. v. Maryland Optometric Ass'n, 187

Fed. Appx. 299, 303 (4th Cir. 2006) ("A party's capacity to arbitrate is analytically distinct from

its standing to sue in federal court.").  However, in this case, there is reason to conclude that

NAASF is in active concert with the Defendants.  Defendants are not only members of NAASF

but members of NAASF's board of directors.  In addition to the fact that the NAASF lawsuit is

solely pursuing the claims of Defendants and other NAASF members (see NAASF Compl. ¶ 6),

the Defendants exert direct control over NAASF's pursuit of its members claims in the State

Court action through their roles on the NAASF Board of Directors.  The Court therefore

concludes that NAASF is in sufficient "active concert or participation" with Defendants to fall

within the ambit of Rule 65(d) and to be enjoined from pursuing the NAASF lawsuit at this time.

The Court granted a similar request for injunctive relief in Doctor's Associates v.

Hollingsworth.  There, franchisees sued DAI in state court, and DAI petitioned this Court to

compel arbitration with the non-Florida franchisees with whom DAI had diversity and who were

named federal defendants.  The Court granted the petitions to compel arbitration and enjoined the

entire state court lawsuit, including the claims brought by the Florida franchisees.  The Court

-13-

concluded that an injunction against the Florida franchisees was also necessary because they

were pressing claims on behalf of the federal defendants and therefore fell within the ambit of

Rule 65(d). 949 F. Supp. 77. at 86. A similar relationship exists in this case between NAASF

and the Defendants. Although NAASF is a separate legal entity with discrete rights and

obligations, it is not pursuing any legal claims independent from the issues which are subject to

arbitration. Because NAASF is only pressing claims on behalf of Defendants which should be

resolved through arbitration, "continued litigation of these issues in parallel state proceedings

will undermine, if not moot," the order compelling arbitration. Id. at 86 (citing Doctor's Assocs.,

Inc. v. Distajo, 870 F. Supp. 34, 36 (D. Conn. 1994), aff'd in part, rev'd in part, 66 F.3d 438 (2d

Cir. 1995), cert. denied, 517 U.S. 1120 (1996)). Accordingly, the NAASF lawsuit should be

enjoined pending arbitration between DAI and Defendants.

  In their objection to DAI's motions for a preliminary injunction, Defendants contend that

the anti-injunction statute, 28 U.S.C. § 2283, prohibits the Court from enjoining the NAASF

lawsuit. Section 22283 provides in relevant part: "A court of the United States may not grant an

injunction to stay proceedings in a State court except ... where necessary in aid of its jurisdiction,

or to protect or effectuate its judgments." § 2283. Although these narrow exceptions are not to

be enlarged by loose statutory construction, see Atl. Coast Line R.R. Co. v. Bd. of Locomotive

Eng'rs, 398 U.S. 281, 297 (1970); Standard Microsystems Corp. v. Tex. Instruments Inc., 916

F.2d 58, 60 (2d Cir. 1990), they are "meant to give sufficient flexibility that a federal court, as a

court of equity, may ... deal adequately with the situation at hand." Doctor's Assocs., Inc. v.

Distajo, 944 F. Supp. 1007, 1009 (D. Conn. 1996) (internal citations omitted). In this case,

because the issues sought to be litigated by NAASF fall within the scope of the arbitration clause

and are therefore subject to arbitration, NAASF must be enjoined from prosecuting the state

court action in order to effectuate the judgment compelling arbitration.  See Doctor's Assocs.,

Inc. v. Hollingsworth, 949 F. Supp. at 85.  "Continued litigation of these issues in parallel state

proceedings will undermine, if not moot, this ruling."  Id. at 86 (citing Doctor's Assocs., Inc. v.

Distajo, 870 F. Supp. at 36).  Accordingly, an injunction will enter enjoining Defendant

franchisees, the NAASF, and/or any third party from prosecuting the state court action pending in

Connecticut Superior Court, New Haven, Connecticut, entitled North American Association of

Subway Franchisees, Inc. v. Doctor's Associates, Inc., Docket No. CV-06-4-21494-S, until

further order of this Court.

## IV.    CONCLUSION

   For the foregoing reasons, Plaintiff's Petition to Compel Arbitration [Doc. No. 1] is

**granted.**  Plaintiff's Motions for Preliminary Injunction [Doc. Nos. 2, 14, 15, 16, 17, 18, 19, 20,

21, 22, and 23] are **granted.**  Defendants, the NAASF, and/or any third party are hereby

enjoined, unitl further order of this Court, from prosecuting North American Association of

Subway Franchisees, Inc. v. Doctor's Associates, Inc., Docket No. CV-06-4-21494-S, in

Connecticut Superior Court.  The parties are hereby ordered to show cause on or before February

27, 2007, why this case should not be dismissed without prejudice, reserving the right of all

parties to reopen it for the purpose of resolving any issue regarding the injunction or enforcing an

arbitration award.

   SO ORDERED.

   Dated at New Haven, Connecticut, this 12th day of February, 2007.

/s/_____

Peter C. Dorsey, U.S. District Judge
United States District Court

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 3190521 (D.Conn.), 98 A.F.T.R.2d 2006-8344, 2007-1 USTC P 50,199
(Cite as: 2006 WL 3190521 (D.Conn.))

H

United States District Court,
D. Connecticut.
George CUARTERO, Plaintiff,
v.
UNITED STATES of America, Defendants.
No. 3:05CV1161 (RNC).

Nov. 1, 2006.

George Cuartero, Waterbury, CT, pro se.

David X. Sullivan, U.S. Attorney's Office, New Haven, CT, Karen E. Wozniak, U.S. Department of Justice, Tax Division, Washington, DC, for Defendants.

*RULING ON MOTION TO COMPEL*

DONNA F. MARTINEZ, Magistrate Judge.

*1 The plaintiff has filed this lawsuit seeking review of the Internal Revenue Service's ("IRS") decisions regarding his tax liability. The plaintiff's complaint appears to allege that the IRS has failed to point him to any law authorizing it to tax him. In addition, he challenges the regulations and procedures that the IRS applied in determining that he was liable for unpaid taxes and in entering a tax lien upon his Social Security retirement benefits. Plaintiff's complaint includes allegations that the IRS deprived him of due process by failing to provide him with certain documents during the administrative proceeding. Plaintiff has now requested some or all of those documents in formal discovery in this proceeding.

Pending before the court is plaintiff's Resubmitted Motion to Compel Answers to Amendment to Interrogatories and Admissions (doc. # 24).[FN1] Plaintiff served a series of interrogatories and requests for admission upon the defendant. The defendant objected to these discovery requests on several grounds. First, the defendant claims that this court lacks subject matter jurisdiction of some of plaintiff's claims. In addition, the defendant argues that, where a court reviews an administrative agency determination, such review is for abuse of discretion only and is limited to the administrative record. The defendant urges the

court to stay discovery pending a decision on its Motion to Affirm Determination Concerning Collection Action and Motion to Dismiss All Other Claims (doc. # 26) (the "Motion to Dismiss").[FN2]

> FN1. Plaintiff's original Motion to Compel was denied for failure to comply with the requirements of D. Conn. L. Civ. R. 37. The resubmitted motion was referred to the undersigned by Chief Judge Robert N. Chatigny (doc. # 25).

> FN2. The Motion to Dismiss, which is pending before Judge Chatigny, addresses the legal viability of plaintiff's claims, the court's jurisdiction over those claims and the question of whether the plaintiff was entitled to the production of certain documents during the course of the I.R.S. proceedings. If successful, it could be dispositive of all or part of plaintiff's complaint.

Pursuant to Fed.R.Civ.P. 26(c), the court "has the discretion to stay discovery for 'good cause,' and ... good cause may be shown where a party has filed (or sought leave to file) a dispositive motion." *Anti-Monopoly, Inc. v. Hasbro, Inc.*, No. 94 Civ. 2120, 1996 U.S. Dist. LEXIS 2684, * 6 (S.D.N.Y. Mar. 7, 1996); *see also Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 130 (2d Cir.1987)(upholding trial court's decision to stay discovery pending decision on *forum non conveniens* motion, because permitting discovery would defeat the purpose of the motion); *Rivera v. Heyman*, No. 96 Civ. 4489, 1997 U.S. Dist. LEXIS 2003, *3 (S.D.N.Y. Feb. 27, 1997) (noting that where there was a "substantial argument for dismissal" and where the motion to dismiss could significantly narrow, if not eliminate, the issues in the case, proceeding with discovery "would waste the parties' resources and constitute an undue burden on defendants"). In determining whether good cause exists for a stay of discovery, the court should consider several factors, including the breadth of the discovery sought, the burden of responding to it, and the prejudice that would be suffered by the party opposing the stay." *Anti-Monopoly, Inc.*, 1996 U.S. Dist. LEXIS 2684, * 7-8 (S.D.N.Y. Mar. 7, 1996). "[A] court should also consider the strength of the disposi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2006 WL 3190521 (D.Conn.), 98 A.F.T.R.2d 2006-8344, 2007-1 USTC P 50,199
(Cite as: 2006 WL 3190521 (D.Conn.))

tive motion that is the basis of the discovery stay application." *Spencer Trask Software and Info. Servs, LLC v. RPOST Int'l Ltd.,* 206 F.R.D. 367, 368 (S.D.N.Y.2002).

*2 The plaintiff has not responded to the suggestion that discovery should be stayed. Nor has the plaintiff provided any explanation why discovery should go forward in the face of the defendant's assertion that this court lacks jurisdiction and that the plaintiff is not entitled under law to the discovery he seeks.

Plaintiff also has not indicated that he requires discovery in order to respond to the Motion to Dismiss. Indeed, he has already filed an objection to the Motion to Dismiss, with a supporting memorandum of law (docs.# 28, 29). Plaintiff's objection to the Motion to Dismiss does not indicate that he was hampered in preparing it because of the lack of discovery.

The court expresses no opinion as to the outcome of the Motion to Dismiss, but the defendant's memorandum of law does appear to raise substantial issues based on statutes, caselaw and the facts of this case. In addition, there is significant caselaw suggesting that, in the administrative proceedings, the plaintiff was not entitled to production of the documents that he now seeks from the IRS. *See, e .g., Farenga v. U.S.,* No. 5:01-CV-1478, 2004 U.S. Dist. LEXIS 7290, *11-17 (N.D.N.Y. Mar. 24, 2004) (in administrative proceedings, IRS was not required to produce to the taxpayer regulations, statutory authority, evidence of delegations of administrative authority or the identity and authority of individuals who authorized penalties); *Borchardt v. Commissioner of Internal Revenue,* 338 F.Supp.2d 1040, 1044 (D.Minn. Oct. 12, 2004) (in administrative proceedings, IRS had no obligation to produce the identity of employees who determined a taxpayer's return, a copy of the Delegation of Authority empowering IRS employees to assess penalties, a copy of a supervisor's written approval to assess such penalty, or documentation backing up the Secretary of the Treasury's verification that all applicable law and administrative procedures have been complied with); *Cole v. U.S.,* No. 1:02-CV-137, 2002 U.S. Dist. LEXIS 22892 (W.D.Mich. Oct. 21, 2002) (in administrative proceedings, IRS was not required to produce delegations of authority or other verification that proper procedures had been followed); *Olsen v. U.S.,* 414 F.3d 144 (1st Cir.2005). There is also caselaw indi-

cating that, even if the plaintiff's claim survives the Motion to Dismiss, he is not entitled to any discovery beyond the administrative record. *See, e.g., Camp v. Pitts,* 411 U.S. 138, 142 (1973) ("[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Olsen v. U.S.,* 414 F.3d 144, 155 (1st Cir.2005)(citing *Camp v. Pitts* as authority for upholding denial of motion for discovery in a tax appeal case); *Gardner v. U.S.,* No. 04-2686, 2005 U.S. Dist. LEXIS 12364 (D.N.J. Apr. 5, 2005) (denying plaintiff's motion to suspend final ruling on IRS's motion for summary judgment pending discovery, because plaintiff was not entitled to any discovery beyond administrative record).

*3 The court need not decide, at this juncture, whether the plaintiff is entitled to any discovery at all. Rather, the court merely finds that there is good cause for staying discovery pending a decision on the Motion to Dismiss. Permitting discovery to proceed at this point would be unduly burdensome to the defendant and would be inefficient for both parties, since the court's decision on the Motion to Dismiss may significantly narrow the issues. If discovery were to continue, it would also be likely to result in additional motion practice, since the IRS contends that it is not required to produce anything at all to the plaintiff. The prejudice to plaintiff from a stay of discovery will be minimal, as discovery will only be stayed until a decision is reached on the Motion to Dismiss.

For all the foregoing reasons, discovery in this action is stayed pending resolution of the defendant's dispositive motion (doc. # 26). Plaintiff's Motion to Compel (doc. # 24) is denied without prejudice. If the plaintiff's complaint survives the Motion to Dismiss in whole or in part, the plaintiff may resubmit his Motion to Compel.

SO ORDERED at Hartford, Connecticut this 1st day of November, 2006.

D.Conn.,2006.
Cuartero v. U.S.
Not Reported in F.Supp.2d, 2006 WL 3190521 (D.Conn.), 98 A.F.T.R.2d 2006-8344, 2007-1 USTC P 50,199

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2006 WL 3190521 (D.Conn.), 98 A.F.T.R.2d 2006-8344, 2007-1 USTC P 50,199
(Cite as: 2006 WL 3190521 (D.Conn.))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 1925100 (D.Colo.)
(Cite as: 2008 WL 1925100 (D.Colo.))

**C**Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.
FRONTIER STEEL BUILDINGS CORP., a Colo-
rado corporation, Plaintiff,
v.
S.J. AMOROSO CONSTRUCTION CO., INC., a
California corporation, Defendants.
Civil Action No. 08-cv-00408-MSK-KLM.

May 1, 2008.

John Alexander Meininger, John A. Meininger, At-
torney at Law, Denver, CO, for Plaintiff.

Janette George Leonidou, Leonidou & Rosin, Moun-
tain View, CA, for Defendants.

**MINUTE ORDER**

KRISTEN L. MIX, United States Magistrate Judge.

**ORDER ENTERED BY MAGISTRATE JUDGE
KRISTEN L. MIX**

*1 This matter is before the Court on Plaintiff's [un-
opposed] Motion to Vacate Scheduling Conference
Pending Disposition of Defendant's Motion to
Dismiss for Lack of Personal Jurisdiction, or Im-
proper Venue, or, in the Alternative, Motion to
Transfer the Case to the District of California and
for Temporary Stay of Discovery [Docket No. 9;
filed April 30, 2008] (the "Motion to Vacate and for
Stay"). The Court has reviewed the Motion to Vacate
and for Stay, the entire case file and applicable case
law and is sufficiently advised in the premises. Ac-
cordingly, IT IS HEREBY ORDERED that the Mo-
tion to Vacate and for Stay is GRANTED, as set
forth below.

Plaintiff moves this Court to vacate the Scheduling
Conference currently set for May 7, 2008, and to stay
all corresponding Fed.R.Civ.P. 26 deadlines until
resolution of Defendant's pending Motion to Dismiss
[Docket No. 6; filed April 3, 2008].

Although a stay of discovery is generally disfavored
in this jurisdiction, the Court has broad discretion to
stay an action while a Motion to Dismiss is pending
pursuant to Fed.R.Civ.P. 26(c). See String Cheese
Incident, LLC v. Stylus Shows, Inc., 2006 WL
894955, at *2 (D.Colo. Mar. 30, 2006).

In weighing the factors set forth for determining the
propriety of a stay, the Court finds that a stay is ap-
propriate here. Id. First, the Court balances the Plain-
tiff's desire to proceed expeditiously with his case
against the burden on Defendants of proceeding for-
ward. Id. Application of this factor is unique in this
case because Plaintiff apparently does not seek to
proceed with its case for the time being. In addition,
Defendant has filed a Motion to Dismiss asserting,
inter alia, that the Court lacks personal jurisdiction.
Defendant has done more than offer conclusory as-
sertions that jurisdiction is lacking-it has filed a Mo-
tion to Dismiss supported by legal analysis.[FN1] In
such circumstances, the Court determines that appli-
cation of this factor weighs in favor of the requested
stay. See id. (finding "that subjecting a party to dis-
covery when a motion to dismiss for lack of personal
jurisdiction is pending may subject him to undue
burden and expense, particularly if the motion to
dismiss is later granted").

> FN1. The Court takes no position as to
> whether Defendants' Motion to Dismiss
> should be granted, but merely notes that it
> appears that the Motion is based upon more
> than idle speculation.

The Court also considers its own convenience, the
interests of non-parties, and the public interest in
general. None of these factors prompt the Court to
reach a different result. In fact, the Court notes that
neither its nor the parties' time is well-served by be-
ing involved in the "struggle over the substance of
the suit" when, as here, a dispositive motion involv-
ing jurisdiction is pending. Democratic Rep. of
Congo v. FG Hemisphere Assocs., LLC, 2007 WL
4165397, at *2 (D.C.Cir. Nov. 27, 2007) (unpub-
lished decision) (noting that the reason jurisdictional
defenses should be raised at the outset is to avoid
unnecessary litigation); see also Chavous v. D.C. Fin.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2008 WL 1925100 (D.Colo.)
(Cite as: 2008 WL 1925100 (D.Colo.))

*Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D.
1, 2 (D.D.C.2001) ("A stay of discovery pending the
determination of a dispositive motion 'is an emi-
nently logical means to prevent wasting the time and
effort of all concerned, and to make the most efficient
use of judicial resources.' " (citations omitted)).
Likewise, the imposition of a stay pending a decision
on a dispositive motion that would fully resolve the
case·"furthers the ends of economy and efficiency,
since if [the motion] is granted, there will be no need
for discovery." *Chavous*, 201 F.R.D at 5. Finally,
this case relates to breach of contract issues and nei-
ther party has asserted any compelling nonparty or
public interests triggered by the facts at issue.

*2 Accordingly, IT IS HEREBY ORDERED that the
Motion to Vacate and for Stay is GRANTED. The
Scheduling Conference set for May 7, 2008 is VA-
CATED and the case is STAYED, until such time as
the Court rules on Defendant's Motion to Dismiss.

IT IS FURTHER ORDERED that the Parties shall
file a written status report with the Court on or before
June 15, 2008.

D.Colo.,2008.
Frontier Steel Bldgs. Corp. v. S.J. Amoroso Const.
Co., Inc.
Not Reported in F.Supp.2d, 2008 WL 1925100
(D.Colo.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp., 1994 WL 702004 (S.D.N.Y.)
(Cite as: 1994 WL 702004 (S.D.N.Y.))

HOnly the Westlaw citation is currently available.

United States District Court, S.D. New York.
Mark GANDLER and International Sports Advisors
Co., Plaintiffs,
v.
Andrei NAZAROV, Defendant.
No. 94 Civ. 2272 (CSH).

Dec. 14, 1994.

*MEMORANDUM OPINION AND ORDER*

HAIGHT, District Judge:

*1 Three issues in this breach of contract action are now before the Court: (1) Whether the law firm of Berkovich & McMenamin should be disqualified from representing plaintiffs; (2) Whether plaintiffs are entitled to Rule 11 sanctions based on defendant's motion for disqualification; and (3) Whether discovery should be stayed pending resolution of defendant's motion to dismiss for lack of personal jurisdiction. I will consider each of these issues in turn.

1. Law Firm Disqualification

The Court is presented with the issue of whether vicarious disqualification of a law firm is warranted when one of the firm's attorney's is disqualified under the advocate-witness rule.

Plaintiffs had previously been represented by Alexander Berkovich, a partner in the firm of Berkovich & McMenamin. The underlying action surrounds a contract allegedly entered into by the parties.

Plaintiff International Sports Advisors Co. ("ISA") is in the business of representing professional hockey players in the National Hockey League ("NHL"). Plaintiff Mark Gandler is a principal of ISA. In May of 1992, plaintiffs entered into a written Representation Agreement with defendant Andrei Nazarov, at the time a 17-year old Russian hockey player aspiring to play in the NHL in the United States. This Agreement provided that ISA would represent Nazarov in his attempts to secure employment in the NHL, in

return for which Nazarov would pay ISA a commission.

In April of 1993, Nazarov informed ISA that he was terminating the Representation Agreement. Plaintiffs maintain that this attempted termination placed Nazarov in breach of the Representation Agreement, prompting them to institute the present suit. Nazarov contends that the contract is unenforceable, in whole or in part, because the terms of the contract were never adequately explained to him, he was never provided a Russian translation of the contract, and the terms of the contract are inherently unfair.

Of particular significance here is a dispute over the extent to which plaintiffs translated and explained the terms and meaning of the Representation Agreement to Nazarov. On May 15 and 16, 1992, Berkovich met with Nazarov and Nazarov's father to discuss the Representation Agreement. Berkovich maintains that his efforts at those meetings adequately conveyed to Nazarov the import of the various provisions of the Representation Agreement. Nazarov disputes the scope of the efforts that Berkovich says he made, and contends that they were entirely inadequate.

It is thus apparent that a key issue is what happened at those meetings in May of 1992. Aware of the centrality of this issue, the Court, on July 1, 1994, raised with counsel the possibility that Berkovich would need to serve as a witness at trial, and that this possibility might merit disqualification of Berkovich under the advocate-witness rule.

After allowing the parties an opportunity to present arguments on the issue, this Court issued an opinion on July 27, 1994, finding that Berkovich should be disqualified as counsel. That ruling was grounded on Disciplinary Rule ("DR") 5-102(A), which reads:

"If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer ought to be called as a witness on behalf of his own client, the lawyer shall withdraw as an advocate before the tribunal, except that the lawyer may continue as an advocate and may testify in the circumstances enumerated in DR 5-101(B)(1)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 702004 (S.D.N.Y.)
(Cite as: 1994 WL 702004 (S.D.N.Y.))

through (4)."

*2 Applying this Rule, this Court wrote:

"Berkovich was intimately involved in the negotia-
tion and execution of the Representation Agreement.
Absent his testimony, it will be impossible for the
plaintiffs to explain or rebut defendant's testimony.
See *MacArthur v. Bank of New York*, 524 F.Supp.
1205, 1207 (S.D.N.Y.1981) (applying a "signifi-
cantly useful" standard rather than a "necessary"
standard). The mandatory direction of DR 5-102(A)
requires that in those circumstances, an attorney be
disqualified."

Following the disqualification of Berkovich, Paul
McMenamin, Berkovich's law partner, informed the
Court by letter that he would be substituting as coun-
sel for plaintiffs.[FN1] By letter to the Court dated Au-
gust 11, 1994, defendant argues that since Berkovich
was disqualified, the lawyers in Berkovich's firm
should be vicariously disqualified, and that
McMenamin should therefore not be allowed to sub-
stitute as counsel. In its reply papers, plaintiff main-
tains that relatively recent revisions to the New York
Code of Professional Responsibility dictate that
Berkovich's firm should not be disqualified.

*Discussion*

Attorney disqualification and vicarious disqualifica-
tion of an attorney's law firm are in the discretion of
the court. *Kubin v. Miller*, 801 F.Supp. 1101
(S.D.N.Y.1992). Nonetheless, the cases are uniform
in holding that pursuant to Disciplinary Rule 5-
102(A) of the New York Code of Professional Re-
sponsibility (22 NYCRR 1200.21), an attorney's firm
should not be disqualified simply because that attor-
ney will testify on behalf of his client. *Talvy v.
American Red Cross*, 1994 WL 593353 (N.Y.A.D.
1st Dep't 1994); *Tisby v. Buffalo General Hospital*,
1994 WL 522792 (W.D.N.Y.1994); *Kubin*, 801
F.Supp. at 1114; *Kaplan v. Maytex Mills, Inc.*, 590
N.Y.S.2d 136 (N.Y.A.D. 2nd Dep't 1992); *Minami
International Corp. v. Clark*, 1991 WL 102464
(S.D.N.Y.1991); *Paretti v. Cavalier Label Company,
Inc.*, 722 F.Supp. 985, 988-89 (S.D.N.Y.1989).

In its opposition papers, defendant cites a number of
cases that reached an opposite result, holding that
vicarious disqualification of a law firm follows after

one of the firm's attorney's is disqualified as a wit-
ness. These cases, however, all predate 1990, before
the New York Code of Professional Responsibility
was revised to permit a law firm to continue repre-
sentation even if one attorney in the firm is required
to testify. *Kaplan*, 590 N.Y.S. at 137.[FN2]

Given that the cases cited by defendant are no longer
good law, the only component of defendant's argu-
ment that might plausibly allow a finding in its favor
is its contention that disqualification is in the discre-
tion of the Court.[FN3] Indeed, defendant acknowledges
that its cited cases predate the 1990 revisions to the
disciplinary rules, but maintains that the policy rea-
sons cited for the old rule should still guide the Court
in its exercise of discretion.

While defendant is correct that this Court has the
discretion to disqualify Berkovich's law firm, it has
offered no reason why the Court, in exercising its
discretion, should not be guided by the revised disci-
plinary rules. Vicarious disqualification of a law firm
is discretionary because the New York Code of Pro-
fessional Responsibility is not legally binding on the
federal courts in New York. See, e.g. *United States v.
Perlmutter*, 637 F.Supp. 1134, 1137 (S.D.N.Y.1986).
Nonetheless, the ethical guidelines contained in the
New York Code of Professional Responsibility, and
the cases applying those guidelines, are highly in-
structive to the Court in arriving at an equitable reso-
lution of the disqualification issue.

*3 The 1990 revisions reflected a growing consensus
that vicarious disqualification of a law firm should
occur only rarely, and that the reasons traditionally
stated for disqualifying the firm when one of its at-
torneys will testify were no longer compelling. See,
e.g., *Paretti*, 772 F.Supp. at 988-89.[FN4] Undoubtedly,
there is a clear public policy in preventing an indi-
vidual attorney from being both trial counsel and
witness. See, e.g., *Paretti*, 722 F.Supp. at 988.[FN5] As
to the attorney's firm, however, the New York State
Bar Association argued, in recommending the revi-
sion to the disciplinary rules at issue here, that "[t]he
change is consistent with the public policy of avoid-
ing confusion between the lawyer's role as advocate
and witness without unduly interfering with the cli-
ent's ability to. be represented by counsel of the cli-
ent's choice." *New York State Bar Ass'n, Report of the
Special Committee to Consider Adoption of ABA
Model Rules of Professional Conduct*, 21 (1984).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp., 1994 WL 702004 (S.D.N.Y.)
(Cite as: 1994 WL 702004 (S.D.N.Y.))

Given that those with an expertise in formulating the ethics of the profession feel that public policy is best served by not disqualifying a firm when one of its attorneys must serve as a party witness, it is wise for this Court to adopt that same view in reaching an equitable resolution of the present case. Indeed, as the cases cited earlier show, those federal courts that have considered the revisions have embraced them as well.

Therefore, defendant having offered no reason why the Court's discretion should be exercised in its favor, and the weight of authority being in favor of no vicarious disqualification in the present situation, defendant's motion to disqualify the firm of Berkovich & McMenamin is denied. McMenamin may therefore substitute as counsel for plaintiffs.

McMenamin has also moved to be admitted to practice before this Court pursuant to Local Rule 2(C) of the United States District Courts for the Southern District. He has submitted the required documentation, and his motion is granted.

2. Rule 11 Sanctions

McMenamin, in his letter opposing disqualification, asks the Court to impose Rule 11 sanctions upon defendant for making what he believes is a frivolous disqualification motion. It is this Court's policy to entertain Rule 11 motions only at the conclusion of the case. Therefore, McMenamin's request for Rule 11 sanctions is denied without prejudice and is freely renewable at the conclusion of the case.

3. Discovery

On July 5, 1994, this Court ordered that discovery in this case be stayed. Prior to the issuance of that Order, defendant had argued that a stay was warranted, since defendant had made a motion to dismiss for lack of personal jurisdiction, potentially obviating the need to engage in costly discovery. Plaintiffs opposed this motion, and expressed their belief that discovery should proceed expeditiously, since difficulties were perceived in finding an opportunity to depose defendant once the NHL season had begun.[FN6]

*4 The July 5 Order staying discovery, however, was

not a ruling on whether discovery should be stayed pending adjudication of the motion to dismiss. Rather, the Court stayed discovery pending resolution of the motion to disqualify counsel. As this opinion holds, that motion is denied. Plaintiffs have thus moved to lift the stay and begin discovery.

It is well-settled that a district court has discretion to halt discovery pending its decision on a motion to dismiss. *Chrysler Capital Corporation v. Century Power Corp.,* 137 F.R.D. 209, 211 (S.D.N.Y.1991); *Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 130 (2d Cir.1987). Defendant's motion to dismiss based on lack of personal jurisdiction is potentially dispositive, and appears to be not unfounded in the law. In addition, plaintiffs have not presented any evidence to suggest that they will be unfairly prejudiced by a stay. Therefore, because the adjudication of the pending motion to dismiss might avoid the need for costly and time-consuming discovery, all discovery in this case is hereby stayed pending resolution of defendant's motion to dismiss.

The pending motion to dismiss is *sub judice,* and will be resolved in due course.

SO ORDERED.

FN1. McMenamin also applied for *pro hac vice* admission before this Court.

FN2. Prior to the revision, DR 5-102(A) read:

"If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B)(1) through (4)." (emphasis added).

FN3. If Berkovich had been disqualified due to a conflict of interest, or if he were going to offer testimony adverse to his client, then

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp., 1994 WL 702004 (S.D.N.Y.)
(Cite as: 1994 WL 702004 (S.D.N.Y.))

disqualification of the firm might be warranted. As this Court's July 27, 1994, opinion made clear, however, Berkovich will be testifying, if at all, only on behalf of his client.

FN4. Indeed, the American Bar Association's Code of Professional Responsibility, as well as the Model Rules of Professional Conduct, both embody the principle that vicarious disqualification is no longer necessary when an individual attorney is disqualified as a necessary witness. _Kubin, 801 F.Supp. at 1113-14._

FN5. "[The] cases explain that _D.R. 5-102(A)_ is designed to avoid the public perception that the lawyer as witness is distorting the truth for the sake of a client, or is enhancing his own credibility as an advocate by taking an oath as a witness, and is also designed to deny opposing counsel the unfair and difficult task of cross-examining an adversary and impeaching the adversary's credibility." _Paretti, 722 F.Supp. at 988._

FN6. A difficulty that, sadly, no longer seems present.

S.D.N.Y.,1994.
Gandler v. Nazarov
Not Reported in F.Supp., 1994 WL 702004 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.